UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Criminal Case No. 03-cr-00249-WYD-1

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    MICHAEL KEBLES,

    Defendant.

---

## MICHAEL KEBLES' PROFFER RE DURESS DEFENSE

---

Defendant Michael Kebles, through undersigned counsel, hereby respectfully submits his proffer regarding the defense of duress/coercion, as follows:

### FACTS

The defense intends to introduce the evidence detailed below in support of its duress/coercion defense through the testimony of eight witnesses, Michael Kebles, Teresa Kebles, Julie Rutter, Cheri Rieg, Priscilla Parker, Dustin Slade, Laura Hemborg, and Dwayne Davis. In addition, much of this evidence will be corroborated through the government's own witnesses, including the informant Robert Wilson himself, DEA agents who had contact with Wilson including Special Agent Carl Force, as well as official documents generated by the U.S. Drug Enforcement Administration ("DEA") and the U.S. Department of Justice

obtained in discovery.

The following facts demonstrate the duress/coercion defense and proposed instruction as tendered by the defense:  The informant Robert Wilson is a large, intimidating, aggressive individual who is a former college football player.

Wilson first contacts Mr. Kebles in December 2002, because he was given Mr. Kebles' phone number by his desperate sister Teresa Kebles, to whom Wilson had provided cocaine on numerous occasions.  In his first phone call to Mr. Kebles (which is unrecorded and undocumented), Wilson indicates that he wants to buy methylenedioxymethamphetamine ("MDMA"/"Ecstasy") to distribute at a party he was giving.  Mr. Kebles has no interest in selling MDMA to Wilson or anyone else, so Mr. Kebles says:  "I will call you back – bye," with no intention of calling Wilson back.  But Wilson calls and harasses Mr. Kebles nearly every day, from mid-December 2002, until January 13, 2003, the day before he finally meets Mr. Kebles, in person for the first time, at his sister's home.  At this time, Mr. Kebles knows that Wilson knows where Teresa Kebles lives.  Mr. Kebles reiterates to his sister Teresa Kebles his desire not to sell MDMA to Wilson or anyone else.

Wilson's frequent threats and harassment of Mr. Kebles escalate in intensity and number, and Wilson invokes his closeness with Mr. Kebles' sister and Mr. Kebles' niece as leverage, saying "I thought you were straight.  Your sister said you were cool — she really loves you, man.  You have got to try to help me."  On this call, Wilson's voice sounds as if he were going to explode; he was extremely angry, and was not afraid to show it.  Responding to Mr. Kebles'

continuing reluctance, Wilson then intimates that he knows where Mr. Kebles lives, saying: "This fucking sucks, man. Why can't you help me? What am I going to do now? Where do you live? I know you live downtown. Tell me exactly where; come on, your sister already told me where."

Mr. Kebles is angry and scared because he can't understand why Wilson is so adamant about Mr. Kebles helping him, and worries that Wilson keeps bringing up Mr. Kebles' sister and niece, Priscilla Parker. Mr. Kebles attempts unsuccessfully to get Wilson to calm down, then hangs up.

Mr. Kebles is now worried that hanging up on Wilson will make him even more angry, so Mr. Kebles calls Wilson back to try to apologize. Mr. Kebles tells Wilson: "I can't find what you want. It is not my forte." Wilson gets angrier and keeps saying: "Fuck-fuck-fuck, you son of a bitch! I will get you for this!" Mr. Kebles said, "I can't get what you want. It is just not possible." Trying to get away from his anger and profanity, and in a vain hope that Wilson will cool down if Mr. Kebles stalls, he tells Wilson to call Mr. Kebles back tomorrow and hangs up the phone.

Wilson calls Mr. Kebles (again unrecorded) and says "So where are we meeting? I need 100 pills." Mr. Kebles says, "I can't get what you want." Wilson explodes and makes his most explicit threat of physical violence yet, saying, "I shit turds bigger than you. I will snap you in half. Don't be fucking with me!" Shocked at his response and knowing that Wilson is huge and violent, Mr. Kebles calmly says: "I build houses and remodel them. That is what I do

3

best." While trying to tell him all this, Wilson shouts over Mr. Kebles and says, "You are making a big mistake" as he becomes extremely upset saying things like: "You son of a bitch, now I am pissed off! What am I going to do? Why can't you do this for me? Your sister said you were cool, man." Mr. Kebles says he was sorry and hung up the phone. Mr. Kebles hopes Wilson would not call Mr. Kebles back, but he did. Wilson does not tape record this very heated conversation, nor tell the DEA agents about the threats, for obvious reasons. By this point, Wilson knows where both Mr. Kebles and his sister live, and the threats are inescapable.

Friends and family of Mr. Kebles, even if not directly privy to the threats made against him, observe a significant behavioral change in Mr. Kebles during the relevant time period as he struggles with the prospect of Wilson's daily and relentless threats and harassment against him.

