IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 03-CR-249-WYD

MICHAEL KEBLES, '10-CV-01528

    Movant,

v.

UNITED STATES OF AMERICA

    Respondent.

---

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION PURSUANT TO 28 U.S.C. §2255

---

The Movant, Michael Kebles, hereby files this Memorandum of Law in Support of Motion Pursuant to 28 U.S.C. § 2255.

### I. MOTIONS PURSUANT TO 28 U.S.C. § 2255

Relief under 28 U.S.C. 2255 is reserved for transgressions of Constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice. A criminal defendant seeking relief from his conviction or sentence in a Motion to Vacate must therefore establish one of the following conditions: (1) his sentence was imposed in violation of the Constitution or laws of the United States; (2) the sentencing court lacked jurisdiction to impose the sentence; (3) the sentence

1

imposed exceeded the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack.

## II.   MOVANT'S GROUNDS FOR COLLATERAL REVIEW

The Movant raises three issues for collateral review: (1) informant perjury; (2) prosecutorial misconduct; and (3) ineffective assistance of counsel. The indispensable evidence that established all three claims was not used at the Movant's trial in August 2007 and was consequently excluded from the Record on Appeal. Furthermore, a claim of ineffective assistance of counsel, in the Tenth Circuit, should be reserved for a collateral proceeding because such a claim brought on direct appeal is presumptively dismissible and will almost always be dismissed. *United States v. Galloway*, 56 F.3d 1239 (10th Cir.1995). Thus, none of the issues is procedurally defaulted and none implicates the cause and prejudice requirements of *United States v. Frady*, 456 U.S. 152 (1982) because none was available for direct appellate review. All of the issues, accordingly, are properly presented to this District Court for collateral review.

## III.   THE UNUSED EVIDENCE FROM WHICH ALL THREE ISSUES ARISE

On August 28, 2003, the Assistant U.S. Attorney, James R. Boma, provided the Movant's attorney at the time, Ronald Richards, with eleven pages of discovery

documents bearing Bates Stamp page numbers 451 through 461. Pages 458-461 comprise a four-page DEA Report of Investigation in which Special Agent Carl Force debriefed the informant in this case, DEA Confidential Source Robert Wilson, on August 25-26, 2003. During the debriefing, Mr. Wilson admitted to providing cocaine to Teresa Kebles, whom he used as an intermediary for obtaining MDMA or Ecstasy tablets from her brother, the Movant herein, Michael Kebles. On page 3 of the Report, Bates page 460, the pertinent excerpt from paragraph 11 reads as follows:

> S/A Force asked the CS what was his/her motivation for making controlled purchases from Teresa and the CS answered that Teresa angered him/her by calling the CS a "nigger" and that was his/her motivation.

At the trial, Mr. John F. Sullivan, III, defense counsel, introduced five items into the trial record: Exhibits A, D, and E on Day 2, and Exhibits H and I on Day 3. The Report of Investigation was not among them, as the Trial Transcript reveals on pages 435 and 616.

### IV.  **INFORMANT PERJURY**

Mr. Wilson's service as a DEA informant began in July 2002. (Trial Transcript p. 330.) On cross-examination, Mr. Sullivan asked him about the beginning of his DEA tenure. (Tr.Trans. pp. 404-04):

3

Q: Were you upset when you started working for the DEA; was that tough for you?

A: Working with them was not difficult at all . . . And, yes, I did do things that I should not have done, but times come in your life when you have to change that, and that's what made me come to them [DEA], because I wanted to make a difference.

During redirect examination, Mr. Boma asked Mr. Wilson to elaborate. (Tr.Trans. pp. 418-420):

Q: And you mentioned that you weren't interested in money. What were you interested in? Why did you go to the DEA in this case or when you, when you initially approached them?

A: Do you want me to speak about what I was involved in?

Q: I'd like you to explain why, why you went to the DEA and what -- yeah, what your reasons were. You weren't interested in the money; what was the motivation is what I'm asking.

A: Seeing people hurt.

Q: What do you mean by that, sir?

A: Hurt by drugs.

Q: All right. Was that based on your experience and the experience of others?

4

A: Yes, and what I did do for years, people or drug dealers would come to me and my friends, my acquaintances, and would want protection. And I did do that, and that's -- but I never dealt drugs. That's what we did.

