IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  10-cv-01528-WYD
Criminal Action No. 03-cr-00249-WYD

UNITED STATES OF AMERICA,

 Plaintiff-Respondent,

v.

MICHAEL KEBLES,

 Defendant-Movant.

_____

**RESPONSE TO ORDER TO ANSWER
MOTION PURSUANT 28 U.S.C. § 2255**

_____

 The defendant-movant (hereinafter "the movant") has filed a motion pursuant to 28 U.S.C. § 2255 regarding the above-captioned case.  This Honorable Court, in an **Order**, dated and filed July 6, 2010 (doc. 452),  has ordered that the plaintiff-respondent, United States of America (hereinafter "the respondent" or "the Government"), file a response on or before August 9, 2010.  Therefore, the respondent,  by the United States Attorney for the District of Colorado, David M. Gaouette, and the undersigned Assistant United States Attorney, makes the following response in opposition to the movant's motion, pursuant to the **Order**, dated and filed July 6, 2010:

## I.  STATEMENT OF THE CASE[1]

### A.  The motion

The movant filed a motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct sentence by a person in federal custody on June 28, 2010 (doc. 451) (hereinafter cited as **Motion**).  The movant's direct appeal decision was issued on March 30, 2009.  *See United States v. Michael Kebles*, 318 Fed. Appx. 678 (10th Cir. Mar. 30, 2009) (not selected for official publication) (attached as **Case 1**).  Such an initial motion pursuant to § 2255, under the Antiterrorism and Effective Death Penalty Act of 1996 [AEDPA] must be filed within a year of such a decision being "final."  *See Coleman v. United States*, 106 F.3d 339,  341 (10th Cir. 1997).

---

[1]  Reference will be made to documents in the district court file.  A court, of course, always may take judicial notice of records in the same litigation.  *See United States v. Estep*, 760 F.2d 1060, 1063 (10th Cir. 1985).  This should include the documents filed in the Court of Appeals, which are available "on-line."  Nonetheless, for the convenience of this Honorable Court and for the *pro se* movant, all of the pleading documents specifically referenced are attached.  Listed in order of appearance, they are: **Appellee's Answer Brief** – **Attachment 1** (filed in the Tenth Circuit docket, 03/27/2008); DEA Report – **Attachment 2**; **Appellant's Reply Brief** – **Attachment 3** (filed in the Tenth Circuit docket,  04/14/2008); **Appellant's *Pro se* Motion to Supplement the Appellate Record and to Request a Further Extension of Time in Which to File the Appellant's *Pro se* Supplemental Opening Brief** (filed in the Tenth Circuit docket, 09/04/2008) – **Attachment 4**; Tenth Circuit **Order** (filed in the Tenth Circuit docket, 09/12/2008) – **Attachment 5**; **Appellant's *Pro Se* Supplemental Opening Brief** (filed in the Tenth Circuit docket, 09/29/2008) – **Attachment 6**.

However, when a writ of certiorari from a circuit decision is not sought from the United States Supreme Court, the 90 days in which a defendant could seek such review is added on to the year's deadline, because the circuit opinion or decision is not considered final during that three-month period. *See United States v. Gibson*, 2001 WL 1301714, *1 (10th Cir. Oct. 26, 2001) (not selected for official publication)(attached as **Case 2**). Therefore, the defendant's motion pursuant to 28 U.S.C. § 2255 was timely filed, albeit only by one day.

**B.   The parties**

The movant, Michael Kebles, Register Number 31863-013, currently is incarcerated at Fort Dix FCI, in New Jersey. The movant has a projected release date of 09/21/2011. *See* http://bop.gov/iloc2/InmateFinederServlet (Accessed 7/21/2010) (BOP public webpage). Therefore, the movant has slightly more than a year of confinement to run on his sentence.

As noted, the respondent is the United States of America ("the Government"), which prosecuted the movant criminally. This occurred in the District of Colorado, making a motion pursuant to 28 U.S.C. § 2255 appropriate.

3

**C.  The allegations**

The movant "was convicted in the United States District Court for the District of Colorado . . . of five counts relating to possession, distribution, and conspiracy to possess with intent to distribute ecstacy." *United States v. Kebles*, 318 Fed. Appx. 678, *1.  Now, in this post-conviction proceeding, the movant makes three basic allegations regarding his prosecution.  However, all three alleged grounds for relief are related.  They all concern the fact, written up in a DEA report, provided in discovery to the defense, that the defendant's sister, during the undercover operation, called the Government informant, Robert "Bob" Wilson, the "n word."  Briefly, summarizing the claims, the contentions are:

**1.**   The movant asserts that there was perjury committed by the undercover informant used in the prosecution of the movant.  This informant (or CS – confidential source – in the pretrial paperwork), Bob Wilson (as detailed in the Government **Appellee's Answer Brief**, at 6 – attached as **Attachment 1**), did, in fact, testify at trial – on redirect – that he had seen "people hurt" by drugs and wanted to get involved against drug dealing because of that.  *See* **Motion** at 4. [Claim One]. However, in a late DEA report, in which Government DEA Special Agent Carl Force learned that Wilson had provided cocaine to Teresa Kebles – the sister of the movant

4

– Wilson said, in the report written by Agent Force, that his "motivation for making controlled purchases from Teresa . . . [was] that Teresa angered him/her by calling the CS a 'nigger' and that was his/her motivation."  *See* **Attachment 2**.  Therefore, according to the movant in this motion pursuant to 28 U.S.C. § 2255, "The altruistic motivation he professed in his trial testimony was a courtroom fabrication contrived to deceive the jury.  It was perjury."  **Motion** at 4. [Claim One].

