Attachment 1

No. 07-1485

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

  v.

MICHAEL KEBLES,

      Defendant-Appellant.

---

### APPELLEE'S ANSWER BRIEF

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
The Honorable Wiley Y. Daniel
District Judge
D.C. No. 03-cr-000249-WYD

---

TROY A. EID
United States Attorney

JAMES R. BOMA
JOHN M. HUTCHINS
Assistant U.S. Attorneys
1225 17th Street, Suite 700
Denver, Colorado  80202
(303) 454-0100
USACO.ECFappellate@usdoj.gov
Attorneys for Plaintiff-Appellee

**ORAL ARGUMENT IS REQUESTED**
**March 27, 2008**

# TABLE OF CONTENTS

Page No.

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

PRIOR OR RELATED APPEALS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

SUBJECT MATTER AND APPELLATE JURISDICTION.. . . . . . . . . . . . . . . . . .  1

ISSUE PRESENTED FOR REVIEW.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF THE FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

ARGUMENTS

I.     The defendant was not, as a matter of law, improperly induced by the Government
       to commit crimes of which he was not predisposed to commit; the issue of
       entrapment was an issue for the jury and was submitted to the jury, which heard
       of the unauthorized conduct of the undercover informant with broad instructions
       desired by the defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

       A.     Issue Raised and Ruled Upon. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

       B.     Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

       C.     Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

STATEMENT REGARDING ORAL ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . .  45

i

Attachment 1

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

CERTIFICATE OF DIGITAL SUBMISSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

# TABLE OF AUTHORITIES

Page No.

## CASES

*United States v. Diaz*,
    189 F.3d 1239 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Estep*,
    760 F.2d 1060 (10th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 42

*United States v. Gifford*,
    17 F.3d 462 (1st Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Hildreth*,
    485 F.3d 1120 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 44

*United States v. McKissick*,
    204 F.3d 1282 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Mosley*,
    965 F.3d 906 (10th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Nguyen*,
    413 F.3d 1170 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 40

*United States v. Osborne*,
    935 F.2d 32 (4th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Quarles*,
    198 F.3d 260 (Table). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Young*,
    954 F.2d 614 (10th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Vega v. Suthers*,
    195 F.3d 573 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## FEDERAL STATUTES AND RULES

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 924(c)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

21 U.S.C. § 841(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3

21 U.S.C. § 846. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

21 U.S.C. § 853(p). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Crim. P. 29. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## PRIOR OR RELATED APPEALS

There are no known prior or related appeals.

## SUBJECT MATTER AND APPELLATE JURISDICTION

There was federal criminal jurisdiction over the offenses alleged here pursuant to 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 21 U.S.C. § 846 [conspiracy to possess with intent to distribute 4-methylenedioxymethamphetamine (MDMA or "ecstasy")]; pursuant to 21 U.S.C. § 841(a)(1) and (b)(1)(C) [possession with intent to distribute and distribution of MDMA] and 18 U.S.C. § 2 [aiding and abetting]; pursuant to 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 924(c)(1)(A) [knowing possession of a firearm in furtherance of a drug trafficking crime]; and pursuant to 21 U.S.C. § 853(p) [forfeiture].

There was general federal criminal jurisdiction in the federal district court pursuant to 18 U.S.C. § 3231. There is general federal appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

Was the defendant improperly induced, as a matter of law, by an undercover informant, then working for the Government, to commit crimes of which he was not predisposed to commit?

Was the normally factual issue of entrapment improperly submitted to the jury, with broad instructions requested by the defense, because, in this particular situation, the evidence regarding entrapment and the admittedly unauthorized misconduct of the

informant was so overwhelming and uncontradicted that this was one of those rare cases which constitute entrapment as a matter of law?

## STATEMENT OF THE CASE[1]

On September 10, 2003, there was a Superseding Indictment filed which named Michael Kebles, the defendant-appellant, and Teresa Kebles, as defendants.[2] Vol. I, doc. 65. The Indictment had seven counts.

Count One accused the defendant and Teresa Kebles, with conspiring, between on or about January 14, 2003, and on or about May 28, 2003, to possess with intent to distribute 4-methylenedioxymethamphetamine [MDMA] ("ecstasy"). This was in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 21 U.S.C. § 846. Vol. I, doc. 65, at 1.

Count Two alleged that the defendant, along with Teresa Kebles, on or about January 14, 2003, distributed an amount of MDMA. This was in violation of 21

_____

[1]   Vol. I of the Record on Appeal (ROA) has the pleadings and other documents. Vol. II through VIII are transcripts regarding the seven days of the trial, including matters regarding voir dire and jury deliberations. Vol. IX is a transcript of sentencing. Vol. X is (out of order and) the transcript of the pre-trial motions hearing. In addition to being the record on appeal, records in the same case, when necessary, may be noted judicially. *See United States v. Estep*, 760 F.2d 1060, 1063 (10th Cir. 1985).

[2]   As set out in the Statement of the Facts, these Kebles were brother and sister.

U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2 (aiding and abetting).  ROA, Vol.

I, doc. 65, at 2.

Count Three alleged that the defendant, on or about February 11, 2003,

distributed an amount of MDMA.  This was in violation of 21 U.S.C. § 841(a)(1) and

(b)(1)(C).  ROA, Vol. I, doc. 65, at 2.

Count Four alleged that the defendant, on or about April 2, 2003, distributed an

amount of MDMA.  This was in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

ROA, Vol. I, doc. 65, at 3.

Count Five alleged that the defendant, on or about May 28, 2003, possessed

with intent to distribute an amount of MDMA.  This was in violation of 21 U.S.C. §

841(a)(1) and (b)(1)(C). Vol. I, doc. 65, at 3.  (This MDMA was found when the

defendant's residence was searched pursuant to a warrant.)

Count Six alleged that the defendant, on or about May 28, 2003, knowingly

possessed a firearm (a Colt pistol), in furtherance of a drug trafficking crime.  This

was in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 924(c)(1)(A).

Vol. I, doc. 65, at 3.  (This weapon was found when the defendant's residence was

searched pursuant to a warrant.)

Count Seven alleged a forfeiture of a 1996 Chevrolet vehicle, $9,690 in cash, $5,773 in cash, $2,000 in cash, $1,439 in cash, and the Colt pistol with ammunition. This was pursuant to 21 U.S.C. § 853(p).  ROA, Vol. I, doc. 65, at 4-5.

After trial, according to the verdict form, the jury found that the defendant was not entrapped, and that he was guilty of Count One.  *See* ROA, Vol. I, doc. 375. According to the verdict form, the jury found that the defendant was not entrapped, and that he was guilty of Count Two.  *Id.*  According to the verdict form, the jury found that the defendant was not entrapped, and that he was guilty of Count Three. *Id.*  According to the verdict form, the jury found that the defendant was not entrapped, and that he was guilty of Count Four.  *Id.*

According to the verdict form, the jury found that the defendant was guilty of Count Five.  This was possession of MDMA.  *Id.*

However, also according to the verdict form, the jury found that the defendant was not guilty of Count Six.  This was the firearm count.  *See* ROA, Vol. I, doc. 375.

And, according to the Special Verdict Form, the jury found that the $9,100 was to be forfeited, the Chevrolet was to be forfeited, and that the $1,439 was not to be forfeited.  *See* ROA, Vol. I, doc. 377.

According to the Judgment in a Criminal Case (J&C), the defendant was sentenced to a total of 63 months.  *See* ROA, Vol. I, doc. 402, at 3.  According to this J&C, the imposition of the judgment was on November 5, 2007.

A notice of appeal, on behalf of the defendant, was filed.  ROA, Vol. I, doc. 407.  This was filed on November 14, 2007, making the appeal timely.  This appeal follows.

