**THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2010 NOV - 1  PM 4: 53

GREGORY C. LANGHAM
CLERK

BY_____DEP. CLK

Civil Action No.        10-CV-1528-WYD

Criminal Action No.  03-CR-0249-WYD


UNITED STATES OF AMERICA,

      Plaintiff-Respondent,

      v.

MICHAEL KEBLES,

      Defendant-Movant.

---

## MOVANT'S REPLY TO
## THE GOVERNMENT'S RESPONSE

---

The Movant, Michael Kebles, *pro se*, hereby files this Reply to the

Government's Response, which was filed on August 3, 2010:


The three grounds for relief originally specified in the Movant's Motion to

Vacate, Set Aside, or Correct Sentence are:


(1) Informant perjury;
(2) Prosecutorial misconduct; and
(3) Ineffective assistance of counsel.

All three issues are interrelated and mutually dependent upon a single

known document, the August 25-26, 2003, DEA Report of Investigation (Bates pages 458-461) that records the admission made by the informant in this case, Mr. Robert Wilson, as to his unlawful motivation for making controlled purchases of the Movant, Michael Kebles, and his sister, Teresa Kebles. The specific basis of the informant's unlawful motivation has already been identified in the § 2255 Motion and in the Movant's supporting Memorandum, on page 3.

The Government's Response, written and filed by the Government's attorney, Mr. John M. Hutchins, begins by challenging the availability of the first and second issues for collateral review in the present proceeding before the District Court.  The Movant had previously believed that the DEA Report upon which those issues are based was *not* part of the appellate record because it had not been introduced into evidence at his trial.  He was not aware that every document provided by the Government in pre-trial discovery, including that document, whether used at the trial or not, was automatically incorporated into the appellate record.   Whether or not that means the first and second issues are procedurally barred pursuant to *United States* v. *Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), the Movant will demonstrate that both of those issues still bear directly upon the third issue.  And the third issue, ineffective assistance of counsel, remains viable regardless of the other two, pursuant to *Massaro* v. *United States*, 538 U.S. 500 (2003).

Mr. Hutchins' undoubtedly sincere and well-intentioned Response is also
undoubtedly a thirty-five-page exercise in obfuscation, and the issue that
exercises him the most is the issue he labors most mightily to bury in an
avalanche of irrelevancy:  the central and inescapable issue of **informant
motivation.**  In opposition to the Motion to Vacate, Mr. Hutchins utilizes
three rather unconventional techniques, followed by three thoroughly
fallacious arguments.

## Three Government Techniques

*First*, Mr. Hutchins simply takes it upon himself to rewrite part of the
Movant's 2255 Motion.  (See Document 451, page 5 of 13, attached hereto
as Exhibit A.) In Ground Two alleging prosecutorial misconduct, the Movant
very plainly writes:

> The Assistant U.S. Attorney . . . was well aware of the
> statement made by the informant to Agent Force about his true
> ***motivation*** for targeting Teresa Kebles directly and through her
> brother, the Movant Michael Kebles, indirectly.  He knew Mr.
> Wilson was not the altruistic informant he pretended to be.
> (p. 5, emphasis added.)

On page 5 of the Government's Response, Mr. Hutchins specifically cites
the identical Ground Two when writing:  "In this second claim, the movant
asserts:

> The Assistant U.S. Attorney . . . was well aware of the
> statement made by the informant to Agent Force about his true
> ***involvement*** for targeting Teresa Kebles directly and through
> her brother, the Movant Michael Kebles, indirectly.  He knew
> Mr. Wilson was not the altruistic informant he pretended to be.

Mr. Hutchins' substitution of "involvement" for "motivation" is rather shocking and quite unjustifiable. The self-serving substitution is repeated an astonishing *second* time on page 14 and a stupefying *third* time on page 22.

Not satisfied with that achievement, Mr. Hutchins decides to rewrite the rest of Ground Two (see Document 451, page 5 of 13). Through the creative misuse of ellipsis marks, Mr. Hutchins writes on page 5 of the Government Response:

> This presentation of Wilson as a more-highly motivated individual . . . **"deprived the Movant of a fair trial,"** according to the movant. (Emphasis added.)

