IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  10-cv-01528-WYD
Criminal Action No.  03-cr-00249-WYD

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  MICHAEL KEBLES,

      Movant.

---

**ORDER**

---

I.    <u>INTRODUCTION</u>

      This matter is before the Court in connection with Michael Kebles' *pro se* Motion

Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence and his

Memorandum in Support of the Motion filed on June 28, 2010.  A response was filed on

August 3, 2010, and a reply was filed on November 1, 2012.

      Before addressing the merits of the motion, I first note that an Order to Show

Cause was issued on November 7, 2011.  The Order asked Mr. Kebles to show cause

why his § 2255 motion should not be denied as moot since he had been released from

the Federal Bureau of Prisons.  A response was filed on November 30, 2012.

Mr. Kebles acknowledged therein that he had been released from custody, but argued

that his § 2255 motion was not moot.  I agree that the § 2255 motion should not be

denied as moot.  Mr. Kebles' motion was filed when he was in custody and challenges

the underlying conviction.  Under these circumstances, Mr. Kebles' "release from

custody does not moot the [2255] request because a conviction carries collateral

consequences that persist even after release."  *United States v. McConnel,* No. 12-

6092, 2012 WL 2626956, at *2 (10th Cir. July 6, 2012) (citing *Spencer v. Kemna*, 523

U.S. 1, 7 (1998)).  Accordingly, the Order to Show Cause is discharged.  I now turn to

Mr. Kebles' § 2255 motion.

II.    FACTUAL BACKGROUND

On August 21, 2007, a jury found Mr. Kebles guilty of five counts relating to the

possession, distribution, and conspiracy to possess with intent to distribute MDMA

("ecstacy") in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 846; and 18 U.S.C. § 2.  The

jury also found that Mr. Kebles had not been entrapped.  Mr. Kebles appealed, and the

Tenth Circuit affirmed.  *United States v. Kebles*, 318 F. App'x 678 (10th.Cir. March 30,

2009) (not selected for official publication).

As noted by the Tenth Circuit, during an undercover DEA investigation, a paid

confidential informant befriended Mr. Kebles' sister, Teresa, who arranged a meeting

with Mr. Kebles so the informant could purchase ecstasy.  *Kebles*, 318 F. App'x at 679.

The meeting took place at Teresa's residence and was recorded.  *Id.*  Mr. Kebles

ultimately sold 601 ecstacy pills to the informant, Robert Wilson, in three separate

transactions occurring over the span of several months.  *Id.*  Mr. Kebles also offered to

sell Mr. Wilson an additional 400 ecstacy pills, which the informant declined to

purchase.  *Id.*  While the DEA did not locate the 400 pills, it did find 77 ecstacy pills in

Mr. Kebles' residence.  *Id.*

The Tenth Circuit noted certain rogue behavior on the part of the informant. Thus, "[w]hile acquiring the ecstacy, the informant violated his agreement with the DEA by illicitly, and without the DEA's knowledge, providing cocaine to Teresa that he consumed with her on several occasions." *Kebles*, 318 F. App'x at 679. "The informant also made several unauthorized phone calls to Mr. Kebles that the DEA did not monitor or record." *Id*. Upon discovery of this rogue conduct, the DEA terminated the informant relationship. *Id*.

On appeal, Mr. Kebles raised four arguments. Three of those argument were raised by Mr. Kebles in his *pro se* supplemental opening brief, which was filed after the Tenth Circuit permitted his counsel to withdraw. *Kebles*, 318 F. App'x at 679. First, Mr. Kebles argued that this Court erroneously denied his motions for judgment of acquittal and new trial based on entrapment as a matter of law. *Id*. Second, he challenged the sufficiency of the evidence respecting count five–possession with intent to distribute the 77 ecstacy pills found in his residence. *Id*. Third, he argued that this Court improperly denied his oral request for a new trial based on newly discovered *Brady* evidence. *Id*. Finally, he argues that this Court "erroneously considered the 'mythical' 400 ecstacy pills as relevant conduct in enhancing his sentence." *Id*. As noted above, the Tenth Circuit rejected Mr. Kebles' arguments and affirmed.