Mr. Kebles begins to look for a way to satisfy Wilson and get him off Mr. Kebles's back. Mr. Kebles could not stop thinking about this big, angry man that his sister is friends with; she told Mr. Kebles he is "nice," but Mr. Kebles knew different. Mr. Kebles knew that Wilson had some sort of unusual "hold" over Mr. Kebles' sister Teresa Kebles, whom Mr. Kebles knew was a vulnerable target because of her drug and alcohol addiction issues. The uncontested evidence will show that Wilson was plying Teresa Kebles with cocaine on a regular basis.

Evidence and testimony will show that Wilson had a direct financial incentive to selectively tape record only the telephone conversations that would be helpful to the prosecution, and to consummate the transaction with Mr. Kebles at

4

any cost, as long as the threats of violence against Mr. Kebles and his family were not taped.  DEA and U.S. Department of Justice records show that if the government wins this case at trial, Wilson gets paid a "bonus."  If the government loses this case, Wilson does not receive the "bonus."  This appears in a January 26, 2004 memorandum from DEA Special Agent Carl Force to AUSA James Boma, the prosecuting attorney in this case.  This memorandum was provided to the defense in discovery.

For years, the government paid Wilson a salary and paid for his rent, security deposit, utilities, car rental, personal cell phone service, ATM fees, and other "emergency expenses."  The government acted as Wilson's personal secretary and legal counsel in making numerous phone calls and exerting pressure on state law enforcement authorities and state court personnel to sweep under the carpet an arrest warrant for domestic violence out of Nevada so that Wilson could get his driver's license.

Even with the government coddling Wilson at every step of his life, and with this strong financial incentive for Wilson to control his behavior on tape, Wilson still cannot completely suppress his anger and violent tendencies.  These readily-apparent traits of Wilson still show through on numerous tapes, even in instances where Wilson knew he was being taped.  On tape N-9, Wilson uses aggressive and loud profanity, screams out "What the fuck!" and "What the hell!"  On tape N-10, Wilson tells Mr. Kebles "What the hell are you thinking?"  On tape N-13, Wilson tells Teresa Kebles he can "hunt that bitch down" if he doesn't get

5

his money, presumably from winning the gambling pool at Teresa Kebles' bar. Incidentally, on this tape Teresa Kebles tells Wilson that Mr. Kebles is unwilling to do a drug transaction with Wilson.

On tape N-16, Wilson is heard screaming at the top of his lungs "come in here looking like a goddam policeman," "MOTHERFUCK!!!," and "GODDAMNIT!!!" Wilson makes these statements possibly because a Denver Police car has pulled into the parking lot where he is to set up Mr. Kebles. On tape N-23, Mr. Kebles shows up outside a restaurant on a scooter, and Wilson says "I'll break that fucking thing."

Wilson's desire to engage in violence for money comes through in evidence of him winning a gambling pool on sports betting at Teresa Kebles' bar, the Sunset Grill. When Wilson is not paid his winnings immediately, he becomes aggressive, loud, agitated, and threatened violence if he was not paid immediately. Numerous witnesses and bar patrons will testify to Wilson's aggressive behavior and statements. Mr. Kebles is aware of these violent threats, as well as being first-hand aware of the direct threats made to him and his family.

Evidence will also show that Wilson is well-acquainted with the aggressive and often violent world of narcotics distribution. Wilson initially became a DEA informant because he was part of a large-scale narcotics distribution operation and was apprehended in or around Las Vegas, Nevada driving a truck full of narcotics. Wilson confided in an old friend in Colorado during the course of apologizing for becoming an informant and setting up his friends. The DEA offered Wilson the

alternative of becoming an informant or facing the criminal charges, so Wilson opted for the former and returned home to Colorado to set people up.

Wilson's violent tendencies, as well as his disrespect for rules and law, are reinforced by further evidence that he had an arrest warrant for domestic violence in the State of Nevada. He dodged the warrant for many years, but eventually it caught up to him. The DEA assisted Wilson in resolving the warrant by putting federal pressure on local authorities.

Wilson knew Mr. Kebles' niece, Priscilla Parker, from the Sunset Grill, a restaurant/bar where Ms. Parker would go to play pool. On numerous occasions, Ms. Parker saw Wilson exiting the restroom with white, powdery cocaine residue around his nose. Wilson was physically aggressive towards Ms. Parker and became more so as she rebuffed his escalating romantic advances. Wilson knew Ms. Parker was 17 years old, yet nevertheless on one occasion he called her from Las Vegas and offered to fly her from Colorado to Las Vegas to "striptease" for money. Wilson said he had many wealthy contacts there that would pay to see the 17-year old striptease for them. Ms. Parker declined, and cut off all ties to Wilson shortly thereafter, and stopped going to the Sunset Grill altogether out of fear because Wilson frequented the place. Mr. Kebles was aware of these interactions as they occurred.

Wilson distributed cocaine to Teresa Kebles on numerous occasions, yet never told the DEA about this until confronted by DEA agents after Teresa Kebles entered her plea and debriefed. Wilson confessed to the distribution, yet was

7

never prosecuted. After this revelation came to light, the DEA still recommended Wilson for the financial "bonus" if the government wins the trial against Mr. Kebles. Later, AUSA James Boma referred to Wilson as a "rogue" informant on the record in open court.