Q: All right. Was it a bodyguard function?

A: Yes.

Q: All right. And you and other people that you knew --

A: Yeah.

Q: -- did it.

Q: All right. And at some point, you decided you'd had enough?

A: Well, there was a shootout, yeah, and that's when decided [sic] I'm going to ... I got to get out, I got to just get away from it.

Q: All right. And you weren't involved in the shooting, but you were present when that occurred?

A: In many, yeah.

Q: All right. But so you saw people being hurt?

A: From the drug use or the guns, yeah, either or. They're all kind of intertwined.

Q: Is that in effect your motivation, then, to approach the DEA?

5

A: That's what -- I was kind of too, too hard, too hardheaded to be scared. So maybe I had 15 minutes of . . . a clear head. To make a conscious decision to -- that I had to change.

Q: All right. And that's what drove you literally, I guess, to DEA?

A: I went to them.

Q: And you don't have any expectation of receiving any money as a result of this case in court here today?

A: I have my own job. I don't need them.

Q: All right. But do you expect to receive any money from the government?

A: Don't want anything.

Mr. Wilson's motivation to serve as a DEA informant, as stated in his testimony in court, cannot be reconciled with his motivation for dealing with Teresa Kebles, as stated in his debriefing out of court. The trial testimony was a courtroom fabrication contrived for the purpose of misleading the jury and it succeeded. It was perjury. In *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959), the U.S. Supreme Court wrote:

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a

defendant's life or liberty may depend. As stated by the New York Court of Appeals . . . (citation omitted): "It is of no consequence that the falsehood bore upon the witness's credibility, rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair."

## V. PROSECUTORIAL MISCONDUCT

Notwithstanding documentary evidence to the contrary, Mr. Boma strenuously asserted the purity of the informant's motivation. During his cross-examination of the defense expert witness, Mr. Michael Levine, the following exchange occurred. (Tr.Trans. pp. 519-21):

Q: You kept using the, what I think is a perjorious [sic] term, criminal informant. There are many types of informants are there not, sir?

A: Yes.

Q: All right. You mentioned two. You mentioned people that are basically mercenary informants, who may or may not have criminal records; is that true?

A: Yeah, they may or may not have criminal records. Although I've never seen, I've never encountered that [sic] did not have, but I've heard they're out there.

Q: Well, I have, sir. Do you doubt that there are people like this out there?

A: No, not at all.

Q: All right. You just never worked with one?

7

A:   No.

Q:   And there are what I would describe as philanthropic or socially motivated informants. Have you ever encountered good citizens who get fed up and come to you and agree to work?

A:   I vaguely recall one or two in my career.

Q:   All right. You may have -- your recruiting pool must have been rather narrow. Are you familiar with informants in DEA who volunteer their services because they're fed up with crime or violence in their community and they offer their services knowing the risk and agreeing to undertake dangerous, potentially dangerous, jobs in order to help clean up crime in their neighborhood or whatever?

A:   I've known -- I've worked with them in communities. I wrote a book about it. I've worked a lot with them in communities, but that's a big stretch, very, very, very few will become criminal informants, and that is penetrate crime, work undercover.

Q:   All right.

A:   Deal with criminals. That's different -- for the purposes of instruction, teaching law enforcement, that's the term that's used. It's been used from the time I began teaching in '73 to the time, to this moment right now, last week I taught my last course --

8

Q: Sir, I'm not asking where you've gone or what you've taught about. I'm asking about informants.

A: Yes.

Q: Let's get back on track. Relating to informants, are you familiar with the term "flipped defendant," in quotes?

A: Yes.

Q: What's that mean?

A: That's a person who you've arrested and flipped or you've convinced to work for you or work for the government as an informant.

Q: Usually because of very unsavory, from defendant's point of view, alternatives; is that correct? In other words, they're facing time or whatever?

A: That's correct; they don't want to go to jail.

Q: They're trying to help their situation; would that be accurate?

A: Yes.

Q: Are you aware that Bob Wilson had no criminal record and had no criminal charges pending at the time he was used as an informant in this case?

MR. SULLIVAN: Objection, Your Honor, assumes facts not in evidence.

THE COURT: Overruled.