    **2.**   The movant next complains that this same basic issue coalesced into prosecutorial misconduct, personal with the trial AUSA. In this second claim, the movant asserts:

> The Assistant U.S. Attorney . . . was well aware of the statement made by the informant to Agent Force about his true involvement for targeting Teresa Kebles directly and through her brother, the Movant Michael Kebles, indirectly.  He knew Mr. Wilson was not the altruistic informant he pretended to be.

**Motion** at 5. [Claim Two].  This presentation of Wilson as a more-highly motivated individual, especially when the AUSA was sparring with the defense expert, "deprived the Movant of a fair trial," according to the movant.  *Id.*

    **3.**   The third claim of the movant relates to alleged ineffectiveness of counsel also dealing with the inappropriate vernacular used by his sister when she was dealing

with informant Wilson.  The movant, implicitly acknowledging that the DEA report

was included in the pretrial discovery, asserts:

> The Movant's trial attorney . . . failed or refused to use the single most
> important piece of evidence in his possession, the aforementioned DEA Report
> of Investigation, to impeach Mr. Wilson's credibility and ultimately to
> demolish it.

**Motion** at 7. [Claim Three].

It also must be noted that, in support of his motion pursuant to 28 U.S.C. §

2255 the movant has filed a **Memorandum of Law in Support of Motion Pursuant**

**to 28 U.S.C. § 2255** (doc. 451-1) (hereinafter cited as **Memorandum**).

**D.   The relief requested**

The movant seeks, according to his pleading, for the Court "to vacate his

conviction, sentence, and forfeitures, and to grant him any other relief to which he

may be entitled.  "**Motion**, at 13.  In his supporting memorandum, the movant

similarly asks that "the District Court . . . vacate his conviction, sentence, and

forfeiture."  **Memorandum**, 13.  Thus, unlike in the situation regarding the appeal,

which, if granted on entrapment as a matter of law, the movant apparently recognizes

that his claim, if successful, seemingly would not foreclose the possibility of a retrial.

(The Government respectfully does not think that bridge will have to be crossed.)

## II.   FACTUAL AND LEGAL BACKGROUND

### A.   The facts established at the movant's trial, according to the Tenth Circuit[2]

The Tenth Circuit, in *United States v. Kebles*, 318 Fed. Appx. 678, affirmed the convictions of the defendant.  Although officially unpublished, the appellate decision and order, because of the several issues raised by the defendant and then-defendant's counsel, does include some detail.  As to facts (excluding case citations and with some rearrangement), the Tenth Circuit found:

> During an undercover DEA investigation, a paid confidential informant befriended Mr. Kebles' sister, Teresa, who arranged a meeting with Mr. Kebles so the informant could purchase ecstasy.  The meeting took place at Teresa's residence and was recorded.  In discussing possible future transactions, Mr. Kebles gave the informant his telephone number.  Mr. Kebles sold 601 ecstasy pills to the informant in three separate transactions occurring over the span of several months.  He also offered to sell the informant an additional 400 ecstasy pills, which the informant declined to purchase.  Although the DEA did not locate the 400 offered pills, it did find 77 ecstasy pills in Mr. Kebles' residence.

*United States v. Kebles*, 318 Fed. Appx. at 679.

---

[2]   This Honorable Court, of course, presided at the trial and is well aware of what came out during this hard-fought case that had, for the defense, the helpful fact of misconduct by a "rogue" DEA informant.  In the event, these recited facts, which are, in the view of the Government, only a conservative summation, are those facts judicially noted (on appeal), and are hereby governmentally quoted.

First, the government played an audio tape, albeit of poor quality, of this transaction during trial.  Second, a DEA agent testified that he actually overheard Mr. Kebles offer to sell the informant 400 additional pills. . . .

*United States v. Kebles*, 318 Fed. Appx. at 682.

[As for the 77 pills] [h]ere, a DEA agent testified that the number of ecstasy pills found in Mr. Kebles' residence far exceeded a personal consumption quantity. . . .

*United States v. Kebles*, 318 Fed. Appx. at 681.

While acquiring the ecstasy, the informant violated his agreement with the DEA by illicitly, and without the DEA's knowledge, providing cocaine to Teresa that he consumed with her on several occasions.  The informant also made several unauthorized phone calls to Mr. Kebles that the DEA did not monitor or record.  Upon discovery of the informant's rogue conduct, specifically his cocaine usage with Teresa, the DEA promptly terminated the informant relationship.

*United States v. Kebles*, 318 Fed. Appx. at 679.  In summarizing the effect of the

evidence presented, the Tenth Circuit stated:

The evidence in this case "falls far short of pointing conclusively and unmistakenly to entrapment as a matter of law." . . .  In fact, it clearly shows Mr. Kebles was not induced.  That the informant made numerous phone calls (both authorized and unauthorized) to Mr. Kebles after the first purchase, even assuming an average of two to three calls per week, does not constitute persuasion and harassment.  That the informant occasionally provided Teresa with cocaine may qualify as inducement of *Teresa*, but it does not, without more, translate into inducement of Mr. Kebles.  The informant simply used Teresa as an intermediary.  Contrary to Mr. Kebles' assertion, moreover, there is no evidence the informant made a plea "based on need, sympathy or friendship." . . .  The evidence does not show that Mr. Kebles even knew the informant gave his sister cocaine.  Thus, Mr. Kebles' entrapment defense necessarily fails because the government sufficiently disproved inducement. . . .