## STATEMENT OF THE FACTS

**A.**     **The Government case as presented at trial**

**1.**     **Introduction**

While there were several Government witnesses at trial, the lead-off and primary witness was Drug Enforcement Administration Special Agent Carl Force.  As will be noted, there also were recordings which were related by the agent in court and which were played for the jury.  However, there admittedly were telephone calls made by an informant, which were not always recorded or, if recorded, not always perfect.  *See* ROA, Vol. III, at 353-354.

**2.**     **The Government case**

In December, 2002, Drug Enforcement Administration Special Agent Carl Force got a duty telephone call from a Mr. Robert "Bob" Wilson, who said that he had "a bunch of information about a . . . large cocaine trafficker here in Denver."  The

5

information contained details which could be verified through other sources and seemed very credible information.  ROA, Vol. II, at 222, 227.

Bob Wilson later testified that his motivation for getting involved as an informant was because he had seen "people hurt" "by drugs."  ROA, Vol. III, at 418.  Wilson claimed that for years he acted as a body guard for drug dealers and provided protection, although he never himself dealt drugs.  Then, after a shootout, which he wasn't involved in, Wilson felt he had "to just get away from it."  *See* ROA, Vol. III, at 419.  So Wilson went to the DEA.  Since he had his own job, he did not expect any money.  ROA, Vol. III, at 420.

Agent Force went to his supervisor and suggested that this informant be used.  But the group in which Force was a member at the time was called a Mobile Enforcement Team (MET), which was supposed to go after "very low, low-level dealer[s], like people [who] are basically junkies, selling little amounts of marijuana or crack or heroin."  ROA, Vol. II, at 222.  Therefore, there was a decision that the matter be held in abeyance until Agent Force "was transferred to another group within the Denver Division."  *See* ROA, Vol. II, at 223.

In about 2003, Agent Force got transferred to a task force, so he decided to go "out and [he] reestablished communication with Mr. Wilson to recruit him as a confidential informant."  Agent Force became Wilson's controlling agent.  ROA, Vol.

II, at 223.  Agent Force basically was the agent who signed Wilson up and worked

with him.  ROA, Vol. II, at 225.

Agent Force explained what this duty entailed and how it was done:

. . .  Basically when you come in, you're going to establish or manage an
informant, you need an investigation to do it.  You can't just go out and sign up
an informant.  So I established and managed Mr. Wilson under the Scott
Anthony Raymond title file.

ROA, Vol. II, at 223.

The process is very lengthy and detailed.  You got to check the person for
warrants, you got to look into any criminal history.  We're not going to take
anybody with domestic violence on there.

ROA, Vol. II, at 222-224.

You have to have them sign an agreement that details that they can't do
anything outside of your authorization because you're not going to be with
them 24/7, for example, taking drugs with the defendants.  They can't go out
and get up any drug deals on their own, without our permission.  So you go
through that agreement.

ROA, Vol. II, at 224.

You go ahead and you take your fingerprints, you photograph them.  It's a
pretty, pretty lengthy progress.  And then it's going to go through your
supervisor who has to approve it, and then it usually have [sic] to go to a
second line supervisor who will approve this also, the use of . . . this person as
an informant.

ROA, Vol. II, at 224.

As for the work of this Wilson, "[w]hile he was an informant with the DEA, he worked on two specific file titles.  The Scott Raymond file title and another file title under . .  Mirabal, Rodney Mirabal."  ROA, Vol. II, at 224.

But, while Wilson volunteered for this duty, he did not end up as an unpaid volunteer.  He was paid by the DEA to be an informant , and for his work he was paid a total of $12,839.  For the investigation of Michael and Teresa Kebles, Wilson was paid $4,450 and $150 in reimbursed expenses (one of which was for cell phone expenses).  The balance of the money Wilson received was involving other targets.  ROA, Vol. II, at 225.  *See also* ROA, Vol. II, at 226.  The money paid to the informant was in installments.  ROA, Vol. II, at 225-226.

Then, in January, 2003, according to Agent Force, Wilson was informed that the task force "wanted to target any individuals that were distributing ecstasy.  Teresa Kebles was identified as a potential source of this drug.  *See* ROA, Vol. II, at 226-227.  When Agent Force asked Wilson if he knew anyone "dealing in X right now," Wilson said, "Yeah, I might know somebody.  Terry."  The DEA did not then have her – Terry – "fully identified yet."  ROA, Vol. II, at 227.

Wilson said, "Why don't I give her a call and I'll see if we can arrange to do something."   "Basically," related Agent Force, "Robert, Bob, engaged in

conversations with Terry over the telephone where they arranged for him to purchase a hundred tablets of ecstasy." ROA, Vol. II, at 227.

While Agent Force could only hear Wilson's side of the conversation, this conversation was recorded (*via* a so-called KEL recording) and Force later listened to the entire call.  He got where he could recognize Terry's voice (and know that she was Teresa Kebles) and, of course, Wilson's voice.  *See* ROA, Vol. II, at 228.

This conversation (which was played for the jury at trial) was, according to Agent Force, a situation where Wilson and Ms. Kebles were "coordinating for the meeting to occur where Bob can purchase the ecstasy pills from Michael Kebles." The meeting was to take place at Teresa Kebles' residence at 1475 East Hermosa Drive, Highlands Ranch, Colorado.  ROA, Vol. II, at 230-232.  It occurred on January 14, 2003.  *See* ROA, Vol. III, at 243.

Therefore, according to Agent Force,

Well, we started surveillance on the residence first.  So we had agents in place. And then myself and another task-force agent met with a confidential source [Wilson] where I provided him with the $1600 in government funds.  I gave him a KEL transmitter, which is at the time, I believe, was like a -- I don't know not going to -- it was basically like an electronic device that could transmit and we could receive it.

ROA, Vol. II, at 232.  In addition, regarding Wilson, the confidential source, according to the agent, "We searched him and we searched his vehicle.  So we patted him down like you'd pat down a prisoner."  ROA, Vol. II, at 232.  No contraband,

9

other money, or anything else was found on the person or in the car.  *See* ROA, Vol.

II, at 233.

Then, once the undercover operation arrived at Highlands Ranch, according to

Agent Force,

> Then we had instructed him to go to the house.  We followed him, we kept
> surveillance on him.  We had the agents there at the house already.  We
> observed him as he arrived at the house.  He parked his car.  And he entered
> the residence.

ROA, Vol. II, at 233.

The events were broadcast and recorded, so Agent Force thought he knew what

was going on inside.  The informant spoke to Ms. Kebles.  Also inside were Ms.

Kebles' daughter and her boyfriend.  After a while, a white Suburban vehicle arrived

at the residence.  The surveillance team "ran the plate" and found that it was

registered to Michael Kebles, the defendant, in Elizabeth, Colorado.  Mr. Kebles got

out of his car, went to the confidential source's car and inspected it.  According to

Agent Force, "He looked inside it.  He looked underneath it.  And then he proceeded

inside the home, Teresa's residence."  *See* ROA, Vol. II, at 233-234.

On the subsequent recorded conversation in the residence, the defendant's

voice was softer than that of the informant's.  *See* ROA, Vol. II, at 235.  The

discussion between these two spoke of red, yellow, and white.  Agent Force, from his

professional experience, thought that this related to types of narcotics.  *Id.*

10

In discussing future transactions, the defendant gave his telephone number and that they would talk in the future, hook up, get together.  ROA, Vol. II, at 236.   The defendant's sister could also be heard.  *Id.*  In addition, according to Agent Force's testimony,

> In listening to the KEL and being there live, you could hear Mr. Kebles also counting out the money.  I put that, I remember putting that in my report of investigation, the $1600.

ROA, Vol. II, at 236.