In fact, immediately preceding the words "deprived the Movant of a fair trial," in the excerpt above, the Movant did not allege that Mr. Wilson was presented "as a more-highly motivated individual". Instead, the Movant actually wrote:

> [Mr. Boma] nonetheless presented [Mr. Wilson] to the jury, by analogy, as a "philanthropic or socially motivated" informant, one who was "fed up with crime or violence in" his community and volunteered his services "in order to help clean up crime in [his] neighborhood or whatever." (Trial Transcript pp. 519-20.) Even if Mr. Wilson's original motivation were as altruistic as he professed and Mr. Boma guaranteed, he quickly abandoned it six months later when he targeted Teresa directly for revenge and through Michael indirectly. **By vouching for Mr. Wilson, Mr. Boma assisted in his deception of the jury, *which was deprived of the information it required to evaluate the***

4

> ***informant's credibility, which <u>deprived the Movant of a fair</u> <u>trial</u>.***

(Emphasis added. See Motion to Vacate, page 5, Ground 2, Document 451.)

*Second*, Mr. Hutchins arrogates unto himself the right to speak for the Movant, and in his name, when telling this Court what the underlying basis of the 2255 Motion is really all about, as exemplified by these eight excerpts from the Government's Response:

1.   "However, all three alleged grounds for relief are related.  They all concern the fact . . . that the defendant's sister, during the undercover operation, called the Government informant, Robert "Bob" Wilson, the "n word'". (Page 4)

2.   "The third claim of the movant relates to alleged ineffectiveness of counsel also dealing with the inappropriate vernacular used by his sister when she was dealing with informant Wilson."  (Pages 5-6)

3.   ". . . the movant next complains that this same issue about the "n word" morphed into prosecutorial misconduct."  (Page 14)

4.   ". . . it is hard to see how the movant can allege that his counsel erred in not specifically including the claim that the movant's sister made a nasty racist remark about a Government witness . . . that supposed failing certainly was not ineffective assistance of counsel."  (Page 17)

5.   "The movant, basing the complaint again on the use of the 'n word' by his sister . . ."  (Page 22)

6.   "The movant's then-counsel was not ineffective regarding not telling the jury that the movant's sister used an ugly racist term in referring to the informant in the informant's presence . . ."  (Page 26)

7.   "As set out above, the third claim of the movant relates to alleged

ineffectiveness of counsel, also dealing with the inappropriate language employed by his sister (apparently but once) when she was dealing with Wilson . . ." (Page 26)

8.   "As for the effectiveness of his counsel, the movant cannot demonstrate that his counsel, in keeping out racist language emanating from his family, committed an error of omission." (Page 33)

In every one of these supposedly clever distortions of the Movant's unambiguous statements, Mr. Hutchins manages to omit *informant motivation*, which is the true subject of the Movant's grievance implicating informant perjury, prosecutorial misconduct, and ineffective assistance of counsel.  The cumulative effect of Mr. Hutchins' transparently misleading (and unfortunately unauthorized) revisions is so staggering that the Movant feels compelled to reassert and reaffirm what his Motion to Vacate is really all about:  the statement made by the informant, Robert Wilson, on Bates page 460, paragraph 11, on August 26, 2003:  that his "motivation for making controlled purchases from Teresa [Kebles]" was the fact that Teresa had angered him by calling him [a derogatory name] "and that was [his] motivation."

*Third*, Mr. Hutchins alleges that "motivation" is simply too amorphous and too imponderable a concept to be used in court.  On p. 19 of his Response, he writes:  "Motivation, of all emotions, is a very mixed affair -- as recognized by actors who attempt to portray characters doing particular

6

exploits. Legally, of course, motivation to do anything is a difficult thing to quantify or to summarize."  In support of that dubious claim, he calls the District Court's attention to *Colorado* v. *Connelly*, 479 U.S. 157, 165-166 (1986), which he summarizes as meaning "the job of the courts is not to 'divine a defendant's motivation for speaking or acting as he did' regarding confessions, if there is no Government misconduct."  The confession to which Mr. Hutchins is here referring is Mr. Wilson's, which he made on August 25-26, 2003, regarding his "motivation for making controlled purchases from Teresa [Kebles] . . ." (See DEA Report of Investigation, Bates pages 458-61.)  There was indisputably "no Government misconduct" involved in the informant's confession.  And so Mr. Hutchins is presenting *Colorado* v. *Connelly* as a veritable order from the Supreme Court to this District Court to refrain from divining Mr. Wilson's "motivation for speaking or acting as he did", during his service as a DEA informant.  In fact, a citation more inappropriate than Mr. Hutchins' citation of *Colorado* v. *Connelly* can scarcely be imagined.  That case began, coincidentally, in the city of Denver in 1983.  Entirely on his own initiative, Francis Connelly approached Denver police, waived his *Miranda* rights, and voluntarily confessed to having committed a murder in 1982.  In pre-trial proceedings that followed, Mr. Connelly claimed to be following the "voice of God" who