As to the entrapment argument, the Tenth Circuit found that "[t]he evidence in this case "falls far short of pointing conclusively and unmistakenly to entrapment as a matter of law." *Kebles*, 318 F. App'x at 679. "In fact, it clearly shows Mr. Kebles was not induced. *Id*. In explanation, the Tenth Circuit stated:

-3-

That the informant made numerous phone calls (both authorized and unauthorized) to Mr. Kebles after the first purchase, even assuming an average of two to three calls per week, does not constitute persuasion and harassment. That the informant occasionally provided Teresa with cocaine may qualify as inducement of *Teresa*, but it does not, without more, translate into inducement of Mr. Kebles. The informant simply used Teresa as an intermediary. Contrary to Mr. Kebles' assertion, moreover, there is no evidence the informant made a plea "based on need, sympathy or friendship.". . .The evidence does not show that Mr. Kebles even knew the informant gave his sister cocaine. Thus, Mr. Kebles' entrapment defense necessarily fails because the government sufficiently disproved inducement . . . .

*Id.*

Mr. Kebles' *Brady* argument arose from the informant's criminal history. Prior to trial the government disclosed a record of a 1985 arrest for aggravated car theft for an individual with the same name and birth date as the informant, and informed Mr. Kebles that the informant denied he was this individual. *Kebles*, 318 F. App'x at 681. This arrest did not result in a conviction. *Id.* The government advised that any reference to this arrest would lack a good faith basis and constitute an improper impeachment attempt. *Id.* However, after trial and shortly before sentencing, Mr. Kebles discovered the informant was in fact the person who was arrested for aggravated car theft in 1985. *Id.* Mr. Kebles "orally requested a new trial, contending this new evidence was significant because it showed the informant lied to the government about his prior criminal history and his supposed altruistic motive for working with the DEA." *Id.* He also argued that the evidence could be used to impeach the informant's credibility. *Id.* at 681-82. This Court denied the motion. *Id.* at 682.

-4-

On appeal, the Tenth Circuit found that a new trial was not warranted. *Kebles*, 318 F. App'x at 682. It found that this evidence was "immaterial" as, among other reasons, "[t]he Federal Rules of Evidence require a *conviction* for impeachment–not simply an arrest." *Id.* (emphasis in original). The Tenth Circuit also stated that, even if it assumed the evidence could have lead to *other* evidence that revealed government cooperation, . . . [it] still would not reach a different result." *Id.* It then stated:

> The jury heard testimony that the informant was paid for his participation in the undercover investigation. The jury already knew, therefore, that the informant's motivation was not purely altruistic and that he had a financial interest in catching drug dealers. In sum, it is not reasonably probable that this impeachment evidence would have altered the jury's verdict.

*Id.*

III.   ANALYSIS

Defendant's motion raises three grounds for collateral review of his conviction: (1) alleged informant perjury, (2) prosecutorial misconduct, and (3) ineffective assistance of counsel. The Government concedes, and I find, that the motion was timely filed.

As to the merits, I must construe liberally the § 2255 motion because Mr. Kebles is representing himself. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, I should not be the *pro se* litigant's advocate. *See Hall*, 935 F.2d at 1110. After reviewing the entire file, I find that an evidentiary hearing is not necessary. For the reasons stated below, the § 2255 motion will be denied.

All of the issues raised by Mr. Kebles relate to evidence in the form of a DEA Report of Investigation dated August 27, 2003 (Bates Nos. 000458-000461) in which Special Agent Carl Force debriefed the informant in this case, Robert Wilson [hereafter "the DEA Report"].  (United States' Resp. to Order to Answer Mot. Pursuant to 28 U.S.C. ¶ 2255 ["Gov.'s Resp."], Attach. 2.)  During the debriefing, which occurred on August 25-26, 2003, Mr. Wilson admitted to providing cocaine to Mr. Kebles' sister, Teresa Kebles, whom he used as an intermediary for obtaining MDMA or Ecstasy tablets from Mr. Kebles.  The DEA Report also states in pertinent part on page three, paragraph 11:

> S/A Force asked the CS what his/her motivation for making controlled purchases from Teresa and the CS answered that Teresa angered him/her by calling the CS a "nigger" and that was his/her motivation.

(*Id.* ¶ 11, Bates No. 000460.)  This evidence was not offered or introduced at trial.