## ARGUMENT

Mr. Kebles "is entitled to jury instructions on any theory of defense finding support in the evidence and the law. Failure to so instruct is reversible error." United States v. Scafe, 822 F.2d 928, 932 (10th Cir. 1987); see also, e.g., 2A Charles Alan Wright, Federal Practice and Procedure § 482, at 346-48 (3d ed. 2000) ("A party is entitled to a specific instruction on his theory of the case if there is evidence to support it and a proper request for such an instruction is made."); United States v. Lofton, 776 F.2d 918, 920 (10th Cir. 1985) (vacating conviction for failure of jury instructions to adequately apprise jury of defense theory: "When a criminal defendant has raised a theory of defense, the trial court should refer to that theory and to the testimony bearing on it and submit the issue with an instruction on the applicable law. The jury should be advised of the defendant's position so as to put the issues raised by the theory of defense squarely before it.") (citations omitted); United States v. Lewis, 592 F.2d 1282, 1286 (5th Cir. 1979) (vacating conviction for failure of jury instructions to adequately apprise jury of the defendant's theory of defense: "[In considering] whether the instruction should have been given, allowing the jury to consider the defense thus

8

raised, <u>we must accept the testimony most favorably to the defendant</u>.") (emphasis added).

To be entitled to a coercion instruction, the defendant bears the threshold burden to introduce sufficient evidence as to all elements of the coercion defense. <u>United States v. Glass</u>, 128 F.3d 1398, 1409 (10th Cir. 1997); <u>United States v. Scott</u>, 901 F.2d 871, 873 (10th Cir. 1990). Once the defendant has made the threshold showings to trigger the instruction, the burden is on the government to prove beyond a reasonable doubt that the defendant was not coerced. <u>United States v. Falcon</u>, 766 F.2d 1469, 1477 (10th Cir. 1985).

Mr. Kebles has already tendered his proposed duress/coercion instruction, taken verbatim from the Tenth Circuit's Pattern Jury Instructions (2005), as follows:

> Michael Kebles has offered evidence that he was coerced, or forced, to commit the crime.
>
> Under the law, Michael Kebles is not guilty of a crime if, at the time it was committed, (1) there was an immediate threat of death or bodily injury to Michael Kebles (or others); (2) Michael Kebles had a well-grounded fear that the threat would be carried out; and (3) Michael Kebles had no reasonable opportunity to escape the threatened harm.
>
> On this issue, the government must prove beyond a reasonable doubt that Michael Kebles was not coerced. In other words, for you to find Michael Kebles guilty, the government must prove that (1) there was no immediate threat; *or* (2) Michael Kebles's fear that the threat would be carried out was not wellgrounded; *or* (3) Michael Kebles had a reasonable opportunity to escape the threatened harm.

9

This instruction is appropriate and should go to the jury. Any opposition from the government would go to weight, rather than the threshold propriety of the defense's proposed duress/coercion instruction.

The principle underlying the duress defense is that sometimes social welfare is maximized by forgiving a relatively minor offense in order to avoid a greater harm. 1 Wayne R. LaFave & Austin W. Scott. Jr., Substantive Criminal Law § 5.3(a), at 614-15 (1986) ("The rationale of the duress defense is that . . . . , even though [the defendant] has done the act the crime requires and has the mental state which the crime requires, [the defendant's] conduct which violates the literal language of the criminal law is justified because he has thereby avoided a harm of greater magnitude."); John Lawrence Hill, A Utilitarian Theory of Duress, 84 Iowa L. Rev. 275, 321 (1999) ("[T]he criminal law's recognition of the defense of duress is utility-maximizing.").

Through this filing, Mr. Kebles has sufficiently proffered, and will demonstrate at trial, the elements of the duress/coercion defense. Mr. Kebles shows that (1) there were numerous credible and immediate threats of bodily injury against himself and family members made by the informant Wilson; (2) that he had a well-grounded fear the threats would be carried out; and (3) that he had no reasonable opportunity to escape the threatened harm. Especially under the legal standard applicable at this threshold stage of taking all evidence in the light most favorable to the defendant, Mr. Kebles is entitled to have the jury instructed as to his theory of the case through a duress/coercion instruction.

## **CONCLUSION**

For the above reasons and those that will be shown at a hearing and at the trial of this case, Mr. Kebles is entitled to the duress/coercion instruction.

Date:   January 20, 2006                    Respectfully Submitted,


                                            s/ Robert J. Corry, Jr.
                                            Robert J. Corry, Jr.
                                            600 Seventeenth Street
                                            Suite 2800 South Tower
                                            Denver, Colorado 80202
                                            303-634-2244
                                            Robert.Corry@comcast.net
                                            Attorney for Michael Kebles

## Certificate of Service

      I certify that on January 20, 2006, I served the above **MICHAEL KEBLES' PROFFER RE DURESS DEFENSE** by delivering a true and correct copy electronically to the following:

James R. Boma
Assistant United States Attorney
1225 Seventeenth Street, Suite 700
Denver, CO 80202
fax: 303-454-0401
email: james.boma@usdoj.gov

                                                s/ Robert J. Corry, Jr.