THE WITNESS: I'm aware of an arrest record that included battery or violence, and that's all, I think.

9

In this fashion, Mr. Boma presented the informant as a high-minded, public-spirited, anti-drug crusader who was working tirelessly with the DEA to cleanse his community of drugs and violence.

In collateral proceedings, the proper standard for prosecutorial misconduct is whether the prosecution's behavior caused substantial prejudice to the defendant, thereby rendering the trial fundamentally unfair. *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974). Whether the behavior was prejudicial "depends heavily on the context of the case" and rests largely on three factors: (1) the severity of the misconduct; (2) curative measures taken by the court; and (3) the certainty of conviction absent misconduct. *United States v. Young*, 470 U.S. 1, 12 (1985).

Mr. Boma's misconduct was the severest kind of misconduct conceivable: aiding the informant's deception of the jury by making provocative and false statements of his own. And even if, for the sake of argument only, Mr. Wilson had once been a heroic, altruistic informant at the beginning of his DEA tenure in July 2002, by the time of his first approach to Teresa and Michael Kebles in January 2003, he had abandoned his heroism and altruism to pursue the basest and crudest of objectives: revenge for a perceived racial insult. The jurors were entitled to this information. They needed it to evaluate the Movant's entrapment defense, particularly the issue of inducement. Mr. Boma deprived them of it and substituted his own misinformation instead.

As to curative measures taken by the District Court, there were none, precisely because the Court, like the jury, was kept unaware of the existence of the DEA Report that documented the informant's incriminating admission. As to the certainty of conviction absent the misconduct, a reasonable jury properly informed as to the informant's true motivation would have had abundant evidence of inducement and abundant grounds for acquittal. Thus, the prosecutorial misconduct identified here caused substantial prejudice to the defendant, thereby rendering the trial fundamentally unfair.

## VI.  INEFFECTIVE ASSISTANCE OF COUNSEL

The Movant's trial attorney, Mr. John F. Sullivan, III, failed or refused to use the single most important piece of evidence in his possession, the aforementioned DEA Report of Investigation, to impeach Mr. Wilson's credibility and ultimately demolish it. By admitting he was "angered" because of Teresa Kebles' alleged racial insult, and by admitting that the anger was his "motivation" for making controlled purchases of illegal drugs from her, Mr. Wilson unwittingly admitted that he was doing much more than providing his targets an *opportunity* to violate the drug laws. He was, in effect, confessing that he *induced* Teresa and her brother Michael to violate the drug laws so that he might incriminate both and thereby satisfy his desire to avenge Teresa's alleged racial insult. He was indisputably confessing, three years before his forthcoming trial testimony to the

11

contrary, that he was no "socially-motivated" informant -- unless he began as one in July 2002, but degenerated into an angry avenger of racial insults by January 2003, a mere six months later. His well-documented hatred for Terry provided Mr. Wilson with a motive to induce and entrap her and Michael as well. For his hatred of the sister necessarily carried over to the brother -- unless one cares to argue that Mr. Wilson targeted Teresa for selfish, illegal reasons, but upon meeting Michael, suddenly switched back to selfless, legal ones. The entire trial would have been dramatically altered by the Report of Investigation, which Mr. Sullivan inexplicably failed or refused to utilize.

To prevail on a claim of ineffective assistance of counsel, the defendant must show, first, that his counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland* v. *Washington*, 466 U.S. 668 (1984). With regard to the required showing of prejudice, the proper standard requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. That standard has been indisputably demonstrated here.

## VII. <u>CONCLUSION</u>

On March 30, 2009, the U.S. Court of Appeals for the Tenth Circuit, in rejecting the Movant's *Brady* claim, wrote: "The jury heard testimony that the informant was paid for his participation in the undercover investigation. The jury already knew, therefore, that the informant's motivation was not purely altruistic . . ." What the jury and the Tenth Circuit did *not* know was that the informant's motivation was *purely no*t altruistic. The difference between the former and the latter is the decisive, determinative difference between enforcement and entrapment, between acquittal and conviction. The jury was deprived of its right to know the truth, and the Movant was therefore denied his Constitutional right to a fair trial. Accordingly, the Movant, Michael Kebles, asks the District Court to vacate his conviction, sentence, and forfeitures.