*United States v. Kebles*, 318 Fed. Appx. at 680.  Finally, the Tenth Circuit added,

regarding the impeachment of Wilson,

> The jury heard testimony that the informant was paid for his participation in
> the undercover investigation.  The jury already knew, therefore, that the
> informant's motivation was not purely altruistic and that he had a financial
> interest in catching drug dealers. . . .

*United States v. Kebles*, 318 Fed. Appx. at 682.

## B.  Additional facts not mentioned by the Tenth Circuit

The Tenth Circuit rendition above, while accurate, and sufficient to uphold the

conviction regarding the issue of sufficiency of the evidence, was but a summary.

There were other facts which came out at the trial of the movant.  Some of this

evidence has been noted by the movant in his motion pursuant to 28 U.S.C. § 2255.

Some of the same information, as well as additional information, quoted from the trial

transcripts and from various pleadings, will be relied on in the arguments below.

## III.   ARGUMENT

## A.    At least two of the issues raised by the movant are procedurally barred

The real issues raised by the movant, excluding the one which is grounded on a

complaint about the effectiveness of the movant's counsel, relate to issues which were

raised or legally could have been raised by the movant on his direct appeal.  While

the Government agrees that complaints dealing with ineffective assistance of counsel

almost always should be brought in a collateral proceeding such as a motion pursuant

to 28 U.S.C. § 2255, *see United States v. Bergman*, 599 F.3d 1142, 1149-1150 (10th

Cir. March 25, 2010), the Government also points out that the movant even grounds

this claim on his first two claims which were raised or which could have been raised

previously.  *See United States v. Kebles*, 318 Fed. Appx. at 681 (on direct appeal,

defense argued that lack of the informant's full criminal history was a significant

omission "because it showed the informant lied to the government about his prior

criminal history and his supposed altruistic motive for working with the DEA.")

(underlining added).

> 1.     **The movant's appellate counsel sufficiently raised the claim regarding the informant's motivations for being an informant to have the attempted resurrection of the claim considered legally redundant; in addition, the movant, who took over his direct appeal, also could have advanced the claim that Wilson had committed perjury**

As noted above, in his first claim, the movant asserts that there was perjury

committed by the undercover informant used in the prosecution of the movant.  Also

as noted above, the movant claims that the perjury was the fact that the informant

testified at trial that he was motivated by having seen "people hurt" by drugs and

wanted to get involved against drug dealing because of that.  However, as posited by

the movant, in a DEA report written by Special Agent Force, which purported to

quote the informant, it was related that when the agent confronted the informant with the revelation about Wilson illegally providing cocaine to Teresa Kebles, the informant said that his "motivation for making controlled purchases from Teresa . . . [was] that Teresa angered him/her by calling the CS a 'nigger' and that was his/her motivation." *See* **Attachment 2**. Therefore, the movant says, "The altruistic motivation he [Wilson] professed in his trial testimony was a courtroom fabrication contrived to deceive the jury. It was perjury."

While the Government will point out below that this scenario, taken as true, hardly constitutes perjury, the Government defends that the movant's trial and appellate counsel (the same lawyer) sufficiently raised this issue to have that prior defense position act as a bar to raising it again. While not mentioning the hearsay fact that the movant's sister called the informant an extremely ugly racist name, the movant's counsel, on appeal, although acknowledging the informant's "incredible lack of memory as to critical events," did argue about "the real motivation of Mr. Wilson" as presented to the jury. **Appellant's Reply Brief**, at 10-11. Attached as **Attachment 3**.[3]

---

[3]   While the Government, during the direct appeal, contended this was part of a new and belated argument on appeal, the Tenth Circuit panel obviously considered the defense position, as evidenced by the decision's quote about Wilson's impeachment regarding motivation.

In addition, once the movant took over his own appeal, he had at least an opportunity to advance the appellate claim by arguing for the relevance of the DEA report and the connection with the  previously raised assertion that the defense was frustrated in presenting the full story of Mr. Wilson.  Yet the movant appears to have intentionally delayed this specific argument when he had an opportunity to make it before the Tenth Circuit, at least preliminarily.

The movant, in <u>now</u>  justifying the raising of this impeachment issue in a post-conviction proceeding, says:

> The issue is based upon a DEA Report of Investigation that was not introduced into the trial record, was not in the Record on Appeal, and was thus not available for direct appeal.

**Motion** at 4. [Claim One].  However, this excuse does not set out the whole story.  It is true that the DEA report, Bate-stamped and provided to the defense as part of pretrial discovery, was not introduced as a trial exhibit by the defense.  (Indeed, defense counsel normally do not want to introduce hearsay Government reports into evidence – which may then be considered by a jury to a defendant's detriment.)  But the defendant, when he took over his appeal from his defense counsel, moved, without Government opposition, to supplement the appellate record with, among other items, "Bates No. 0458 through 0461: DEA Report of Investigation prepared

08/26/03 and dated 08/27/03." *See* **Appellant's *Pro se* Motion to Supplement the Appellate Record and to Request a Further Extension of Time in Which to File the Appellant's *Pro se* Supplemental Opening Brief**, at 1 (filed in the Tenth Circuit 08/09/2010). Attached as **Attachment 4**. However, in that motion, the defendant did not even assert that he needed the report to demonstrate perjury of a witness (or misconduct by the prosecution – or anything else in particular). Therefore, not surprisingly, the Tenth Circuit said that it would examine the entire trial record, but would not expand the record to include items outside of the district court record. **Order**, at 2 (filed September 12, 2008). Attached as **Attachment 5**.