Then, when Informant Wilson left the resident at Highlands Ranch, the surveillance folks kept him in view, the whole time as he drove to a so-called neutral location or neutral site, some distance away.  There, Agent Force and TFO Creedon patted down the informant and "checked the car to see if there was narcotics or anything else and found nothing."  ROA, Vol. II, at 236-237.  Meanwhile, Wilson had turned over a hundred pills (counted by Force) and the electronic transmitter. ROA, Vol. II, at 237.  The pills (less those tested) were an exhibit at trial.  *See* ROA, Vol. II, at 237; Vol. III, at 383.

There were three telephone calls before the next transaction.  *See* ROA, Vol. III, at 243.  The first, according to Agent Force, was on January 23, 2003, when Wilson called the defendant, trying to arrange for a purchase of 300 tablets of ecstasy that day in Guvnr's Park [a restaurant] in Denver.  But that deal fell through because

Force wanted to try to introduce himself in an undercover capacity.  Such an introduction is done both to try to protect the identity of an informant and to protect the informant by cutting the informant out of the negotiations.  *See* ROA, Vol. III, at 243-244.  However, it often happens that one transaction is not enough to gain the trust of the dealer regarding the confidential source so that the dealer figures out he hasn't yet been arrested, so everything must be okay.  *See* ROA, Vol. III, at 244.  The defendant still was "hinky," meaning skittish.  *Id.*

The second telephone call came on January 29, 2003.  This was when Wilson went through Teresa Kebles to try to set up the 300-pill transaction.  There was a mention of "Mike" and the informant wanted "the same thing."   *See* ROA, Vol. III, at 245-246.

Then, there was a telephone call on January 30, 2003.  Once again, Wilson called Teresa Kebles, wanting to know why things weren't happening regarding the 300 pills of ecstasy.  The two also had a supposedly unrelated discussion about money.  *See* ROA, Vol. III, at 246-247.

Finally, a meeting was arranged on February 11, 2003.  It was to take place at the Chipotle restaurant at 2480 South Colorado Boulevard.  The plan was to meet at night there and exchange $4500 for 300 pills.  *See* ROA, Vol. III, at 247.  Once again, the standard operating procedure was employed; the agents met first with the

informant, searched him and his vehicle for any money or contraband, fitted him with an electronic listening device, gave him the money, and had him drive to the rendezvous, all under surveillance.  *See* ROA, Vol. III, at 248.

But the informant and the surveillance team had to wait about an hour and a half for the defendant actually do the transaction.  There were a couple of security vehicles at the strip mall, and they might have been thought to be Denver Police.  So the informant and the defendant met quickly and agreed to meet at the nearby King Soopers grocery store and deal there.  *See* ROA, Vol. III, at 248-249.

The surveillance team could see that Wilson, after driving to the side of the strip mall, got into the defendant's Suburban, where he gave the money to the defendant and got actually 301 pills.  *See* ROA, Vol. III, at 249.  Then, the earlier procedure was followed; the informant and the surveillance team drove to a neutral site, had a search, and got the transmitter and drugs.  Once again, the untested portion of the pills were admitted for the jury.  *Id.*; Vol. III, at 383.

Meanwhile, the defendant was followed back to his own residence at 442 Clarkson Street in Denver.  ROA, Vol. III, at 250.  It is normal procedure not to attempt this on a suspect after the very first transaction, because they are too "hinky" and this will "hink" them and investigators want to be able to go up the production-consumer ladder as far as they are able.  *See* ROA, Vol. III, at 251.

Since, according to Agent Force, the investigators suspected where the drugs were coming from, they began to set up coordinated investigation with other agencies in other states.  This made it a long term investigation and Agent Force "began working with Immigration and Customs Enforcement (ICE) in the Houston office." *See* ROA, Vol. III, at 252.

With this expansion of the investigation, the next activity regarding the defendant occurred on April 2, 2003.  As Agent Force testified about the progress:

> Each time, each three times, are basically the same manner.  So there's telephone calls coordinating, you know, the meeting.   And then we go ahead and we decide to meet.  This time we're going to meet at the Brothers BBQ.  You know, it's a couple blocks from Mr. Kebles' house at that time, which I mentioned before was 442 Clarkson Street in Denver.  So the arrangement was to buy 200 pills of ecstasy, this time for $3,000.

ROA, Vol. III, at 252.  Once, again, there was a recorded telephone call setting up this meeting, which the jury heard.  ROA, Vol. III, at 253.  This third purchase was made because the investigation was continuing and the investigators hoped to identify the source of the pills, and progress was being made in that regard.  *See* ROA, Vol. III, at 257.

Once again, the standard procedure was observed by the task force regarding this meeting.  As Agent Force related,

> We met at a neutral location.  I believe it was 200 pills for $3,000.  So provided him with $3,000.  Provided him with the KEL transmitter, searched

him and his vehicle, and then told him to go ahead and proceed to the location where they were going to do the deal.

ROA, Vol. III, at 253-254.

> So we surveilled him to that location, waited for Michael Kebles to arrive. We had surveillance set up on his house this time, monitoring the front of his house. We had agents that observed him leave on motorized scooter. It's kind of like a little toy, like the little, the kids use them now, those little skate things that had the handles, but it had a motor on the back.

> So he goes up to the meet location, meets with Mr. Wilson. They kind of play around on the scooter for a little bit, have some fun, and then they execute the transaction where they, he gets the 200 pills for the - - Mr. Wilson gets the 200 pills, and he gives the $3,000 to Mr. Kebles.

> Also on this - - I was monitoring the KEL, as I was on the other two transactions; we overheard Mr. Kebles telling the informant that basically they're having a conversation and Mr. Kebles was telling him he was going to get out of the game, but he said, if you want to get some pills now, now's the time, because I think I can do 400 pills right now, 400 pills I could also send to you.

> And you hear Mr. Wilson say, No, no, no let's wait for a day or two. I need to talk to my people first basically, which would have been myself.

ROA, Vol. III, at 254. As Force testified, they were not sure that they could get authorization to purchase that amount. ROA, Vol. III, at 255. This transaction was recorded. *See* ROA, Vol. III, at 255-256.

Again, after this transaction, the undercover people went to a neutral location. As before, there was a search of the informant and his vehicle. As for the defendant, he was followed to his residence. Once there and off his scooter, the defendant

15

walked a couple of houses away and spoke to some construction workers.   The

defendant then returned to his residence, went inside, and the surveillance was

terminated.  ROA, Vol. III, at 256.  The pills purchased were admitted into evidence.

*See* ROA, Vol. III, at 257,  383.

At this time, as noted, the investigators were trying to locate the defendant's

source of supply for his pills.  They believed the source was in Houston, Texas.  *See*

ROA, Vol. III, at 257-258.

To advance the investigation, the task force folks decided it was time to get a

search warrant and execute it on the defendant's residence.  This was done, the

warrant being signed on May 27, 2003, and executed on 442 Clarkson Street on May

28, 2003.  *See* ROA, Vol. III, at 258-259.

According to Agent Force, the investigators wanted the search warrant

execution to be low-key, and they did not even want to arrest the defendant.  They

wanted him to cooperate so that they could go up the investigative ladder regarding

getting bigger dealers.  The agents waited hours and contacted the defendant when he

was outside of his house.  While he did cooperate some regarding the location of 70

ecstasy pills and the Colt .357 magnum pistol found in the residence, most of the

investigators' attempts at mutual cooperation was met with overt hostility.  The

defendant, at first, claimed that he did not believe that they were officers or that they

had a warrant.  He wanted to call the issuing magistrate.  *See* ROA, Vol. III, at 259-262.