told him "either to confess to the killing or to commit suicide." *Connelly*, 479 U.S. at 161. Finding he was suffering from a "psychosis [that] motivated his confession" the trial court suppressed his confession and waiver of his Constitutional rights, saying that although "the police had done nothing wrong or coercive in securing [his] confession, Connelly's illness destroyed his volition", making his confession and waiver "involuntary". *Id.* at 162. The Colorado Supreme Court affirmed that decision pursuant to the Due Process clause of the Fourteenth Amendment. But the U.S. Supreme Court reversed it, Chief Justice Rehnquist writing:

> The difficulty with the approach of the Supreme Court of Colorado is that it fails to recognize the essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other. The flaw in [Connelly's] constitutional argument is that it would expand our previous line of "voluntariness" cases into a far-ranging requirement that courts must ***divine a defendant's motivation for speaking or acting as he did*** even though there be no claim that governmental conduct coerced his decision.

> *Id.*, at 165-66.

*Colorado* v. *Connelly*, quite clearly, bears no relevance whatsoever to Mr. Wilson's August 2003 confession regarding cocaine distribution and his illegal motivation for serving as an informant. He was never charged with a crime, never waived his *Miranda* rights, never tried to retract his

confession, never invoked the Due Process Clause of the Fourteenth Amendment, was never found to be suffering from a psychosis, and never claimed to be conversing with God. Furthermore, Mr. Hutchins radically misconstrues the Supreme Court's admonition against "divin[ing] a defendant's motivation for speaking or acting as he did even though there be no claim that governmental conduct coerced his decision." The Chief Justice was referring to an *uncoerced* and therefore Constitutionally *voluntary* confession that *obviated* the need to "divine a defendant's motivation" for confessing, precisely because the confession was voluntary and the motivation was therefore irrelevant. He most certainly was not denying the right and the necessity of a court to ascertain a defendant's motivation for testifying as he did, or an informant's motivation for engaging in controlled purchases of illegal drugs. Mr. Hutchins' citation of *Colorado v. Connelly*, therefore, is not simply misleading. It is flamboyantly misleading.

### THREE GOVERNMENT ARGUMENTS

### I. Informant's Confession is Suspect

Mr. Hutchins strongly insinuates that Mr. Wilson's admission regarding his motivation to engage in controlled purchases is inherently unreliable because when making it, he "was on the defensive", (pp. 18-19); "talking to an [upset] agent" (p. 19); "like a kid caught at the cookie jar" and making a "flustered statement" (pages 18-20). But the accusation of cocaine

9

distribution was not made by a DEA agent.  It was merely *conveyed* by a

DEA Agent to Mr. Wilson from his accuser, Teresa Kebles.  If anyone "was

on the defensive", it was clearly Ms. Kebles herself, whose allegation

sounded perfectly ridiculous, coming, as it did, from a defendant then

facing federal felony charges as a consequence of Mr. Wilson's allegations

*against her.*  Under the circumstances, all Mr. Wilson had to do was deny

her allegation, for which there was no evidence whatsoever, and that would

have been the end of it.  Instead, in an unprecedented moment in informant

history, Mr. Wilson actually confessed to his former target's allegation

*against him*, and lost his DEA job because of it.  Far from being "like a kid

caught at the cookie jar", Mr. Wilson was behaving more like young George

Washington, candidly confessing to chopping down the legendary cherry

tree, and candidly explaining his motivation for being a cherry-tree chopper.

There is, however, one notable difference between the two stories:  the

cherry tree was merely apocryphal, while the cocaine was all too real.

## II.  Inflammatory Race Issue

*Second*, Mr. Hutchins claims that a "'normal defendant'" would not want to

be associated with the use of  the 'n word'" (p. 28).  Its alleged use by the

Movant's sister is proof they are *both* "racists" (p. 30) and come "from a

family of racists" (p.32).   "That apparent racism would not, and should not, gain jury empathy in the District of Colorado." (p. 30).   Unfortunately, in his haste to exploit the race issue for everything it is worth, Mr. Hutchins forgets his own eloquent plea, on page 28, for "calm color-blind logic [rather than] hate and emotion . . . Certainly, racist and derogatory names are always to be avoided, if possible."   Furthermore, Mr. Hutchins forgets his own brilliant diagnosis of the Kebles siblings, which he presented to the Tenth Circuit in his appellate brief, in which he wrote:

**Surely, the [Movant, Michael Kebles] is not arguing that the sister [Teresa Kebles] was the mere extension of the brother.  They apparently are not twins, much less co-joined twins.  They are separate, volitional beings, in law and in fact.**

(See Appellate Case, 07-1485, Document 0101154350, pages 46-47.)