On cross-examination during trial, defense attorney John F. Sullivan, III asked Mr. Wilson about the beginning of his DEA Tenure:

> Q:  Were you upset when you started working for the DEA, was that tough for you?
>
> A:  Working with them was not difficult at all.  It was the people that I had to bring myself around on a daily basis that I did not want to be around because in life sometimes you have to put things behind you.  And, yes, I did do things that I should not have done, but times come in your life when you have to change that, and that's what made me come to them [DEA] because I wanted to make a difference.

(Trial Transcript, Trial to Jury, Day 2, at 403:18 - 404:1, ECF No. 421 ["Trial Tr. Day 2."])

During direct examination, government counsel James R. Boma asked Mr. Wilson to elaborate.  The following exchange occurred:

Q: . . .And you mentioned that you weren't interested in money.  What were you interested in?  Why did you go to the DEA in this case or when you, when you initially approached them?

A.  Do you want me to speak about what I was involved in?

Q:  I'd like you to explain why, why you went to the DEA and what – yeah, what your reasons were.

You weren't interested in the money; what was the motivation is what I"m asking.

A:  Seeing people hurt.

Q:  What do you mean by that, sir?

A:  Hurt by drugs.

Q:  All right.  Was that based on your experience and the experience of others?

A:  Yes, and what I did do for years, people or drug dealers would come to me and my friends, my acquaintances, and would want protection.  And I did do that, and that's – but I never dealt drugs.  That's what we did.

Q:  All right.  Was it a bodyguard function?

A:  Yes.

Q:  All right.  And you and other people that you knew –

A:  Yeah.

Q:  – did it.

Q:  All right.  And at some point, you decided you'd had enough?

A:  Well, there was a shootout, yeah, and that's when decided [sic] I'm going to    . . . I got to get out, I got to just get away from it.

Q:  All right.  And you weren't involved in the shooting, but you were present when that occurred?

A: In many, yeah.

Q:  All right.  But so you saw people being hurt?

A:  From the drug use or the guns, year, either or.  They're all kind of intertwined.

Q:  Is that in effect your motivation, then, to approach the DEA?

A.  That's what – I was kind of too, too hard, too hardheaded to be scared. So maybe I had 15 minutes of . . . a clear head.  To make a conscious decision to – that I had to change.

Q:  All right.  And that's what drove you literally, I guess, to DEA?

A.  I went to them.

Q:  And you don't have any expectation of receiving any money as a result of this case in court here today?

A: I have my own job.  I don't need them.

Q: All right.  But do you expect to receive any money from the government?

A:  Don't want anything.

(Trial Tr. Day 2 at 418:15-420:11.)

Mr. Kebles argues that Mr. Wilson's motivation to serve as a DEA informant, as stated in his testimony in court, cannot be reconciled with his motivation for dealing with Teresa Kebles, as stated in the DEA Report in regard to his debriefing.  He further argues that Mr. Wilson's "trial testimony was a courtroom fabrication contrived for the purpose of misleading the jury and it succeeded", and that "[i]t was perjury".  (Mem. of Law in Supp. of Mot. Pursuant to 28 U.S.C. § 2255 [Movant's Mem."], ECF No. 451-1.)

-8-

Related to this, Mr. Kebles argues prosecutorial misconduct on the part of government counsel Mr. Boma in that, notwithstanding documentary evidence to the contrary, Mr. Boma "strenuously asserted the purity of the informant's motivation." (Movant's Mem. at 7.)  He points to Mr. Boma's cross-examination of the defense expert witness, Mr. Michael Levine, regarding the different types of informants, including those "who volunteer their services because they're fed up with crime or violence in their community and they offer their services knowing the risk and agreeing to undertake dangerous, potentially dangerous, jobs in order to help clean up crime in their neighborhood or whatever?"  (Trial Transcript, Trial to Jury, Day 3, at 520:12-17, ECF No. 422 ["Trial Tr. Day 3"].)