Nonetheless, even though the movant says that he lacked a document he wanted considered, the legal issue regarding the credibility of Wilson has been raised previously in the direct appeal. As noted above, the Tenth Circuit said that the jury knew "that the informant's motivation was not purely altruistic and that he had a financial interest in catching drug dealers. . . ." *United States v. Kebles*, 318 Fed. Appx. at 682. Just because the defendant now wishes this Honorable Court to consider an additional document and wants this Honorable Court to refine the conclusion of the Tenth Circuit on the lack of purity of Mr. Wilson's motives does not mean that he should get the proverbial "second bite at the apple." *See United States v. Gilmer*, 814 F. Supp. 44, 45 (D. Colo. 1992) (Government did not get

13

another chance to introduce more evidence).  He should not, especially when he cannot claim the information is not "newly discovered."

Therefore, either this issue has been litigated and held against the defendant and constitutes the "law of the case" or this issue, however meritless, could have been raised on direct appeal, but was not.  (Neither was it previously raised before this Honorable Court.)  Thus, it is procedurally-barred pursuant to *United States v. Frady*, 456 U.S. 152 (1982).  *See United States v. Dago*, 441 F.3d 1238, 1243-1244 (10th Cir. 2006) (procedural bar should be raised by the government in the district court).

> **2.      The movant, who took over his direct appeal, could have raised a claim (no matter how weak) that the AUSA improperly had vouched for his witness or otherwise had acted improperly**

Also as set out above, the movant next complains that this same issue about the "n word" morphed into prosecutorial misconduct.  The movant asserts, in playing free and easy with who the real target of this ecstasy investigation was, "The Assistant U.S. Attorney . . . was well aware of the statement made by the informant to Agent Force about his true involvement for targeting Teresa Kebles directly and through her brother, the Movant Michael Kebles, indirectly.  He knew Mr. Wilson was not the altruistic informant he pretended to be."  **Motion** at 5. [Claim Two].  The movant broadly asserts that this prosecutorial conduct, occurring during the cross-

14

examination of an expert witness, "deprived the Movant of a fair trial." *Id.*

Certainly, a litigant, through counsel or otherwise, may assert, on a direct appeal, that a prosecutor has crossed over an ethical line during the conduct of the trial. *See, e.g., United States v. Rogers*, 556 F.3d 1130, 1140-1143 (10th Cir. 2009) (claims regarding allegedly improper prosecutorial closing argument). However, it also ought to be noted that the experienced defense counsel here did not believe this to be the situation, at least regarding any prosecutorial "hiding of the ball" regarding other negative information about the informant. *See United States v. Kebles*, 318 Fed. Appx. at 682 n. 3. Thus, while also noting that the movant's present claim is both reckless and unsupported, it can be argued that these belated assertions regarding prosecutorial improprieties have been waived by that defense concession. Certainly, actual complaints about the Government cross-examination during trial have been waived, for such issues should be raised on direct appeal. This matter regarding the alleged misconduct of the prosecutor could have been fully litigated below and directly and specifically appealed.

Of course, the movant argues, as set out below, that his counsel was ineffective. It is true, for example, that when a convicted defendant requests that his counsel file an appeal, failure to do so very well may constitute ineffective assistance

15

of counsel.  *See United States v. Herrera-Martinez*, 484 F. Supp.2d 872, 874-875

(N.D. Indiana 2007).  Here, the movant did have an appeal, and it initially was

handled by an experienced counsel.  As set out below, such counsel need not raise

issues they think meritless.

But, more importantly, this movant took over the appeal (mid-stream) from his

counsel.  As noted above, the movant did not then raise, in his supplemental brief,

that the prosecutor acted improperly, even though the movant argued that Wilson lied

about "his criminal record and his real motives for becoming a DEA Informant."

**Appellant's *Pro Se* Supplemental Opening Brief**, at 5.  Attached as **Attachment 6**.

Thus, this second claim which the movant now makes could have been raised

by the movant, but he did not do so (which probably speaks to its perceived obvious

lack of merit or importance at the time).  This also does not mean, as is made clear

below, that the issue, if specifically raised and/or appealed, would have been

successful.  It would not have been successful.

**3.     If the two claims above are procedurally barred, then it is
        hard to see how the movant can assert that his counsel, before
        the movant took over, was deficient**

If the issues regarding the supposed perjury of the witness and the supposed

misconduct of the prosecutor have been waived, previously litigated sufficiently, or

otherwise procedurally barred, it is hard to see how the movant can allege that his

counsel erred in not specifically including the claim that the movant's sister made a

nasty racist remark about a Government witness.  However, since it is presumed that

a claim of ineffective assistance of counsel is ripe for consideration in a motion

pursuant to 28 U.S.C. § 2255, considerable facts and law set out below amply

demonstrate how that supposed failing certainly was not ineffective assistance of

counsel.