Finally, according to Agent Force, "Because of that [hostility], my supervisor was like, look, this is, this is unacceptable, we're going to have to arrest the guy.  So we arrested him on probable cause after that."  ROA, Vol. III, at 261-262.  So the defendant, as he apparently wished, was *Mirandized* and was arrested.  *See* ROA, Vol. III, at 262.

The investigators did speak with the defendant.  He claimed that $17,000 which he had in several accounts was from his contracting business.  Eight hundred dollars in one-hundred-dollar bills were found in a dresser in the defendant's bedroom.  None of it matched the currency paid him during undercover buys.  *See* ROA, Vol. III, at 262.  Before he was put in jail, $639 was found in the defendant's pocket.  ROA, Vol. III, at 262-263.

Regarding the pills found in the residence, while the defendant said it was for personal use, a normal "hit" for partying would be one pill.  *See* ROA, Vol. III, at 261, 263.  In addition to the bag of 70, other pills or pieces of pills found in the residence made a total of 77 pills.  *See* ROA, Vol. III, at 263, 266.  Also, some marijuana ("user amounts") was found.  *See* ROA, Vol. III, at 261, 266.  Some prescription medication (hydrocodone) was found, as well, although Agent Force,

who was in charge of the search, did not see a prescription from a doctor.  *See* ROA, Vol. III, at 261, 263, 266-267.

At the time of the investigation regarding the defendant, he had no felony convictions.  *See* ROA, Vol. III, at 349.  When he was in jail after his arrest, he made telephone calls to persons other than his attorneys.  *See* ROA, Vol. III, at 283.  The calls, which were played for the jury, were in the nature of confessions and one, to the defendant's mother, even complained or cried about the Government having zero-tolerance for ecstasy since a young woman died.  *See* ROA, Vol. V, at 671-672; 694 [closing arguments].

It was after Teresa Kebles was debriefed in this investigation that Agent Force found out that the informant, Wilson, was providing drugs to her.  *See* ROA, Vol. III, at 347, 351.  Upon inquiry, Wilson acknowledged that her assertion was true, he was providing user amounts of cocaine to Teresa Kebles.  ROA, Vol. III, at 351-352. Wilson also provided drugs to at least two other targets he was working on.   *See* ROA, Vol. III, at 342.  This, obviously, was in violation of DEA protocol.  *See* ROA, Vol. III, at 339-341.  In fact, the agreement which Wilson signed prohibited such illegal and independent action and prohibited entrapment.  *See* ROA, Vol. III, at 330-333.

According to Agent Kebles, once it was sufficiently confirmed that this distribution had occurred, Wilson was deactivated as an informant and it meant that Wilson would get no portion of any forfeited property.  *See* ROA, Vol. III, at 296, 347-349.  On the other hand, since Teresa Kebles provided this honest information during debriefing with the Government, the information apparently benefitted her sentencing.  *See* ROA, Vol. III, at 343.

**B.      The trial evidence regarding misconduct by the informant or weaknesses in the Government's case**

        **1.      Introduction**

The defendant (then represented by other counsel) had argued, unsuccessfully, that the defendant had been subjected by the Government to vindictive prosecution.  *See* Vol. I, doc. 135, at 5 [Courtroom Minutes].  Also, by the motions hearing on November 29, 2004, it was known that the defense was raising entrapment.  *See* ROA, vol. X, at 59.  Thus, especially after the defendant obtained present defense counsel, the Government knew that alleged governmental misconduct would be an evidentiary issue.  Indeed, in the opening statement, the Government acknowledged to the jury that Wilson had given lines of cocaine to Teresa Kebles before and after the first transaction, which was dead wrong and resulted in Wilson's deactivation as a Government informant.  *See* ROA, Vol. II, at 199-200.

19

Therefore, in its case-in-chief, the Government called Bob Wilson as the second "Government" witness. *See* ROA, Vol. III, at 385. Wilson testified, although certainly not loquaciously, that he had purchased MDMA from the defendant (whom Wilson called "Mike") on the three occasions. *See* ROA, Vol. III, at 386-389.

On direct, which did not go on at length, Wilson acknowledged that he provided a "small" amount of cocaine to the defendant's sister "just that [one] time." *See* ROA, Vol. III, at 389-390. As Wilson vaguely recalled it, when Agent Force heard about it,

> Yeah, he reprimanded me and, you know, that was a mistake that upon, that I made on my own. And it was just I had so many sources around me that it was kind of . . . kind of went along with what was going on, so.

ROA, Vol. III, at 389.

### 2.    The cross-examination testimony of Wilson

Wilson's real impact came courtesy of the defense. On cross-examination, Wilson vaguely complained that it was some time after he approached the Government that they came and had to "find" him. *See* ROA, Vol. III, at 391-392. While Wilson knew that he signed an agreement with the Government about being a confidential informant, he did not recall signing it. *See* ROA, Vol. III, at 392-393. Wilson said that he did not do anything without Government knowledge, "Not as far as I know." *See* ROA, Vol. III, at 393.

While Wilson protested that he had never dealt cocaine in his life for money, he had delivered it some.  When asked by the defendant's present counsel, how often, Wilson relied, "I was around it a lot.  Professional athletes, all kinds of people, so that's kind of a -- there's no way I could answer that question.  It's not that it was coming from me.  It's just that that was what we were doing."  ROA, Vol. III, at 394.

Wilson continued in this vein:

I don't know we, but that's the, that's the game that we were involved, people around me were involved in.  I was around for another reason.  That's what started this whole thing.

* * *

That wasn't . . . I knew my guidelines, and I didn't, you know, I -- to be around the people I had to be around, unfortunately, you know, and I expressed to them that I didn't like it.  You know, I didn't like anything that I was doing.  I didn't . . . so I tried to, not to take it to any type of extreme.

ROA, Vol. III, at 395.

Wilson reiterated to the defense that he only gave cocaine to Ms. Kebles and it was once.  *See* ROA, Vol. III, at 395-396.  And, he gave it to her due to his own "stupidity."  He did not recall doing that with other "defendants," and he did not recall telling Special Agent Force that he had done so.  *See* ROA, Vol. III, at 396-397.

Indeed, Wilson told the defendant's counsel that he really did not even recall well the first time he spoke to the defendant.  But it surely was in a bar.  *See* ROA, Vol. III, at 397.  The defendant's sister just handed Wilson a telephone and he called

21

her brother.  *See* ROA, Vol. III, at 397-398.  Wilson thought that this call was made before Wilson knew "anything about those people" in the DEA.  *See* ROA, Vol. III, at 398.  *See also* ROA, Vol. III, at 399.  Everything about this first call was vague to Wilson, although he was being "totally honest."  *See* ROA, Vol. III, at 398-399.

However, the details of when and under what circumstance Wilson gave cocaine to Terry Kebles, as well as what he might have told the DEA previously, were basically forgotten by Wilson when he was testifying on cross-examination.  Such past events to him were "insignificant."  *See* ROA, Vol. III, at 400-401.

Wilson, on cross-examination, was sure that Ms. Kebles had been working at the Sunset Bar and Grill in 2003.  Wilson knew Julia Rutter at the place, although, back then, she did not own it.  She was one of Wilson's "best friends," but he did not recall telling her that he worked for the DEA.  *See* ROA, Vol. III, at 401-402.  While he apparently said something which may have related to not getting "big fish like they wanted," he did not say those words and he was not referring to the DEA.  *See* ROA, Vol. III, at 403.  Actually, Wilson indicated that he liked working with the DEA, although he did some things which he should not have done, and he did not like being around other people.  But he "wanted to make a difference."  *See* ROA, Vol. III, at 403-404.  While, since then, he may have come off as "being a bad guy," he just let that go now.  *See* ROA, Vol. III, at 404.