Surely Mr. Hutchins "is not [now] arguing that the sister *is* the mere extension of the brother" or vice versa.  Mr. Hutchins cannot plausibly (or consistently) accuse the Kebles siblings of being Siamese-twin racists in District Court after having already diagnosed them as being "not twins, much less co-joined twins" in the Court of Appeals.  His desire to taint Michael with the unproven racial allegation hovering over Teresa is palpable, but quite unjustifiable.  And as for the jurors, they would have been fair-minded enough not to have convicted the Movant on the basis of one unproven allegation made by the informant about his sister, unless Mr. Hutchins is advocating guilt by association, which, like racism, "would not,

11

and should not, gain jury empathy in the District of Colorado." (p. 30).

With regard to the inflammatory racial issue, Mr. Hutchins attempts three more peculiar arguments, all three of them notably unsuccessful.  On page 28 he writes:  "Although the reasoning has varied, depending on the enlightenment of the particular era, it long has been considered highly inappropriate and prejudicial to use that [n] word, especially in legal proceedings . . ."  But so-called "enlightenment" makes a poor, and a highly ironic excuse for keeping the jury in the dark as to the informant's true motivation.  On pages 28-29, Mr. Hutchins next cites, quite inexplicably, *United States* v. *Frasch*, 818 F.2d 631, 634 (7th Cir. 1987).  In that case, the defendant claimed he was prejudiced by the trial court's refusal to **_redact his own_** racially derogatory remarks from tape-recorded evidence being used, at the trial, **_by the prosecution against him,_** which is completely the reverse of the present case, in which the Movant alleges his own defense counsel was ineffective for not using incriminating evidence against his chief accuser, the informant.  And finally, on page 32, Mr. Hutchins writes:  "In addition, the detrimental (for the movant) information in this [racially derogatory] discovery, quite ethically, was not exploited by the Government."  This world-turned-upside-down allegation comes dangerously close to proclaiming the Government actually had an ethical obligation to deceive the jurors, who were indeed deceived by Mr. Boma's misleading presentation of Mr. Wilson.

### III.  Experienced Counsel Utilizing Reasonable Trial Strategy

Mr. Hutchins seeks to immunize the defense counsel, Mr. John F. Sullivan, III, against the Movant's claim of ineffectiveness by alleging, an exorbitant seven times, that Mr. Sullivan was a capable trial attorney implementing a reasonable trial strategy:

1.  "the experienced defense counsel" p. 15;

2.  "the logical (and almost successful) defense strategy at trial" p. 26;

3.  "the clever and well-built defense strategy put together by the movant's counsel" p. 26;

4.  "the hard-hitting defense at trial masterminded by his experienced counsel" p. 29;

5.  "this experienced (and often successful) counsel . . . exercising 'reasonable trial strategy'" p. 31;

6.  "the defense trial strategy (which almost succeeded) p. 32; and

7.  "the rational theory of the defense as developed by the defendant's counsel" p. 33.

But, says Mr. Hutchins, that "defense at trial masterminded by his experienced counsel" "would [have] been mess[ed]" up (p. 30) by any reference at trial to the informant's corrupt motivation.  And so, Mr. Hutchins reassures this Court that Mr. Sullivan wisely withheld the supposedly confusing and contaminating information from the judge and

jury in a stellar example of *effective* assistance of counsel.  As proof for this

astounding and stupefying allegation, Mr. Hutchins seizes (p. 29) upon one

solitary statement made by the defense counsel in his closing remarks to

the jury:

> It also allowed [Wilson the informant] to gain the trust of Teresa.
> And that's what goes to the inducement part.  You don't expect
> a government agent to give you drugs.  It establishes in a very
> dark way trust between an agent [sic] and the informant.  That
> trust between [him] and Teresa enabled her to pull Michael in.
> Because the sympathy and familial relationships, all this can be
> considered in entrapment.  When he got her, he got him.  And it
> was by giving her cocaine that she could trust him and
> therefore she could tell Michael, hey, you can trust this guy. But
> that's okay.  They got the drugs, so don't worry about
> prosecuting him [the informant], he's a great guy, philanthropic
> or whatever he said.
>
> [Trial Transcript, pp. 696-97.]