Mr. Kebles argues that "Mr. Boma presented the informant as a high-minded, public-spirited, anti-drug crusader who was working tirelessly with the DEA to cleanse his community of drugs and violence."  (Movant's Mem. at 10.)  He further asserts that "Mr. Boma's misconduct was the severest kind of misconduct conceivable, aiding the informant's deception of the jury by making provocative and false statements of his own."  (*Id.*)  According to Mr. Kebles, the jurors were entitled to the information about the informant's true motive for buying drugs from Teresa Kebles and needed it to evaluate his entrapment defense–particularly the issue of inducement–but Mr. Boma deprived them of it.  Mr. Kebles concludes that "a reasonable jury properly informed as to the informant's true motivation would have had abundant evidence of inducement and abundant grounds for acquittal."  (*Id.* at 11.)  Thus, he argues that the prosecutorial misconduct caused him substantial prejudice, rendering the trial unfair.  (*Id.*)

Finally, Mr. Kebles argues ineffective assistance of his trial counsel Mr. Sullivan in regard to his failure or refusal to use the evidence in the DEA Report to impeach the informant. He asserts that this was "the single and most important piece of information in his possession" (Movant's Mem. at 11), as it was, in effect, a confession that the informant "*induced* Teresa Kebles and her brother Michael to violate the drug laws so that he might incriminate both and thereby satisfy his desire to avenge Teresa's alleged racial insult." (*Id.*) Mr. Kebles further asserts that the informant's "well-documented hatred for [Teresa] provided Mr. Wilson with a motive to induce and entrap her and Michael as well" as "his hatred of the sister necessarily carried over to the brother. . . ." (*Id.* at 12.) It is argued that the entire trial would have been dramatically altered by the DEA Report that revealed the informant's motive, and that Mr. Sullivan's representation was ineffective in failing to introduce this to the jury.

I agree with the government that the first two arguments–alleged perjury by the informant and alleged prosecutorial misconduct by government counsel Mr. Boma– are barred. Claims previously considered and disposed of on direct appeal may not be reasserted in a § 2255 action. *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994); *United States v. Prichard*, 875 F.2d 789, 791 (10th Cir. 1989). In addition, a motion to vacate pursuant to § 2255 is not available to test the legality of a matter that should have been raised on direct appeal. *See United States v. Allen*, 16 F.3d 377, 378 (10th Cir. 1994). Mr. Kebles is barred from raising in a § 2255 motion a procedurally defaulted claim "unless he can show cause for his procedural default and

actual prejudice resulting from the alleged errors, or can show that a fundamental miscarriage of justice will occur if his claim is not addressed." *Id.*

To demonstrate cause for his procedural default, Mr. Kebles must show that some objective factor external to the defense impeded his ability to comply with the relevant procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *United States v. Salazar*, 323 F.3d 852, 855 (10th Cir. 2003). A fundamental miscarriage of justice occurs when "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496; *see also United States v. Cervini*, 379 F.3d 987, 991-92 (10th Cir. 2004). A "substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). To demonstrate a fundamental miscarriage of justice, Mr. Kebles first must "support his allegations of constitutional error with new reliable evidence. . . that was not presented at trial." *Id.* Mr. Kebles then must demonstrate "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327.

Mr. Kebles does not dispute the fact that his first two claims are procedurally defaulted, other than to suggest that the DEA Report was not part of the appellate record. While the government raised the issue of procedural default in its response, Mr. Kebles made no fact-based attempt to demonstrate cause and prejudice or a fundamental miscarriage of justice.

Further, as to the first claim alleging perjury on the part of the informant in connection with his motivation, Mr. Sullivan (Mr. Kebles' trial and appellate counsel)

sufficiently raised this issue to have that prior defense position act as a bar to raising it again.  While not mentioning the hearsay fact that Mr. Kebles' sister called the informant a racist name, Mr. Sullivan argued on appeal that Mr. Wilson's "motivation for becoming an informant was an important issue in trial" and that his stated "motivation to get drugs off the street that were hurting people" was not his "real motivation".  (Appellant's Reply Brief at 10, Attach. 3 to Gov.'s Resp.)  In addition, once Mr. Kebles took over his own appeal, he had an opportunity to advance this claim by arguing for the relevance of the DEA Report and the connection with the previously raised assertion that the defense was frustrated in presenting the full story of Mr. Wilson's motivation.  Indeed, the Tenth Circuit allowed Mr. Kebles to file a *pro se* Supplemental Opening Brief.  (Attach. 6 to Gov.'s Resp.)