**B.    The movant must factually fail regarding the merits of his claims**

If the claims made by the movant in his motion are examined, they clearly are

meritless.  The record contains sufficient proof of this so as to make an evidentiary

hearing unnecessary.

**1.    The informant, who, as acknowledged on direct appeal, was a terribly ineffective witness for the Government during the trial, did not commit perjury and was not even inconsistent; in the event, further impeachment of him would not have changed the result**

As noted above, in his first claim, the movant asserts that there was a piece of

discovery, turned over by the Government, which was not exploited by the defense.

This document, a DEA report which indicated that the informant was getting even

with Teresa Kebles for calling the informant the racist name, shows that the informant

lied regarding his motivation to get drug dealers, according to the movant.

Of course, the movant claims, in a convoluted way, that the informant committed perjury because, during redirect (after a particularly lackluster "I-can't-recall" direct examination and a "shooting-fish-in-a-barrel" cross-examination), the prosecutor (in obvious response to the movant's counsel asking how Wilson got involved as an informant  – *see* **Trial Transcript, Day 2**, 391-392[4]) asked Wilson what had motivated him to become an unofficial Government helper.  The informant, in denying he did it for money, said that he was motivated by "[s]eeing people hurt. . . . "Hurt by drugs."  **Trial Transcript, Day 2**, 418.  The informant said that he was finally motivated to change his life around after seeing folks hurt by guns and drugs. **Trial Transcript, Day 2**, 419-420.  The informant had a job, so he wasn't expecting to be paid (as he was).  *See* **Trial Transcript, Day 2**, 420.

This claim of motivation did not even sound very convincing during the trial, coming as it did from an extremely vulnerable Government witness who was, to put it mildly, befuddled during his trial testimony and who was a Government witness who had handed out drugs.  It hardly supports a claim of perjury, especially when one recalls that, during the interview memorialized in the DEA report, Wilson was on the

---

[4]   The Government also asked on redirect whether the informant, according to the defense, said that he was stressed out because he was going to have to implicate some good people because he couldn't catch any "big fish."  **Trial Transcript, Day 2**, 416-417.

defensive when confronted with the issue of providing drugs and was talking to an agent who was upset that Wilson had given Ms. Kebles cocaine (and that information, as set out in the report, had come from Ms. Kebles).

Seemingly inconsistent testimony does not necessarily lead to a conclusion of perjury, and different answers may not even be inconsistent. *See United States v. Henderson*, 179 Fed. Appx. 535, 540 (10th Cir. May 5, 2006) (not selected for official publication) (attached as **Case 3**). Motivation, of all emotions, is a very mixed affair – as recognized by actors who attempt to portray characters doing particular exploits. Legally, of course, motivation to do anything is a difficult thing to quantify or to summarize. *See, e.g., Colorado v. Connelly*, 479 U.S. 157, 165-166 (1986) (the job of the courts is not to "divine a defendant's motivation for speaking or acting as he did" regarding confessions, if there is no Government misconduct).

In the case of informant Wilson, his motivations were effectively dissected during cross-examination. Still, it did not amount to perjury for Wilson to claim, on redirect as the prosecutor tried to rehabilitate a near-worthless Government witness, that he decided to get into the war on drugs because of things he had seen and experienced. Plus, Special Agent Carl Force testified that it was not until later that the DEA wanted to go after ecstasy dealers in particular – and this brought Teresa

19

Kebles into the picture as a potential source.  *See* **Trial Transcript, Day 2**, 226-227.

Therefore, Wilson's statements on motivation were not even inconsistent, much less

perjury.  His testimony was in general, and not limited to the Kebles.  His flustered

statement in the DEA report was specific to Teresa Kebles – and obviously something

that the informant, like a kid caught at the cookie jar, extemporaneously was pulling

out of his memory.

Finally, even though the movant now thinks that further impeachment of the

informant would have changed the result of the trial, that obviously is not so.  As

reiterated many times, and as confirmed by the direct testimony to be found in the

transcript, Robert "Bob" Wilson was a terrible witness for the Government, even

though he basically confirmed the testimony of Special Agent Force and corroborated

the drug dealing of the defendant (which fortunately was backed up by some

recordings).  Nonetheless, playing the Government cards as they were dealt, the

prosecution did not "hide the ball," but, instead, put Wilson on the stand for the jury

to see and for the movant's experienced defense attorney to have a fun field day in

cross-examining.

The evidence of which the movant argues was (theoretically, at best – *see*

below) impeaching, and it would not have changed the outcome of the trial.  The

movant's desire to change the standard from "the informant's motivation was not

purely altruistic and . . . he had a financial interest in catching drug dealers. . . .,"

*United States v. Kebles*, 318 Fed. Appx. at 682, to "the informant's motivation was

*purely not* altruistic," *see* **Memorandum**, at 13, is cutting too fine a semantic point

and probably is a psychological impossibility when speaking of motives.  *See United*

*States v. Henderson*, 179 Fed. Appx. at 539-540 (attached as **Case 3**) (movant in

2255 did not meet his burden by poring over record and claiming every inconsistency

was evidence of perjury and subornation of perjury by Government).  *Cf. United*

*States v. Akers*, 215 F.3d 1089, 1103-1104 (10th Cir. 2000) (alleged inconsistency

between a witness' grand jury and trial testimonies was not enough to reverse

conviction, especially where, according to the trial court, "the eyewitness's

'uncertainty was later made eminently clear to the jury at trial.'").  *See also United*

*States v. Holly*, 2010 WL 1981035, *1-*2 (10th Cir. May 19, 2010) (not selected for

official publication) (attached as **Case 4**) (defendant, in seeking new trial, claimed he

had such new evidence as the prosecution witnesses having a drug party and that a

prosecution witnesses was under the influence of drugs when testifying).