While Wilson did not recall even calling the defendant, he acknowledged that

he would play the role of "buddy buddy" "just to break the ice."  This was to do what

he "was instructed to do,." such as doing buys.  *See* ROA, Vol. III, at 404.

The defendant's counsel and Wilson continued in this vein, with Wilson

seemingly not understanding questions.  While Wilson did not recall specifics about

his agreement with the DEA or whether he called the defendant, he seemed to assume

that he read the agreement and that he did call the defendant.  *See* ROA, Vol. III, at

4051-406.  In fact, he made a "guesstimation" that he had called the defendant "ten to

15 times."  While the DEA tape-recorded some calls, they did not tape all of them.

*See* ROA, Vol. III, at 406-407.  While Wilson said that Agent Force knew everything

Wilson did, he did not know if there were occasions when Wilson called and he

wasn't supposed to.  *See* ROA, Vol. III, at 407-408.

When asked whether Agent Force knew about the delivery of the cocaine,

Wilson quibbled that it was not a delivery, he just gave it to somebody.  But,

acknowledged Wilson, while he implied that he voluntarily told the agent about the

cocaine, the agent did not know about it at the time of the transfer.  Wilson claimed

that he told Agent Force right afterwards, although he could not be sure, since he was

doing a lot at that time.  *See* ROA, Vol. III, at 408-409.  Indeed, Agent Force was a

"great guy" and Wilson would not say that the agent was wrong if he thought it was

three or four months later that he heard about it.  *See* ROA, Vol. III, at 409.

Regarding any particular date, Wilson indicated that he was confused.  *See* ROA,

Vol. III, at 409-410.

As for spacial, rather than temporal, locations, Wilson believed that the first

purchase from the defendant was, at least, in the vicinity of Highlands Ranch.  Wilson

did not recall the second deal, although, upon reflection, it was in a parking lot,

perhaps at University Hills. But, on further reflection, that was deal number two or

three, out of three or four such deals.  *See* ROA, Vol. III, at 410-411.

And, for Wilson pinpointing the third deal, that was a bit of a "blur."  He was

not even sure that there was not a fourth deal.  As for prices he paid on behalf of the

DEA, Wilson definitely could not recall the amounts.  *See* ROA, Vol. III, at 411-412.

When it came to the number of pills in each transaction, Wilson could not even

hazard an estimate.  But, regarding the money DEA paid him, that was not an issue,

because Wilson was making more money on his "real job."  "And actually," recalled

Wilson, "when I first came to them, I said I didn't want a dime."  *See* ROA, Vol. III,

at 412.

Additionally, when asked by the defendant's counsel if he was paid $11,800,

Wilson had no idea.  Indeed, he couldn't tell if he had remembered to pay taxes on

the money.  *See* ROA, Vol. III, at 412-413.  As for being promised an incentive or

bonus amount regarding a percentage on forfeited property, this Government witness indicated that he would have discounted such promises, but he was not promised anything, not that he remembered.  *See* ROA, Vol. III, at 413-414.

Upon further cross-examination, Wilson said that he may have been told by the defendant that the defendant had a job, but, he did not especially recall anything he said and "[a]ny drug dealer is going to tell you they work."  Regarding weapons, that the informant would have recalled, and he didn't remember any weapons.  As for being terminated or deactivated by the DEA, Wilson did not remember any of that. He was not "even here," because he had started using cocaine because he was "around these people."  But, with his regular work and all, he wasn't using cocaine every day then, but his weekly use "did happen."  *See* ROA, Vol. III, at 414-416.

**3.      The defense case-in-chief**

The defense case was not limited to the cross-examination of Wilson.  The first of the defense's own four witnesses was Julia Anne Rutter.  She was part owner (with her husband) of the Sunset Grill and previously had worked there.  ROA, Vol. IV, at 442-443.  She had known Teresa Kebles, who also had worked at the Sunset Grill, since about 2002.  Ms. Rutter also had known Bob Wilson since when she was a high school freshman, at Cherry Creek High School, which was about 28 years previously. *See* ROA, Vol. IV, at 443-444.

Ms. Rutter would see Wilson occasionally before she started working at the grill. Thereafter, she would see him "many times," perhaps "two or three times a week" at the Sunset Grill. *See* ROA, Vol. IV, at 444-445. Sometimes he would have a lot of cash, and sometimes he would need to drink on credit. *See* ROA, Vol. IV, at 445-447. It appeared to Ms. Rutter that Wilson was friends with Teresa Kebles. Ms. Rutter also recalled that Wilson was very supportive to her during a period of health problems, "being very sweet and very nice." *See* ROA, Vol. IV, at 447.

But, then, one day, there was a reversal of roles. Wilson came in and, "in front of all the customers," said to Ms. Rutter, "I have to talk to you, I have to talk to you." According to Ms. Rutter's testimony, she said, "Okay." *See* ROA, Vol. IV, at 447.

Ms. Rutter said that Wilson started crying, which was not like him. ROA, Vol. IV, p. 447. She said she did not know what to make of this. Wilson then told her that he "worked fo the DEA." He also said that "the real reason that he was so upset and distraught was that he said that he couldn't get the big fish." He added that therefore "he was going to take down some really nice people that had nothing to do with a drug deal." ROA, Vol. IV, at 448.

The second of the defense's four witnesses was Laura Suzanne Sminjeong Hemborg. She was X-ray technologist at Littleton Hospital, who had known the defendant for almost five years. In fact, in 2003, she was living with the defendant.

*See* ROA, Vol. IV, at 450-452.  But she moved out about the "end of 2003," she

thought.  *See* ROA, Vol. IV, at 453-454.

During that period when the defendant lived with Ms. Hemborg, he was doing

construction and fixing houses.  Both the defendant and Ms. Hemborg worked mostly

every day.  She never saw him giving drugs to anyone.  She never saw large amounts

of money in the house.  She never knew him to carry a weapon.  She never saw any

drug paraphernalia in the house, such as scales.  *See* ROA, Vol. IV, at 452-454.  And,

on cross-examination, she denied knowing about the ecstasy pills and burnt marijuana

found in the residence during the execution of the search, even though she was living

there at that time (in May, 2003).  *See* ROA, Vol. IV, at 455-457.

However, during this time in 2003 when Ms. Hemborg lived with the

defendant, she remembered that Wilson called the defendant "maybe two, three times

a week."  The defendant told Ms. Hemborg that Wilson was "his sister's friend."

Despite this, Ms. Hemborg said that the defendant "would get irritate[d] and would

leave the room" when Wilson called.  *See* ROA, Vol. IV, at 454.

Dwayne Davis testified as the third of the defense's four witnesses.  He

testified regarding the home restoration and construction work done by the defendant

over 2002 and 2003.  *See* ROA, Vol. IV, at 458-474.  On cross-examination, Davis

stated that he also was the defendant's friend.  He testified that he was not aware that

the defendant was selling ecstasy tablets and, if someone approached him to buy drugs and he didn't want to, he said, ". . . I am sure I would call the police."  *See* ROA, Vol. IV, at 474-478.

The final of the defense's four witnesses was Michael Levine.   He was a former federal employee and was now a defense expert witness in undercover operations and informant handling.  His testimony was critical of the investigation here.  *See* ROA, Vol. IV, at 478-4-514.  The witness had been retired from the DEA since 1990 and was being paid $5,000 plus expenses for his participation in the case.  He made over $130,000 the previous year for defense consulting work; he invariably was a defense witness since retirement.   *See* ROA, Vol. IV, at 514-519.

After Levine was further cross-examined, *see* ROA, Vol. IV, at 519-553, he reiterated that he thought there was an inducement in order to have Mr. Kebles deal ecstasy.  ROA, Vol. IV, at 553.  The defendant also was not predisposed to be a drug dealer.  ROA, Vol. IV, at 553-554.  Levine also opined that the defendant was entrapped.  ROA, Vol. IV, at 554.