On page 30 of his Response, Mr. Hutchins attempts to explain the

significance of Mr. Sullivan's closing remarks to the jury:

> Thus, to have Teresa's inducement be the movant's
> inducement, the defendant's counsel had to emphasize that the
> close and friendly relationships included, not only family siblings
> Teresa and Michael, but included Wilson, as well.  The
> introduction of the "n word" into the proceedings would mess
> this defense theory up.  It would show Teresa to not be so
> chummy with Wilson -- which would detract from the
> presentation of Wilson as a sort of Judas-like betrayer.

Mr. Hutchins' reference to "the presentation of Wilson as a sort of Judas-

like betrayer" would be much more effective if it actually appeared in the

Trial Transcript, which, of course, it does not.  Whether or not Mr. Sullivan's

statement above represents his central defense strategy, or merely an

auxiliary defense theory, it cannot be said to have been logical, clever, well-

built, hard-hitting, or reasonable.  Nor was it "masterminded" or "almost

successful".  In fact, Mr. Sullivan's statement to the jury sets forth the

invalid legal doctrine of *vicarious entrapment:*  (Mr. Wilson entrapped

Teresa and Teresa entrapped Michael, so Mr. Wilson entrapped Michael),

which is a counterfeit version of entrapment that every federal court in the

United States has rejected, and the jury obviously rejected as well.  Nor

would this very District Court have granted an entrapment jury instruction

on all four relevant counts if it had believed the defense theory was

founded upon vicarious entrapment. (See Trial Transcript, pp. 578-79; 580-

82; 589; 592; 595-599; 602-05; 608-10.)  Accordingly, if telling the jury

about Mr. Wilson's true motivation for serving as an informant would have

"messed up" a faulty defense theory of vicarious entrapment, then the jury

should definitely have been told all about it.

On page 27, Mr. Hutchins writes:  "If anything, there is a presumption that a

defense counsel was competent and rendered effective assistance.  See

*Lufkins* v. *Solem*, 554 F.Supp. 988, 993 (D. S.D. 1983), *affirmed*, 716 F.2d

532 (8th Cir. 1983), *cert. denied,* 467 U.S. 1219 (1984)."  Mr. Hutchins'

citation of *Lufkins* is quite peculiar, considering the fact that the U.S. District

Court there reversed the Supreme Court of South Dakota in order to

**uphold** Mr. Lufkins' claim of ineffective assistance of counsel:

> [Lufkins'] trial counsel is an experienced attorney who has been a member of the South Dakota bar for thirty-five years.  He has represented a significant number of criminal defendants in that time.  A court reviewing a defense attorney's work should not sit merely to second-guess the attorney with the benefits of hindsight.  Even with due regard to his experience, however, counsel's conduct of the defense must still meet the standard that an attorney should 'exercise the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances.  Under the circumstances of this case, [Lufkins'] counsel did not meet this standard.  (All citations omitted.) 554 F.Supp. at 994.

[Lufkins] had given a statement to the authorities implicating himself in a

homicide.  At the time of the trial, counsel knew that his client claimed the

statement was both involuntary and inaccurate. *Id.* at 994.

> A reasonably competent attorney exercising minimal skill in the representation of petitioner would have sought to test the voluntariness of his client's statement . . . A perfunctory objection such as counsel's in this case does not meet basic standards of representation.  The Court can only conclude that counsel did not make a specific objection on due process grounds because counsel was unaware of the due process dimension of holding the voluntariness hearing in the jury's presence . . . Counsel in this case seems to have formed the opinion that his client's statement was voluntarily given. Indeed, at trial, counsel bolstered [the police opinion] as to

voluntariness.  The instances in which the Eighth Circuit upheld an attorney's a decision not to prosecute available procedures were instances where such prosecution was obviously doomed to failure.  Petitioner's voluntariness claim was not so obviously condemned." (Citations omitted.) *Id.*, at 995 . . .
The evidence compels the conclusion that a writ of habeas corpus is appropriate." *Id.*, at 996.

## The Significance of Mr. Wilson's Unused Confession

*First*, during his service as a DEA informant, Mr. Wilson had legal

authorization to engage in Otherwise Illegal Activity, as defined by the

*Attorney General's Guidelines Regarding the Use of Confidential*

*Informants.*  But that extraordinary authorization was granted on the

condition that it be used to help enforce the drug laws of the United States.