In now justifying the raising of this impeachment issue in the 2255 proceeding, Mr. Kebles asserts that the DEA Report was not introduced into the trial record, was not in the Record on Appeal, and that he did not believe it was not available for direct appeal.  However, as the government notes, this does not tell the whole story.  While the DEA Report, Bate-stamped and provided to the defense as part of pretrial discovery, was not introduced as a trial exhibit by the defense, Mr. Kebles moved, without Government opposition, to supplement the appellate record with, among other items, the DEA Report at issue.  (*See* Appellant's *Pro se* Mot. to Supplement the Appellate R. and to Request a Further Extension of Time in Which to File the Appellant's Pro se Supplemental Opening Br. at 1, Attach. 4 to Gov.'s Resp.)  However, Mr. Kebles' motion did not advise the Tenth Circuit that he needed the DEA Report to

demonstrate perjury of a witness (or misconduct by the prosecution) or for any other reason. (*Id.*)  Therefore, not surprisingly, the Tenth Circuit said that it would examine the entire trial record, but would not expand the record to include items outside of the district court record.  (Order filed September 12, 2008 at 2, Attach. 5 to Gov.'s Resp.)

Nonetheless, even though Mr. Kebles says that the appellate record lacked this document, the legal issue regarding the credibility of Wilson as to his motivation has been raised previously in the direct appeal.  Indeed, the Tenth Circuit said that the jury knew "that the informant's motivation was not purely altruistic. . . ."  *Kebles*, 318 F. App'x at 682.  Just because Mr. Kebles now wishes the Court to consider an additional document and refine the conclusion of the Tenth Circuit on the lack of purity of Mr. Wilson's motives does not mean that he should get the proverbial "second bite at the apple", especially since the DEA Report at issue is not newly discovered.  *See United States v. Gilmer*, 814 F. Supp. 44, 45 (D. Colo. 1992) (government did not get another chance to introduce more evidence).  Accordingly, this claim is procedurally-barred.  *United States v. Frady*, 456 U.S. 152 (1982); *United States v. Dago*, 441 F.3d 1238, 1243-1244 (10th Cir. 2006).

The second claim of prosecutorial misconduct–that government counsel Mr. Bohn improperly vouched for his witness or otherwise acted improperly in introducing testimony about the informant being altruistic when he knew from the DEA Report that this was false–could also have been raised in the direct appeal.  The Tenth Circuit has made clear that a litigant, through counsel or otherwise, may assert on a direct appeal that a prosecutor has crossed over an ethical line during the conduct of

the trial.  *See, e.g., United States v. Rogers*, 556 F.3d 1130, 1140-1143 (10th Cir. 2009)

(claims regarding allegedly improper prosecutorial closing argument).  While counsel for

Mr. Kebles did not believe this to be the situation, at least regarding any prosecutorial

"hiding of the ball" regarding other negative information about the informant, *Kebles*,

318 F. App'x at 682 n. 3, this could have been raised by Mr. Kebles himself when he

took over the appeal and filed a supplemental opening brief.  Indeed, Mr. Kebles argued

the related issue that the informant lied about "his criminal record and his real motives

for becoming a DEA Informant."  (Appellant's *Pro Se* Supplemental Opening Brief at 5,

Attach. 6 to Gov.'s Resp.)

Accordingly, I find that Mr. Kebles' first and second claims may be dismissed as

procedurally barred.  However, for the reasons stated below, I also find that the claims

lack substantive merit.

First, as to the alleged perjury by the informant, I note that Mr. Kebles cites

*Napue v. Illinois*, 360 U.S. 264 (1959).  That case held:

> The principle that the State may not knowingly use false evidence, including
> false testimony, to obtain a tainted conviction,. . . does not cease to apply
> merely because the false testimony goes only to the credibility of the witness.
> The jury's estimate of the truthfulness and reliability of a given witness may
> well be determinative of guilt or innocence, and is upon such subtle factors
> as the possible interest of the witness in testifying falsely that a defendant's
> life or liberty may depend. . . . "A lie is a lie, no matter what its subject, and,
> if it is any way relevant to the case, the district attorney has the responsibility
> and duty to correct what he knows to be false and elicit the truth. . . . That the
> district attorney's silence was not the result of guilt or a desire to
> prejudice matters little, for its impact was the same, preventing, as it did, a trial that
> could in really sense be termed fair."