     2.    **The trial AUSA, in cross-examining an expert witness about a hypothetical situation regarding testimony presented by the expert, did not act improperly; neither did the prosecutor improperly vouch for his witness**

Also as set out above, the movant next complains that his fair trial rights were denied him because of what the trial AUSA did during the cross-examination of Michael Levine, a retired Government agent and certified as a defense expert in undercover operations. *See* **Trial Transcript, Day 3**, 493-500. The movant, basing the complaint again on the use of the "n word" by his sister, asserts:

> The Assistant U.S. Attorney . . . was well aware of the statement made by the informant to Agent Force about his true involvement for targeting Teresa Kebles directly and through her brother, the Movant Michael Kebles, indirectly. He knew Mr. Wilson was not the altruistic informant he pretended to be.

**Motion** at 5. [Claim Two].

During the direct-examination of Mr. Levine he went into detail about the typical undercover informant. "The one thing that you've got to keep in mind about criminal informants," he testified, "is they have one thing, usually, in common. They will lie if they can get away with it. They will use their informant status to commit crimes, if they can get away with it, because they're criminals." **Trial Transcript, Day 3**, 502.

Of course, much of what experts say are hypothetical and supposedly-typical situations; often, as here, travelling into the realm of hyperbole.  Although informant Wilson was shown not to be as "pure as Caesar's wife," he was hardly "a criminal," at least a career criminal with convictions.  *See United States v. Kebles*, 318 Fed. Appx. at 681-682 (appellate discussion of the informant's arrest for aggravated car theft four years before trial).

Nonetheless, the expert also delved into the typical motivations of the typical informant.  Levine testified:

> 25 years' experience has shown me, in the handling of informants, 17 years in the review of informant-generated cases, so it's 42 years of training and experience has shown me that informants will lie for several motives.

**Trial Transcript, Day 3**, 505.

> The first is when an informant is in trouble or an informant is trying to, as we say in the parlance, work of a beef; that is, get credit for giving government or the police a case for his informant activities, thereby having some problem he has with the law erased, vanish.  Well, an informant who informs on, for instance, a dangerous criminal, a real drug dealer, who will kill him, will kill his family, if he can get away with it, he would much prefer to con someone into getting involved and supplying drugs.  In essence, the informant will create the crime.  And deliver as satisfaction of his agreement anyone who is foolish enough or vulnerable enough to bite, not someone who is a real threat to him.

**Trial Transcript, Day 3**, 505-506.

Naturally, just as the movant's trial counsel did an effective job of cross-examining the informant, the Government counsel here had the duty fairly to cross-examine the expert who was making grand and dismissive statements about an undercover operation that he did not participate in and who was making all-encompassing psychological conclusions about an informant he did not know. During this cross-examination of Mr. Levine, the AUSA asked the expert about the existence of "philanthropic or socially motivated informants."  When the expert "vaguely recall[ed] one or two in [his] career," the AUSA then asked about DEA informants "who volunteer their services because they're fed up with crime or violence in their community and they offer their services knowing the risk and agreeing to undertake dangerous, potentially dangerous, jobs in order to help clean up crime in their neighborhood or whatever." **Trial Transcript, Day 3**, 520.  The expert, who  modestly acknowledged, "I wrote a book about it," also described how there were other, less admirable, motivations for informants.  *See* **Trial Transcript, Day 3**, 520-521.  The expert and the AUSA also debated the criminal record – or lack of it, regarding Wilson.  *See* **Trial Transcript, Day 3**, 521-524.

Thus, this was fair cross-examination of the expert, Levine, especially because Levine was an expert dealing with hypotheticals, educated guesses, broad

assumptions, and grand, vicarious conclusions.  The prosecutor simply was

presenting the possibility that Wilson's statements about his general motivations

regarding assisting the Government in general were based on truthful situations.

Again, the *pro se* movant, in his claim, is conducting a post-game quarter-

backing, based not upon his verdict-supported guilt, but upon his "por[ing] over the

trial transcript, hunting for minor discrepancies" in support of claims of perjury and

prosecutorial misconduct.  *See United States v. Henderson*, 179 Fed. Appx. 535, 539-

540 (attached as **Case 3**).  The AUSA here was asking legitimate questions based

upon the record and was not doing anything improper.  Plus, when such hypothetical

questions are posited to experts during cross-examination and which do not have a

basis of support in the record, the occasion can easily be, at worst, harmless error on

the part of the Government, based upon the entire trial record.  *See United States v.

Langston*, 970 F.2d 692, 700-701 (10th Cir. 1992).

Finally, neither was the prosecutor "vouching" for the informant.  Vouching

occurs when an attorney tends to say that he knows something outside the courtroom

that means someone is telling the truth.  *See United States v. Rogers*, 556 F.3d at 1143

n. 7.  The AUSA did nothing of the kind here, but was basing his inquiry on the

informant's testimony.