However, when Levine was re-crossed, he noted that the actions of the informant, while not with the defendant, was entrapment related to "this informant's actions in inducing Teresa Kebles with cocaine."  ROA, Vol. IV, at 556.  Teresa Kebles being induced and "reach[ing] out to that source of supply" was enough.  *See*

ROA, Vol. IV, at 557.  The witness concluded that it was the Government's fault: "I would say that he had become a drug dealer, there's no doubt about that, after the informant's introduction and creation of the whole scenario."  .  *See* ROA, Vol. IV, at 563.  The expert witnesses believed that this was a case where a "sister might be pleading with them to get it."  *See* ROA, Vol. IV, at 564.

## C.    The instructions requested by the defense after the evidence was closed

### 1.    Introduction

As set out below, the discussion after the evidence was closed related to the theory of entrapment.  At trial, the AUSA argued that, at best (or worst), the admitted evidence of informant misconduct was s form of "vicarious entrapment," since it related only to what the informant did wrong regarding the defendant's sister, not with the defendant.   *See* ROA, Vol. IV, at 565-565.  The defendant, below, argued that this was a case of entrapment.[3]

### 2.    The instructions

The discussion of the instructions, especially whether entrapment applied, and as to what counts, went on at length.  *See* ROA, Vol. IV, at 565-614.  The district court, during this discussion, gradually was persuaded, as to each point, to reconsider

---

[3]   In fairness to the defendant's argument, outrageous government conduct (when that exists) "bears a family resemblance" to entrapment.  *United States v. Gifford*, 17 F.3d 462, 470 (1st Cir. 1994).

and to agree with the positions as argued by the defendant's counsel.  *See* ROA, Vol.

IV, at 578-579, 580-582, 589, 592, 595-597, 598, 599, 602-605, 608-609, 610.[4]

As noted, the Government objected to instructions given to the jury regarding

entrapment because the defense had not met its burden, and was not entitled, as a

matter of law, to such instructions.  *See* ROA, Vol. IV, at 565-567.  The defendant's

counsel argued that the unrecorded telephone calls of the informant to the defendant

were enough.  What constitutes inducement, according to the defense, was "a factual

question, not a legal question."  ROA, Vol. IV, at 567.

The district court determined that an entrapment instruction was warranted by

the evidence.  First, the court relied on the testimony of Ms. Rutter, who said that the

informant worried that he was going to take down some nice people who had nothing

to do with drug dealing.  Second, the court relied on the expert testimony of Mr.

Levine, who said informants often will target relatively minor dealers because it is

safer.  *See* ROA, Vol. IV, at 570-571.  Therefore, the court concluded that the

defendant had met his burden and that the Government would have to prove to the

jury, beyond a reasonable doubt, that entrapment did not apply.  *See* ROA, Vol. IV, at

571.

_____

[4]   The basic instructions at issue, conceded the defendant's counsel, were
Tenth Circuit instructions, so there is no debate about their basic appropriateness.  *See*
ROA, Vol. IV, at 567.

At first, the district court was persuaded by the Government's argument and was not going to give an entrapment instruction as to all counts regarding conspiracy and distribution.  (Everyone seemed to acknowledge that entrapment was not applicable to the possession of ecstasy count, the possession of the gun count, and the forfeiture count.  *See* ROA, Vol. IV, at 602, 614.)  As part of this discussion, the defense even objected to the a proposal that the Government dismiss the conspiracy count so as to have the court only give an entrapment instruction regarding the first count of distribution (Count Two).  But, finally, the district court refused to dismiss the conspiracy count and decided to give entrapment to the first four counts.  *See* ROA, Vol. IV, at 571-605.   By this, the district court did not mean to hint that entrapment actually did exist, only that it should go to the jury.   *See* ROA, Vol. IV, at 603-604.

The district court then fashioned the verdict forms as set out in the Statement of the Case, so that the jury, on the four counts, had to determine no entrapment before deciding on the actual evidence of guilt.  *See* ROA, Vol. IV, at 607-608.  The defendant's counsel thought that this "sounds fine."  *See* ROA, Vol. IV, at 608.

Thus, the instructions regarding entrapment meant that the jury was to be told that they were the determiners of that issue, and that the defendant could argue the

facts established entrapment and the Government could argue against that.  As the

defendant's counsel argued:

> Judge, I think it's perfectly appropriate for him to argue that there was no
> entrapment as to any count, however he wants to do it.  I do note, something I
> didn't state earlier, that in -- I know you've already -- It sounds like you're
> going to give the instruction, but I wanted to make sure that I noted that for the
> purposes of determining the sufficiency of the evidence to raise the jury issue
> on entrapment, the testimony most favorable to the defendant should be
> accepted.  And I think the Court's already seen that.

ROA, Vol. IV, at 610.

As for the instructions finally given, the district court gave Instruction 40,

which instructed, as to Counts One, Two, Three, and Four, that the defendant could

show that the Government induced the defendant to commit the offense or offenses

and that the defendant was not predisposed to commit the offense or offenses.  The

instruction also said that, once properly raised, "the government must prove beyond a

reasonable doubt that the defendant was not entrapped."  *See* ROA, Vol. V, at 658-4-

660.

**D.     Closing arguments**

The Assistant U.S. Attorney argued, in his opening closing, that "[t]his case is

not about entrapment."  ROA, Vol. V, at 667.  The defendant was only entrapped by

money.  *See* ROA, Vol. V, at 669.  The prosecutor argued, "There's nothing that

shows that Mike Kebles knew anything about his sister getting cocaine, before or

after the first transaction.  Nothing.  It's made up."  ROA, Vol. V, at 676.   The

AUSA acknowledged that it was up to the jury regarding entrapment, but he argued

against it and against non-predisposition.  *See* ROA, Vol. V, at 681-683.

As for the defendant's counsel, he argued, as a former prosecutor, that the

Government in this case did not disprove entrapment.  *See* ROA, Vol. V, at 674-686.

The defendant's counsel asked for acquittal "on all the counts."  ". . . Mr. Kebles was

entrapped."  ROA, Vol. V, at 686.   The informant gave Teresa Kebles drugs.  ROA,

Vol. V, at 689.   In addition, the defendant's counsel argued that Wilson was "pesky"

and "pushy" when it came to getting MDMA from the defendant.  *See* ROA, Vol. V,

at 698.

The defendant's counsel, since he got his instructions as to the four conspiracy

and distribution counts, naturally emphasized entrapment, even calling an informant a

"government agent."  He argued, implicitly acknowledging the strength of the

Government evidence,

> Again, it matters how you get evidence.  It matters how you charge people.  It
> matters.  That's why entrapment is a very viable and important part of the law.
> That's why you have an instruction for it.  There is cover-up here.  There is
> drug-dealing by a government agent.  There is payment, there is incompetence.
> It's not a smoke screen.  It matters how you get to where you're going.  The
> ends do not justify the means.

ROA, Vol. V, at 693-694.

Finally, the defendant's counsel reiterated that the Government "need[s] to do better." Therefore, he asked the jury "to find him not guilty of all counts." *See* ROA, Vol. V, at 703.

The prosecutor then gave his final closing. *See* ROA, Vol. V, at 704-711. He argued that this situation with the informant was no Government "plot." ROA, Vol. V, at 705.