Specifically, Mr. Wilson, as an informant, was legally authorized to engage

in otherwise illegal activity "merely [to] afford opportunities or facilities for

the commission of [an] offense. . . The appropriate object of this permitted

activity, frequently essential to the enforcement of the law, is to reveal the

criminal design . . ." *Sorrells* v. *United States*, 287 U.S. 435 (1932).

According to his own confession, however, the criminal design originated

with *him*.  *Sorrells,* at 442.  Mr. Wilson was radically, indeed, illegally

misusing that authorization for the basest and crudest of motives, i.e., to

avenge a perceived racial insult.  As an angry avenger of alleged racial

17

defamation, he was no longer interested (if he ever was) in "merely afford[ing] opportunities or facilities for the commission of [an] offense."  He was, instead, doing what the Supreme Court condemned in its first entrapment decision:  inciting and creating crime for the sole purpose of prosecuting and punishing it, *Id.,* at 444, grossly abusing the "authority given for the purpose of detecting and punishing crime, and not for the making of criminals . . ." *Id.*, at 441.  This information was indispensable to the jurors' evaluation of the Movant's entrapment defense, yet it was withheld by Mr. Boma and Mr. Sullivan as well.

*Second*, Mr. Sullivan's inexplicable failure to use the confession specifically undermined his own rational and even brilliant defense strategy -- not the auxiliary vicarious entrapment argument that Mr. Hutchins cites in a masterpiece of convoluted misdirection -- but the government corruption strategy, about which Mr. Sullivan told the jurors:

> However, where the government and I part ways is it does matter how you charge people. It does matter how you gather evidence. And it's important that you do things the right way, and the reason is because when you don't, you get innocent people. You get them caught up in the system that is designed to grind them in and get them in jail, to keep them away from the public, and in some cases, that's perfectly fine. But if you don't do things the right way, then that's a problem. It violates justice. And the government, I submit, has focused completely on the results of this case and not on the

methods. Not at all. When anybody can stand here and tell you that it is a smoke screen or it is irrelevant that a confidential informant getting paid by the Drug Enforcement Administration is giving cocaine to people on the street who have no drug history, no convictions, that is a smoke screen for us to stand up here and argue with, that's a problem. That offends the ten years I was a prosecutor and the experiences I've had. I've handled informants. That's a problem to me. That's not a smoke screen. Sometimes it's hard to sit there and listen to that. But I can tell you two things, and they're the two things I told when you I started today. They have to do a better job, and the ends do not justify the means. [Trial Transcript, pp. 685-86.]

Now, the thing that I don't understand beyond all of this is this memo. Now, you look at this memo, and you say, okay, on its face, it was written January 26, 2004. It's written by Carl Force. And it says, In my opinion, he has contributed considerably to file no., blacked out, such that I have told him that I intend to suggest compensation for him. However, I told the source that the amount received is subjective and dependent upon DEA management procedures for confidential-source awards. Further, any such payment will be dependent upon the final disposition of the case. Where is it in that memo that this documents conversation we had a year before? I mean, and as Mr. Boma calls it, meaningless. Your government is writing these kind of memos and saying it's meaningless. So either Wilson's drug use and improper handling of an investigation merits a reward, because that's what the memo says, or the memo's a lie. Either way, it's equally offensive. It was either written to document something but it wasn't backdated; there's nothing in there to document an old report. So in other words, when he wrote it, he knew it wasn't true. Or they're rewarding a guy for dealing drugs. Again, it matters how you get evidence. It matters how you charge people. It matters. That's why entrapment is a very viable and important part of the law. That's why you have an instruction for it. There is cover-up here. There is drug-dealing by a government agent. There is payment, there is incompetence. It's not a smoke screen. It matters how you get to where you're going. The ends do not justify the means. [Trial Transcript, pp. 693-94.]