*Id.* at 269-70 (quotation omitted).  I further note that "[t]he prosecution's knowing solicitation

of, or failure to correct, perjured testimony violates the defendant's due process rights and will be grounds for a new trial 'if the false testimony could in any reasonable likelihood have affected the judgment of the jury.'"  *United States v. Henderson*, 179 F. App'x 535, 540 (10th Cir. 2006) (quoting *United States v. Vaziri,* 164 F.3d 556, 563 (10th Cir.1999)).

In this case, however, I find that Mr. Kebles has failed to demonstrate that the informant committed perjury, let alone that the government solicited perjured testimony. That is because Mr. Wilson's testimony that he became an informant because he had seen people get "hurt" by drugs and for the other reasons he articulated on the stand is not necessarily inconsistent with the motivation he may have had regarding making controlled purchases from Teresa Kebles as referenced in the DEA Report.  He may well have had altruistic reasons for becoming an informant generally with the DEA, even if he later became angered at Teresa for calling him a racist name and decided to buy drugs from her in retaliation.  Indeed, Mr. Kebles acknowledges in his motion that Mr. Wilson did not have contact with Teresa until six months *after* he became an informant, and that he could have originally been motivated by altruistic reasons.[1]  Mr. Wilson was never asked about his motivation regarding Teresa Kebles and his decision to buy drugs from her or sell her cocaine; therefore, it cannot reasonably be inferred that he actually lied on the stand.  Nor can I find that the government presented false testimony through the redirect examination as to Mr. Wilson's motives for becoming an informant.

---

[1]  Specifically, Mr. Kebles wrote, "[e]ven if Mr. Wilson's original motivation were [sic] as altruistic as he professed and Mr. Boma guaranteed, he quickly abandoned it six months later when he targeted Teresa directly for revenge. . . ."  (Movant's § 2255 Mot. at 6, Ground Two.)

-15-

I also find that Mr. Kebles has not shown that the evidence in the DEA Report about Mr. Wilson's motives regarding Teresa Kebles would have changed the outcome of the trial.  On the impeachment issue, the Tenth Circuit noted that the jury already knew that Mr. Wilson's motives were not purely altruistic.  Mr. Kebles argues, however, that the jury was entitled to the information about Mr. Wilson's motive as to Teresa "to evaluate the Movant's entrapment defense, particularly the issue of inducement."  (Movant's Mem. at 10.)  He asserts that the DEA Report shows Mr. Wilson "was, in effect, confessing that he *induced* Teresa and her brother Michael to violate the drug laws so that he might incriminate both and thereby satisfy his desire to avenge Teresa's alleged racial insult."  (*Id.* at 11.)

However, as the Tenth Circuit noted, "[t]hat the informant occasionally provided Teresa with cocaine may qualify as inducement of *Teresa*, but it does not, without more, translate into inducement of Mr. Kebles."  *Kebles*, 318 F. App'x at 680 (emphasis in original).  Indeed, the evidence does not show that Mr. Kebles even knew the informant gave his sister cocaine.  *Id.*  Further, Mr. Kebles has not shown that Mr. Wilson otherwise induced him to sell him drugs, through "persuasion and harassment" or through "a plea 'based on need, sympathy or friendship.'"  *Id.* (quotation omitted).  While Mr. Kebles argues that Mr. Wilson's "well-documented hatred for [Teresa] provided Mr. Wilson with a motive to induce and entrap Michael as well", there was no evidence that Mr. Wilson's motivation regarding Teresa carried over to Mr. Kebles and Mr. Wilson's dealings with him.

Finally, there was substantial evidence in the record apart from Mr. Wilson's testimony that supported the jury's verdict.  As noted by the Tenth Circuit, "the government played [at trial] an audio tape, albeit of poor quality, of the transaction" with Teresa Kebles,

Mr. Wilson and Mr. Kebles where they discussed future transactions regarding the purchase of ecstacy. *Kebles*, 318 F. App'x at  682.  Also, a DEA agent testified that he actually overheard Mr. Kebles offer to sell the informant 400 additional pills. *Id.* Further, "a DEA agent testified that the number of ecstasy pills found in Mr. Kebles' residence far exceeded a personal consumption quantity. . . ." *Id.* Given that evidence, I find that it is not reasonably probable that this impeachment evidence as to Mr. Wilson would have altered the jury's verdict.