     **3.**     **The movant's then-counsel was not ineffective regarding not telling the jury that the movant's sister used an ugly racist term in referring to the informant in the informant's presence; at the least, that would have gone against the logical (and almost successful) defense strategy at trial**

As set out above, the third claim of the movant relates to alleged ineffectiveness of counsel, also dealing with the inappropriate language employed by his sister (apparently but once) when she was dealing with Wilson – another person actually involved (it turned out) in the drug trade.  The movant, a lay person and certainly emotionally involved in the aspects of his own prosecution, claims that, regarding the DEA report turned over in discovery, his "trial attorney . . . failed or refused to use the single most important piece of evidence in his possession, the aforementioned DEA Report of Investigation, to impeach Mr. Wilson's credibility and ultimately to demolish it."  **Motion** at 7. [Claim Three].  The Government (which believes that the distribution of drugs to Teresa Kebles by the informant was the "single most important piece of evidence" for the defense) will discuss, below, factually how this "evidence" clearly was not exculpatory or even beneficial regarding the movant, especially when one looks at the clever and well-built defense strategy put together by the movant's counsel.

But first of all, this movant has a heavy legal burden to demonstrate that his counsel did anything wrong, and, in addition, that any error prejudiced the movant's case.

A defendant, in order to make out an ineffective assistance of counsel claim, must assert both an error and show that the error caused a reasonable probability of prejudice. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). However, if there obviously is no prejudice, the first prong, that of an error being made, does not even have to be addressed. *See Strickland*, 466 U.S. at 697. Further, if a district court denies a motion to vacate a conviction on an ineffective assistance basis and there is insufficient evidence in the record supporting a movant's claims, then the denial will be upheld. *See United States v. Dago*, 441 F.3d at 1251 ("Because the evidentiary record before us is insufficient to permit an assessment of Dago's claim, we must affirm the judgment of the district court denying the relief that Dago seeks.")

Thus, the movant here has a burden of proof, or at least he must make some showing to shift that burden to the Government. If anything, there is a presumption that a defense counsel was competent and rendered effective assistance. *See Lufkin v. Solem*, 554 F. Supp. 988, 993 (D. S.D. 1983), *affirmed*, 716 F.2d 532 (8th Cir. 1983), *cert. denied*, 467 U.S. 1219 (1984). At the least, a defendant claiming ineffective

27

assistance is required to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland v. Washington*, 466 U.S. at 690.

While this movant has identified the alleged omission, obviously, as set out below, it is no basis for claiming ineffective assistance of counsel. It was neither error nor prejudicial.

First of all, it is obvious why neither attorney brought out the tidbit that Ms. Kebles had called the informant the "n word." Although the reasoning has varied, depending on the enlightenment of the particular era, it long has been considered highly inappropriate and prejudicial to use that word, especially in legal proceedings which are supposed to be based on calm color-blind logic, not on hate and emotion – unless the use is material and relevant and not unfairly prejudicial. Certainly, racist and derogatory names are always to be avoided, if possible. *See United States v. Frasch*, 818 F.2d 631, 634 (7th Cir. 1987) (although not reversible error to use recordings which had corrupt policeman using the "n word," there are ways and occasions when it can be substituted at trial).

If fact, a "normal defendant" would not want to be associated with the use of the "n word" against a victim or a prosecution witness. *See United States v. Frasch*,

28

818 F.2d at 633-634;  *United States v. Cilia*, 2005 WL 1164153, *2 (S.D. N.Y. May 17, 2005) (threats by loan shark included the word; it was not unfairly prejudicial because it made the threat more forceful).

However, this movant undoubtedly will protest that it was his sister and not he using the word.  Unfortunately for the movant's claims, this theory would undercut the hard-hitting defense at trial masterminded by his experienced counsel (who had, due to the unlawful activity of the informant, considerable hay to make Governmental misconduct bricks).  As recognized by the Tenth Circuit, the defense was hanging its hat on the claim that the entrapment of Teresa Kebles by the informant – through the distribution of cocaine to her – was the equivalent, in this supposedly close-knit family, to the entrapment of the movant himself.[5]  As the defendant's counsel argued in closing, regarding Wilson giving drugs to the movant's sister:

> It also allowed him to gain the trust of Teresa.  And that's what goes to the inducement part.  You don't expect a government agent to give you drugs.  It establishes in a very dark way trust between an agent and the informant.  That trust between he [sic] and Teresa enabled her to pull Michael in.  Because the sympathy and familial relationships, all this can be considered in entrapment.  <u>When he got her, he got him.</u>  And it was by giving her cocaine that she could trust him and therefore she could tell Michael, hey, you can trust this guy.  But that's okay.  They got the drugs, so don't worry about prosecuting him, he's a great guy, philanthropic or whatever he said.

---

[5]   However, as noted above, the Tenth Circuit rejected, as a matter of law, this defense strategy, saying that "there is no evidence the informant made a plea 'based on need, sympathy or friendship.'"  *United States v. Kebles*, 318 Fed. Appx. at 680.

**Trial Transcript, Day 4**, 696-697 (underlining added).   Thus, to have Teresa's inducement be the movant's inducement, the defendant's counsel had to emphasize that the close and friendly relationships included, not only family siblings Teresa and Michael, but included Wilson, as well.   The introduction of the  "n word" into the proceedings would mess this defense theory up.   It would show Teresa to not be so chummy with Wilson – which would detract from the presentation of Wilson as a sort of Judas-like betrayer.   And, if the defense was showing the sister and brother were close, the introduction of the "n word" would tend to show that both Teresa and the movant were racists.   That apparent racism would not, and should not, gain jury empathy in the District of Colorado.