## E.      The verdicts

The closing arguments were on August 16, 2007, and the jury got the case just after noon. *See* ROA, Vol. V, at 617, 712. The jury deliberated until almost 5 p.m. *See* ROA, Vol. V, at 725. The jury deliberated all of the next day, August 17, 2007, and then the jurors were sent home for the weekend. *See* ROA, Vol. VI, at 728. The jury then deliberated all Monday, August 20, 2007, receiving an *Allen*-type charge. *See* ROA, Vol. VII, at 731-740. Finally, in the early afternoon of August 21, 2007, the jury rendered the verdicts as set out in the Statement of the Case. *See* ROA, Vol. VIII, at 748. The jury then was sent to deliberate the forfeitures. *See* ROA, Vol. VIII, at 764. As noted in the Statement of the Case, the defendant (and the Government) won some and lost some.

## SUMMARY OF THE ARGUMENT

The defendant was not, as a matter of law, improperly induced by the Government to commit crimes of which he was not predisposed to commit; the issue of entrapment was an issue for the jury and was submitted to the jury, which heard of the unauthorized conduct of the undercover informant with instructions desired by the defense.

The defendant was convicted of most of the counts, with the jury specifically rejecting entrapment. This is not a case in which the defense can argue that there were no facts or circumstances to contradict the defense theory of entrapment.

## ARGUMENTS

I.     **The defendant was not, as a matter of law, improperly induced by the Government to commit crimes of which he was not predisposed to commit; the issue of entrapment was an issue for the jury and was submitted to the jury, which heard of the unauthorized conduct of the undercover informant with broad instructions desired by the defense**

A.     **Issue raised and ruled upon**

The defendant, during the discussion of the motions pursuant to Fed. R. Crim. P. 29, claiming insufficient evidence, argued that there was "entrapment as a matter of law . . ." ROA, Vol. IV, at 439-440. The district court considered this motion and denied it, saying that it could not "conclude as a matter of law that entrapment has been proven as a matter of law . . ." *See* ROA, Vol. IV, at 411. Thereafter, of course,

35

the defense helped to determine the instructions which went to the factual issue of

entrapment, conceding that inducement was "a factual question, not a legal question."

ROA, Vol. IV, at 567.

### B.      Standard of review

In an appeal regarding entrapment as a matter of law, the refusal of the district

court to direct a verdict for the defendant is reviewed as a Rule 29 motion for

acquittal due to insufficient evidence.  "We review de novo a district court's denial of

a motion for a judgment of acquittal, viewing all the evidence and drawing all

reasonable inferences in the light most favorable to the government."  *United States v.*

*Hildreth*, 485 F.3d 1120, 1125 (10th Cir. 2007) (internal quotation marks and citation

omitted).  Furthermore, when a jury has found that no entrapment existed, the

appellate court can alter the finding on legal grounds only where the holding should

be made without choosing between conflicting witnesses nor judging credibility. *Id.*;

*United States v. Nguyen*, 413 F.3d 1170, 1178 (10th Cir. 2005).  Indeed, the Tenth

Circuit will overturn a jury's rejection of the entrapment defense only if **no**

reasonable jury could have found that the government proved beyond a reasonable

doubt that there was no entrapment.  *United States v. Young*, 954 F.2d 614, 618 (10th

Cir. 1992).

36

### C.      Discussion

### 1.      Entrapment versus outrageous Government conduct

First of all, as the trial AUSA argued below, this defense argument really appears to be an argument of theoretical "vicarious entrapment." The line or lines of cocaine, which logically could be called an inducement, were provided by Wilson to Teresa Kebles. The cocaine was not provided to Michael Kebles, the defendant. Analytically, therefore, the unlawful actions of this rogue informant would appear to be more in the nature of supposed "outrageous Government conduct."

But that sort of claim, which is constitutional and goes to basic due process, is even harder to prove than entrapment, requiring that conduct be shocking to a sense of basic fairness, and the defendant has the burden of establishing it. Also, it is a legal issue that is decided by a district court, it is not a factual issue which goes to the jury. *See. e.g., United States v. McKissick*, 204 F.3d 1282, 1289-1290, 1294 (10th Cir. 2000); *United States v. Diaz*, 189 F.3d 1239, 1245-1246 (10th Cir. 1999) . *See also Vega v. Suthers*, 195 F.3d 573, 583 (10th Cir. 1999) (while outrageous conduct is constitutional, entrapment is a permissive affirmative defense which is not constitutionally based). Finally, being an issue that relates only to Government misconduct, alleged outrageous Government conduct does not subjectively ask how it

37

affected a defendant, as does entrapment.  *See United States v. Mosley*, 965 F.3d 906, 908-909 (10th Cir. 1992).

Any mistake of the Government agent  here, in supervising an informant, was, at worst, a question of negligence, not an example of shocking behavior.  Undercover drug investigations cannot be choreographed exactly and mistakes sometimes happen. As another example here, the ammunition from the weapon seized from the defendant's residence mistakenly was destroyed prior to trial.  *See* ROA, Vol. III, at 274-276.  Thus, the defense here put all of its evidentiary eggs into the entrapment/Government failings basket, hoping to get all of the instructions wanted and hoping to sway the jury.  Indeed, since the defendant's counsel also emphasized the destruction of the ammunition, *see* ROA, Vol. V, at 691 [closing argument], and the defendant was acquitted of the firearms count, the defense strategy was not without effect.

It almost worked even to a greater extent, even though there really was no evidence that the defendant was induced to do something against his propensity. Certainly, the defendant did not testify that his sister put pressure on him because she needed to get a line or two of cocaine from Wilson.

**2.      Entrapment as a matter of law did not exist here**

●      **the courtroom battle was fairly fought and justly decided**

This case was an classic trial contest, with a very experienced and respected

prosecutor opposed by an experienced, respected, and often successful defense

counsel.  Further, unlike the Children of Israel in Egypt, the defense here was not

without straw when it came to making bricks to construct a theoretically-viable

defensive wall.  While there was not an unlimited amount of this defense-evidence

straw, the prosecution was hobbled, as everyone conceded, by inappropriate and

illegal action on the part of a rogue informant.  And, at trial, that informant, though

forthrightly called by the Government, was such a poor witness that he effectively

provided murky scenarios for the defense to work with.[5]  The defendant's counsel, in

closing, basically asked the jury to punish the Government, even with veiled

references to a type of jury nullification.

In addition, the district court, in instructing the jury, in a commendable sense of

caution, bent over backward to provide the defense with requested instructions

regarding entrapment.  Indeed, while this defendant was not entitled to entrapment as

---

[5]   The informant, Wilson, as a witness, was vague, befuddled, and unhelpful, to
say it charitably.  He even attempted to tell the defense that he was an informant
because he was a good citizen, not even wanting a dime (to "drop a dime" on others).
The informant demonstrated why Government agents try to meet themselves with
dealers, and why informant transactions are often recorded.

39

a defense in his subsequent deliveries of ecstasy, or on the conspiracy itself, *see*

*United States v. Nguyen*, 413 F.3d at1181-1182, he was given, over strenuous

Government objection, entrapment regarding Counts One through Four.  Indeed, the

district court gave the jury special verdicts in which entrapment had to be rejected

before each count ultimately was voted upon.  *See* ROA, Vol. IV, at 606.  And, the

district court even gave the defense the option to argue for the order of the counts

being submitted to the jury.  The defendant's counsel did not object to the conspiracy

count (with entrapment included) being submitted first.  *See* ROA, Vol. IV, at 611-

612.  Finally, the district court, to accommodate the defense, denied the Government

request for the dismissal of the conspiracy count, in order to limit entrapment being

applied to all of the distribution counts.