And then the last government witness is your only eyewitness. Which is Bob Wilson. Agent Force did not see drugs being handed. Bob

Wilson is the only eyewitness to the actual transaction. Just think
about what you, what you heard from the stand, okay. It's your
memory that's important. But if you recall, Force might have
surveilled him going to these locations; but Bob Wilson is the one that
can say exactly what happened while they were close together. Bob
Wilson is the eyewitness. And Bob Wilson is a tragedy. And it's not
because his memory's terrible, because it is. It's -- and it's not
because his lack of detail is substantial, and it's not because he
didn't pay taxes on the money he got, okay, it's not because he
violated his agreements 25 days to Sunday, and it's not because
he agreed to participate because he was a bodyguard for
somebody else who was involved in high-level drug-trafficking
and he beat people up, or whatever he meant by what he meant by
talking about why he became an informant.  It's because he
doesn't care. He doesn't care. He kicked back on that stand
and he just said, hey, you know, that was a long time ago. I
don't remember. And that's okay? Your only eyewitness doesn't care
or doesn't remember or whatever the reason is why he doesn't know
anything, could have been three or four deals. It could have
been -- well, what are the dates. I don't remember. How many
pills, don't know. I win this. This is your case. It doesn't matter,
'cause we got the drugs. Well, were you dealing cocaine to targets.
Maybe once. You know, I was -- You using a lot of cocaine back then.
Hey, man, that was the life style. Oh, okay, well, then, no problem.
You know, not all informants are criminals. There are
some great people that do a lot of great work. And we worked
with them before. But I've never seen anything like that. I've never
seen anybody get up, have no detail, no clue, and not care a bit. And
expect all of us to just say, hey, it's okay, man, however you got him,
you got him. That's what entrapment is for. It's for guys like that.
Well, why don't you -- Bob, why don't you just go read some of the old
police reports, how about if we take you to the scene of where these
supposedly happened, and let's see if your memory is refreshed at
all, let's take you back to the parking lot. No, nothing.
It's just not okay. [Trial Transcript, pp. 694-96.]

_____

*Third*, by failing to make use of Mr. Wilson's confession, Mr. Sullivan failed

to expose to the jury the basic dishonesty and incompetence that pervaded the Government's case throughout the trial.  In his Report of Investigation documenting Mr. Wilson's confession (Bates pages 458-61), Special Agent Carl Force failed to inform the informant that he had just confessed to abusing his authority to engage in Otherwise Illegal Activity, and that such abuse constituted a felony every time he misused it to settle a personal grievance with Teresa Kebles and, by extension, with Michael Kebles.  Agent Force would have been compelled, under oath, to explain whether or not he understood Mr. Wilson's misconduct actually constituted entrapment, and to explain, furthermore, why he failed to report the misconduct as such in his DEA Report.  Mr. Boma, for his part, having presented Mr. Wilson as a "philanthropic or socially motivated" informant eager "to help clean up crime in [his] neighborhood or whatever" (Trial Trans. pp. 519-20), would have appeared to have been dishonest with the jurors once they were informed that Mr. Wilson's desire for revenge had nothing in common with philanthropy or social motivation or "clean[ing] up crime in [his] neighborhood or whatever."  And Mr. Wilson, having just told the jurors that he became a DEA informant because he "wanted to make a difference" in the Drug War, would certainly have been dismissed as just another common criminal informant -- the very classification Mr. Boma called "perjorious" (Trial Trans. p. 519) and struggled so assiduously to avoid.  The dramatic difference in motivations, Mr. Boma's version as opposed to the DEA-documented version, "would reasonably have . . .

troubled" the jury, "would have fueled a withering cross-examination, destroying confidence in" the informant's testimony "and raising a substantial implication that the prosecutor had coached him to give it." *Kyles* v. *Whitley*, 514 U.S. 419, 443 (1995).  Mr. Sullivan would have been able to attack "the thoroughness and even the good faith of the investigation, as well" *Id*., at 445.  And the Government's strenuous denials regarding the DEA Memorandum, promising Mr. Wilson a significant monetary bonus *after* he had been deactivated for cocaine distribution, may well have been dismissed by the jurors as a frantic cover-up of rampant Government corruption and dishonesty.

*Fourth*, Mr. Hutchins argues on page 20 of his Response:  "Finally, even though the movant now thinks that further impeachment of the informant would have changed the result of the trial, that obviously is not so.  As reiterated many times, and as confirmed by the direct testimony to be found in the transcript, Robert "Bob" Wilson was a terrible witness for the Government . . ." Terrible or not, Mr. Wilson was nonetheless presented as a morally-superior informant (despite unused evidence to the contrary) who was as far removed from entrapment as a "philanthropic or socially motivated" informant could possibly get.