I now turn to the argument regarding prosecutorial misconduct on the part of government counsel.  Even if Mr. Boma's questions on cross-examination of Defendant's expert witness Michael Levine could be read as portraying Mr. Wilson to the jury as a "philanthropic or socially motivated" informant or an informant with other altruistic methods, this does not constitute prosecutorial misconduct or improper vouching for the witness.  First, Mr. Boma's questions were in response to the direct examination of Mr. Levine where he testified about the typical motives of informants, including the fact that "[t]hey will lie if they can get away with it.  They will use their informant status to commit crimes, if they can get away with it, because they're criminals."  (Trial Tr. Day 3 at 502:9-12.)  Thus, his questions were fair cross-examination.  Second, Mr. Boma's questions were based on the record from what Mr. Wilson testified to.  As discussed previously, Mr. Wilson was not necessarily lying when he testified about altruistic motives for becoming an informant generally, even if he had a different motive in regard to purchasing drugs from Teresa Kebles.

Further, Mr. Boma did not improperly vouch for Mr. Wilson . "'Argument or evidence is impermissible vouching only if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony.'" *Thornburg v. Mullin*, 422 F.3d 1113, 1132 (10th Cir. 2005) (quoting *United States v. Magallanez*, 408 F.3d 672, 680 (10th Cir. 2005)). Mr. Boma's questions did not explicitly provide personal assurances of Mr. Wilson's testimony, nor did they implicitly indicate that information not presented to the jury supports Mr. Wilson's testimony.

Finally, as to the ineffective assistance of counsel claim, the Supreme Court has established a two-prong test to review such claims. *See Strickland v. Washington*, 466 U.S. 668 (1984). Mr. Kebles must demonstrate both that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance was prejudicial. *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. There is a "strong presumption" that counsel's performance falls within the range of "reasonable professional assistance." *Id.* It is the defendant's burden to overcome this presumption by showing that the alleged errors were not sound strategy under the circumstances. *Id.*

In the case at hand, Mr. Kebles has identified "the acts or omissions of counsel that are alleged not to have been the result of professional judgment." *Strickland*, 466 U.S. at 490. He alleges that Mr. Sullivan was ineffective because he did not present to the jury the evidence of Mr. Wilson's motivation towards Teresa based on her calling

-18-

him a racist name as discussed in the DEA Report.  However, I find that Mr. Kebles has not shown that defense counsel's performance fell below an objective standard of reasonableness.

To determine if Mr. Sullivan's performance was deficient, "the relevant inquiry is whether trial counsel's decision was an informed tactical decision that was reasonable under the circumstances of the case."  *See Brecheen v. Reynolds*, 41 F.3d 1343, 1369 (10th Cir. 1994).  In this case, I find that Mr. Sullivan made an informed tactical decision to present the defense of entrapment by the informant.  He argued that the distribution of cocaine to Teresa Kebles was the equivalent, in this supposedly close-knit family, to the entrapment of Mr. Kebles himself.  As Mr. Sullivan argued in closing regarding Mr. Wilson's giving drugs to Teresa Kebles:

> It also allowed him to gain the trust of Teresa. And that's what goes to the inducement part.  You don't expect a government agent to give you drugs. It establishes in a very dark way trust between an agent and the informant. That trust between he [sic] and Teresa enabled her to pull Michael in. Because the sympathy and familial relationships, all this can be considered in entrapment.  When he got her, he got him.  And it was by giving her cocaine that she could trust him and therefore she could tell Michael, hey, you can trust this guy.  But that's okay.  They got the drugs, so don't worry about prosecuting him, he's a great guy, philanthropic or whatever he said.

(Trial Transcript, Trial to Jury Day 4, at 696:22-697:8.)