This trial strategy, to undercut predisposition to distribute drugs, is obvious elsewhere.   The defense witnesses supported the defense theory of the case as best they could.

During the testimony of defense witness Julia Anne Rutter, a bar maid, she opined that she thought Wilson and Teresa Kebles "were friends."   **Trial Transcript, Day 3**, 447.   Basically, according to the testimony of Rutter, this personal relationship, which made Wilson's being an informant a betrayal, seemed, therefore, to be behind "the real reason that he was so upset and distraught . . . [because] he couldn't get the big fish."   **Trial Transcript, Day 3**, 448.

As for the defense evidence given by Laura Hemborg, the movant's live-in girl friend (who had no idea about marijuana-usage at the house – *see* **Trial Transcript, Day 3**, 453, 456-457) , she also portrayed Wilson as someone who did not have any reason to be out to get the movant or his sister.  Not only did the informant apparently pester the movant into giving into Wilson's demands regarding drugs, Wilson told Ms. Hemborg that he was the movant's "sister's friend."  **Trial Transcript, Day 3**, 454.

Finally, regarding the defense testimony from the supposed expert, Michael Levine, his basic testimony was, as he put it during recross-examination, that the situation was a case of improper inducement of dealers where "[t]heir sister might be pleading with them to get it." **Trial Transcript, Day 3**, 564.  Again, the introduction of the racial epithet would have raised confusing questions, into the defense, regarding what did the movant know about his sister's racism and when did he know it?  The last thing the defense would have wanted was that the expert would get into the movant's motivation to sell drugs to someone he also thought of in derogatory terms.  That certainly would tend to portray the movant in a bad light for the jury.

Therefore, this was an obvious case of this experienced (and often successful) counsel of exercising "reasonable trial strategy."  *See, e.g., United States v. Foreman*,

323 F.3d 498, 502-505 (6th Cir. 2003). Introducing the evidence that would have tended "to trash" Teresa Kebles would have been counter-productive, to say the least. Indeed, a defendant could later complain that introducing evidence that he came from a family of racists would be independent cause for post-conviction complaint.

In summary, the previously-provided discovery (the DEA report) was not helpful to the defense trial strategy (which *almost* succeeded). In addition, the detrimental (for the movant) information in this discovery, quite ethically, was not exploited by the Government.

## C.    An evidentiary hearing is not necessary in this case

The holding of a hearing by a court usually is a matter within the court's sound discretion. An evidentiary hearing does not need to be held when the files and records of the case conclusively show that the prisoner is entitled to no relief. *See United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995). As should be obvious, the movant has not set out any facts which would support an evidentiary hearing. There certainly has been no substantial factual allegation indicating that there likely would have been a different result. Indeed, if anything, the negative information about the movant's sister would have gained the movant some disapproval rather than any sympathy

As for the effectiveness of his counsel, the movant cannot demonstrate that his counsel, in keeping out racist language emanating from his family, committed an error of omission.  Indeed, not only was there no prejudice in keeping out this language, keeping it out supported the rational theory of the defense as developed by the defendant's counsel.

As emphasized in this response, the movant has not alleged any facts which would mandate an evidentiary hearing.  Indeed, the record supports an easy conclusion that there is absolutely no merit to the claims of the movant.  Dismissal without a hearing would be more than appropriate.[6]

## IV. CONCLUSION

For the foregoing reasons, the movant's motion pursuant to 28 U.S.C. § 2255 should be denied.  This case does not demonstrate any sort of miscarriage of justice which would justify relief *via* a motion pursuant to 28 U.S.C. § 2255.  Indeed, this case seems to be the situation which is the antipodal of a miscarriage of justice.  In addition, no evidentiary hearing is necessary.

---

[6]   However, if there actually is an evidentiary hearing, the movant's then-counsel will be able to testify to defend himself from the claims on the part of the movant.  By his attack on the professional conduct of his attorney at his prosecution, the movant has waived relevant portions of his attorney-client privilege.  *See, e.g., Tasby v. United States*, 504 F.2d 332, 336 (8th Cir. 1974).

Respectfully submitted,

David M. Gaouette
United States Attorney


_s/John M. Hutchins_

John M. Hutchins
Assistant U.S. Attorney
1225 Seventeenth Street, Ste. 700
Seventeenth Street Plaza
Denver, CO 80202
Telephone: (303) 454-0200
FAX: (303) 454-0402
E-mail: john.hutchins@usdoj.gov
Attorneys for Respondent

34

**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that one this 3rd day of August, 2010, I electronically filed the foregoing **RESPONSE TO ORDER TO ANSWER MOTION PURSUANT 28 U.S.C. § 2255**, with the Clerk of Court using the ECF system.

I further hereby certify that a copy of the above and foregoing **RESPONSE TO ORDER TO ANSWER MOTION PURSUANT 28 U.S.C. § 2255**, was mailed on the 3rd day of August, 2010, postage prepaid, addressed to the following:

> Michael Kebles
> Reg. No. 31863-013
> FCI – Fort Dix
> P.O. Box 2000
> Fort Dix, New Jersey  08640

*s/Dorothy Burwell*
Dorothy Burwell
United States Attorney's Office