- **the facts here allowed the jury to rebut the defense theory regarding inducement and lack of criminal propensity**

"The defense of entrapment is generally an issue for the jury and not for the

court."  *United States v. Young*, 954 F.2d at 616.  "If there is any conflicting evidence

upon which a jury could find no entrapment, the issue must be determined by the

jury."  *Id.*  In addition,

> The elements required to find entrapment are: first, government agents must
> have induced the defendant to commit the offense; and second, the defendant
> must not have been otherwise predisposed to commit the offense, given the
> opportunity.  Once a credible entrapment defense is raised, the prosecution has
> the burden of proving, beyond a reasonable doubt, that a defendant was not

40

> entrapped.  The two elements of entrapment are closely related and often the
> same evidence and arguments will speak to both elements.  The primary
> distinction between these elements is that inducement focuses on the
> government's conduct while predisposition focuses on a defendant's attitude or
> condition.

*United States v. Young*, 954 F.2d at 616 (internal citations and quotation marks

omitted).  In this case, as noted in *Young*, both sides argued the opposite sides of the

evidentiary coins.  For example, regarding the defendant's telephone calls from jail,

the prosecutor argued that they portrayed confessions from a trapped drug dealer,

while the defense asserted they were made by a scared kid.  *See* ROA, Vol. V, at 671-

672; 694 [closing arguments].

The defendant, at trial and on appeal, continues to claim that the inducement by

Wilson was just too much, although it lacks some logical persuasiveness.  ""The

informant made unauthorized calls [presumably, in addition to the authorized calls] to

the Appellant and provided drugs to the Appellant's sister as improper inducement

for the Appellant to sell drugs to the informant."  Opening Brief, at 11.   Also, the

defendant asserts that the informant gave cocaine to Teresa Kebles, "manipulating her

to make her brother . . . cooperate in selling drugs to Mr. Wilson and entrap the

Appellant.  Opening Brief, at 14.

Again, in both of these assertions, the defendant fails to connect up inducement

of Teresa to Michael.  Surely, the defendant is not arguing that the sister was the mere

extension of the brother.  They apparently are not twins, much less co-joined twins.

They are separate, volitional beings, in law and in fact.[6]

As to predisposition, it also is helpful to know that, in this case, when the

informant was asked, before his misconduct, about helping locate "X," he

immediately thought of "Terry" Kebles.  In addition, the fact that marijuana,

supposedly unbeknownst to Ms. Hemborg, was found in the defendant's residence, is

something that can be used, for what it is worth, to determine predisposition

regarding illegal drugs.  *See United States v. Young*, 954 F.2d at 617 (evidence that

defendant bought and used marijuana went to predisposition).  *Cf. United States v.*

*Quarles*, 198 F.3d 260 (Table), *3 (10th Cir. Nov. 4, 1999)  (entrapment defense

opens up issue of propensities regarding other drugs).  Indeed, the fact that there were

found, at the time of the search, a total of 77 MDMA pills would indicate that this

defendant was not at all adverse to dealing.

Even the evidence presented by Ms. Hemborg, that she never knew anything

about the defendant selling or even using drugs (when burnt marijuana was found in

---

[6]   The Opening Brief, at 15, asserts that the defendant "is very close with his
family, including his sister Teresa."  The other brother of Teresa Kebles and Michael
Kebles is Daniel Kebles, a fugitive defendant in a related CCE ecstasy case, 03-cr-
00539-WYD (D. Colo.).  This information, which may be judicially noted pursuant to
*United States v. Estep*, 760 F.2d at 1063, tends to corroborate the closeness of the
family, but it also tends to rebut the lack of predisposition when it comes to the family
members.

the house) could go to predisposition, since her blanket denials presumably were rejected by the jury.  If testimony of purity is rejected, it almost necessarily admits an acknowledgment of uncleanliness.

In addition, Ms. Hemborg's testimony, *see* ROA, Vol. IV, at 454, that she remembered that Wilson called the defendant "maybe two, three times a week," with the defendant telling Ms. Hemborg that Wilson was "his sister's friend," also can contradict lack of predisposition.  Even when Ms. Hemborg said that the defendant "would get irritate[d] and would leave the room" when Wilson called, a jury could see that as irritation that somebody was calling a businessman at home.  The calling of the defendant by Wilson, without more, hardly amounts to harassment or coercive tactics.  *See United States v. Young*, 954 F.2d at 617.

Certainly, the mere solicitation of the defendant by Wilson, regarding the purchase of ecstasy, is not such an inducement that would overcome a predisposition not to break the law.  *See United States v. Osborne*, 935 F.2d 32, 38 (4th Cir. 1991).  Indeed, as one of the defendant's own witnesses, Dwayne Davis, testified, if someone approached him to buy drugs and he didn't want to, ". . . I am sure I would call the police."  *See* ROA, Vol. IV, at 474-478.  Instead, what the defendant did initially, was suspiciously inspect Wilson's car.  ROA, Vol. II, at 233-234.

Finally, lack of predisposition to break the law should not be so easily overcome by a mere chance to make money.  Indeed, the defendant presented evidence that he was making plenty of money legitimately.  Nonetheless, the selling of pills at fifteen dollars per pill, amounting to thousands of dollars, especially when it is done surreptitiously, tends to show predisposition to engage in the prohibited conduct.  Such evidence also tends to show that the defendant was not entrapped as a matter of law.  *United States v. Hildreth*, 485 F.3d at 1126.

The jury, which deliberated earnestly and at length, obviously considered the defendant's case, acquitting him of the weapon charge.  That jury also found that the Government proved its case beyond a reasonable doubt.  If that jury, which the defendant wanted so hard to hear his case, were to be considered unreasonable then the almost sacred institution of trial by jury is at serious risk.

## CONCLUSION

The Government requests that the convictions of the defendant be affirmed.

## STATEMENT REGARDING ORAL ARGUMENT

The Government does not believe that oral argument is necessary, since the briefs sufficiently set out the arguments and this case involves no novel issues.  In addition, in this strictly factual debate, the jury verdicts cannot be shown to be unreasonable.  Nonetheless, since the appellant has requested oral argument, the Government, in a sense of professional courtesy, joins in the appellant's request for oral argument.

Respectfully Submitted,
TROY A. EID
United States Attorney


 *s/John M. Hutchins*
By: JOHN M. HUTCHINS
Assistant U.S. Attorney
1225 17th Street, Suite 700
Denver, Colorado  80202
(303) 454-0100
USACO.ECFappellate@usdoj.gov
Attorneys for Plaintiff-Appellee

Attachment 1

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(a)(7)(C), I certify that this brief is proportionally spaced and contains  10,745  words.  I relied on my word processor, with WordPerfect Version 12 software, to obtain the count.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

_____

DOROTHY BURWELL

 *s/Dorothy Burwell*_____
DOROTHY BURWELL (digital)
Assistant United States Attorney

46

Attachment 1

## CERTIFICATE OF DIGITAL SUBMISSION

All required privacy redactions, if any, have been made and, with the exception of those redactions, every document submitted in Digital Form or scanned PDF format is an exact copy of the written document filed with the Clerk.

The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program TREND MICRO Office Scan for Windows Version 7.3, Engine Version 8.550.1001, Virus Pattern File 5.189.00 dated 3/26/08 and, according to the program, are free of viruses.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

_s/Dorothy Burwell_
U.S. Attorney's Office

47

Attachment 1

# CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of March, 2008, two copies of the foregoing **APPELLEE'S ANSWER BRIEF** were mailed, postage prepaid, to:

John F. Sullivan, III, Esq.
The Law Office of John F. Sullivan, III, P.C.
155 S. Madison Street, # 209
Denver, Colorado 80209

and a copy submitted by e-mail to jfslaw1@aol.com.

*s/Dorothy Burwell*
Dorothy Burwell
United States Attorney's Office
1225 17th Street, Suite 700
Denver, Colorado 80202
Telephone 303-454-0100
Fax: 303-454-0461
E-mail: dorothy.burwell@usdoj.gov