*Fifth*, the unused confession demonstrates conclusively that Mr. Boma, in his examination of Mr. Wilson, either led the informant to perjury, or to the

very brink of it.  Their carefully-crafted questions and answers exemplify the kind of deception that was suspected in *Dupart* v. *United States*, 541 F.2d 1148, 1150 (5th Cir. 1976).  There the Fifth Circuit evaluated an Assistant U.S. Attorney's examination of a government witness and concluded: "However, assuming the allegations to be true, such a formalistic exchange of testimony even though technically not perjurious, would surely be highly misleading to the jury, a body generally untrained in such artful distinctions."  On page 19, Mr. Hutchins claims Mr. Boma merely "tried to rehabilitate a near-worthless Government witness . . ."  Of course, if the jurors had known what Mr. Boma knew all too well but shrewdly declined to tell them, the so-called "rehabilitation" of Mr. Wilson would have been an exercise in courtroom futility.  That is precisely the reason Mr. Sullivan should have intervened and presented the jury with the truth. In an indisputable example of ineffectiveness, Mr. Sullivan failed or refused to do so.

## CONCLUSION

On page 19 of his Response, Mr. Hutchins claims the Movant "should [not] get the proverbial 'second bite at the apple.'  See *United States* v. *Gilmer*, 814 F.Supp. 44, 45 (D. Colo. 1992)."  That citation may have been ill-advised and is certainly counterproductive, for in that case, the

Government was represented by Mr. Hutchins himself, and the District Court judge was addressing Mr. Hutchins personally when he wrote:

> "As to the Government's other arguments, I reject them as meritless.   The Government offers no legal authority contrary to my conclusion that it failed to meet its burden of proving that defendant waived his Fifth and Sixth Amendment rights.  ***I decline to give it a second bite at the apple.***  I heard the evidence and judged the credibility of the witnesses in reaching my factual determinations. ***The Government obviously disagrees, in several instances by taking findings out of context and twisting them.***  I believe the record as a whole supports the findings."
>
> (Emphasis added.)

In fact, the Movant is still waiting to get a *first* bite at the apple, legally speaking.   But his Motion to Vacate is about much, much more than that. The Movant's defense counsel, Mr. John F. Sullivan, III, failed or refused to inform the jurors that they were being deceived; that the informant had already confessed that the criminal design originated with him; that Mr. Wilson, far from being a crime fighter trying to cleanse his community of drugs and violence, was actually a classic entrapper deliberately abusing his authority to create crime instead of detect it, all for the purpose of settling a personal grievance. The difference between the two versions is

the difference between effective and ineffective assistance of counsel, and between acquittal and conviction.

The Movant has indisputably demonstrated prejudice arising from his defense counsel's ineffectiveness.  The Motion to Vacate, files, and records of this case do not "conclusively show that the prisoner is entitled to no relief."  *U.S.* v. *Galloway*, 56 F.3d 1239 (10th Cir. 1995). Accordingly, the Movant respectfully requests an evidentiary hearing on his Motion to Vacate.

Respectfully submitted this first day of November, 2010.

Michael Kelba

## CERTIFICATE OF SERVICE

I do hereby certify that I served the foregoing Movant's Reply to the Government's Response upon the Plaintiff-Respondent, the United States of America, on November 1, 2010, by depositing a true, correct, and accurate copy thereof into the United States mail, postage prepaid, and addressed to the Plaintiff-Respondent's attorney at the following address:

Mr. John M. Hutchins
Assistant U.S. Attorney
1225 Seventeenth Street, Suite 700
Seventeenth Street Plaza
Denver, Colorado 80202

Dwane D. Davis

Page 6

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(3) Did you receive a hearing on your motion, petition, or application?

    Yes ❏   No ❏

(4) Did you appeal from the denial of your motion, petition, or application?

    Yes ❏   No ❏

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes ❏   No ❏

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:




**GROUND TWO:**

Prosecutorial Misconduct.

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

The Assistant U.S. Attorney, James R. Boma, was well aware of the statement made by the informant to Agent Force about his true motivation for targeting Teresa Kebles directly and through her brother, the Movant Michael Kebles, indirectly.  He knew Mr. Wilson was not the altruistic informant he pretended to be.  He nonetheless presented him to the jury, by analogy, as a "philanthropic or socially motivated" informant, one who was "fed up with crime or violence in" his community and volunteered his services "in order to help clean up crime in [his] neighborhood or whatever."  (Trial Transcript pp. 519-20.)  Even if Mr. Wilson's original motivation were as altruistic as he professed and Mr. Boma guaranteed, he quickly abandoned it six months later when he targeted Teresa directly for revenge and through Michael indirectly.  By vouching for Mr. Wilson, Mr. Boma assited in his deception of the jury, which was deprived of the information it required to evaluate the informant's credibility, which deprived the Movant of a fair trial.