To have Teresa's inducement be Mr. Kebles' inducement, defense counsel had to emphasize that the close and friendly relationships included, not only family siblings Teresa and Michael, but included Mr. Wilson, as well.  Mr. Sullivan introduced testimony from Julia Anne Rutter that she believed Teresa Kebles and Mr. Wilson were friends, as "they would always tell stories, they had dinner, they were at some party and they were

-19-

hanging out." (Trial Tr. Day 3, at 447:8-15.) In further support of this defense, evidence was given by Laura Hemborg, Mr. Kebles' live-in girl friend. Ms. Hemborg testified that Mr. Wilson called two to three times a week in early 2003 and that Mr. Kebles told her that Mr. Wilson was "his sister's friend." (*Id.* at 454:2-17.) Testimony from Mr. Kebles' expert Michael Levine also supported this defense. He testified that this was a case of improper inducement of Mr. Kebles whereby he became a "drug dealer, . . . after the informant's introduction and creation of the whole scenario". (*Id.* at 563:17-19.) He further stated in connection with a hypothetical question about a person in the general population that the reason that person may have become a drug dealer was because "[t]heir sister might be pleading with them to get it." (*Id.* at 563:25-564:4.)

Therefore, I find that this was a situation where defense counsel made an informed tactical decision to portray Mr. Wilson and Ms. Kebles as friendly to support an entrapment defense. This was reasonable under the circumstances of the case, since entrapment can be shown by governmental conduct (in this case from the informant) that "creates a substantial risk that an undisposed person . . . would commit the offense", which can take the form of "pleas based on need, sympathy or friendship." *United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir. 1986). Introduction of the evidence in the DEA Report that Teresa Kebles allegedly called Mr. Wilson a "nigger" would have been inconsistent with this defense, as Teresa would likely not be calling a friend such a racist word. In other words, introduction of the evidence in the DEA Report "might simply have made [Mr. Kebles'] defense more suspect. *Foreman*, 323 F.3d at 505.

-20-

Further, as the defense was implying that the sister and brother were close, and that Mr. Kebles may have been influenced by his sister's actions, the introduction of the racist word at issue could make the jury believe that both Teresa and Mr. Kebles were racists. That apparent racism would certainly not make a favorable impression on the jury. *See United States v. Frasch*, 818 F.2d 631, 634 (7th Cir. 1987) ("the offensive word 'nigger'. . . had a great deal of prejudicial potential"); *Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1423 (7th Cir. 1986) (evidence that a defendant called black people "niggers" was evidence of what his racial attitudes were). Indeed, introducing evidence that Mr. Kebles came from a family of racists could be independent cause for post-conviction complaint.

Accordingly, I find that it was a reasonable trial strategy not to introduce the evidence in the DEA Report. I further find that Defendant has not carried his burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound strategy.'" *Strickland*, 466 U.S. at 689 (quotation omitted). Thus, Mr. Kebles has not shown that his counsel's performance fell below an objective standard of reasonableness, the first prong of an ineffective assistance claim.

Moreover, even if Mr. Kebles could demonstrate deficient performance, I find that he cannot show that he was prejudiced. At best, the evidence about Mr. Wilson's motivation towards Teresa Kebles due to her calling him a racist word would have impeached Mr. Wilson's credibility with the jury. But Mr. Wilson's credibility was already suspect due to the fact he had sold drugs to Teresa in violation of his informant agreement with the government and the fact that the jury knew that his motives were

-21-

not purely altruistic as he was being paid for being an informant.  Accordingly, I find it is

not reasonably probable that this impeachment evidence would have altered the jury's

verdict.  This evidence would also not have supported the inducement defense, as set

forth previously in this Order and by the Tenth Circuit.

Finally, this evidence would not have directly undermined the evidence that

Mr. Kebles was engaged in drug dealing, including the testimony from a DEA agent that

he overheard Mr. Kebles offer to sell the informant 400 additional ecstacy pills and that

fact that ecstacy pills were found at Mr. Kebles' residence in an amount that was not

consistent with personal consumption.  Accordingly, I find that it is not reasonably

probable "that, but for counsel's unprofessional errors, the result of the proceeding

would have been different".  *Strickland*, 466 U.S. at 694.  Thus, I deny Mr. Kebles'

argument that his counsel was ineffective.

IV.    CONCLUSION

Based upon the foregoing, it is

ORDERED that Michael Kebles' Motion Under 28 U.S.C. § 2255 to Vacate, Set

Aside, or Correct Sentence is **DENIED**.

Dated:  November 6, 2012

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge

-22-