✎AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of _____ COLORADO _____

UNITED STATES OF AMERICA

**V.**

MICHAEL KEBLES

## JUDGMENT IN A CRIMINAL CASE

Case Number:     03-cr-00249-WYD-01

USM Number:     31863-013

John F. Sullivan, III, Appointed
Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☒ was found guilty on count(s)     one through five of the Superseding Indictment
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846 | Conspiracy to Possess With Intent to Distribute MDMA (Ecstasy) | 05/28/03 | One |
| 21 U.S.C. §§ 841(a)(1), and (b)(1)(C), and 2 | Possession with Intent to Distribute MDMA (Ecstasy), Aiding and Abetting | 01/14/03 | Two |

The defendant is sentenced as provided in pages 2 through _____12_____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☒ The defendant has been found not guilty on count(s)     six of the Superseding Indictment

☐ Count(s) _____ ☐ is ☐ are  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

November 5, 2007
Date of Imposition of Judgment

s/ Wiley Y. Daniel
Signature of Judge

Wiley Y. Daniel, U.S. District Judge
Name and Title of Judge

November 6, 2007
Date

AO 245B  (Rev. 06/05) Criminal Judgment
Sheet 1A

Judgment—Page __2__ of __11__

DEFENDANT:      MICHAEL KEBLES
CASE NUMBER:    03-cr-00249-WYD-01

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 U.S.C. § 841(a)(1) and (b)(1)(C) | Possession with Intent to Distribute MDMA (Ecstasy) | 02/11/03 | Three |
| 21 U.S.C. § 841(a)(1) and (b)(1)(C) | Possession with Intent to Distribute MDMA (Esctasy) | 04/02/03 | Four |
| 21 U.S.C. § 841(a)(1) and (b)(1)(C) | Possession with Intent to Distribute MDMA (Ecstasy) | 05/28/03 | Five |

AO 245B    (Rev. 06/05) Judgment in Criminal Case
           Sheet 2 — Imprisonment

Judgment — Page   3   of   12

DEFENDANT:        MICHAEL KEBLES
CASE NUMBER:      03-cr-00249-WYD-01

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:        sixty-three (63) months.

[X]    The court makes the following recommendations to the Bureau of Prisons:

That defendant be designated to a prison camp in Colorado.

[X]    The defendant is remanded to the custody of the United States Marshal.

[ ]    The defendant shall surrender to the United States Marshal for this district:

[ ] at _____   [ ] a.m. [ ] p.m.   on _____ .

as notified by the United States Marshal.

[ ]    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

[ ]    before 12 p.m. on _____ .

[ ]    as notified by the United States Marshal.

[ ]    as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page __4__ of __12__

DEFENDANT:        MICHAEL KEBLES
CASE NUMBER:      03-cr-00249-WYD-01

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of:    three (3) years.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  (Check, if applicable.)

☒    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  (Check, if applicable.)

☒    The defendant shall cooperate in the collection of DNA as directed by the probation officer.  (Check, if applicable.)

☐    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer.  (Check, if applicable.)

☐    The defendant shall participate in an approved program for domestic violence.  (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)    the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    the defendant shall support his or her dependents and meet other family responsibilities;

5)    the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)    the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)    the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement; and

14)   the defendant shall provide access to any requested financial information.

AO 245B        (Rev. 06/05) Judgment in a Criminal Case
               Sheet 3C — Supervised Release

Judgment—Page ___6___ of ___12___

DEFENDANT:        MICHAEL KEBLES
CASE NUMBER:      03-cr-00249-WYD-01

## SPECIAL CONDITIONS OF SUPERVISION

1.     The defendant shall participate in a program of testing and treatment for drug abuse, as directed by the probation officer, until such time as the defendant is released from the program by the probation officer.  The defendant shall abstain from the use of alcohol or other intoxicants during the course of treatment and shall pay the cost of treatment as directed by the probation officer.

AO 245B     (Rev. 06/05) Judgment in a Criminal Case
           Sheet 5 — Criminal Monetary Penalties

Judgment — Page    7    of      12

DEFENDANT:         MICHAEL KEBLES
CASE NUMBER:     03-cr-00249-WYD-01

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 500.00 | $ 0.00 | $ 0.00 |

☐    The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐    The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

       If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| **TOTALS** | $       0.00 | $       0.00 | |

☐    Restitution amount ordered pursuant to plea agreement    $ _____

☐    The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐    The court determined that the defendant does not have the ability to pay interest and it is ordered that:

      ☐   the interest requirement is waived for the    ☐   fine    ☐   restitution.

      ☐   the interest requirement for the    ☐   fine    ☐   restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page __8__ of __12__

DEFENDANT:         MICHAEL KEBLES
CASE NUMBER:       03-cr-00249-WYD-01

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A**  ☐  Lump sum payment of $ _____ due immediately, balance due

  ☐  not later than _____ , or
  ☐  in accordance  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B**  ☒  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

AO 245B  (Rev. 06/05) Criminal Judgment
  Attachment (Page 1) — Statement of Reasons

|  |  | Judgment—Page 9 of 12 |
|---|---|---|

DEFENDANT:  MICHAEL KEBLES
CASE NUMBER:  03-cr-00249-WYD-01

# STATEMENT OF REASONS

## I   COURT FINDINGS ON PRESENTENCE INVESTIGATION REPORT

A ☐   **The court adopts the presentence investigation report without change.**

B ☒   **The court adopts the presentence investigation report with the following changes.**

(Check all that apply and specify court determination, findings, or comments, referencing paragraph numbers in the presentence report, if applicable.)
(Use page 4 if necessary.)

1 ☒   **Chapter Two of the U.S.S.G. Manual** determinations by court (including changes to base offense level, or specific offense characteristics):

Based on the facts presented at trial and information contained in the Government's Sentencing Statement, the Court finds that the firearm found inside the defendant's residence on May 28, 2003, does not satisfy the requisites prescribed in §2D1.1(b)(1).  Therefore, the Court finds that the two-level Specific Offense Characteristic increase pursuant to §2D1.1(b)(1) which was addressed in the Presentence Investigation Report, is not warranted.

2 ☐   **Chapter Three of the U.S.S.G. Manual** determinations by court (including changes to victim-related adjustments,  role in the offense, obstruction of justice, multiple counts, or acceptance of responsibility):

3 ☐   **Chapter Four of the U.S.S.G. Manual** determinations by court (including changes to criminal history category or scores, career offender, or criminal livelihood determinations):

4 ☐   **Additional Comments or Findings** (including comments or factual findings concerning certain information in the presentence report that the Federal Bureau of Prisons may rely on when it makes inmate classification, designation, or programming decisions):

C ☐   **The record establishes no need for a presentence investigation report pursuant to Fed.R.Crim.P. 32.**

## II   COURT FINDING ON MANDATORY MINIMUM SENTENCE (Check all that apply.)

A ☒   No count of conviction carries a mandatory minimum sentence.

B ☐   Mandatory minimum sentence imposed.

C ☐   One or more counts of conviction alleged in the indictment carry a mandatory minimum term of imprisonment, but the sentence imposed is below a mandatory minimum term because the court has determined that the mandatory minimum

does not apply based on

☐   findings of fact in this case

☐   substantial assistance (18 U.S.C. § 3553(e))

☐   the statutory safety valve (18 U.S.C. § 3553(f))

## III   COURT DETERMINATION OF ADVISORY GUIDELINE RANGE (BEFORE DEPARTURES):

Total Offense Level:   26
Criminal History Category:   I
Imprisonment Range:   63   to   75   months
Supervised Release Term:   3 years
Fine Range: $ 12,500   to   $ 5,000,000
☒   Fine waived or below the guideline range because of inability to pay.

AO 245B    (Rev. 06/05) Criminal Judgment
          Attachment (Page 2) — Statement of Reasons

|  | Judgment—Page __10__ of __12__ |
|---|---|

DEFENDANT:       MICHAEL KEBLES
CASE NUMBER:     03-cr-00249-WYD-01

# STATEMENT OF REASONS

**IV   ADVISORY GUIDELINE SENTENCING DETERMINATION** (Check only one.)

A   ☒   **The sentence is within an advisory guideline range that is not greater than 24 months, and the court finds no reason to depart.**

B   ☐   **The sentence is within an advisory guideline range that is greater than 24 months, and the specific sentence is imposed for these reasons.**
          (Use page 4 if necessary.)

C   ☐   **The court departs from the advisory guideline range for reasons authorized by the sentencing guidelines manual.**
          (Also complete Section V.)

D   ☐   **The court imposed a sentence outside the advisory sentencing guideline system.**  (Also complete Section VI.)

**V   DEPARTURES AUTHORIZED BY THE ADVISORY SENTENCING GUIDELINES** (If applicable.)

A   **The sentence imposed departs** (Check only one.):
    ☐   below the advisory guideline range
    ☐   above the advisory guideline range

B   **Departure based on** (Check all that apply.):

    1   **Plea Agreement** (Check all that apply and check reason(s) below.):
        ☐   5K1.1 plea agreement based on the defendant's substantial assistance
        ☐   5K3.1 plea agreement based on Early Disposition or "Fast-track" Program
        ☐   binding plea agreement for departure accepted by the court
        ☐   plea agreement for departure, which the court finds to be reasonable
        ☐   plea agreement that states that the government will not oppose a defense departure motion.

    2   **Motion Not Addressed in a Plea Agreement** (Check all that apply and check reason(s) below.):
        ☐   5K1.1 government motion based on the defendant's substantial assistance
        ☐   5K3.1 government motion based on Early Disposition or "Fast-track" program
        ☐   government motion for departure
        ☐   defense motion for departure to which the government did not object
        ☐   defense motion for departure to which the government objected

    3   **Other**
        ☐   Other than a plea agreement or motion by the parties for departure (Check reason(s) below.):

C   **Reason(s) for Departure** (Check all that apply other than 5K1.1 or 5K3.1.)

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ | 4A1.3 | Criminal History Inadequacy | ☐ 5K2.1 | Death | ☐ 5K2.11 | Lesser Harm |
| ☐ | 5H1.1 | Age | ☐ 5K2.2 | Physical Injury | ☐ 5K2.12 | Coercion and Duress |
| ☐ | 5H1.2 | Education and Vocational Skills | ☐ 5K2.3 | Extreme Psychological Injury | ☐ 5K2.13 | Diminished Capacity |
| ☐ | 5H1.3 | Mental and Emotional Condition | ☐ 5K2.4 | Abduction or Unlawful Restraint | ☐ 5K2.14 | Public Welfare |
| ☐ | 5H1.4 | Physical Condition | ☐ 5K2.5 | Property Damage or Loss | ☐ 5K2.16 | Voluntary Disclosure of Offense |
| ☐ | 5H1.5 | Employment Record | ☐ 5K2.6 | Weapon or Dangerous Weapon | ☐ 5K2.17 | High-Capacity, Semiautomatic Weapon |
| ☐ | 5H1.6 | Family Ties and Responsibilities | ☐ 5K2.7 | Disruption of Government Function | ☐ 5K2.18 | Violent Street Gang |
| ☐ | 5H1.11 | Military Record, Charitable Service, Good Works | ☐ 5K2.8 | Extreme Conduct | ☐ 5K2.20 | Aberrant Behavior |
| | | | ☐ 5K2.9 | Criminal Purpose | ☐ 5K2.21 | Dismissed and Uncharged Conduct |
| ☐ | 5K2.0 | Aggravating or Mitigating Circumstances | ☐ 5K2.10 | Victim's Conduct | ☐ 5K2.22 | Age or Health of Sex Offenders |
| | | | | | ☐ 5K2.23 | Discharged Terms of Imprisonment |
| | | | | | ☐ | Other guideline basis (e.g., 2B1.1 commentary) |

D   **Explain the facts justifying the departure.**  (Use page 4 if necessary.)

AO 245B    (Rev. 06/05) Criminal Judgment
             Attachment (Page 3) — Statement of Reasons

Judgment—Page    11    of     12

DEFENDANT:        MICHAEL KEBLES
CASE NUMBER:    03-cr-00249-WYD-01

# STATEMENT OF REASONS

**VI**    **COURT DETERMINATION FOR SENTENCE OUTSIDE THE ADVISORY GUIDELINE SYSTEM**
      (Check all that apply.)

A     **The sentence imposed is** (Check only one.):

      ☐ below the advisory guideline range

      ☐ above the advisory guideline range

B     **Sentence imposed pursuant to** (Check all that apply.):

    1      **Plea Agreement** (Check all that apply and check reason(s) below.):
        ☐ binding plea agreement for a sentence outside the advisory guideline system accepted by the court
        ☐ plea agreement for a sentence outside the advisory guideline system, which the court finds to be reasonable
        ☐ plea agreement that states that the government will not oppose a defense motion to the court to sentence outside the advisory guideline system system

    2      **Motion Not Addressed in a Plea Agreement** (Check all that apply and check reason(s) below.):
        ☐ government motion for a sentence outside of the advisory guideline system
        ☐ defense motion for a sentence outside of the advisory guideline system to which the government did not object
        ☐ defense motion for a sentence outside of the advisory guideline system to which the government objected

    3      **Other**
        ☐ Other than a plea agreement or motion by the parties for a sentence outside of the advisory guideline system (Check reason(s) below.):

C     **Reason(s) for Sentence Outside the Advisory Guideline System** (Check all that apply.)

      ☐ the nature and circumstances of the offense and the history and characteristics of the defendant pursuant to 18 U.S.C. § 3553(a)(1)

      ☐ to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense (18 U.S.C. § 3553(a)(2)(A))

      ☐ to afford adequate deterrence to criminal conduct (18 U.S.C. § 3553(a)(2)(B))

      ☐ to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(C))

      ☐ to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner (18 U.S.C. § 3553(a)(2)(D))

      ☐ to avoid unwarranted sentencing disparities among defendants (18 U.S.C. § 3553(a)(6))

      ☐ to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7))

D     **Explain the facts justifying a sentence outside the advisory guideline system.**   (Use page 4 if necessary.)

AO 245B      (Rev. 06/05) Criminal Judgment
                Attachment (Page 4) — Statement of Reasons

DEFENDANT:      MICHAEL KEBLES
CASE NUMBER:    03-cr-00249-WYD-01

# STATEMENT OF REASONS

## VII   COURT DETERMINATIONS OF RESTITUTION

A  **☒** Restitution Not Applicable.

B  Total Amount of Restitution: _____

C  Restitution not ordered (Check only one.):

1  ☐  For offenses for which restitution is otherwise mandatory under 18 U.S.C. § 3663A, restitution is not ordered because the number of identifiable victims is so large as to make restitution impracticable under 18 U.S.C. § 3663A(c)(3)(A).

2  ☐  For offenses for which restitution is otherwise mandatory under 18 U.S.C. § 3663A, restitution is not ordered because determining complex issues of fact and relating them to the cause or amount of the victims' losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim would be outweighed by the burden on the sentencing process under 18 U.S.C. § 3663A(c)(3)(B).

3  ☐  For other offenses for which restitution is authorized under 18 U.S.C. § 3663 and/or required by the sentencing guidelines, restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweigh the need to provide restitution to any victims under 18 U.S.C. § 3663(a)(1)(B)(ii).

4  ☐  Restitution is not ordered for other reasons.  (Explain.)

D  ☐ Partial restitution is ordered for these reasons (18 U.S.C. § 3553(c)):

## VIII  ADDITIONAL FACTS JUSTIFYING THE SENTENCE IN THIS CASE (If applicable.)

Sections I, II, III, IV, and VII of the Statement of Reasons form must be completed in all felony cases.

# '10 - CV - 0 1 5 2 8

Page 2

### MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District of Colorado |
|---|---|
| Name (under which you were convicted):<br>Michael Kebles | Docket or Case No.:<br>03-CR-249-WYD |
| Place of Confinement:<br>FCI Fort Dix, Fort Dix, New Jersey | Prisoner No.:<br>31863-013 |
| UNITED STATES OF AMERICA<br><br>v. | Movant (include name under which you were convicted)<br>MICHAEL KEBLES |

## MOTION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

    United States District Court for the District of Colorado
    Alfred A. Arraj U.S. Courthouse
    Denver, Colorado 80294

    (b) Criminal docket or case number (if you know):  03-CR-249-WYD

2.  (a) Date of the judgment of conviction (if you know):  8/21/2007

    (b) Date of sentencing:  11/5/2007

3.  Length of sentence:  Sixty-three (63) months.

4.  Nature of crime (all counts):

    Conspiracy to Possess with Intent to Distribute MDMA (Ecstasy)  --  Count One -- Guilty.
    Distribution of MDMA (Ecstasy) -- Counts Two, Three, and Four  --  Guilty.
    Possession with Intent to Distribute MDMA (Ecstasy) Count Five  --  Guilty.

    Possession of a Firearm in Furtherance of Drug Trafficking -- Count Six -- Not Guilty.

5.  (a) What was your plea? (Check one)

    (1)   Not guilty ☑        (2)   Guilty ☐        (3)   Nolo contendere (no contest) ☐

    (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

6.  If you went to trial, what kind of trial did you have? (Check one)        Jury ☑        Judge only ☐

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?   Yes ☑   No ☐

8.  Did you appeal from the judgment of conviction?   Yes ☑   No ☐

9.  If you did appeal, answer the following:

(a) Name of court:   United States Court of Appeals for the Tenth Circuit.

(b) Docket or case number (if you know):  07-1485.

(c) Result:   Judgment affirmed as to all counts.

(d) Date of result (if you know):  3/30/2009

(e) Citation to the case (if you know):  Not published.

(f) Grounds raised:

1. Entrapment as a matter of law.
2. Insufficient evidence to prove Count Five.
3. Newly discovered Brady evidence.
4. Erroneous enhancement of sentence.

(g) Did you file a petition for certiorari in the United States Supreme Court?   Yes ☐   No ☑

If "Yes," answer the following:

(1) Docket or case number (if you know):

(2) Result:

(3) Date of result (if you know):

(4) Citation to the case (if you know):

(5) Grounds raised:

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

Yes ☐   No ☑

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?   Yes ❏   No ❏

(7) Result:

(8) Date of result (if you know):

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?   Yes ❏   No ❏

(7) Result:

(8) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1) First petition:   Yes ❏   No ❏

(2) Second petition:   Yes ❏   No ❏

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the facts supporting each ground.

**GROUND ONE:**

Informant Perjury.

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

The informant in the investigation that led to this case, DEA Confidential Source Robert Wilson, committed perjury at the trial on August 14, 2007.  He testified falsely regarding his motivation for serving as an informant.  He falsely claimed he grew weary of "Seeing people hurt . . . hurt by drugs" and decided he "wanted to make a difference."  In August 2004, however, he was debriefed by Special Agent Carl Force and was specifically asked about his motivation for engaging in controlled purchases of MDMA/Ecstasy with the Movant's sister, Teresa Kebles, who acted as an intermediary between himself and the informant.  Agent Force reported that Mr. Wilson "answered that Teresa angered [him] by calling the CS a 'nigger' and that was [his] motivation."  The altruistic motivation he professed in his trial testimony was a courtroom fabrication contrived to deceive the jury.  It was perjury.  The jury had the right to know that the informant's true motivation in this case was not the lofty ambition to cleanse his community of illegal drugs, but rather the overwhelming desire to avenge an inflammatory racial insult.

(b) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑   No ☑

(2) If you did not raise this issue in your direct appeal, explain why:

The issue is based upon a DEA Report of Investigation that was not introduced into the trial record, was not in the Record on Appeal, and was thus not available for direct appeal.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❑   No ☑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Page 6

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(3) Did you receive a hearing on your motion, petition, or application?

Yes ❏   No ❏

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ❏   No ❏

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ❏   No ❏

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:



**GROUND TWO:**

Prosecutorial Misconduct.

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

The Assistant U.S. Attorney, James R. Boma, was well aware of the statement made by the informant to Agent Force about his true motivation for targeting Teresa Kebles directly and through her brother, the Movant Michael Kebles, indirectly.  He knew Mr. Wilson was not the altruistic informant he pretended to be.  He nonetheless presented him to the jury, by analogy, as a "philanthropic or socially motivated" informant, one who was "fed up with crime or violence in" his community and volunteered his services "in order to help clean up crime in [his] neighborhood or whatever."  (Trial Transcript pp. 519-20.)  Even if Mr. Wilson's original motivation were as altruistic as he professed and Mr. Boma guaranteed, he quickly abandoned it six months later when he targeted Teresa directly for revenge and through Michael indirectly.  By vouching for Mr. Wilson, Mr. Boma assited in his deception of the jury, which was deprived of the information it required to evaluate the informant's credibility, which deprived the Movant of a fair trial.

(b) **Direct Appeal of Ground Two:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ❑   No ☑

    (2) If you did not raise this issue in your direct appeal, explain why:

    The issue is based upon a DEA Report of Investigation that was not introduced into the trial record, was not in the Record on Appeal, and was thus not available for direct appeal.

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ❑   No ☑

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:

    Name and location of the court where the motion or petition was filed:

    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

    (3) Did you receive a hearing on your motion, petition, or application?

        Yes ❑   No ❑

    (4) Did you appeal from the denial of your motion, petition, or application?

        Yes ❑   No ❑

    (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

        Yes ❑   No ❑

    (6) If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed:

    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

Page 8

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THREE:**

Ineffective Assistance of Counsel.

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

The Movant's trial attorney, Mr. John F. Sullivan, failed or refused to use the single most important piece of evidence in his possession, the aforementioned DEA Report of Investigation, to impeach Mr. Wilson's credibility and ultimately to demolish it.

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑   No ☑

(2) If you did not raise this issue in your direct appeal, explain why:

In the Tenth Circuit, ineffective assistance of counsel claims should be brought in collateral proceedings, not on direct appeal.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❑   No ☑

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

    Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

    Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND FOUR:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Four:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ❑   No ❑

    (2) If you did not raise this issue in your direct appeal, explain why:


(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ❑   No ❑

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:

    Name and location of the court where the motion or petition was filed:


    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):


    (3) Did you receive a hearing on your motion, petition, or application?

        Yes ❑   No ❑

    (4) Did you appeal from the denial of your motion, petition, or application?

        Yes ❑   No ❑

    (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

        Yes ❑   No ❑

    (6) If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed:


    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

They are the three grounds presented above: (1) informant perjury; (2) prosecutorial misconduct; and (3) ineffective assistance of counsel. All three issues are based upon the same document that was excluded from the trial and appellate records and thus unavailable for appellate review. Furthermore, an issue such as the third issue is not normally raised upon direct appeal. See United States v. Galloway, 56 F.3d 1239 (10th Cir.1995): "We reaffirm and reemphasize the central principle laid down in Beaulieu v. United States, 930 F.2d 805, 806-07 (10th Cir.1991). Ineffective assistance of counsel claims should be brought in collateral proceedings, not on direct appeal. Such claims brought on direct appeal are presumptively dismissible, and virtually all will be dismissed."

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the judgment you are challenging?      Yes ❏    No ☑

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:

   Mr. Walter Gerash, Denver, Colorado.

(b) At arraignment and plea:

   Mr. Walter Gerash, Denver, Colorado.

(c) At trial:

   Mr. John F. Sullivan, III, 155 South Madison Street, Suite 209, Denver, Colorado 80209.

(d) At sentencing:

   Mr. John F. Sullivan, III, 155 South Madison Street, Suite 209, Denver, Colorado 80209.

(e) On appeal:

Mr. John F. Sullivan, until he withdrew to permit Movant to represent himself pro se.

(f) In any post-conviction proceeding:

N/A

(g) On appeal from any ruling against you in a post-conviction proceeding:

N/A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?        Yes ☑ No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?        Yes ☐ No ☑

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:


(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?   Yes ☐   No ☐

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

    A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of —

        (1) the date on which the judgment of conviction became final;

        (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

        (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

        (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Therefore, the Movant, Michael Kebles, respectfully asks this District Court to vacate his convictions, sentence, and forfeitures, and to grant him any other relief to which he may be entitled.

Executed on June 28, 2010.

Michael Keble

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Action No.  03-CR-249-WYD

MICHAEL KEBLES,   '10 − CV − 0 1 5 2 8

Movant,

v.

UNITED STATES OF AMERICA


Respondent.

---

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION PURSUANT TO 28 U.S.C. §2255

---

The Movant, Michael Kebles, hereby files this Memorandum of Law in Support of Motion Pursuant to 28 U.S.C. § 2255.


## I. MOTIONS PURSUANT TO 28 U.S.C.  § 2255

Relief under 28 U.S.C. 2255 is reserved for transgressions of Constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice.  A criminal defendant seeking relief from his conviction or sentence in a Motion to Vacate must therefore establish one of the following conditions:  (1) his sentence was imposed in violation of the Constitution or laws of the United States; (2) the sentencing court lacked jurisdiction to impose the sentence; (3) the sentence

1

imposed exceeded the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack.

## II.   MOVANT'S GROUNDS FOR COLLATERAL REVIEW

The Movant raises three issues for collateral review: (1) informant perjury; (2) prosecutorial misconduct; and (3) ineffective assistance of counsel. The indispensable evidence that established all three claims was not used at the Movant's trial in August 2007 and was consequently excluded from the Record on Appeal. Furthermore, a claim of ineffective assistance of counsel, in the Tenth Circuit, should be reserved for a collateral proceeding because such a claim brought on direct appeal is presumptively dismissible and will almost always be dismissed. *United States* v. *Galloway*, 56 F.3d 1239 (10th Cir.1995). Thus, none of the issues is procedurally defaulted and none implicates the cause and prejudice requirements of *United States* v. *Frady*, 456 U.S. 152 (1982) because none was available for direct appellate review. All of the issues, accordingly, are properly presented to this District Court for collateral review.

## III.   THE UNUSED EVIDENCE FROM WHICH ALL THREE ISSUES ARISE

On August 28, 2003, the Assistant U.S. Attorney, James R. Boma, provided the Movant's attorney at the time, Ronald Richards, with eleven pages of discovery

2

documents bearing Bates Stamp page numbers 451 through 461.  Pages 458-461 comprise a four-page DEA Report of Investigation in which Special Agent Carl Force debriefed the informant in this case, DEA Confidential Source Robert Wilson, on August 25-26, 2003.  During the debriefing, Mr. Wilson admitted to providing cocaine to Teresa Kebles, whom he used as an intermediary for obtaining MDMA or Ecstasy tablets from her brother, the Movant herein, Michael Kebles.  On page 3 of the Report, Bates page 460, the pertinent excerpt from paragraph 11 reads as follows:

> S/A Force asked the CS what was his/her motivation for making controlled purchases from Teresa and the CS answered that Teresa angered him/her by calling the CS a "nigger" and that was his/her motivation.

At the trial, Mr. John F. Sullivan, III, defense counsel, introduced five items into the trial record:  Exhibits A, D, and E on Day 2, and Exhibits H and I on Day 3.  The Report of Investigation was not among them, as the Trial Transcript reveals on pages 435 and 616.

## IV.   INFORMANT PERJURY

Mr. Wilson's service as a DEA informant began in July 2002.  (Trial Transcript p. 330.)  On cross-examination, Mr. Sullivan asked him about the beginning of his DEA tenure. (Tr.Trans. pp. 404-04):

3

Q:     Were you upset when you started working for the DEA; was that tough for you?

A:     Working with them was not difficult at all . . . And, yes, I did do things that I should not have done, but times come in your life when you have to change that, and that's what made me come to them [DEA], because I wanted to make a difference.

During redirect examination, Mr. Boma asked Mr. Wilson to elaborate. (Tr.Trans. pp. 418-420):

Q:     And you mentioned that you weren't interested in money. What were you interested in?  Why did you go to the DEA in this case or when you, when you initially approached them?

A:     Do you want me to speak about what I was involved in?

Q:     I'd like you to explain why, why you went to the DEA and what -- yeah, what your reasons were.   You weren't interested in the money; what was the motivation is what I'm asking.

A:     Seeing people hurt.

Q:     What do you mean by that, sir?

A:     Hurt by drugs.

Q:     All right.  Was that based on your experience and the experience of others?

4

A:     Yes, and what I did do for years, people or drug dealers would come to me and my friends, my acquaintances, and would want protection. And I did do that, and that's -- but I never dealt drugs. That's what we did.

Q:     All right. Was it a bodyguard function?

A:     Yes.

Q:     All right. And you and other people that you knew --

A:     Yeah.

Q:     -- did it.

Q:     All right. And at some point, you decided you'd had enough?

A:     Well, there was a shootout, yeah, and that's when decided [sic] I'm going to . . . I got to get out, I got to just get away from it.

Q:     All right. And you weren't involved in the shooting, but you were present when that occurred?

A:     In many, yeah.

Q:     All right. But so you saw people being hurt?

A:     From the drug use or the guns, yeah, either or. They're all kind of intertwined.

Q:     Is that in effect your motivation, then, to approach the DEA?

A:   That's what -- I was kind of too, too hard, too hardheaded to be scared. So maybe I had 15 minutes of . . . a clear head. To make a conscious decision to -- that I had to change.

Q:   All right. And that's what drove you literally, I guess, to DEA?

A:   I went to them.

Q:   And you don't have any expectation of receiving any money as a result of this case in court here today?

A:   I have my own job. I don't need them.

Q:   All right. But do you expect to receive any money from the government?

A:   Don't want anything.


Mr. Wilson's motivation to serve as a DEA informant, as stated in his testimony in court, cannot be reconciled with his motivation for dealing with Teresa Kebles, as stated in his debriefing out of court.   The trial testimony was a courtroom fabrication contrived for the purpose of misleading the jury and it succeeded.   It was perjury.   In *Napue* v. *Illinois*, 360 U.S. 264, 269-70 (1959), the U.S. Supreme Court wrote:

The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness.   The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a

6

defendant's life or liberty may depend.   As stated by the New York Court of Appeals . . . (citation omitted):  "It is of no consequence that the falsehood bore upon the witness's credibility, rather than directly upon defendant's guilt.  A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair."

## V.   <u>PROSECUTORIAL MISCONDUCT</u>

Notwithstanding documentary evidence to the contrary, Mr. Boma strenuously asserted the purity of the informant's motivation.  During his cross-examination of the defense expert witness, Mr. Michael Levine, the following exchange occurred. (Tr.Trans. pp. 519-21):

Q:    You kept using the, what I think is a perjorious [sic] term, criminal informant. There are many types of informants are there not, sir?

A:    Yes.

Q:    All right.  You mentioned two.  You mentioned people that are basically mercenary informants, who may or may not have criminal records; is that true?

A:    Yeah, they may or may not have criminal records.  Although I've never seen, I've never encountered that [sic] did not have, but I've heard they're out there.

Q:    Well, I have, sir.  Do you doubt that there are people like this out there?

A:    No, not at all.

Q:    All right.  You just never worked with one?

A:    No.

Q:    And there are what I would describe as philanthropic or socially motivated informants. Have you ever encountered good citizens who get fed up and come to you and agree to work?

A:    I vaguely recall one or two in my career.

Q:    All right. You may have -- your recruiting pool must have been rather narrow. Are you familiar with informants in DEA who volunteer their services because they're fed up with crime or violence in their community and they offer their services knowing the risk and agreeing to undertake dangerous, potentially dangerous, jobs in order to help clean up crime in their neighborhood or whatever?

A:    I've known -- I've worked with them in communities. I wrote a book about it. I've worked a lot with them in communities, but that's a big stretch, very, very, very few will become criminal informants, and that is penetrate crime, work undercover.

Q:    All right.

A:    Deal with criminals. That's different -- for the purposes of instruction, teaching law enforcement, that's the term that's used. It's been used from the time I began teaching in '73 to the time, to this moment right now, last week I taught my last course --

8

Q:    Sir, I'm not asking where you've gone or what you've taught about. I'm asking about informants.

A:    Yes.

Q:    Let's get back on track.  Relating to informants, are you familiar with the term "flipped defendant," in quotes?

A:    Yes.

Q:    What's that mean?

A:    That's a person who you've arrested and flipped or you've convinced to work for you or work for the government as an informant.

Q:    Usually because of very unsavory, from defendant's point of view, alternatives; is that correct?   In other words, they're facing time or whatever?

A:    That's correct; they don't want to go to jail.

Q:    They're trying to help their situation; would that be accurate?

A:    Yes.

Q:    Are you aware that Bob Wilson had no criminal record and had no criminal charges pending at the time he was used as an informant in this case?

MR. SULLIVAN:  Objection, Your Honor, assumes facts not in evidence.

THE COURT:  Overruled.

THE WITNESS:  I'm aware of an arrest record that included battery or violence, and that's all, I think.

9

In this fashion, Mr. Boma presented the informant as a high-minded, public-spirited, anti-drug crusader who was working tirelessly with the DEA to cleanse his community of drugs and violence.

In collateral proceedings, the proper standard for prosecutorial misconduct is whether the prosecution's behavior caused substantial prejudice to the defendant, thereby rendering the trial fundamentally unfair. *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 642 (1974). Whether the behavior was prejudicial "depends heavily on the context of the case" and rests largely on three factors: (1) the severity of the misconduct; (2) curative measures taken by the court; and (3) the certainty of conviction absent misconduct. *United States* v. *Young*, 470 U.S. 1, 12 (1985).

Mr. Boma's misconduct was the severest kind of misconduct conceivable: aiding the informant's deception of the jury by making provocative and false statements of his own. And even if, for the sake of argument only, Mr. Wilson had once been a heroic, altruistic informant at the beginning of his DEA tenure in July 2002, by the time of his first approach to Teresa and Michael Kebles in January 2003, he had abandoned his heroism and altruism to pursue the basest and crudest of objectives: revenge for a perceived racial insult. The jurors were entitled to this information. They needed it to evaluate the Movant's entrapment defense, particularly the issue of inducement. Mr. Boma deprived them of it and substituted his own misinformation instead.

10

As to curative measures taken by the District Court, there were none, precisely because the Court, like the jury, was kept unaware of the existence of the DEA Report that documented the informant's incriminating admission. As to the certainty of conviction absent the misconduct, a reasonable jury properly informed as to the informant's true motivation would have had abundant evidence of inducement and abundant grounds for acquittal. Thus, the prosecutorial misconduct identified here caused substantial prejudice to the defendant, thereby rendering the trial fundamentally unfair.

## VI.   INEFFECTIVE ASSISTANCE OF COUNSEL

The Movant's trial attorney, Mr. John F. Sullivan, III, failed or refused to use the single most important piece of evidence in his possession, the aforementioned DEA Report of Investigation, to impeach Mr. Wilson's credibility and ultimately demolish it. By admitting he was "angered" because of Teresa Kebles' alleged racial insult, and by admitting that the anger was his "motivation" for making controlled purchases of illegal drugs from her, Mr. Wilson unwittingly admitted that he was doing much more than providing his targets an *opportunity* to violate the drug laws. He was, in effect, confessing that he *induced* Teresa and her brother Michael to violate the drug laws so that he might incriminate both and thereby satisfy his desire to avenge Teresa's alleged racial insult. He was indisputably confessing, three years before his forthcoming trial testimony to the

11

contrary, that he was no "socially-motivated" informant -- unless he began as one in July 2002, but degenerated into an angry avenger of racial insults by January 2003, a mere six months later. His well-documented hatred for Terry provided Mr. Wilson with a motive to induce and entrap her and Michael as well. For his hatred of the sister necessarily carried over to the brother -- unless one cares to argue that Mr. Wilson targeted Teresa for selfish, illegal reasons, but upon meeting Michael, suddenly switched back to selfless, legal ones. The entire trial would have been dramatically altered by the Report of Investigation, which Mr. Sullivan inexplicably failed or refused to utilize.

To prevail on a claim of ineffective assistance of counsel, the defendant must show, first, that his counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland* v. *Washington*, 466 U.S. 668 (1984). With regard to the required showing of prejudice, the proper standard requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. That standard has been indisputably demonstrated here.

## VII.   **CONCLUSION**

On March 30, 2009, the U.S. Court of Appeals for the Tenth Circuit, in rejecting the Movant's *Brady* claim, wrote: "The jury heard testimony that the informant was paid for his participation in the undercover investigation. The jury already knew, therefore, that the informant's motivation was not purely altruistic . . ." What the jury and the Tenth Circuit did *not* know was that the informant's motivation was *purely no*t altruistic. The difference between the former and the latter is the decisive, determinative difference between enforcement and entrapment, between acquittal and conviction. The jury was deprived of its right to know the truth, and the Movant was therefore denied his Constitutional right to a fair trial. Accordingly, the Movant, Michael Kebles, asks the District Court to vacate his conviction, sentence, and forfeitures.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  10-cv-01528-WYD
Criminal Action No.  03-cr-00249-WYD

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  MICHAEL KEBLES,

      Movant.

---

ORDER

---

      After preliminary consideration of Movant's motion to vacate, set aside, or correct

the sentence imposed by this Court, it is now

      ORDERED that the United States Attorney on or before <u>Monday, August 9, 2010,</u>

shall file an answer or other pleading directed to the motion pursuant to Rule 4 of the Rules

Governing Section 2255 Proceedings.

      Dated this <u>6th</u> day of July, 2010.

                        BY THE COURT:


                        <u>s/ Wiley Y. Daniel</u>
                        WILEY Y. DANIEL,
                        CHIEF UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  10-cv-01528-WYD
Criminal Action No. 03-cr-00249-WYD

UNITED STATES OF AMERICA,

     Plaintiff-Respondent,

v.

MICHAEL KEBLES,

     Defendant-Movant.

_____

**RESPONSE TO ORDER TO ANSWER
MOTION PURSUANT 28 U.S.C. § 2255**

_____

     The defendant-movant (hereinafter "the movant") has filed a motion pursuant to 28 U.S.C. § 2255 regarding the above-captioned case.  This Honorable Court, in an **Order**, dated and filed July 6, 2010 (doc. 452),  has ordered that the plaintiff-respondent, United States of America (hereinafter "the respondent" or "the Government"), file a response on or before August 9, 2010.  Therefore, the respondent,  by the United States Attorney for the District of Colorado, David M. Gaouette, and the undersigned Assistant United States Attorney, makes the following response in opposition to the movant's motion, pursuant to the **Order**, dated and filed July 6, 2010:

## I.  STATEMENT OF THE CASE[1]

**A.  The motion**

The movant filed a motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct sentence by a person in federal custody on June 28, 2010 (doc. 451) (hereinafter cited as **Motion**).  The movant's direct appeal decision was issued on March 30, 2009.  *See United States v. Michael Kebles*, 318 Fed. Appx. 678 (10th Cir. Mar. 30, 2009) (not selected for official publication) (attached as **Case 1**).  Such an initial motion pursuant to § 2255, under the Antiterrorism and Effective Death Penalty Act of 1996 [AEDPA] must be filed within a year of such a decision being "final."  *See Coleman v. United States*, 106 F.3d 339,  341 (10th Cir. 1997).

---

[1]  Reference will be made to documents in the district court file.  A court, of course, always may take judicial notice of records in the same litigation.  *See United States v. Estep*, 760 F.2d 1060, 1063 (10th Cir. 1985).  This should include the documents filed in the Court of Appeals, which are available "on-line."  Nonetheless, for the convenience of this Honorable Court and for the *pro se* movant, all of the pleading documents specifically referenced are attached.  Listed in order of appearance, they are: **Appellee's Answer Brief** – **Attachment 1** (filed in the Tenth Circuit docket, 03/27/2008); DEA Report – **Attachment 2**; **Appellant's Reply Brief** – **Attachment 3** (filed in the Tenth Circuit docket,  04/14/2008); **Appellant's *Pro se* Motion to Supplement the Appellate Record and to Request a Further Extension of Time in Which to File the Appellant's *Pro se* Supplemental Opening Brief** (filed in the Tenth Circuit docket, 09/04/2008) – **Attachment 4**; Tenth Circuit **Order** (filed in the Tenth Circuit docket, 09/12/2008) – **Attachment 5**; **Appellant's *Pro Se* Supplemental Opening Brief** (filed in the Tenth Circuit docket, 09/29/2008) – **Attachment 6**.

However, when a writ of certiorari from a circuit decision is not sought from the United States Supreme Court, the 90 days in which a defendant could seek such review is added on to the year's deadline, because the circuit opinion or decision is not considered final during that three-month period.  *See United States v. Gibson*, 2001 WL 1301714, *1 (10th Cir. Oct. 26, 2001) (not selected for official publication)(attached as **Case 2**).  Therefore, the defendant's motion pursuant to 28 U.S.C. § 2255 was timely filed, albeit only by one day.

## B.   The parties

The movant, Michael Kebles, Register Number 31863-013, currently is incarcerated at Fort Dix FCI, in New Jersey.  The movant has a projected release date of 09/21/2011.  *See* http://bop.gov/iloc2/InmateFinederServlet (Accessed 7/21/2010) (BOP public webpage).  Therefore, the movant has slightly more than a year of confinement to run on his sentence.

As noted, the respondent is the United States of America ("the Government"), which prosecuted the movant criminally.  This occurred in the District of Colorado, making a motion pursuant to 28 U.S.C. § 2255 appropriate.

**C.  The allegations**

The movant "was convicted in the United States District Court for the District of Colorado . . . of five counts relating to possession, distribution, and conspiracy to possess with intent to distribute ecstacy." *United States v. Kebles*, 318 Fed. Appx. 678, *1.  Now, in this post-conviction proceeding, the movant makes three basic allegations regarding his prosecution.  However, all three alleged grounds for relief are related.  They all concern the fact, written up in a DEA report, provided in discovery to the defense, that the defendant's sister, during the undercover operation, called the Government informant, Robert "Bob" Wilson, the "n word."  Briefly, summarizing the claims, the contentions are:

**1.**  The movant asserts that there was perjury committed by the undercover informant used in the prosecution of the movant.  This informant (or CS – confidential source – in the pretrial paperwork), Bob Wilson (as detailed in the Government **Appellee's Answer Brief**, at 6 – attached as **Attachment 1**), did, in fact, testify at trial – on redirect – that he had seen "people hurt" by drugs and wanted to get involved against drug dealing because of that.  *See* **Motion** at 4. [Claim One]. However, in a late DEA report, in which Government DEA Special Agent Carl Force learned that Wilson had provided cocaine to Teresa Kebles – the sister of the movant

4

– Wilson said, in the report written by Agent Force, that his "motivation for making controlled purchases from Teresa . . . [was] that Teresa angered him/her by calling the CS a 'nigger' and that was his/her motivation." *See* **Attachment 2**. Therefore, according to the movant in this motion pursuant to 28 U.S.C. § 2255, "The altruistic motivation he professed in his trial testimony was a courtroom fabrication contrived to deceive the jury. It was perjury." **Motion** at 4. [Claim One].

**2.** The movant next complains that this same basic issue coalesced into prosecutorial misconduct, personal with the trial AUSA. In this second claim, the movant asserts:

> The Assistant U.S. Attorney . . . was well aware of the statement made by the informant to Agent Force about his true involvement for targeting Teresa Kebles directly and through her brother, the Movant Michael Kebles, indirectly. He knew Mr. Wilson was not the altruistic informant he pretended to be.

**Motion** at 5. [Claim Two]. This presentation of Wilson as a more-highly motivated individual, especially when the AUSA was sparring with the defense expert, "deprived the Movant of a fair trial," according to the movant. *Id.*

**3.** The third claim of the movant relates to alleged ineffectiveness of counsel also dealing with the inappropriate vernacular used by his sister when she was dealing

with informant Wilson.  The movant, implicitly acknowledging that the DEA report was included in the pretrial discovery, asserts:

> The Movant's trial attorney . . . failed or refused to use the single most important piece of evidence in his possession, the aforementioned DEA Report of Investigation, to impeach Mr. Wilson's credibility and ultimately to demolish it.

**Motion** at 7. [Claim Three].

It also must be noted that, in support of his motion pursuant to 28 U.S.C. § 2255 the movant has filed a **Memorandum of Law in Support of Motion Pursuant to 28 U.S.C. § 2255** (doc. 451-1) (hereinafter cited as **Memorandum**).

## D.  The relief requested

The movant seeks, according to his pleading, for the Court "to vacate his conviction, sentence, and forfeitures, and to grant him any other relief to which he may be entitled.  "**Motion**, at 13.  In his supporting memorandum, the movant similarly asks that "the District Court . . . vacate his conviction, sentence, and forfeiture."  **Memorandum**, 13.  Thus, unlike in the situation regarding the appeal, which, if granted on entrapment as a matter of law, the movant apparently recognizes that his claim, if successful, seemingly would not foreclose the possibility of a retrial. (The Government respectfully does not think that bridge will have to be crossed.)

## II.   FACTUAL AND LEGAL BACKGROUND

### A.   The facts established at the movant's trial, according to the Tenth Circuit[2]

The Tenth Circuit, in *United States v. Kebles*, 318 Fed. Appx. 678, affirmed the convictions of the defendant.  Although officially unpublished, the appellate decision and order, because of the several issues raised by the defendant and then-defendant's counsel, does include some detail.  As to facts (excluding case citations and with some rearrangement), the Tenth Circuit found:

> During an undercover DEA investigation, a paid confidential informant befriended Mr. Kebles' sister, Teresa, who arranged a meeting with Mr. Kebles so the informant could purchase ecstasy.  The meeting took place at Teresa's residence and was recorded.  In discussing possible future transactions, Mr. Kebles gave the informant his telephone number.  Mr. Kebles sold 601 ecstasy pills to the informant in three separate transactions occurring over the span of several months.  He also offered to sell the informant an additional 400 ecstasy pills, which the informant declined to purchase.  Although the DEA did not locate the 400 offered pills, it did find 77 ecstasy pills in Mr. Kebles' residence.

*United States v. Kebles*, 318 Fed. Appx. at 679.

---

[2]   This Honorable Court, of course, presided at the trial and is well aware of what came out during this hard-fought case that had, for the defense, the helpful fact of misconduct by a "rogue" DEA informant.  In the event, these recited facts, which are, in the view of the Government, only a conservative summation, are those facts judicially noted (on appeal), and are hereby governmentally quoted.

First, the government played an audio tape, albeit of poor quality, of this transaction during trial.  Second, a DEA agent testified that he actually overheard Mr. Kebles offer to sell the informant 400 additional pills. . . .

*United States v. Kebles*, 318 Fed. Appx. at 682.

[As for the 77 pills] [h]ere, a DEA agent testified that the number of ecstasy pills found in Mr. Kebles' residence far exceeded a personal consumption quantity. . . .

*United States v. Kebles*, 318 Fed. Appx. at 681.

While acquiring the ecstasy, the informant violated his agreement with the DEA by illicitly, and without the DEA's knowledge, providing cocaine to Teresa that he consumed with her on several occasions.  The informant also made several unauthorized phone calls to Mr. Kebles that the DEA did not monitor or record.  Upon discovery of the informant's rogue conduct, specifically his cocaine usage with Teresa, the DEA promptly terminated the informant relationship.

*United States v. Kebles*, 318 Fed. Appx. at 679.  In summarizing the effect of the

evidence presented, the Tenth Circuit stated:

The evidence in this case "falls far short of pointing conclusively and unmistakenly to entrapment as a matter of law." . . .  In fact, it clearly shows Mr. Kebles was not induced.  That the informant made numerous phone calls (both authorized and unauthorized) to Mr. Kebles after the first purchase, even assuming an average of two to three calls per week, does not constitute persuasion and harassment.  That the informant occasionally provided Teresa with cocaine may qualify as inducement of *Teresa*, but it does not, without more, translate into inducement of Mr. Kebles.  The informant simply used Teresa as an intermediary.  Contrary to Mr. Kebles' assertion, moreover, there is no evidence the informant made a plea "based on need, sympathy or friendship." . . .  The evidence does not show that Mr. Kebles even knew the informant gave his sister cocaine.  Thus, Mr. Kebles' entrapment defense necessarily fails because the government sufficiently disproved inducement. . . .

*United States v. Kebles*, 318 Fed. Appx. at 680.  Finally, the Tenth Circuit added,

regarding the impeachment of Wilson,

> The jury heard testimony that the informant was paid for his participation in
> the undercover investigation.  The jury already knew, therefore, that the
> informant's motivation was not purely altruistic and that he had a financial
> interest in catching drug dealers. . . .

*United States v. Kebles*, 318 Fed. Appx. at 682.

## B.  Additional facts not mentioned by the Tenth Circuit

The Tenth Circuit rendition above, while accurate, and sufficient to uphold the

conviction regarding the issue of sufficiency of the evidence, was but a summary.

There were other facts which came out at the trial of the movant.  Some of this

evidence has been noted by the movant in his motion pursuant to 28 U.S.C. § 2255.

Some of the same information, as well as additional information, quoted from the trial

transcripts and from various pleadings, will be relied on in the arguments below.

## III.  ARGUMENT

## A.  At least two of the issues raised by the movant are procedurally barred

The real issues raised by the movant, excluding the one which is grounded on a

complaint about the effectiveness of the movant's counsel, relate to issues which were

raised or legally could have been raised by the movant on his direct appeal.  While

the Government agrees that complaints dealing with ineffective assistance of counsel

almost always should be brought in a collateral proceeding such as a motion pursuant

to 28 U.S.C. § 2255, *see United States v. Bergman*, 599 F.3d 1142, 1149-1150 (10th

Cir. March 25, 2010), the Government also points out that the movant even grounds

this claim on his first two claims which were raised or which could have been raised

previously. *See United States v. Kebles*, 318 Fed. Appx. at 681 (on direct appeal,

defense argued that lack of the informant's full criminal history was a significant

omission "because it showed the informant lied to the government about his prior

criminal history and <u>his supposed altruistic motive for working with the DEA</u>.")

(underlining added).

> 1.   **The movant's appellate counsel sufficiently raised the claim regarding the informant's motivations for being an informant to have the attempted resurrection of the claim considered legally redundant; in addition, the movant, who took over his direct appeal, also could have advanced the claim that Wilson had committed perjury**

As noted above, in his first claim, the movant asserts that there was perjury

committed by the undercover informant used in the prosecution of the movant. Also

as noted above, the movant claims that the perjury was the fact that the informant

testified at trial that he was motivated by having seen "people hurt" by drugs and

wanted to get involved against drug dealing because of that. However, as posited by

the movant, in a DEA report written by Special Agent Force, which purported to

10

quote the informant, it was related that when the agent confronted the informant with the revelation about Wilson illegally providing cocaine to Teresa Kebles, the informant said that his "motivation for making controlled purchases from Teresa . . . [was] that Teresa angered him/her by calling the CS a 'nigger' and that was his/her motivation." *See* **Attachment 2**.  Therefore, the movant says, "The altruistic motivation he [Wilson] professed in his trial testimony was a courtroom fabrication contrived to deceive the jury.  It was perjury."

While the Government will point out below that this scenario, taken as true, hardly constitutes perjury, the Government defends that the movant's trial and appellate counsel (the same lawyer) sufficiently raised this issue to have that prior defense position act as a bar to raising it again.  While not mentioning the hearsay fact that the movant's sister called the informant an extremely ugly racist name, the movant's counsel, on appeal, although acknowledging the informant's "incredible lack of memory as to critical events," did argue about "the real motivation of Mr. Wilson" as presented to the jury.  **Appellant's Reply Brief**, at 10-11.  Attached as **Attachment 3**.[3]

---

[3]   While the Government, during the direct appeal, contended this was part of a new and belated argument on appeal, the Tenth Circuit panel obviously considered the defense position, as evidenced by the decision's quote about Wilson's impeachment regarding motivation.

11

In addition, once the movant took over his own appeal, he had at least an opportunity to advance the appellate claim by arguing for the relevance of the DEA report and the connection with the  previously raised assertion that the defense was frustrated in presenting the full story of Mr. Wilson.  Yet the movant appears to have intentionally delayed this specific argument when he had an opportunity to make it before the Tenth Circuit, at least preliminarily.

The movant, in <u>now</u>  justifying the raising of this impeachment issue in a post-conviction proceeding, says:

> The issue is based upon a DEA Report of Investigation that was not introduced into the trial record, was not in the Record on Appeal, and was thus not available for direct appeal.

**Motion** at 4. [Claim One].  However, this excuse does not set out the whole story.  It is true that the DEA report, Bate-stamped and provided to the defense as part of pretrial discovery, was not introduced as a trial exhibit by the defense.  (Indeed, defense counsel normally do not want to introduce hearsay Government reports into evidence – which may then be considered by a jury to a defendant's detriment.)  But the defendant, when he took over his appeal from his defense counsel, moved, without Government opposition, to supplement the appellate record with, among other items, "Bates No. 0458 through 0461: DEA Report of Investigation prepared

08/26/03 and dated 08/27/03." *See* **Appellant's *Pro se* Motion to Supplement the Appellate Record and to Request a Further Extension of Time in Which to File the Appellant's *Pro se* Supplemental Opening Brief**, at 1 (filed in the Tenth Circuit 08/09/2010).  Attached as **Attachment 4**.  However, in that motion, the defendant did not even assert that he needed the report to demonstrate perjury of a witness (or misconduct by the prosecution – or anything else in particular).  Therefore, not surprisingly,  the Tenth Circuit said that it would examine the entire trial record, but would not expand the record to include items outside of the district court record.  **Order**, at 2 (filed September 12, 2008).  Attached as **Attachment 5**.

Nonetheless, even though the movant says that he lacked a document he wanted considered, the legal issue regarding the credibility of Wilson has been raised previously in the direct appeal.  As noted above, the Tenth Circuit said that the jury knew "that the informant's motivation was not purely altruistic and that he had a financial interest in catching drug dealers. . . ."  *United States v. Kebles*, 318 Fed. Appx. at 682.  Just because the defendant now wishes this Honorable Court to consider an additional document and wants this Honorable Court to refine the conclusion of the Tenth Circuit on the lack of purity of Mr. Wilson's motives does not mean that he should get the proverbial "second bite at the apple."  *See United States v. Gilmer*, 814 F. Supp. 44, 45 (D. Colo. 1992) (Government did not get

13

another chance to introduce more evidence).  He should not, especially when he cannot claim the information is not "newly discovered."

Therefore, either this issue has been litigated and held against the defendant and constitutes the "law of the case" or this issue, however meritless, could have been raised on direct appeal, but was not.  (Neither was it previously raised before this Honorable Court.)  Thus, it is procedurally-barred pursuant to *United States v. Frady*, 456 U.S. 152 (1982).  *See United States v. Dago*, 441 F.3d 1238, 1243-1244 (10th Cir. 2006) (procedural bar should be raised by the government in the district court).

> **2.  The movant, who took over his direct appeal, could have raised a claim (no matter how weak) that the AUSA improperly had vouched for his witness or otherwise had acted improperly**

Also as set out above, the movant next complains that this same issue about the "n word" morphed into prosecutorial misconduct.  The movant asserts, in playing free and easy with who the real target of this ecstasy investigation was, "The Assistant U.S. Attorney . . . was well aware of the statement made by the informant to Agent Force about his true involvement for targeting Teresa Kebles directly and through her brother, the Movant Michael Kebles, indirectly.  He knew Mr. Wilson was not the altruistic informant he pretended to be."  **Motion** at 5. [Claim Two].  The movant broadly asserts that this prosecutorial conduct, occurring during the cross-

14

examination of an expert witness, "deprived the Movant of a fair trial." *Id.*

Certainly, a litigant, through counsel or otherwise, may assert, on a direct appeal, that a prosecutor has crossed over an ethical line during the conduct of the trial. *See, e.g., United States v. Rogers*, 556 F.3d 1130, 1140-1143 (10th Cir. 2009) (claims regarding allegedly improper prosecutorial closing argument). However, it also ought to be noted that the experienced defense counsel here did not believe this to be the situation, at least regarding any prosecutorial "hiding of the ball" regarding other negative information about the informant. *See United States v. Kebles*, 318 Fed. Appx. at 682 n. 3. Thus, while also noting that the movant's present claim is both reckless and unsupported, it can be argued that these belated assertions regarding prosecutorial improprieties have been waived by that defense concession. Certainly, actual complaints about the Government cross-examination during trial have been waived, for such issues should be raised on direct appeal. This matter regarding the alleged misconduct of the prosecutor could have been fully litigated below and directly and specifically appealed.

Of course, the movant argues, as set out below, that his counsel was ineffective. It is true, for example, that when a convicted defendant requests that his counsel file an appeal, failure to do so very well may constitute ineffective assistance

15

of counsel.  *See United States v. Herrera-Martinez*, 484 F. Supp.2d 872, 874-875

(N.D. Indiana 2007).  Here, the movant did have an appeal, and it initially was

handled by an experienced counsel.  As set out below, such counsel need not raise

issues they think meritless.

But, more importantly, this movant took over the appeal (mid-stream) from his

counsel.  As noted above, the movant did not then raise, in his supplemental brief,

that the prosecutor acted improperly, even though the movant argued that Wilson lied

about "his criminal record and his real motives for becoming a DEA Informant."

**Appellant's *Pro Se* Supplemental Opening Brief**, at 5.  Attached as **Attachment 6**.

Thus, this second claim which the movant now makes could have been raised

by the movant, but he did not do so (which probably speaks to its perceived obvious

lack of merit or importance at the time).  This also does not mean, as is made clear

below, that the issue, if specifically raised and/or appealed, would have been

successful.  It would not have been successful.

> **3.     If the two claims above are procedurally barred, then it is
> hard to see how the movant can assert that his counsel, before
> the movant took over, was deficient**

If the issues regarding the supposed perjury of the witness and the supposed

misconduct of the prosecutor have been waived, previously litigated sufficiently, or

otherwise procedurally barred, it is hard to see how the movant can allege that his

counsel erred in not specifically including the claim that the movant's sister made a

nasty racist remark about a Government witness.  However, since it is presumed that

a claim of ineffective assistance of counsel is ripe for consideration in a motion

pursuant to 28 U.S.C. § 2255, considerable facts and law set out below amply

demonstrate how that supposed failing certainly was not ineffective assistance of

counsel.

**B.    The movant must factually fail regarding the merits of his claims**

If the claims made by the movant in his motion are examined, they clearly are

meritless.  The record contains sufficient proof of this so as to make an evidentiary

hearing unnecessary.

> **1.    The informant, who, as acknowledged on direct appeal, was a terribly ineffective witness for the Government during the trial, did not commit perjury and was not even inconsistent; in the event, further impeachment of him would not have changed the result**

As noted above, in his first claim, the movant asserts that there was a piece of

discovery, turned over by the Government, which was not exploited by the defense.

This document, a DEA report which indicated that the informant was getting even

with Teresa Kebles for calling the informant the racist name, shows that the informant

lied regarding his motivation to get drug dealers, according to the movant.

17

Of course, the movant claims, in a convoluted way, that the informant committed perjury because, during redirect (after a particularly lackluster "I-can't-recall" direct examination and a "shooting-fish-in-a-barrel" cross-examination), the prosecutor (in obvious response to the movant's counsel asking how Wilson got involved as an informant  – *see* **Trial Transcript, Day 2**, 391-392[4]) asked Wilson what had motivated him to become an unofficial Government helper.  The informant, in denying he did it for money, said that he was motivated by "[s]eeing people hurt. . . . "Hurt by drugs."  **Trial Transcript, Day 2**, 418.  The informant said that he was finally motivated to change his life around after seeing folks hurt by guns and drugs.  **Trial Transcript, Day 2**, 419-420.  The informant had a job, so he wasn't expecting to be paid (as he was).  *See* **Trial Transcript, Day 2**, 420.

This claim of motivation did not even sound very convincing during the trial, coming as it did from an extremely vulnerable Government witness who was, to put it mildly, befuddled during his trial testimony and who was a Government witness who had handed out drugs.  It hardly supports a claim of perjury, especially when one recalls that, during the interview memorialized in the DEA report, Wilson was on the

---

[4]   The Government also asked on redirect whether the informant, according to the defense, said that he was stressed out because he was going to have to implicate some good people because he couldn't catch any "big fish."  **Trial Transcript, Day 2**, 416-417.

defensive when confronted with the issue of providing drugs and was talking to an

agent who was upset that Wilson had given Ms. Kebles cocaine (and that information,

as set out in the report, had come from Ms. Kebles).

Seemingly inconsistent testimony does not necessarily lead to a conclusion of

perjury, and different answers may not even be inconsistent.  *See United States v.*

*Henderson*, 179 Fed. Appx. 535, 540 (10th Cir. May 5, 2006) (not selected for

official publication) (attached as **Case 3**).  Motivation, of all emotions, is a very

mixed affair – as recognized by actors who attempt to portray characters doing

particular exploits.  Legally, of course, motivation to do anything is a difficult thing to

quantify or to summarize.  *See, e.g., Colorado v. Connelly*, 479 U.S. 157, 165-166

(1986) (the job of the courts is not to "divine a defendant's motivation for speaking or

acting as he did" regarding confessions, if there is no Government misconduct).

In the case of informant Wilson, his motivations were effectively dissected

during cross-examination.  Still, it did not amount to perjury for Wilson to claim, on

redirect as the prosecutor tried to rehabilitate a near-worthless Government witness,

that he decided to get into the war on drugs because of things he had seen and

experienced.  Plus, Special Agent Carl Force testified that it was not until later that

the DEA wanted to go after ecstasy dealers in particular – and this brought Teresa

Kebles into the picture as a potential source.  *See* **Trial Transcript, Day 2**, 226-227.

Therefore, Wilson's statements on motivation were not even inconsistent, much less

perjury.  His testimony was in general, and not limited to the Kebles.  His flustered

statement in the DEA report was specific to Teresa Kebles – and obviously something

that the informant, like a kid caught at the cookie jar, extemporaneously was pulling

out of his memory.

Finally, even though the movant now thinks that further impeachment of the

informant would have changed the result of the trial, that obviously is not so.  As

reiterated many times, and as confirmed by the direct testimony to be found in the

transcript, Robert "Bob" Wilson was a terrible witness for the Government, even

though he basically confirmed the testimony of Special Agent Force and corroborated

the drug dealing of the defendant (which fortunately was backed up by some

recordings).  Nonetheless, playing the Government cards as they were dealt, the

prosecution did not "hide the ball," but, instead, put Wilson on the stand for the jury

to see and for the movant's experienced defense attorney to have a fun field day in

cross-examining.

The evidence of which the movant argues was (theoretically, at best – *see*

below) impeaching, and it would not have changed the outcome of the trial.  The

movant's desire to change the standard from "the informant's motivation was not purely altruistic and . . . he had a financial interest in catching drug dealers. . . .," *United States v. Kebles*, 318 Fed. Appx. at 682, to "the informant's motivation was *purely not* altruistic," *see* **Memorandum**, at 13, is cutting too fine a semantic point and probably is a psychological impossibility when speaking of motives. *See United States v. Henderson*, 179 Fed. Appx. at 539-540 (attached as **Case 3**) (movant in 2255 did not meet his burden by poring over record and claiming every inconsistency was evidence of perjury and subornation of perjury by Government). *Cf. United States v. Akers*, 215 F.3d 1089, 1103-1104 (10th Cir. 2000) (alleged inconsistency between a witness' grand jury and trial testimonies was not enough to reverse conviction, especially where, according to the trial court, "the eyewitness's 'uncertainty was later made eminently clear to the jury at trial.'"). *See also United States v. Holly*, 2010 WL 1981035, *1-*2 (10th Cir. May 19, 2010) (not selected for official publication) (attached as **Case 4**) (defendant, in seeking new trial, claimed he had such new evidence as the prosecution witnesses having a drug party and that a prosecution witnesses was under the influence of drugs when testifying).

21

    **2.**    **The trial AUSA, in cross-examining an expert witness about a hypothetical situation regarding testimony presented by the expert, did not act improperly; neither did the prosecutor improperly vouch for his witness**

Also as set out above, the movant next complains that his fair trial rights were denied him because of what the trial AUSA did during the cross-examination of Michael Levine, a retired Government agent and certified as a defense expert in undercover operations.  *See* **Trial Transcript, Day 3**, 493-500.  The movant, basing the complaint again on the use of the "n word" by his sister, asserts:

> The Assistant U.S. Attorney . . . was well aware of the statement made by the informant to Agent Force about his true involvement for targeting Teresa Kebles directly and through her brother, the Movant Michael Kebles, indirectly.  He knew Mr. Wilson was not the altruistic informant he pretended to be.

**Motion** at 5. [Claim Two].

During the direct-examination of Mr. Levine he went into detail about the typical undercover informant.  "The one thing that you've got to keep in mind about criminal informants," he testified, "is they have one thing, usually, in common.  They will lie if they can get away with it.  They will use their informant status to commit crimes, if they can get away with it, because they're criminals."  **Trial Transcript, Day 3**, 502.

22

Of course, much of what experts say are hypothetical and supposedly-typical situations; often, as here, travelling into the realm of hyperbole.  Although informant Wilson was shown not to be as "pure as Caesar's wife," he was hardly "a criminal," at least a career criminal with convictions.  *See United States v. Kebles*, 318 Fed. Appx. at 681-682 (appellate discussion of the informant's arrest for aggravated car theft four years before trial).

Nonetheless, the expert also delved into the typical motivations of the typical informant.  Levine testified:

> 25 years' experience has shown me, in the handling of informants, 17 years in the review of informant-generated cases, so it's 42 years of training and experience has shown me that informants will lie for several motives.

**Trial Transcript, Day 3**, 505.

> The first is when an informant is in trouble or an informant is trying to, as we say in the parlance, work of a beef; that is, get credit for giving government or the police a case for his informant activities, thereby having some problem he has with the law erased, vanish.  Well, an informant who informs on, for instance, a dangerous criminal, a real drug dealer, who will kill him, will kill his family, if he can get away with it, he would much prefer to con someone into getting involved and supplying drugs.  In essence, the informant will create the crime.  And deliver as satisfaction of his agreement anyone who is foolish enough or vulnerable enough to bite, not someone who is a real threat to him.

**Trial Transcript, Day 3**, 505-506.

23

Naturally, just as the movant's trial counsel did an effective job of cross-examining the informant, the Government counsel here had the duty fairly to cross-examine the expert who was making grand and dismissive statements about an undercover operation that he did not participate in and who was making all-encompassing psychological conclusions about an informant he did not know. During this cross-examination of Mr. Levine, the AUSA asked the expert about the existence of "philanthropic or socially motivated informants."  When the expert "vaguely recall[ed] one or two in [his] career," the AUSA then asked about DEA informants "who volunteer their services because they're fed up with crime or violence in their community and they offer their services knowing the risk and agreeing to undertake dangerous, potentially dangerous, jobs in order to help clean up crime in their neighborhood or whatever." **Trial Transcript, Day 3**, 520.  The expert, who  modestly acknowledged, "I wrote a book about it," also described how there were other, less admirable, motivations for informants.  *See* **Trial Transcript, Day 3**, 520-521.  The expert and the AUSA also debated the criminal record – or lack of it, regarding Wilson.  *See* **Trial Transcript, Day 3**, 521-524.

Thus, this was fair cross-examination of the expert, Levine, especially because Levine was an expert dealing with hypotheticals, educated guesses, broad

24

assumptions, and grand, vicarious conclusions.  The prosecutor simply was

presenting the possibility that Wilson's statements about his general motivations

regarding assisting the Government in general were based on truthful situations.

Again, the *pro se* movant, in his claim, is conducting a post-game quarter-

backing, based not upon his verdict-supported guilt, but upon his "por[ing] over the

trial transcript, hunting for minor discrepancies" in support of claims of perjury and

prosecutorial misconduct.  *See United States v. Henderson*, 179 Fed. Appx. 535, 539-

540 (attached as **Case 3**).  The AUSA here was asking legitimate questions based

upon the record and was not doing anything improper.  Plus, when such hypothetical

questions are posited to experts during cross-examination and which do not have a

basis of support in the record, the occasion can easily be, at worst, harmless error on

the part of the Government, based upon the entire trial record.  *See United States v.*

*Langston*, 970 F.2d 692, 700-701 (10th Cir. 1992).

Finally, neither was the prosecutor "vouching" for the informant.  Vouching

occurs when an attorney tends to say that he knows something outside the courtroom

that means someone is telling the truth.  *See United States v. Rogers*, 556 F.3d at 1143

n. 7.  The AUSA did nothing of the kind here, but was basing his inquiry on the

informant's testimony.

> **3.    The movant's then-counsel was not ineffective regarding not telling the jury that the movant's sister used an ugly racist term in referring to the informant in the informant's presence; at the least, that would have gone against the logical (and almost successful) defense strategy at trial**

As set out above, the third claim of the movant relates to alleged ineffectiveness of counsel, also dealing with the inappropriate language employed by his sister (apparently but once) when she was dealing with Wilson – another person actually involved (it turned out) in the drug trade.  The movant, a lay person and certainly emotionally involved in the aspects of his own prosecution, claims that, regarding the DEA report turned over in discovery, his "trial attorney . . . failed or refused to use the single most important piece of evidence in his possession, the aforementioned DEA Report of Investigation, to impeach Mr. Wilson's credibility and ultimately to demolish it."  **Motion** at 7. [Claim Three].  The Government (which believes that the distribution of drugs to Teresa Kebles by the informant was the "single most important piece of evidence" for the defense) will discuss, below, factually how this "evidence" clearly was not exculpatory or even beneficial regarding the movant, especially when one looks at the clever and well-built defense strategy put together by the movant's counsel.

But first of all, this movant has a heavy legal burden to demonstrate that his counsel did anything wrong, and, in addition, that any error prejudiced the movant's case.

A defendant, in order to make out an ineffective assistance of counsel claim, must assert both an error and show that the error caused a reasonable probability of prejudice. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). However, if there obviously is no prejudice, the first prong, that of an error being made, does not even have to be addressed. *See Strickland*, 466 U.S. at 697. Further, if a district court denies a motion to vacate a conviction on an ineffective assistance basis and there is insufficient evidence in the record supporting a movant's claims, then the denial will be upheld. *See United States v. Dago*, 441 F.3d at 1251 ("Because the evidentiary record before us is insufficient to permit an assessment of Dago's claim, we must affirm the judgment of the district court denying the relief that Dago seeks.")

Thus, the movant here has a burden of proof, or at least he must make some showing to shift that burden to the Government. If anything, there is a presumption that a defense counsel was competent and rendered effective assistance. *See Lufkin v. Solem*, 554 F. Supp. 988, 993 (D. S.D. 1983), *affirmed*, 716 F.2d 532 (8th Cir. 1983), *cert. denied*, 467 U.S. 1219 (1984). At the least, a defendant claiming ineffective

27

assistance is required to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland v. Washington*, 466 U.S. at 690.

While this movant has identified the alleged omission, obviously, as set out below, it is no basis for claiming ineffective assistance of counsel. It was neither error nor prejudicial.

First of all, it is obvious why neither attorney brought out the tidbit that Ms. Kebles had called the informant the "n word." Although the reasoning has varied, depending on the enlightenment of the particular era, it long has been considered highly inappropriate and prejudicial to use that word, especially in legal proceedings which are supposed to be based on calm color-blind logic, not on hate and emotion – unless the use is material and relevant and not unfairly prejudicial. Certainly, racist and derogatory names are always to be avoided, if possible. *See United States v. Frasch*, 818 F.2d 631, 634 (7th Cir. 1987) (although not reversible error to use recordings which had corrupt policeman using the "n word," there are ways and occasions when it can be substituted at trial).

If fact, a "normal defendant" would not want to be associated with the use of the "n word" against a victim or a prosecution witness. *See United States v. Frasch*,

28

818 F.2d at 633-634;  *United States v. Cilia*, 2005 WL 1164153, *2 (S.D. N.Y. May 17, 2005) (threats by loan shark included the word; it was not unfairly prejudicial because it made the threat more forceful).

However, this movant undoubtedly will protest that it was his sister and not he using the word.  Unfortunately for the movant's claims, this theory would undercut the hard-hitting defense at trial masterminded by his experienced counsel (who had, due to the unlawful activity of the informant, considerable hay to make Governmental misconduct bricks).  As recognized by the Tenth Circuit, the defense was hanging its hat on the claim that the entrapment of Teresa Kebles by the informant – through the distribution of cocaine to her – was the equivalent, in this supposedly close-knit family, to the entrapment of the movant himself.[5]  As the defendant's counsel argued in closing, regarding Wilson giving drugs to the movant's sister:

> It also allowed him to gain the trust of Teresa.  And that's what goes to the inducement part.  You don't expect a government agent to give you drugs.  It establishes in a very dark way trust between an agent and the informant.  That trust between he [sic] and Teresa enabled her to pull Michael in.  Because the sympathy and familial relationships, all this can be considered in entrapment.  When he got her, he got him.  And it was by giving her cocaine that she could trust him and therefore she could tell Michael, hey, you can trust this guy.  But that's okay.  They got the drugs, so don't worry about prosecuting him, he's a great guy, philanthropic or whatever he said.

---

[5]   However, as noted above, the Tenth Circuit rejected, as a matter of law, this defense strategy, saying that "there is no evidence the informant made a plea 'based on need, sympathy or friendship.'"  *United States v. Kebles*, 318 Fed. Appx. at 680.

**Trial Transcript, Day 4**, 696-697 (underlining added).   Thus, to have Teresa's inducement be the movant's inducement, the defendant's counsel had to emphasize that the close and friendly relationships included, not only family siblings Teresa and Michael, but included Wilson, as well.  The introduction of the  "n word" into the proceedings would mess this defense theory up.  It would show Teresa to not be so chummy with Wilson – which would detract from the presentation of Wilson as a sort of Judas-like betrayer.  And, if the defense was showing the sister and brother were close, the introduction of the "n word" would tend to show that both Teresa and the movant were racists.  That apparent racism would not, and should not, gain jury empathy in the District of Colorado.

This trial strategy, to undercut predisposition to distribute drugs, is obvious elsewhere.  The defense witnesses supported the defense theory of the case as best they could.

During the testimony of defense witness Julia Anne Rutter, a bar maid, she opined that she thought Wilson and Teresa Kebles "were friends."  **Trial Transcript, Day 3**, 447.  Basically, according to the testimony of Rutter, this personal relationship, which made Wilson's being an informant a betrayal, seemed, therefore, to be behind "the real reason that he was so upset and distraught . . . [because] he couldn't get the big fish."  **Trial Transcript, Day 3**, 448.

30

As for the defense evidence given by Laura Hemborg, the movant's live-in girl friend (who had no idea about marijuana-usage at the house – *see* **Trial Transcript, Day 3**, 453, 456-457) , she also portrayed Wilson as someone who did not have any reason to be out to get the movant or his sister.  Not only did the informant apparently pester the movant into giving into Wilson's demands regarding drugs, Wilson told Ms. Hemborg that he was the movant's "sister's friend."  **Trial Transcript, Day 3**, 454.

Finally, regarding the defense testimony from the supposed expert, Michael Levine, his basic testimony was, as he put it during recross-examination, that the situation was a case of improper inducement of dealers where "[t]heir sister might be pleading with them to get it." **Trial Transcript, Day 3**, 564.  Again, the introduction of the racial epithet would have raised confusing questions, into the defense, regarding what did the movant know about his sister's racism and when did he know it?  The last thing the defense would have wanted was that the expert would get into the movant's motivation to sell drugs to someone he also thought of in derogatory terms.  That certainly would tend to portray the movant in a bad light for the jury.

Therefore, this was an obvious case of this experienced (and often successful) counsel of exercising "reasonable trial strategy."  *See, e.g., United States v. Foreman*,

31

323 F.3d 498, 502-505 (6th Cir. 2003). Introducing the evidence that would have tended "to trash" Teresa Kebles would have been counter-productive, to say the least. Indeed, a defendant could later complain that introducing evidence that he came from a family of racists would be independent cause for post-conviction complaint.

In summary, the previously-provided discovery (the DEA report) was not helpful to the defense trial strategy (which <u>almost</u> succeeded). In addition, the detrimental (for the movant) information in this discovery, quite ethically, was not exploited by the Government.

## C.    An evidentiary hearing is not necessary in this case

The holding of a hearing by a court usually is a matter within the court's sound discretion. An evidentiary hearing does not need to be held when the files and records of the case conclusively show that the prisoner is entitled to no relief. *See United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995). As should be obvious, the movant has not set out any facts which would support an evidentiary hearing. There certainly has been no substantial factual allegation indicating that there likely would have been a different result. Indeed, if anything, the negative information about the movant's sister would have gained the movant some disapproval rather than any sympathy

32

As for the effectiveness of his counsel, the movant cannot demonstrate that his counsel, in keeping out racist language emanating from his family, committed an error of omission.  Indeed, not only was there no prejudice in keeping out this language, keeping it out supported the rational theory of the defense as developed by the defendant's counsel.

As emphasized in this response, the movant has not alleged any facts which would mandate an evidentiary hearing.  Indeed, the record supports an easy conclusion that there is absolutely no merit to the claims of the movant.  Dismissal without a hearing would be more than appropriate.[6]

## IV. CONCLUSION

For the foregoing reasons, the movant's motion pursuant to 28 U.S.C. § 2255 should be denied.  This case does not demonstrate any sort of miscarriage of justice which would justify relief *via* a motion pursuant to 28 U.S.C. § 2255.  Indeed, this case seems to be the situation which is the antipodal of a miscarriage of justice.  In addition, no evidentiary hearing is necessary.

---

[6]   However, if there actually is an evidentiary hearing, the movant's then-counsel will be able to testify to defend himself from the claims on the part of the movant.  By his attack on the professional conduct of his attorney at his prosecution, the movant has waived relevant portions of his attorney-client privilege.  *See, e.g., Tasby v. United States*, 504 F.2d 332, 336 (8th Cir. 1974).

33

Respectfully submitted,

David M. Gaouette
United States Attorney


*s/John M. Hutchins*
John M. Hutchins
Assistant U.S. Attorney
1225 Seventeenth Street, Ste. 700
Seventeenth Street Plaza
Denver, CO 80202
Telephone: (303) 454-0200
FAX: (303) 454-0402
E-mail: john.hutchins@usdoj.gov
Attorneys for Respondent

34

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that one this 3rd day of August, 2010, I electronically filed the foregoing **RESPONSE TO ORDER TO ANSWER MOTION PURSUANT 28 U.S.C. § 2255**, with the Clerk of Court using the ECF system.

I further hereby certify that a copy of the above and foregoing **RESPONSE TO ORDER TO ANSWER MOTION PURSUANT 28 U.S.C. § 2255**, was mailed on the 3rd day of August, 2010, postage prepaid, addressed to the following:

Michael Kebles
Reg. No. 31863-013
FCI – Fort Dix
P.O. Box 2000
Fort Dix, New Jersey  08640

_s/Dorothy Burwell_____
Dorothy Burwell
United States Attorney's Office

Attachment 1

No. 07-1485

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

  v.

MICHAEL KEBLES,

      Defendant-Appellant.

---

## APPELLEE'S ANSWER BRIEF

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
The Honorable Wiley Y. Daniel
District Judge
D.C. No. 03-cr-000249-WYD

---

TROY A. EID
United States Attorney

JAMES R. BOMA
JOHN M. HUTCHINS
Assistant U.S. Attorneys
1225 17th Street, Suite 700
Denver, Colorado  80202
(303) 454-0100
USACO.ECFappellate@usdoj.gov
Attorneys for Plaintiff-Appellee

**ORAL ARGUMENT IS REQUESTED**
**March 27, 2008**

Attachment 1

# TABLE OF CONTENTS

Page No.

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

PRIOR OR RELATED APPEALS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

SUBJECT MATTER AND APPELLATE JURISDICTION.. . . . . . . . . . . . . . . . . .  1

ISSUE PRESENTED FOR REVIEW.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF THE FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

SUMMARY OF THE ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

ARGUMENTS

I.    The defendant was not, as a matter of law, improperly induced by the Government
      to commit crimes of which he was not predisposed to commit; the issue of
      entrapment was an issue for the jury and was submitted to the jury, which heard
      of the unauthorized conduct of the undercover informant with broad instructions
      desired by the defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

      A.    Issue Raised and Ruled Upon. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

      B.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

      C.    Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

STATEMENT REGARDING ORAL ARGUMENT.. . . . . . . . . . . . . . . . . . . . . .  45

i

Attachment 1

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

CERTIFICATE OF DIGITAL SUBMISSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Attachment 1

# TABLE OF AUTHORITIES

<u>Page No.</u>

## CASES

*United States v. Diaz*,
    189 F.3d 1239 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Estep*,
    760 F.2d 1060 (10th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 42

*United States v. Gifford*,
    17 F.3d 462 (1st Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v.  Hildreth*,
    485 F.3d 1120 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 44

*United States v. McKissick*,
    204 F.3d 1282 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Mosley*,
    965 F.3d 906 (10th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Nguyen*,
    413 F.3d 1170 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 40

*United States v. Osborne*,
    935 F.2d 32 (4th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Quarles*,
    198 F.3d 260 (Table). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Young*,
    954 F.2d 614 (10th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Vega v. Suthers*,
    195 F.3d 573 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## FEDERAL STATUTES AND RULES

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 924(c)(1)(A).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

21 U.S.C. § 841(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3

21 U.S.C. § 846. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

21 U.S.C. § 853(p).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Crim. P. 29. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## PRIOR OR RELATED APPEALS

There are no known prior or related appeals.

iv

## SUBJECT MATTER AND APPELLATE JURISDICTION

There was federal criminal jurisdiction over the offenses alleged here pursuant to 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 21 U.S.C. § 846 [conspiracy to possess with intent to distribute 4-methylenedioxymethamphetamine (MDMA or "ecstasy")]; pursuant to 21 U.S.C. § 841(a)(1) and (b)(1)(C) [possession with intent to distribute and distribution of MDMA] and 18 U.S.C. § 2 [aiding and abetting]; pursuant to 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 924(c)(1)(A) [knowing possession of a firearm in furtherance of a drug trafficking crime]; and pursuant to 21 U.S.C. § 853(p) [forfeiture].

There was general federal criminal jurisdiction in the federal district court pursuant to 18 U.S.C. § 3231.  There is general federal appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

Was the defendant improperly induced, as a matter of law, by an undercover informant, then working for the Government, to commit crimes of which he was not predisposed to commit?

Was the normally factual issue of entrapment improperly submitted to the jury, with broad instructions requested by the defense, because, in this particular situation, the evidence regarding entrapment and the admittedly unauthorized misconduct of the

informant was so overwhelming and uncontradicted that this was one of those rare cases which constitute entrapment as a matter of law?

## STATEMENT OF THE CASE[1]

On September 10, 2003, there was a Superseding Indictment filed which named Michael Kebles, the defendant-appellant, and Teresa Kebles, as defendants.[2] Vol. I, doc. 65.  The Indictment had seven counts.

Count One accused the defendant and Teresa Kebles, with conspiring, between on or about January 14, 2003, and on or about May 28, 2003, to possess with intent to distribute 4-methylenedioxymethamphetamine [MDMA] ("ecstasy").  This was in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 21 U.S.C. § 846.  Vol. I, doc. 65, at 1.

Count Two alleged that the defendant, along with Teresa Kebles, on or about January 14, 2003, distributed an amount of MDMA.  This was in violation of 21

---

[1]   Vol. I of the Record on Appeal (ROA) has the pleadings and other documents.  Vol. II through VIII are transcripts regarding the seven days of the trial, including matters regarding voir dire and jury deliberations.  Vol. IX is a transcript of sentencing.  Vol. X is (out of order and) the transcript of the pre-trial motions hearing. In addition to being the record on appeal, records in the same case, when necessary, may be noted judicially.  *See United States v. Estep*, 760 F.2d 1060, 1063 (10th Cir. 1985).

[2]   As set out in the Statement of the Facts, these Kebles were brother and sister.

U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2 (aiding and abetting).  ROA, Vol. I, doc. 65, at 2.

Count Three alleged that the defendant, on or about February 11, 2003, distributed an amount of MDMA.  This was in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).  ROA, Vol. I, doc. 65, at 2.

Count Four alleged that the defendant, on or about April 2, 2003, distributed an amount of MDMA.  This was in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). ROA, Vol. I, doc. 65, at 3.

Count Five alleged that the defendant, on or about May 28, 2003, possessed with intent to distribute an amount of MDMA.  This was in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Vol. I, doc. 65, at 3.  (This MDMA was found when the defendant's residence was searched pursuant to a warrant.)

Count Six alleged that the defendant, on or about May 28, 2003, knowingly possessed a firearm (a Colt pistol), in furtherance of a drug trafficking crime.  This was in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 924(c)(1)(A). Vol. I, doc. 65, at 3.  (This weapon was found when the defendant's residence was searched pursuant to a warrant.)

Count Seven alleged a forfeiture of a 1996 Chevrolet vehicle, $9,690 in cash, $5,773 in cash, $2,000 in cash, $1,439 in cash, and the Colt pistol with ammunition. This was pursuant to 21 U.S.C. § 853(p).  ROA, Vol. I, doc. 65, at 4-5.

After trial, according to the verdict form, the jury found that the defendant was not entrapped, and that he was guilty of Count One.  *See* ROA, Vol. I, doc. 375. According to the verdict form, the jury found that the defendant was not entrapped, and that he was guilty of Count Two.  *Id.*  According to the verdict form, the jury found that the defendant was not entrapped, and that he was guilty of Count Three. *Id.*  According to the verdict form, the jury found that the defendant was not entrapped, and that he was guilty of Count Four.  *Id.*

According to the verdict form, the jury found that the defendant was guilty of Count Five.  This was possession of MDMA.  *Id.*

However, also according to the verdict form, the jury found that the defendant was not guilty of Count Six.  This was the firearm count.  *See* ROA, Vol. I, doc. 375.

And, according to the Special Verdict Form, the jury found that the $9,100 was to be forfeited, the Chevrolet was to be forfeited, and that the $1,439 was not to be forfeited.  *See* ROA, Vol. I, doc. 377.

According to the Judgment in a Criminal Case (J&C), the defendant was sentenced to a total of 63 months.  *See* ROA, Vol. I, doc. 402, at 3.  According to this J&C, the imposition of the judgment was on November 5, 2007.

A notice of appeal, on behalf of the defendant, was filed.  ROA, Vol. I, doc. 407.  This was filed on November 14, 2007, making the appeal timely.  This appeal follows.

## STATEMENT OF THE FACTS

**A.**     **The Government case as presented at trial**

**1.**     **Introduction**

While there were several Government witnesses at trial, the lead-off and primary witness was Drug Enforcement Administration Special Agent Carl Force.  As will be noted, there also were recordings which were related by the agent in court and which were played for the jury.  However, there admittedly were telephone calls made by an informant, which were not always recorded or, if recorded, not always perfect.  *See* ROA, Vol. III, at 353-354.

**2.**     **The Government case**

In December, 2002, Drug Enforcement Administration Special Agent Carl Force got a duty telephone call from a Mr. Robert "Bob" Wilson, who said that he had "a bunch of information about a . . . large cocaine trafficker here in Denver."  The

information contained details which could be verified through other sources and seemed very credible information.  ROA, Vol. II, at 222, 227.

Bob Wilson later testified that his motivation for getting involved as an informant was because he had seen "people hurt" "by drugs."  ROA, Vol. III, at 418. Wilson claimed that for years he acted as a body guard for drug dealers and provided protection, although he never himself dealt drugs.  Then, after a shootout, which he wasn't involved in, Wilson felt he had "to just get away from it."  *See* ROA, Vol. III, at 419.  So Wilson went to the DEA.  Since he had his own job, he did not expect any money.  ROA, Vol. III, at 420.

Agent Force went to his supervisor and suggested that this informant be used. But the group in which Force was a member at the time was called a Mobile Enforcement Team (MET), which was supposed to go after "very low, low-level dealer[s], like people [who] are basically junkies, selling little amounts of marijuana or crack or heroin."  ROA, Vol. II, at 222.  Therefore, there was a decision that the matter be held in abeyance until Agent Force "was transferred to another group within the Denver Division."  *See* ROA, Vol. II, at 223.

In about 2003, Agent Force got transferred to a task force, so he decided to go "out and [he] reestablished communication with Mr. Wilson to recruit him as a confidential informant."  Agent Force became Wilson's controlling agent.  ROA, Vol.

Attachment 1

II, at 223.  Agent Force basically was the agent who signed Wilson up and worked

with him.  ROA, Vol. II, at 225.

Agent Force explained what this duty entailed and how it was done:

. . .  Basically when you come in, you're going to establish or manage an informant, you need an investigation to do it.  You can't just go out and sign up an informant.  So I established and managed Mr. Wilson under the Scott Anthony Raymond title file.

ROA, Vol. II, at 223.

The process is very lengthy and detailed.  You got to check the person for warrants, you got to look into any criminal history.  We're not going to take anybody with domestic violence on there.

ROA, Vol. II, at 222-224.

You have to have them sign an agreement that details that they can't do anything outside of your authorization because you're not going to be with them 24/7, for example, taking drugs with the defendants.  They can't go out and get up any drug deals on their own, without our permission.  So you go through that agreement.

ROA, Vol. II, at 224.

You go ahead and you take your fingerprints, you photograph them.  It's a pretty, pretty lengthy progress.  And then it's going to go through your supervisor who has to approve it, and then it usually have [sic] to go to a second line supervisor who will approve this also, the use of . . . this person as an informant.

ROA, Vol. II, at 224.

As for the work of this Wilson, "[w]hile he was an informant with the DEA, he worked on two specific file titles.  The Scott Raymond file title and another file title under . .  Mirabal, Rodney Mirabal."  ROA, Vol. II, at 224.

But, while Wilson volunteered for this duty, he did not end up as an unpaid volunteer.  He was paid by the DEA to be an informant , and for his work he was paid a total of $12,839.  For the investigation of Michael and Teresa Kebles, Wilson was paid $4,450 and $150 in reimbursed expenses (one of which was for cell phone expenses).  The balance of the money Wilson received was involving other targets. ROA, Vol. II, at 225.  *See also* ROA, Vol. II, at 226.  The money paid to the informant was in installments.  ROA, Vol. II, at 225-226.

Then, in January, 2003, according to Agent Force, Wilson was informed that the task force "wanted to target any individuals that were distributing ecstasy.  Teresa Kebles was identified as a potential source of this drug.  *See* ROA, Vol. II, at 226-227.  When Agent Force asked Wilson if he knew anyone "dealing in X right now," Wilson said, "Yeah, I might know somebody.  Terry."  The DEA did not then have her – Terry – "fully identified yet."  ROA, Vol. II, at 227.

Wilson said, "Why don't I give her a call and I'll see if we can arrange to do something."   "Basically," related Agent Force, "Robert, Bob, engaged in

conversations with Terry over the telephone where they arranged for him to purchase a hundred tablets of ecstasy." ROA, Vol. II, at 227.

While Agent Force could only hear Wilson's side of the conversation, this conversation was recorded (*via* a so-called KEL recording) and Force later listened to the entire call.  He got where he could recognize Terry's voice (and know that she was Teresa Kebles) and, of course, Wilson's voice.  *See* ROA, Vol. II, at 228.

This conversation (which was played for the jury at trial) was, according to Agent Force, a situation where Wilson and Ms. Kebles were "coordinating for the meeting to occur where Bob can purchase the ecstasy pills from Michael Kebles." The meeting was to take place at Teresa Kebles' residence at 1475 East Hermosa Drive, Highlands Ranch, Colorado.  ROA, Vol. II, at 230-232.  It occurred on January 14, 2003.  *See* ROA, Vol. III, at 243.

Therefore, according to Agent Force,

Well, we started surveillance on the residence first.  So we had agents in place. And then myself and another task-force agent met with a confidential source [Wilson] where I provided him with the $1600 in government funds.  I gave him a KEL transmitter, which is at the time, I believe, was like a -- I don't know not going to -- it was basically like an electronic device that could transmit and we could receive it.

ROA, Vol. II, at 232.  In addition, regarding Wilson, the confidential source, according to the agent, "We searched him and we searched his vehicle.  So we patted him down like you'd pat down a prisoner."  ROA, Vol. II, at 232.  No contraband,

other money, or anything else was found on the person or in the car.  *See* ROA, Vol.

II, at 233.

Then, once the undercover operation arrived at Highlands Ranch, according to

Agent Force,

> Then we had instructed him to go to the house.  We followed him, we kept
> surveillance on him.  We had the agents there at the house already.  We
> observed him as he arrived at the house.  He parked his car.  And he entered
> the residence.

ROA, Vol. II, at 233.

The events were broadcast and recorded, so Agent Force thought he knew what

was going on inside.  The informant spoke to Ms. Kebles.  Also inside were Ms.

Kebles' daughter and her boyfriend.  After a while, a white Suburban vehicle arrived

at the residence.  The surveillance team "ran the plate" and found that it was

registered to Michael Kebles, the defendant, in Elizabeth, Colorado.  Mr. Kebles got

out of his car, went to the confidential source's car and inspected it.  According to

Agent Force, "He looked inside it.  He looked underneath it.  And then he proceeded

inside the home, Teresa's residence."  *See* ROA, Vol. II, at 233-234.

On the subsequent recorded conversation in the residence, the defendant's

voice was softer than that of the informant's.  *See* ROA, Vol. II, at 235.  The

discussion between these two spoke of red, yellow, and white.  Agent Force, from his

professional experience, thought that this related to types of narcotics.  *Id.*

In discussing future transactions, the defendant gave his telephone number and that they would talk in the future, hook up, get together.  ROA, Vol. II, at 236.   The defendant's sister could also be heard.  *Id.*  In addition, according to Agent Force's testimony,

> In listening to the KEL and being there live, you could hear Mr. Kebles also counting out the money.  I put that, I remember putting that in my report of investigation, the $1600.

ROA, Vol. II, at 236.

Then, when Informant Wilson left the resident at Highlands Ranch, the surveillance folks kept him in view, the whole time as he drove to a so-called neutral location or neutral site, some distance away.  There, Agent Force and TFO Creedon patted down the informant and "checked the car to see if there was narcotics or anything else and found nothing."  ROA, Vol. II, at 236-237.  Meanwhile, Wilson had turned over a hundred pills (counted by Force) and the electronic transmitter. ROA, Vol. II, at 237.  The pills (less those tested) were an exhibit at trial.  *See* ROA, Vol. II, at 237; Vol. III, at 383.

There were three telephone calls before the next transaction.  *See* ROA, Vol. III, at 243.  The first, according to Agent Force, was on January 23, 2003, when Wilson called the defendant, trying to arrange for a purchase of 300 tablets of ecstasy that day in Guvnr's Park [a restaurant] in Denver.  But that deal fell through because

11

Force wanted to try to introduce himself in an undercover capacity. Such an introduction is done both to try to protect the identity of an informant and to protect the informant by cutting the informant out of the negotiations. *See* ROA, Vol. III, at 243-244. However, it often happens that one transaction is not enough to gain the trust of the dealer regarding the confidential source so that the dealer figures out he hasn't yet been arrested, so everything must be okay. *See* ROA, Vol. III, at 244. The defendant still was "hinky," meaning skittish. *Id.*

The second telephone call came on January 29, 2003. This was when Wilson went through Teresa Kebles to try to set up the 300-pill transaction. There was a mention of "Mike" and the informant wanted "the same thing." *See* ROA, Vol. III, at 245-246.

Then, there was a telephone call on January 30, 2003. Once again, Wilson called Teresa Kebles, wanting to know why things weren't happening regarding the 300 pills of ecstasy. The two also had a supposedly unrelated discussion about money. *See* ROA, Vol. III, at 246-247.

Finally, a meeting was arranged on February 11, 2003. It was to take place at the Chipotle restaurant at 2480 South Colorado Boulevard. The plan was to meet at night there and exchange $4500 for 300 pills. *See* ROA, Vol. III, at 247. Once again, the standard operating procedure was employed; the agents met first with the

informant, searched him and his vehicle for any money or contraband, fitted him with an electronic listening device, gave him the money, and had him drive to the rendezvous, all under surveillance.  *See* ROA, Vol. III, at 248.

But the informant and the surveillance team had to wait about an hour and a half for the defendant actually do the transaction.  There were a couple of security vehicles at the strip mall, and they might have been thought to be Denver Police.  So the informant and the defendant met quickly and agreed to meet at the nearby King Soopers grocery store and deal there.  *See* ROA, Vol. III, at 248-249.

The surveillance team could see that Wilson, after driving to the side of the strip mall, got into the defendant's Suburban, where he gave the money to the defendant and got actually 301 pills.  *See* ROA, Vol. III, at 249.  Then, the earlier procedure was followed; the informant and the surveillance team drove to a neutral site, had a search, and got the transmitter and drugs.  Once again, the untested portion of the pills were admitted for the jury.  *Id.*; Vol. III, at 383.

Meanwhile, the defendant was followed back to his own residence at 442 Clarkson Street in Denver.  ROA, Vol. III, at 250.  It is normal procedure not to attempt this on a suspect after the very first transaction, because they are too "hinky" and this will "hink" them and investigators want to be able to go up the production-consumer ladder as far as they are able.  *See* ROA, Vol. III, at 251.

Since, according to Agent Force, the investigators suspected where the drugs were coming from, they began to set up coordinated investigation with other agencies in other states.  This made it a long term investigation and Agent Force "began working with Immigration and Customs Enforcement (ICE) in the Houston office." *See* ROA, Vol. III, at 252.

With this expansion of the investigation, the next activity regarding the defendant occurred on April 2, 2003.  As Agent Force testified about the progress:

> Each time, each three times, are basically the same manner.  So there's telephone calls coordinating, you know, the meeting.   And then we go ahead and we decide to meet.  This time we're going to meet at the Brothers BBQ. You know, it's a couple blocks from Mr. Kebles' house at that time, which I mentioned before was 442 Clarkson Street in Denver.  So the arrangement was to buy 200 pills of ecstasy, this time for $3,000.

ROA, Vol. III, at 252.  Once, again, there was a recorded telephone call setting up this meeting, which the jury heard.  ROA, Vol. III, at 253.  This third purchase was made because the investigation was continuing and the investigators hoped to identify the source of the pills, and progress was being made in that regard.  *See* ROA, Vol. III, at 257.

Once again, the standard procedure was observed by the task force regarding this meeting.  As Agent Force related,

> We met at a neutral location.  I believe it was 200 pills for $3,000.  So provided him with $3,000.  Provided him with the KEL transmitter, searched

him and his vehicle, and then told him to go ahead and proceed to the location where they were going to do the deal.

ROA, Vol. III, at 253-254.

> So we surveilled him to that location, waited for Michael Kebles to arrive. We had surveillance set up on his house this time, monitoring the front of his house. We had agents that observed him leave on motorized scooter. It's kind of like a little toy, like the little, the kids use them now, those little skate things that had the handles, but it had a motor on the back.

> So he goes up to the meet location, meets with Mr. Wilson. They kind of play around on the scooter for a little bit, have some fun, and then they execute the transaction where they, he gets the 200 pills for the - - Mr. Wilson gets the 200 pills, and he gives the $3,000 to Mr. Kebles.

> Also on this - - I was monitoring the KEL, as I was on the other two transactions; we overheard Mr. Kebles telling the informant that basically they're having a conversation and Mr. Kebles was telling him he was going to get out of the game, but he said, if you want to get some pills now, now's the time, because I think I can do 400 pills right now, 400 pills I could also send to you.

> And you hear Mr. Wilson say, No, no, no let's wait for a day or two. I need to talk to my people first basically, which would have been myself.

ROA, Vol. III, at 254. As Force testified, they were not sure that they could get authorization to purchase that amount. ROA, Vol. III, at 255. This transaction was recorded. *See* ROA, Vol. III, at 255-256.

Again, after this transaction, the undercover people went to a neutral location. As before, there was a search of the informant and his vehicle. As for the defendant, he was followed to his residence. Once there and off his scooter, the defendant

walked a couple of houses away and spoke to some construction workers.   The

defendant then returned to his residence, went inside, and the surveillance was

terminated.  ROA, Vol. III, at 256.  The pills purchased were admitted into evidence.

*See* ROA, Vol. III, at 257,  383.

At this time, as noted, the investigators were trying to locate the defendant's

source of supply for his pills.  They believed the source was in Houston, Texas.  *See*

ROA, Vol. III, at 257-258.

To advance the investigation, the task force folks decided it was time to get a

search warrant and execute it on the defendant's residence.  This was done, the

warrant being signed on May 27, 2003, and executed on 442 Clarkson Street on May

28, 2003.  *See* ROA, Vol. III, at 258-259.

According to Agent Force, the investigators wanted the search warrant

execution to be low-key, and they did not even want to arrest the defendant.  They

wanted him to cooperate so that they could go up the investigative ladder regarding

getting bigger dealers.  The agents waited hours and contacted the defendant when he

was outside of his house.  While he did cooperate some regarding the location of 70

ecstasy pills and the Colt .357 magnum pistol found in the residence, most of the

investigators' attempts at mutual cooperation was met with overt hostility.  The

defendant, at first, claimed that he did not believe that they were officers or that they

had a warrant.  He wanted to call the issuing magistrate.  *See* ROA, Vol. III, at 259-262.

Finally, according to Agent Force, "Because of that [hostility], my supervisor was like, look, this is, this is unacceptable, we're going to have to arrest the guy.  So we arrested him on probable cause after that."  ROA, Vol. III, at 261-262.  So the defendant, as he apparently wished, was *Mirandized* and was arrested.  *See* ROA, Vol. III, at 262.

The investigators did speak with the defendant.  He claimed that $17,000 which he had in several accounts was from his contracting business.  Eight hundred dollars in one-hundred-dollar bills were found in a dresser in the defendant's bedroom.  None of it matched the currency paid him during undercover buys.  *See* ROA, Vol. III, at 262.  Before he was put in jail, $639 was found in the defendant's pocket.  ROA, Vol. III, at 262-263.

Regarding the pills found in the residence, while the defendant said it was for personal use, a normal "hit" for partying would be one pill.  *See* ROA, Vol. III, at 261, 263.  In addition to the bag of 70, other pills or pieces of pills found in the residence made a total of 77 pills.  *See* ROA, Vol. III, at 263, 266.  Also, some marijuana ("user amounts") was found.  *See* ROA, Vol. III, at 261, 266.  Some prescription medication (hydrocodone) was found, as well, although Agent Force,

who was in charge of the search, did not see a prescription from a doctor.  *See* ROA, Vol. III, at 261, 263, 266-267.

At the time of the investigation regarding the defendant, he had no felony convictions.  *See* ROA, Vol. III, at 349.  When he was in jail after his arrest, he made telephone calls to persons other than his attorneys.  *See* ROA, Vol. III, at 283.  The calls, which were played for the jury, were in the nature of confessions and one, to the defendant's mother, even complained or cried about the Government having zero-tolerance for ecstasy since a young woman died.  *See* ROA, Vol. V, at 671-672; 694 [closing arguments].

It was after Teresa Kebles was debriefed in this investigation that Agent Force found out that the informant, Wilson, was providing drugs to her.  *See* ROA, Vol. III, at 347, 351.  Upon inquiry, Wilson acknowledged that her assertion was true, he was providing user amounts of cocaine to Teresa Kebles.  ROA, Vol. III, at 351-352. Wilson also provided drugs to at least two other targets he was working on.   *See* ROA, Vol. III, at 342.  This, obviously, was in violation of DEA protocol.  *See* ROA, Vol. III, at 339-341.  In fact, the agreement which Wilson signed prohibited such illegal and independent action and prohibited entrapment.  *See* ROA, Vol. III, at 330-333.

18

According to Agent Kebles, once it was sufficiently confirmed that this distribution had occurred, Wilson was deactivated as an informant and it meant that Wilson would get no portion of any forfeited property.  *See* ROA, Vol. III, at 296, 347-349.  On the other hand, since Teresa Kebles provided this honest information during debriefing with the Government, the information apparently benefitted her sentencing.  *See* ROA, Vol. III, at 343.

**B.    The trial evidence regarding misconduct by the informant or weaknesses in the Government's case**

**1.    Introduction**

The defendant (then represented by other counsel) had argued, unsuccessfully, that the defendant had been subjected by the Government to vindictive prosecution. *See* Vol. I, doc. 135, at 5 [Courtroom Minutes].  Also, by the motions hearing on November 29, 2004, it was known that the defense was raising entrapment.  *See* ROA, vol. X, at 59.  Thus, especially after the defendant obtained present defense counsel, the Government knew that alleged governmental misconduct would be an evidentiary issue.  Indeed, in the opening statement, the Government acknowledged to the jury that Wilson had given lines of cocaine to Teresa Kebles before and after the first transaction, which was dead wrong and resulted in Wilson's deactivation as a Government informant.  *See* ROA, Vol. II, at 199-200.

19

Therefore, in its case-in-chief, the Government called Bob Wilson as the second "Government" witness.  *See* ROA, Vol. III, at 385.  Wilson testified, although certainly not loquaciously, that he had purchased MDMA from the defendant (whom Wilson called "Mike") on the three occasions.  *See* ROA, Vol. III, at 386-389.

On direct, which did not go on at length, Wilson acknowledged that he provided a "small" amount of cocaine to the defendant's sister "just that [one] time." *See* ROA, Vol. III, at 389-390.  As Wilson vaguely recalled it, when Agent Force heard about it,

> Yeah, he reprimanded me and, you know, that was a mistake that upon, that I made on my own.  And it was just I had so many sources around me that it was kind of . . . kind of went along with what was going on, so.

ROA, Vol. III, at 389.

### 2.    The cross-examination testimony of Wilson

Wilson's real impact came courtesy of the defense.  On cross-examination, Wilson vaguely complained that it was some time after he approached the Government that they came and had to "find" him.  *See* ROA, Vol. III, at 391-392. While Wilson knew that he signed an agreement with the Government about being a confidential informant, he did not recall signing it.  *See* ROA, Vol. III, at 392-393. Wilson said that he did not do anything without Government knowledge, "Not as far as I know."  *See* ROA, Vol. III, at 393.

While Wilson protested that he had never dealt cocaine in his life for money, he had delivered it some.  When asked by the defendant's present counsel, how often, Wilson relied, "I was around it a lot.  Professional athletes, all kinds of people, so that's kind of a -- there's no way I could answer that question.  It's not that it was coming from me.  It's just that that was what we were doing."  ROA, Vol. III, at 394.

Wilson continued in this vein:

I don't know we, but that's the, that's the game that we were involved, people around me were involved in.  I was around for another reason.  That's what started this whole thing.

* * *

That wasn't . . . I knew my guidelines, and I didn't, you know, I -- to be around the people I had to be around, unfortunately, you know, and I expressed to them that I didn't like it.  You know, I didn't like anything that I was doing.  I didn't . . . so I tried to, not to take it to any type of extreme.

ROA, Vol. III, at 395.

Wilson reiterated to the defense that he only gave cocaine to Ms. Kebles and it was once.  *See* ROA, Vol. III, at 395-396.  And, he gave it to her due to his own "stupidity."  He did not recall doing that with other "defendants," and he did not recall telling Special Agent Force that he had done so.  *See* ROA, Vol. III, at 396-397.

Indeed, Wilson told the defendant's counsel that he really did not even recall well the first time he spoke to the defendant.  But it surely was in a bar.  *See* ROA, Vol. III, at 397.  The defendant's sister just handed Wilson a telephone and he called

21

her brother.  *See* ROA, Vol. III, at 397-398.  Wilson thought that this call was made before Wilson knew "anything about those people" in the DEA.  *See* ROA, Vol. III, at 398.  *See also* ROA, Vol. III, at 399.  Everything about this first call was vague to Wilson, although he was being "totally honest."  *See* ROA, Vol. III, at 398-399.

However, the details of when and under what circumstance Wilson gave cocaine to Terry Kebles, as well as what he might have told the DEA previously, were basically forgotten by Wilson when he was testifying on cross-examination.  Such past events to him were "insignificant."  *See* ROA, Vol. III, at 400-401.

Wilson, on cross-examination, was sure that Ms. Kebles had been working at the Sunset Bar and Grill in 2003.  Wilson knew Julia Rutter at the place, although, back then, she did not own it.  She was one of Wilson's "best friends," but he did not recall telling her that he worked for the DEA.  *See* ROA, Vol. III, at 401-402.  While he apparently said something which may have related to not getting "big fish like they wanted," he did not say those words and he was not referring to the DEA.  *See* ROA, Vol. III, at 403.  Actually, Wilson indicated that he liked working with the DEA, although he did some things which he should not have done, and he did not like being around other people.  But he "wanted to make a difference."  *See* ROA, Vol. III, at 403-404.  While, since then, he may have come off as "being a bad guy," he just let that go now.  *See* ROA, Vol. III, at 404.

While Wilson did not recall even calling the defendant, he acknowledged that he would play the role of "buddy buddy" "just to break the ice." This was to do what he "was instructed to do,." such as doing buys. *See* ROA, Vol. III, at 404.

The defendant's counsel and Wilson continued in this vein, with Wilson seemingly not understanding questions. While Wilson did not recall specifics about his agreement with the DEA or whether he called the defendant, he seemed to assume that he read the agreement and that he did call the defendant. *See* ROA, Vol. III, at 4051-406. In fact, he made a "guesstimation" that he had called the defendant "ten to 15 times." While the DEA tape-recorded some calls, they did not tape all of them. *See* ROA, Vol. III, at 406-407. While Wilson said that Agent Force knew everything Wilson did, he did not know if there were occasions when Wilson called and he wasn't supposed to. *See* ROA, Vol. III, at 407-408.

When asked whether Agent Force knew about the delivery of the cocaine, Wilson quibbled that it was not a delivery, he just gave it to somebody. But, acknowledged Wilson, while he implied that he voluntarily told the agent about the cocaine, the agent did not know about it at the time of the transfer. Wilson claimed that he told Agent Force right afterwards, although he could not be sure, since he was doing a lot at that time. *See* ROA, Vol. III, at 408-409. Indeed, Agent Force was a "great guy" and Wilson would not say that the agent was wrong if he thought it was

three or four months later that he heard about it.  *See* ROA, Vol. III, at 409.

Regarding any particular date, Wilson indicated that he was confused.  *See* ROA,

Vol. III, at 409-410.

As for spacial, rather than temporal, locations, Wilson believed that the first

purchase from the defendant was, at least, in the vicinity of Highlands Ranch.  Wilson

did not recall the second deal, although, upon reflection, it was in a parking lot,

perhaps at University Hills. But, on further reflection, that was deal number two or

three, out of three or four such deals.  *See* ROA, Vol. III, at 410-411.

And, for Wilson pinpointing the third deal, that was a bit of a "blur."  He was

not even sure that there was not a fourth deal.  As for prices he paid on behalf of the

DEA, Wilson definitely could not recall the amounts.  *See* ROA, Vol. III, at 411-412.

When it came to the number of pills in each transaction, Wilson could not even

hazard an estimate.  But, regarding the money DEA paid him, that was not an issue,

because Wilson was making more money on his "real job."  "And actually," recalled

Wilson, "when I first came to them, I said I didn't want a dime."  *See* ROA, Vol. III,

at 412.

Additionally, when asked by the defendant's counsel if he was paid $11,800,

Wilson had no idea.  Indeed, he couldn't tell if he had remembered to pay taxes on

the money.  *See* ROA, Vol. III, at 412-413.  As for being promised an incentive or

bonus amount regarding a percentage on forfeited property, this Government witness

indicated that he would have discounted such promises, but he was not promised

anything, not that he remembered.  *See* ROA, Vol. III, at 413-414.

Upon further cross-examination, Wilson said that he may have been told by the

defendant that the defendant had a job, but, he did not especially recall anything he

said and "[a]ny drug dealer is going to tell you they work."  Regarding weapons, that

the informant would have recalled, and he didn't remember any weapons.  As for

being terminated or deactivated by the DEA, Wilson did not remember any of that.

He was not "even here," because he had started using cocaine because he was

"around these people."  But, with his regular work and all, he wasn't using cocaine

every day then, but his weekly use "did happen."  *See* ROA, Vol. III, at 414-416.

### 3.    The defense case-in-chief

The defense case was not limited to the cross-examination of Wilson.  The first

of the defense's own four witnesses was Julia Anne Rutter.  She was part owner (with

her husband) of the Sunset Grill and previously had worked there.  ROA, Vol. IV, at

442-443.  She had known Teresa Kebles, who also had worked at the Sunset Grill,

since about 2002.  Ms. Rutter also had known Bob Wilson since when she was a high

school freshman, at Cherry Creek High School, which was about 28 years previously.

*See* ROA, Vol. IV, at 443-444.

Ms. Rutter would see Wilson occasionally before she started working at the grill.  Thereafter, she would see him "many times," perhaps "two or three times a week" at the Sunset Grill.  *See* ROA, Vol. IV, at 444-445.  Sometimes he would have a lot of cash, and sometimes he would need to drink on credit.  *See* ROA, Vol. IV, at 445-447.   It appeared to Ms. Rutter that Wilson was friends with Teresa Kebles.  Ms. Rutter also recalled that Wilson was very supportive to her during a period of health problems, "being very sweet and very nice."  *See* ROA, Vol. IV, at 447.

But, then, one day, there was a reversal of roles.  Wilson came in and, "in front of all the customers," said to Ms. Rutter, "I have to talk to you, I have to talk to you." According to Ms. Rutter's testimony, she said, "Okay."  *See* ROA, Vol. IV, at 447.

Ms. Rutter said that Wilson started crying, which was not like him.  ROA, Vol. IV, p. 447.  She said she did not know what to make of this.  Wilson then told her that he "worked fo the DEA."  He also said that "the real reason that he was so upset and distraught was that he said that he couldn't get the big fish."  He added that therefore "he was going to take down some really nice people that had nothing to do with a drug deal."  ROA, Vol. IV, at 448.

The second of the defense's four witnesses was Laura Suzanne Sminjeong Hemborg.  She was X-ray technologist at Littleton Hospital, who had known the defendant for almost five years.  In fact, in 2003, she was living with the defendant.

*See* ROA, Vol. IV, at 450-452.  But she moved out about the "end of 2003," she

thought.  *See* ROA, Vol. IV, at 453-454.

During that period when the defendant lived with Ms. Hemborg, he was doing

construction and fixing houses.  Both the defendant and Ms. Hemborg worked mostly

every day.  She never saw him giving drugs to anyone.  She never saw large amounts

of money in the house.  She never knew him to carry a weapon.  She never saw any

drug paraphernalia in the house, such as scales.  *See* ROA, Vol. IV, at 452-454.  And,

on cross-examination, she denied knowing about the ecstasy pills and burnt marijuana

found in the residence during the execution of the search, even though she was living

there at that time (in May, 2003).  *See* ROA, Vol. IV, at 455-457.

However, during this time in 2003 when Ms. Hemborg lived with the

defendant, she remembered that Wilson called the defendant "maybe two, three times

a week."  The defendant told Ms. Hemborg that Wilson was "his sister's friend."

Despite this, Ms. Hemborg said that the defendant "would get irritate[d] and would

leave the room" when Wilson called.  *See* ROA, Vol. IV, at 454.

Dwayne Davis testified as the third of the defense's four witnesses.  He

testified regarding the home restoration and construction work done by the defendant

over 2002 and 2003.  *See* ROA, Vol. IV, at 458-474.  On cross-examination, Davis

stated that he also was the defendant's friend.  He testified that he was not aware that

27

the defendant was selling ecstasy tablets and, if someone approached him to buy

drugs and he didn't want to, he said, ". . . I am sure I would call the police." *See*

ROA, Vol. IV, at 474-478.

The final of the defense's four witnesses was Michael Levine.   He was a

former federal employee and was now a defense expert witness in undercover

operations and informant handling.  His testimony was critical of the investigation

here. *See* ROA, Vol. IV, at 478-4-514.  The witness had been retired from the DEA

since 1990 and was being paid $5,000 plus expenses for his participation in the case.

He made over $130,000 the previous year for defense consulting work; he invariably

was a defense witness since retirement.   *See* ROA, Vol. IV, at 514-519.

After Levine was further cross-examined, *see* ROA, Vol. IV, at 519-553, he

reiterated that he thought there was an inducement in order to have Mr. Kebles deal

ecstasy.  ROA, Vol. IV, at 553.  The defendant also was not predisposed to be a drug

dealer.  ROA, Vol. IV, at 553-554.  Levine also opined that the defendant was

entrapped.  ROA, Vol. IV, at 554.

However, when Levine was re-crossed, he noted that the actions of the

informant, while not with the defendant, was entrapment related to "this informant's

actions in inducing Teresa Kebles with cocaine."  ROA, Vol. IV, at 556.  Teresa

Kebles being induced and "reach[ing] out to that source of supply" was enough.  *See*

ROA, Vol. IV, at 557.  The witness concluded that it was the Government's fault: "I would say that he had become a drug dealer, there's no doubt about that, after the informant's introduction and creation of the whole scenario."  .  *See* ROA, Vol. IV, at 563.  The expert witnesses believed that this was a case where a "sister might be pleading with them to get it."  *See* ROA, Vol. IV, at 564.

**C.   The instructions requested by the defense after the evidence was closed**

**1.   Introduction**

As set out below, the discussion after the evidence was closed related to the theory of entrapment.  At trial, the AUSA argued that, at best (or worst), the admitted evidence of informant misconduct was s form of "vicarious entrapment," since it related only to what the informant did wrong regarding the defendant's sister, not with the defendant.   *See* ROA, Vol. IV, at 565-565.  The defendant, below, argued that this was a case of entrapment.[3]

**2.   The instructions**

The discussion of the instructions, especially whether entrapment applied, and as to what counts, went on at length.  *See* ROA, Vol. IV, at 565-614.  The district court, during this discussion, gradually was persuaded, as to each point, to reconsider

---

[3]   In fairness to the defendant's argument, outrageous government conduct (when that exists) "bears a family resemblance" to entrapment.  *United States v. Gifford*, 17 F.3d 462, 470 (1st Cir. 1994).

29

and to agree with the positions as argued by the defendant's counsel.  *See* ROA, Vol.

IV, at 578-579, 580-582, 589, 592, 595-597, 598, 599, 602-605, 608-609, 610.[4]

As noted, the Government objected to instructions given to the jury regarding

entrapment because the defense had not met its burden, and was not entitled, as a

matter of law, to such instructions.  *See* ROA, Vol. IV, at 565-567.  The defendant's

counsel argued that the unrecorded telephone calls of the informant to the defendant

were enough.  What constitutes inducement, according to the defense, was "a factual

question, not a legal question."  ROA, Vol. IV, at 567.

The district court determined that an entrapment instruction was warranted by

the evidence.  First, the court relied on the testimony of Ms. Rutter, who said that the

informant worried that he was going to take down some nice people who had nothing

to do with drug dealing.  Second, the court relied on the expert testimony of Mr.

Levine, who said informants often will target relatively minor dealers because it is

safer.  *See* ROA, Vol. IV, at 570-571.  Therefore, the court concluded that the

defendant had met his burden and that the Government would have to prove to the

jury, beyond a reasonable doubt, that entrapment did not apply.  *See* ROA, Vol. IV, at

571.

---

[4]   The basic instructions at issue, conceded the defendant's counsel, were
Tenth Circuit instructions, so there is no debate about their basic appropriateness.  *See*
ROA, Vol. IV, at 567.

At first, the district court was persuaded by the Government's argument and was not going to give an entrapment instruction as to all counts regarding conspiracy and distribution.  (Everyone seemed to acknowledge that entrapment was not applicable to the possession of ecstasy count, the possession of the gun count, and the forfeiture count.  *See* ROA, Vol. IV, at 602, 614.)  As part of this discussion, the defense even objected to the a proposal that the Government dismiss the conspiracy count so as to have the court only give an entrapment instruction regarding the first count of distribution (Count Two).  But, finally, the district court refused to dismiss the conspiracy count and decided to give entrapment to the first four counts.  *See* ROA, Vol. IV, at 571-605.   By this, the district court did not mean to hint that entrapment actually did exist, only that it should go to the jury.   *See* ROA, Vol. IV, at 603-604.

The district court then fashioned the verdict forms as set out in the Statement of the Case, so that the jury, on the four counts, had to determine no entrapment before deciding on the actual evidence of guilt.  *See* ROA, Vol. IV, at 607-608.  The defendant's counsel thought that this "sounds fine."  *See* ROA, Vol. IV, at 608.

Thus, the instructions regarding entrapment meant that the jury was to be told that they were the determiners of that issue, and that the defendant could argue the

facts established entrapment and the Government could argue against that. As the

defendant's counsel argued:

> Judge, I think it's perfectly appropriate for him to argue that there was no
> entrapment as to any count, however he wants to do it. I do note, something I
> didn't state earlier, that in -- I know you've already -- It sounds like you're
> going to give the instruction, but I wanted to make sure that I noted that for the
> purposes of determining the sufficiency of the evidence to raise the jury issue
> on entrapment, the testimony most favorable to the defendant should be
> accepted. And I think the Court's already seen that.

ROA, Vol. IV, at 610.

As for the instructions finally given, the district court gave Instruction 40,

which instructed, as to Counts One, Two, Three, and Four, that the defendant could

show that the Government induced the defendant to commit the offense or offenses

and that the defendant was not predisposed to commit the offense or offenses. The

instruction also said that, once properly raised, "the government must prove beyond a

reasonable doubt that the defendant was not entrapped." *See* ROA, Vol. V, at 658-4-

660.

**D.     Closing arguments**

The Assistant U.S. Attorney argued, in his opening closing, that "[t]his case is

not about entrapment." ROA, Vol. V, at 667. The defendant was only entrapped by

money. *See* ROA, Vol. V, at 669. The prosecutor argued, "There's nothing that

shows that Mike Kebles knew anything about his sister getting cocaine, before or

after the first transaction.  Nothing.  It's made up."  ROA, Vol. V, at 676.   The

AUSA acknowledged that it was up to the jury regarding entrapment, but he argued

against it and against non-predisposition.  *See* ROA, Vol. V, at 681-683.

As for the defendant's counsel, he argued, as a former prosecutor, that the

Government in this case did not disprove entrapment.  *See* ROA, Vol. V, at 674-686.

The defendant's counsel asked for acquittal "on all the counts."  ". . . Mr. Kebles was

entrapped."  ROA, Vol. V, at 686.   The informant gave Teresa Kebles drugs.  ROA,

Vol. V, at 689.   In addition, the defendant's counsel argued that Wilson was "pesky"

and "pushy" when it came to getting MDMA from the defendant.  *See* ROA, Vol. V,

at 698.

The defendant's counsel, since he got his instructions as to the four conspiracy

and distribution counts, naturally emphasized entrapment, even calling an informant a

"government agent."  He argued, implicitly acknowledging the strength of the

Government evidence,

> Again, it matters how you get evidence.  It matters how you charge people.  It
> matters.  That's why entrapment is a very viable and important part of the law.
> That's why you have an instruction for it.  There is cover-up here.  There is
> drug-dealing by a government agent.  There is payment, there is incompetence.
> It's not a smoke screen.  It matters how you get to where you're going.  The
> ends do not justify the means.

ROA, Vol. V, at 693-694.

Finally, the defendant's counsel reiterated that the Government "need[s] to do better." Therefore, he asked the jury "to find him not guilty of all counts." *See* ROA, Vol. V, at 703.

The prosecutor then gave his final closing. *See* ROA, Vol. V, at 704-711. He argued that this situation with the informant was no Government "plot." ROA, Vol. V, at 705.

## E.    The verdicts

The closing arguments were on August 16, 2007, and the jury got the case just after noon. *See* ROA, Vol. V, at 617, 712. The jury deliberated until almost 5 p.m. *See* ROA, Vol. V, at 725. The jury deliberated all of the next day, August 17, 2007, and then the jurors were sent home for the weekend. *See* ROA, Vol. VI, at 728. The jury then deliberated all Monday, August 20, 2007, receiving an *Allen*-type charge. *See* ROA, Vol. VII, at 731-740. Finally, in the early afternoon of August 21, 2007, the jury rendered the verdicts as set out in the Statement of the Case. *See* ROA, Vol. VIII, at 748. The jury then was sent to deliberate the forfeitures. *See* ROA, Vol. VIII, at 764. As noted in the Statement of the Case, the defendant (and the Government) won some and lost some.

## SUMMARY OF THE ARGUMENT

The defendant was not, as a matter of law, improperly induced by the Government to commit crimes of which he was not predisposed to commit; the issue of entrapment was an issue for the jury and was submitted to the jury, which heard of the unauthorized conduct of the undercover informant with instructions desired by the defense.

The defendant was convicted of most of the counts, with the jury specifically rejecting entrapment.  This is not a case in which the defense can argue that there were no facts or circumstances to contradict the defense theory of entrapment.

## ARGUMENTS

I.     **The defendant was not, as a matter of law, improperly induced by the Government to commit crimes of which he was not  predisposed to commit; the issue of entrapment was an issue for the jury and was submitted to the jury, which heard of the unauthorized conduct of the undercover informant with broad instructions desired by the defense**

A.     **Issue raised and ruled upon**

The defendant, during the discussion of the motions pursuant to Fed. R. Crim. P. 29, claiming insufficient evidence, argued that there was "entrapment as a matter of law . . ."  ROA, Vol. IV, at 439-440.  The district court considered this motion and denied it, saying that it could not "conclude as a matter of law that entrapment has been proven as a matter of law . . ."  *See* ROA, Vol. IV, at 411.  Thereafter, of course,

35

the defense helped to determine the instructions which went to the factual issue of entrapment, conceding that inducement was "a factual question, not a legal question." ROA, Vol. IV, at 567.

### B.    Standard of review

In an appeal regarding entrapment as a matter of law, the refusal of the district court to direct a verdict for the defendant is reviewed as a Rule 29 motion for acquittal due to insufficient evidence.  "We review de novo a district court's denial of a motion for a judgment of acquittal, viewing all the evidence and drawing all reasonable inferences in the light most favorable to the government."  *United States v. Hildreth*, 485 F.3d 1120, 1125 (10th Cir. 2007) (internal quotation marks and citation omitted).  Furthermore, when a jury has found that no entrapment existed, the appellate court can alter the finding on legal grounds only where the holding should be made without choosing between conflicting witnesses nor judging credibility. *Id.*; *United States v. Nguyen*, 413 F.3d 1170, 1178 (10th Cir. 2005).  Indeed, the Tenth Circuit will overturn a jury's rejection of the entrapment defense only if **no** reasonable jury could have found that the government proved beyond a reasonable doubt that there was no entrapment.  *United States v. Young*, 954 F.2d 614, 618 (10th Cir. 1992).

**C.    Discussion**

**1.    Entrapment versus outrageous Government conduct**

First of all, as the trial AUSA argued below, this defense argument really appears to be an argument of theoretical "vicarious entrapment." The line or lines of cocaine, which logically could be called an inducement, were provided by Wilson to Teresa Kebles. The cocaine was not provided to Michael Kebles, the defendant. Analytically, therefore, the unlawful actions of this rogue informant would appear to be more in the nature of supposed "outrageous Government conduct."

But that sort of claim, which is constitutional and goes to basic due process, is even harder to prove than entrapment, requiring that conduct be shocking to a sense of basic fairness, and the defendant has the burden of establishing it. Also, it is a legal issue that is decided by a district court, it is not a factual issue which goes to the jury. *See. e.g., United States v. McKissick*, 204 F.3d 1282, 1289-1290, 1294 (10th Cir. 2000); *United States v. Diaz*, 189 F.3d 1239, 1245-1246 (10th Cir. 1999) . *See also Vega v. Suthers*, 195 F.3d 573, 583 (10th Cir. 1999) (while outrageous conduct is constitutional, entrapment is a permissive affirmative defense which is not constitutionally based). Finally, being an issue that relates only to Government misconduct, alleged outrageous Government conduct does not subjectively ask how it

affected a defendant, as does entrapment.  *See United States v. Mosley*, 965 F.3d 906, 908-909 (10th Cir. 1992).

Any mistake of the Government agent  here, in supervising an informant, was, at worst, a question of negligence, not an example of shocking behavior.  Undercover drug investigations cannot be choreographed exactly and mistakes sometimes happen.  As another example here, the ammunition from the weapon seized from the defendant's residence mistakenly was destroyed prior to trial.  *See* ROA, Vol. III, at 274-276.  Thus, the defense here put all of its evidentiary eggs into the entrapment/Government failings basket, hoping to get all of the instructions wanted and hoping to sway the jury.  Indeed, since the defendant's counsel also emphasized the destruction of the ammunition, *see* ROA, Vol. V, at 691 [closing argument], and the defendant was acquitted of the firearms count, the defense strategy was not without effect.

It almost worked even to a greater extent, even though there really was no evidence that the defendant was induced to do something against his propensity.  Certainly, the defendant did not testify that his sister put pressure on him because she needed to get a line or two of cocaine from Wilson.

**2.      Entrapment as a matter of law did not exist here**

●      **the courtroom battle was fairly fought and justly decided**

This case was an classic trial contest, with a very experienced and respected

prosecutor opposed by an experienced, respected, and often successful defense

counsel.  Further, unlike the Children of Israel in Egypt, the defense here was not

without straw when it came to making bricks to construct a theoretically-viable

defensive wall.  While there was not an unlimited amount of this defense-evidence

straw, the prosecution was hobbled, as everyone conceded, by inappropriate and

illegal action on the part of a rogue informant.  And, at trial, that informant, though

forthrightly called by the Government, was such a poor witness that he effectively

provided murky scenarios for the defense to work with.[5]  The defendant's counsel, in

closing, basically asked the jury to punish the Government, even with veiled

references to a type of jury nullification.

In addition, the district court, in instructing the jury, in a commendable sense of

caution, bent over backward to provide the defense with requested instructions

regarding entrapment.  Indeed, while this defendant was not entitled to entrapment as

_____

[5]   The informant, Wilson, as a witness, was vague, befuddled, and unhelpful, to
say it charitably.  He even attempted to tell the defense that he was an informant
because he was a good citizen, not even wanting a dime (to "drop a dime" on others).
The informant demonstrated why Government agents try to meet themselves with
dealers, and why informant transactions are often recorded.

a defense in his subsequent deliveries of ecstasy, or on the conspiracy itself, *see United States v. Nguyen*, 413 F.3d at1181-1182, he was given, over strenuous Government objection, entrapment regarding Counts One through Four. Indeed, the district court gave the jury special verdicts in which entrapment had to be rejected before each count ultimately was voted upon. *See* ROA, Vol. IV, at 606. And, the district court even gave the defense the option to argue for the order of the counts being submitted to the jury. The defendant's counsel did not object to the conspiracy count (with entrapment included) being submitted first. *See* ROA, Vol. IV, at 611-612. Finally, the district court, to accommodate the defense, denied the Government request for the dismissal of the conspiracy count, in order to limit entrapment being applied to all of the distribution counts.

- **the facts here allowed the jury to rebut the defense theory regarding inducement and lack of criminal propensity**

"The defense of entrapment is generally an issue for the jury and not for the court." *United States v. Young*, 954 F.2d at 616. "If there is any conflicting evidence upon which a jury could find no entrapment, the issue must be determined by the jury." *Id.* In addition,

> The elements required to find entrapment are: first, government agents must have induced the defendant to commit the offense; and second, the defendant must not have been otherwise predisposed to commit the offense, given the opportunity. Once a credible entrapment defense is raised, the prosecution has the burden of proving, beyond a reasonable doubt, that a defendant was not

> entrapped.  The two elements of entrapment are closely related and often the same evidence and arguments will speak to both elements.  The primary distinction between these elements is that inducement focuses on the government's conduct while predisposition focuses on a defendant's attitude or condition.

*United States v. Young*, 954 F.2d at 616 (internal citations and quotation marks omitted).  In this case, as noted in *Young*, both sides argued the opposite sides of the evidentiary coins.  For example, regarding the defendant's telephone calls from jail, the prosecutor argued that they portrayed confessions from a trapped drug dealer, while the defense asserted they were made by a scared kid.  *See* ROA, Vol. V, at 671-672; 694 [closing arguments].

The defendant, at trial and on appeal, continues to claim that the inducement by Wilson was just too much, although it lacks some logical persuasiveness.  ""The informant made unauthorized calls [presumably, in addition to the authorized calls] to the Appellant and provided drugs to the Appellant's sister as improper inducement for the Appellant to sell drugs to the informant."  Opening Brief, at 11.   Also, the defendant asserts that the informant gave cocaine to Teresa Kebles, "manipulating her to make her brother . . . cooperate in selling drugs to Mr. Wilson and entrap the Appellant.  Opening Brief, at 14.

Again, in both of these assertions, the defendant fails to connect up inducement of Teresa to Michael.  Surely, the defendant is not arguing that the sister was the mere

extension of the brother.  They apparently are not twins, much less co-joined twins.

They are separate, volitional beings, in law and in fact.[6]

As to predisposition, it also is helpful to know that, in this case, when the

informant was asked, before his misconduct, about helping locate "X," he

immediately thought of "Terry" Kebles.  In addition, the fact that marijuana,

supposedly unbeknownst to Ms. Hemborg, was found in the defendant's residence, is

something that can be used, for what it is worth, to determine predisposition

regarding illegal drugs.  *See United States v. Young*, 954 F.2d at 617 (evidence that

defendant bought and used marijuana went to predisposition).  *Cf. United States v.*

*Quarles*, 198 F.3d 260 (Table), *3 (10th Cir. Nov. 4, 1999)  (entrapment defense

opens up issue of propensities regarding other drugs).  Indeed, the fact that there were

found, at the time of the search, a total of 77 MDMA pills would indicate that this

defendant was not at all adverse to dealing.

Even the evidence presented by Ms. Hemborg, that she never knew anything

about the defendant selling or even using drugs (when burnt marijuana was found in

---

[6]  The Opening Brief, at 15, asserts that the defendant "is very close with his family, including his sister Teresa."  The other brother of Teresa Kebles and Michael Kebles is Daniel Kebles, a fugitive defendant in a related CCE ecstasy case, 03-cr-00539-WYD (D. Colo.).  This information, which may be judicially noted pursuant to *United States v. Estep*, 760 F.2d at 1063, tends to corroborate the closeness of the family, but it also tends to rebut the lack of predisposition when it comes to the family members.

the house) could go to predisposition, since her blanket denials presumably were rejected by the jury.  If testimony of purity is rejected, it almost necessarily admits an acknowledgment of uncleanliness.

In addition, Ms. Hemborg's testimony, *see* ROA, Vol. IV, at 454, that she remembered that Wilson called the defendant "maybe two, three times a week," with the defendant telling Ms. Hemborg that Wilson was "his sister's friend," also can contradict lack of predisposition.  Even when Ms. Hemborg said that the defendant "would get irritate[d] and would leave the room" when Wilson called, a jury could see that as irritation that somebody was calling a businessman at home.  The calling of the defendant by Wilson, without more, hardly amounts to harassment or coercive tactics.  *See United States v. Young*, 954 F.2d at 617.

Certainly, the mere solicitation of the defendant by Wilson, regarding the purchase of ecstasy, is not such an inducement that would overcome a predisposition not to break the law.  *See United States v. Osborne*, 935 F.2d 32, 38 (4th Cir. 1991).  Indeed, as one of the defendant's own witnesses, Dwayne Davis, testified, if someone approached him to buy drugs and he didn't want to, ". . . I am sure I would call the police."  *See* ROA, Vol. IV, at 474-478.  Instead, what the defendant did initially, was suspiciously inspect Wilson's car.  ROA, Vol. II, at 233-234.

Finally, lack of predisposition to break the law should not be so easily overcome by a mere chance to make money.  Indeed, the defendant presented evidence that he was making plenty of money legitimately.  Nonetheless, the selling of pills at fifteen dollars per pill, amounting to thousands of dollars, especially when it is done surreptitiously, tends to show predisposition to engage in the prohibited conduct.  Such evidence also tends to show that the defendant was not entrapped as a matter of law.  *United States v. Hildreth*, 485 F.3d at 1126.

The jury, which deliberated earnestly and at length, obviously considered the defendant's case, acquitting him of the weapon charge.  That jury also found that the Government proved its case beyond a reasonable doubt.  If that jury, which the defendant wanted so hard to hear his case, were to be considered unreasonable then the almost sacred institution of trial by jury is at serious risk.

## CONCLUSION

The Government requests that the convictions of the defendant be affirmed.

Attachment 1

## STATEMENT REGARDING ORAL ARGUMENT

The Government does not believe that oral argument is necessary, since the briefs sufficiently set out the arguments and this case involves no novel issues.  In addition, in this strictly factual debate, the jury verdicts cannot be shown to be unreasonable.  Nonetheless, since the appellant has requested oral argument, the Government, in a sense of professional courtesy, joins in the appellant's request for oral argument.

Respectfully Submitted,
TROY A. EID
United States Attorney


 *s/John M. Hutchins*
By: JOHN M. HUTCHINS
Assistant U.S. Attorney
1225 17th Street, Suite 700
Denver, Colorado  80202
(303) 454-0100
USACO.ECFappellate@usdoj.gov
Attorneys for Plaintiff-Appellee

45

Attachment 1

# CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(a)(7)(C), I certify that this brief is proportionally spaced and contains  10,745  words.  I relied on my word processor, with WordPerfect Version 12 software, to obtain the count.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

DOROTHY BURWELL

 _s/Dorothy Burwell_____
DOROTHY BURWELL (digital)
Assistant United States Attorney

46

Attachment 1

## CERTIFICATE OF DIGITAL SUBMISSION

All required privacy redactions, if any, have been made and, with the exception of those redactions, every document submitted in Digital Form or scanned PDF format is an exact copy of the written document filed with the Clerk.

The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program TREND MICRO Office Scan for Windows Version 7.3, Engine Version 8.550.1001, Virus Pattern File 5.189.00 dated 3/26/08 and, according to the program, are free of viruses.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

*s/Dorothy Burwell*
U.S. Attorney's Office

Attachment 1

# CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of March, 2008, two copies of the foregoing **APPELLEE'S ANSWER BRIEF** were mailed, postage prepaid, to:

John F. Sullivan, III, Esq.
The Law Office of John F. Sullivan, III, P.C.
155 S. Madison Street, # 209
Denver, Colorado 80209


and a copy submitted by e-mail to jfslaw1@aol.com.


*s/Dorothy Burwell*
Dorothy Burwell
United States Attorney's Office
1225 17th Street, Suite 700
Denver, Colorado 80202
Telephone 303-454-0100
Fax: 303-454-0461
E-mail: dorothy.burwell@usdoj.gov

48

U.S. Department of Justice
Drug Enforcement Administration

Attachment 2

## REPORT OF INVESTIGATION

Page 1 of 4

| 1. Program Code | 2. Cross File | Related Files | |
|---|---|---|---|
| 5. By: S/A Carl Force  At Denver Field Divison | ☒ CS-02-109063 ☐ ☐ | ▮▮▮▮▮ | ▮▮▮▮▮ |
| 7. ☐ Closed  ☐ Requested Action Completed  ☐ Action Requested By: | ☐ ☐ | 8. Date Prepared  08/26/03 | |

9. Other Officers: I/A Terri Wellman.

10. Report Re: Debriefing of CS-02-109063 on August 25 and 26, 2003 in Englewood, Colorado.

### DRUG RELATED INFORMATION:

1. On August 25, 2003, at approximately noon, CS-02-109063 (hereafter referred to as CS) and S/A Carl Force and I/A Terri Wellman met in Englewood, Colorado.  The CS, S/A Force and I/A Wellman discussed Michael and Teresa KEBLES.

2. Reference is made to the DEA Form - 6 written to this File Number by S/A Carl Force regarding the "Acquisition of Exhibits 13, N-22 and N-23 on April 2, 2003 in Denver, Colorado."

3. S/A Force asked the CS if Michael KEBLES invited him/her back to Michael's apartment to purchase an additional 400 tablets of ecstasy on the day that the CS and Michael KEBLES conducted a drug transaction and Michael showed up on a motorized scooter (April 2, 2003).  The CS responded yes that Michael did ask the CS if he wanted to purchase 400 hits of MDMA back at Michael's residence.

AGENT's NOTE: On August 26, 2003, S/A Force reviewed the kel tape (Exhibit N-23) of the drug transaction and noted that Michael stated that he could sell "400" and the CS replied that he/she wanted to wait two more days.

4. S/A Force informed the CS that Teresa KEBLES was claiming that the CS entrapped her and that the CS had used cocaine with Teresa.  The CS

| 11. Distribution:  Division  District  Other  SARI | 12. Signature (Agent)  S/A Carl Force | 13. Date  08/27/03 |
|---|---|---|
| | 14. Approved (Name and Title)  Jeffrey Boobar  G/S Task Force II | 15. Date  8/27/03 |

DEA Form - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

000458

cf- debriefing of CS-02-109063 on August 25 and 26, 2003
- Originating Office

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.



U.S. Department of Justice
Drug Enforcement Administration

Attachment 2

**REPORT OF INVESTIGATION**

*(Continuation)*

| 4. Page 2 of 4 | |
|---|---|
| 5. Program Code | 6. Date Prepared 08/26/03 |

replied that he/she did not entrap Teresa but that the CS had used cocaine with Teresa at the bar where she worked.
AGENT's NOTE: The DEA, more specifically S/A Force, was not aware or had any suspicion that the CS was using controlled substances during this current investigation.

5. On August 26, 2003, S/A Force had several telephone conversations with the CS to clarify specifics concerning the CS's use of cocaine with Teresa KEBLES and other targets in this investigation.

6. S/A Force asked the CS if he/she made arrangements with Teresa where he/she would supply cocaine to Teresa in exchange for her brokering ecstasy deals and/or providing MDMA. The CS answered no. The CS advised that during a telephone conversation with Teresa that she told the CS that she hit her head on the tub at her home. Teresa told the CS that she was high on ecstasy at the time and that is why she incurred the injury. The CS advised that it was at this time that he/she approached Teresa about obtaining MDMA.

7. S/A Force asked the CS if he/she used cocaine with Teresa during the time frame of this current investigation. The CS responded yes. S/A Force asked the CS if he/she used drugs during the controlled purchases from Michael KEBLES and the CS replied no that he/she never sold or used drugs with Michael KEBLES.

8. The CS elaborated that he/she and Teresa used cocaine about two or three times together at THE SUNSET GRILLE which is located at 8269 South Holly Street in Centennial, Colorado. The CS reiterated that Teresa was a bartender at THE SUNSET GRILLE and that they used cocaine while she was working.

9. The CS stated that he/she provided cocaine to Teresa on each occasion but did not sell it to her. The CS advised that Teresa was always asking the CS to get cocaine for her. S/A Force asked whom the CS obtained the cocaine from and the CS responded ▮▮▮▮▮▮

10. The CS advised that he/she never used ecstasy or MDMA.

DEA Form      - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration  000459

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**3 - Originating Office**

**U.S. Department of Justice**
Drug Enforcement Administration

Attachment 2



## REPORT OF INVESTIGATION
*(Continuation)*

| 4. Page 3 of 4 | |
|---|---|
| 5. Program Code | 6. Date Prepared 08/26/03 |

11.  S/A Force asked the CS what was his/her motivation for making controlled purchases from Teresa and the CS answered that Teresa angered him/her by calling the CS a "nigger" and that was his/her motivation.

12.  S/A Force asked the CS did you supply or use drugs with any other defendants in this case and the CS responded yes. During the investigation, the CS used cocaine with ███████ S/A Force asked the CS if he/she had ever used drugs with the before-mentioned defendants during controlled purchases and the CS answered no.

13.  The CS elaborated that he/she used cocaine with ███████ and ██████ years ago.

14.  S/A Force informed the CS that it was unlawful to use drugs and that his/her actions were unjustified and would not be tolerated. S/A Force told the CS that he was unsure if the CS would be able to work with the DEA in the future because of his/her conduct and that would be determined at a later date.

## NON-DRUG RELATED CRIMINAL INFORMATION:

None.

## FINANCIAL INFORMATION:

None.

## TERRORIST ACTIVITIES:

None.

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration   000460

3 - **Originating Office**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

Attachment 2



**REPORT OF INVESTIGATION**

*(Continuation)*

| 4. | |
|---|---|
| Page 4 of 4 | |
| 5. Program Code | 6. Date Prepared |
| | 08/26/03 |

INDEXING

1. ██████████████████████

2. KEBLES, Michael – NADDIS # 5611577

3. KEBLES, Teresa – NADDIS # 5611583

4. ██████████████████████

5. ██████████████████████

6. ██████████████████████

7. ██████████████████████

DEA Form        - 6a
'Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration    000461

3 - Originating Office

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,          )
     Plaintiff-Appellee,          )
          )
vs.          )          Case # 07-1485
          )
MICHAEL KEBLES,          )
          )
     Defendant-Appellant.          )

---

On Appeal from the United States District Court
for the District of Colorado
The Honorable Wylie Y. Daniel,
D.C. No. 03-CR-000249-WYD

---

**APPELLANT'S REPLY BRIEF**

---

ORAL ARGUMENT
REQUESTED

By: John F. Sullivan, III
THE LAW OFFICE OF JOHN F. SULLIVAN, III, P.C.,
155 S. Madison Street #209
Denver, Colorado  80209
(303) 748-4343

_____Attorney for the Defendant-Appellant

APRIL 14, 2008

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................................................3

DISCUSSION..........................................................................................................4

Mr. Kebles was directly entrapped in that he was improperly induced by a
rogue informant who was allowed to act as he desired in order to secure a
successful drug transaction.  The improper supervision of, and lack of
adequate background investigation into, the informant on the part of the
government was more than negligent.

CONCLUSION.....................................................................................................17

CERTIFICATE OF SERVICE.............................................................................18

CERTIFICATE OF ELECTRONIC SUBMISSIONS...........................................18

APPENDIX A.......................................................................................................19

## TABLE OF AUTHORITIES

**CASES**

*Headrick v. Rockwell Intern. Corp,* 24 F.3d 1272 (10th Cir.1994)............................9

*In re Riverside Linden Investment Co.,* 945 F.2d 320 (9th Cir. 1991)......................9

*United States v. Garcia,* 182 F.3d 1165 (10[th]Cir.1999)....................................14-15

*United States v. Magallanez,* 408 F.3d 672 (10th Cir.2005)...................................16

*United States v. Ortiz,* 804 F.2d 1161 (10th Cir. 1986)...........................................4

*United States v. Ullah,* 976 F.2d 509 (9th Cir.1992)...................................................9

_____**DISCUSSION**

_____

I.                    **The Government's Improper Inducement**

a.            **Vicarious vs. Direct Entrapment**

The government argued in its brief as it did in trial that "the defense argument really appears to be an argument of theoretical vicarious entrapment". Answer Brief, p. 37.  Respectfully, vicarious entrapment is not the theory of the defense in this case.  If indeed an informant interacted with a target only through an intermediary that may be a case for vicarious entrapment but that is not what took place in Mr. Kebles' case.  The evidence is that there was a substantial amount of direct interaction between the informant and Mr. Kebles.  When Mr. Wilson used Teresa Kebles, Mr. Kebles' sister,  to facilitate drug transactions he was using a plea based upon sympathy or friendship in order to have Ms. Kebles contact Mr. Kebles and help gain Mr. Kebles' trust in Mr. Wilson. "Governmental inducement make take the form of 'persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *United States v. Ortiz,* 804 F.2d 1161*, 1165(10th Cir.1986)(citations omitted).

An example of Mr. Wilson's  making a plea based upon sympathy or friendship based upon Mr. Wilson's relationship with Ms. Kebles is Exhibit 15

4

which was a tape of a conversation between Mr. Kebles and Mr. Wilson. ROA

Volume II, pg 253. Teresa Kebles had a substance abuse problem of which both

Mr. Wilson and Mr. Kebles were aware. Mr. Wilson asks Mr. Kebles during the

discussion prior to the third drug deal how Mr. Kebles' sister was doing with her

alcohol problem and about if she is getting treatment. Mr. Kebles was concerned

about his sister and Mr. Wilson feigned interest in Ms. Kebles' situation to garner

sympathy from Mr. Kebles and facilitate the potential drug transaction. Therefore,

it is not vicarious but direct entrapment because Mr. Wilson, an agent of the

government, used improper inducement to consummate a drug transaction when

he improperly played directly upon Mr. Kebles' sympathies for his sister in order

to gain Mr. Kebles ' trust and induce Mr. Kebles to sell him drugs.

### b.    Unsupervised acts of the Informant

Other examples of Mr. Wilson's improper inducement of Mr. Kebles often

occurred when Mr. Wilson was not being properly supervised such as Mr.

Wilson's delivering drugs to targets. The in-court testimony of government

witness Agent Carl Force was as follows:

Q   Okay. And was actually distributing drugs, delivering them?
A   Yes.
Q   To targets?
A   Yes.

5

ROA Volume II, pgs. 293-4.

Q  And since it says defendants, I assume that's at least two . So we now know that Mr. Wilson has been delivering cocaine to at least three targets.  While under the employ of the DEA.
A   Yeah, I would say that's a fair statement.

ROA Volume II, pg 342.  This is clear evidence that Mr. Wilson was delivering drugs on his own to targets to facilitate his being able to buy drugs from them later.  These actions show the great lengths this informant would go to induce a drug buy even if it meant entrapping the target.

There was also evidence that Mr. Wilson made a large number of phone calls to induce Mr. Kebles to sell drugs to him.  The frequency of phone calls could certainly be characterized as harassing.  (Two to three times a week according to defense witness, Laura Hemborg.  *See* ROA, Volume IV, pg 454).  In addition, many of  the calls and meetings were unrecorded and Mr. Wilson has demonstrated that he will go to great extremes to get what he wants and claim memory loss later on.  *See* Answer Brief, p. 39 fn. 5.

Mr. Wilson even made some calls on his own prior to the first deal which were unrecorded and done without DEA supervision.  Evidence of these unrecorded calls support Mr. Kebles' argument that the finder of fact could draw a reasonable and proper inference that Mr. Wilson's coercive tactics during these

6

unrecorded phone calls and/or meetings were improper inducement.  It is a fact

that these unrecorded, unauthorized calls and meetings were a violation of his

agreement with the DEA.  Evidence of the unrecorded calls are noted below

during the testimony of Agent Carl Force:

Q.   What was your recollection of what Mr. Wilson told us that day?
A   He said maybe he might have had conversation with Mr. Kebles.
Q   Before the 14th.
A   There -- yes.

ROA Volume II, pg 303.

Q   So we have five calls, total, maybe that were unrecorded and they were
conversations between the informant and Michael Kebles?
A   Correct.

Q   Okay.  Now, there were some meetings that we know of now between Teresa
Kebles and Bob Wilson where drug transactions were discussed, and those
meetings weren't recorded; is that  correct?
A   That's correct.

ROA Volume II, pg 307.  These calls, much like the illegal drug deliveries, again

show that Mr. Wilson would do what it took, even if it was unauthorized, to

induce a potential target to sell him drugs.

In May, 2003, before the search warrant was served, Mr. Wilson tried to set

up his own drug deal with Mr. Kebles  and the DEA did little to stop him nor did

they document Mr. Wilson's actions with reports or taping of the phone calls.  By

not properly supervising their rogue informant the DEA enabled Mr. Wilson to

constantly violate the terms of his agreement with the DEA including the section

prohibiting acts of entrapment.  Below is a section of Agent Force's testimony

regarding the proposed drug deal, noted after the fact in an Agent's Note, with Mr.

Kebles which was to take place at the Hooter's Restaurant in Glendale, Colorado:

Q   And the only real mention we have in the report is agent's  note about this
negotiation that happened?
A   Correct.
Q   How many calls did he make, do you know?
A   That day, I don't know.  I'd say more than one.
Q   But there's no reports of that, and again, there's no tapes of that?
A   No, sir.

ROA Volume II, pg 337.

The evidence of the unsupervised proposed deal and the evidence of the

unrecorded calls is in stark contravention to Mr. Wilson's testimony at trial that he

did not do anything without government knowledge.  *See* ROA, Vol. III, at 393.

All of these examples of the government's improper inducement, many of them

unsupervised acts by a rogue informant, show that improper government

inducement in Mr. Kebles ' case was not only improper but pervasive and

extreme.

### c.   Government Negligence v. Misconduct

In its Answer Brief the government stated that "[a]ny mistake of the

Government agent here, in supervising the informant was, at worst a question of

8

negligence,..." Answer Brief, p.38.  The problem for Mr. Kebles is that the government was more than negligent both in supervising the informant and in doing a proper background check on the informant and it led to the improper inducement which could have been avoided.

Counsel did address the mishandling of the informant in the Opening Brief. However, counsel does realize that the government negligence issue was not addressed using the example which is to follow.  Counsel submits that the Court has the discretion to review an issue in the Reply Brief even if it was not squarely raised in the Opening Brief. *See Headrick v. Rockwell Intern. Corp,* 24 F.3d 1272, 1278 (10th Cir.1994)(noting that the general rule regarding waiver of an issue if not raised in the opening brief is subject to exceptions).  One of those exceptions is when an issue is raised in the Appellee's Brief which is the case here when the government claims its errors were due to negligence only.  *See In re Riverside Linden Investment Co.,* 945 F.2d 320, 324 (9th Cir. 1991).  *See also, United States v. Ullah,* 976 F.2d 509, 514 (9th Cir.1992)("We will review an issue not presented in an opening brief for good cause shown or if failure to do so would result in manifest injustice.")(citation and internal quotation marks omitted.)

The government claimed that Mr. Wilson's reason for becoming an informant for the DEA was that he was tired of seeing people get hurt by drugs

9

and he just had to get away from the life of protecting drug dealers.  *See* Answer

Brief, p.6.  He also did not expect any money because he had his own job.  *Id.*

Mr. Wilson's motivation for becoming an informant was an important issue

in trial.  There were various assertions as to why he became an informant.

Defense witness, Julia Rutter testified that Mr. Wilson told her he was working for

the DEA so he could get points off of him.  ROA Volume IV, p. 448.   Mr. Wilson

denied this.  He stated the following during his redirect examination:

 Q   I'd like you to explain why, why you went to the DEA and what -- yeah, what
your reasons were. You weren't interested in the money; what was the motivation
is what I'm asking.
A   Seeing people hurt.
Q   What do you mean by that, sir?
A   Hurt by drugs.

 ROA Volume III, p. 418-9.

These statements led the jury to believe that Mr. Wilson's motivation was

merely to get drugs off the street that were hurting people.  Mr. Kebles submits

that was not the real motivation of Mr. Wilson and it was critical to Mr. Kebles'

receiving proper due process that he would have been allowed to properly cross

examine Mr. Wilson as to his potential biases, interests or prejudices.

The defense found and presented direct evidence of Mr. Wilson's

motivation via his statements to Ms. Rutter.  However, Mr. Kebles also tried to

garner information regarding Mr. Wilson's motivations through the discovery

process.  As was demonstrated during trial and during pretrial investigation, Mr.

Wilson had an incredible lack of memory as to critical events.  *See* Answer Brief,

p.39, fn 5.   The defense did make many efforts pre-trial to answer some of the

questions about Mr. Wilson and what his motivation was for being an informant.

On June 19, 2003 government counsel wrote a letter to Mr. Kebles' prior

attorney stating that there is a record of an arrest for aggravated car theft for a

Robert Mark Wilson with the same birth date as Mr. Wilson but that Mr. Wilson

denied that he was the person arrested.  No case file for the arrest was produced

for the defense.  That letter is attached as Appendix "A" and was Defense Exhibit

"B" at the sentencing hearing of November 5, 2007.  The defense requested on the

record that the government permit inspection of the informant file so that counsel

could view items such as the case initiation report, informant establishment report

and informant deactivation report in an effort, among other things, to determine

the motivation behind Mr. Wilson's becoming an informant and those requests

were denied by the District Court on November 29, 2004.  ROA, Vol. X, p. 60.

Current counsel had requested that same file from the government off the record

and that request was denied.

At the sentencing hearing on November 5, 2007 counsel produced two

exhibits (Sentencing Exhibits "A" and "B").  Exhibit "A" was obtained by a

defense witness within a few days of sentencing showing that Mr. Wilson was in

fact the person who was previously arrested for aggravated car theft and confessed

to committing same.  ROA Volume IX, p. 8-25.  The significance of this new

evidence was two-fold.  First, it showed that Mr. Wilson lied to the government

about his prior history  Second, it could explain why Mr. Wilson became an

informant in the first place and corroborates Ms. Rutter's statement quoting Mr.

Wilson as working with the DEA to get points off of him.[1]

At sentencing, counsel made an oral motion for a new trial based upon the

newly discovered evidence regarding the confidential informant, Robert Wilson.

ROA Volume IX, p. 8.  That motion was later denied.  *Id* at p.25

Mr. Wilson made no mention of why he was an informant other than he was

trying to stop people being hurt by drugs which, if true, is honorable and gives his

testimony credence.   However, his lack of memory makes it difficult, without

proper discovery to do an effective cross examination. With the evidence of the

aggravated vehicle theft the defense could have sent its investigator out to

_____

[1] In its Answer Brief, the government itself appears not to believe that the motivation of
Mr. Wilson was what Mr. Wilson stated on the stand.  "He even attempted to tell the defense that
he was an informant because he was a good citizen..... The informant demonstrated why
Government agents try to meet themselves with dealers, and why informant transactions are often
recorded."   Answer Brief, p. 39, fn 5.

interview witnesses or other attorneys to find out if this case or another case were the "points" which Mr. Wilson had to work off.  However, Mr. Kebles was not able to obtain the information necessary for an effective cross examination into Mr. Wilson's bias, interest or motivation through the discovery process because the government did not turn over important parts of the informant's file.

Mr. Kebles agrees with the government that destroying the ammunition in this case may have been merely negligent.  However failures to follow procedure such as improper authorization for eavesdropping on phone calls, failure to tape all contacts between the informant and targets, failure to adequately investigate the background of an informant and failure to investigate felonies being committed by informants in order to secure targets is something altogether different.  These actions or inactions add further support to Mr. Kebles' argument that he was improperly induced by a rogue informant to commit these crimes and the government's lack of adequate supervision or adequate background checks enabled the informant to do so.   Moreover, by denying Mr. Kebles access to some of the prior history of the informant the government denied Mr. Kebles the meaningful ability to confront and cross examine a witness against him.

Finally, even after all the allegations of Mr. Wilson's misconduct had come to light, and Mr. Wilson was terminated (though Mr. Wilson does not remember

the reason for the termination, ROA, Volume III, p.415) Agent Force drafted a

memo, Exhibit D, ROA Volume III, p.344, stating that Mr. Wilson was to receive

a reward for his considerable contributions in this case.  Agent Force admitted in

trial that when he drafted the memo he knew it not to be true.  Agent Force stated

the following:

Q   The memo says he's going to get a payment depending on the outcome of the
case, you had no intention of making that payment for him, correct?
A   At that time, no.
Q   Okay.  Nor at any time --
A   No.
Q   -- after you found out he was using cocaine?
A   Exactly.
Q   So this memo, then, is not true that on January 26, 2004, it says you intended
to pay the CI.  but you really didn't right?
A   I guess that's, yeah, that's the way it could be construed.

ROA Volume II, pg 371. With all due respect to the government, this testimony is

further evidence that it was more than negligent when the  government enabled the

informant to improperly induce Mr. Kebles to commit the crimes charged then

wrote the false memo in an attempt to cover their tracks.

## II.                     **Appellant's Lack of Predisposition**

"Predisposition to commit a criminal act may be shown by evidence of

similar prior illegal acts or it may be inferred from defendant's desire for profit, his

eagerness to participate in the transaction, his ready response to the government's

14

Case No. 1:03-cr-00249-WYD   Document 476-3   filed 01/08/13   USDC Colorado   pg 146 of
240
Case: 07-1485   Document: 0101412400   Date Filed: 04/14/2008   Page: 15

Attachment 3

inducement offer, or his demonstrated knowledge or experience in the criminal

activity." *United States v. Garcia,* 182 F.3d 1165, 1168-9 (10th Cir.1996).

It was undisputed that Mr. Kebles had no prior criminal activity on his record, had

a long time, good-paying job which required skill and did not have the things in

his house which were listed in the search warrant as indicative of someone in the

business of selling drugs for a living.  It took several contacts between him and the

informant in order to agree to a drug transaction and some of those contacts were

unrecorded so it is unknown what sort of inducements were used by the informant.

The sheer number of contacts which also included two times where no deal was

agreed upon shows that Mr. Kebles was not eager to participate in the transaction

nor did he readily respond to the government's offer.

Mr. Kebles had made a good living for years as a contractor and an

irrigation specialist.  He had led a law abiding life and was happy working for

himself.  Without the actions of Mr. Wilson he would not have engaged in this

behavior and jeopardized everything for which he had worked so hard.

### Relevant Conduct

Finally, there arose an issue at sentencing regarding including as relevant

conduct an extra 400 ecstasy pills which were not recovered during execution of

the search warrant nor were they purchased by the informant, Mr. Wilson.  ROA

Volume IX p37-45.  Mr. Kebles  objected at sentencing and objects now to the 400 pills being included as relevant conduct and the subsequent additional two levels which were added on to his guideline calculation because the level of proof of the alleged relevant conduct did not rise to a preponderance of the evidence standard as required by law.  *See United States v. Magallanez*, 408 F.3d 672, 685 (10th Cir.2005).

The evidence which was set before the jury was a poor quality audiotape where Mr. Kebles is alleged to have told Mr. Wilson that he had an additional 400 pills for sale.  Since the tape was inaudible it was difficult to determine what Mr. Kebles was saying.  The only other evidence of the alleged proposed sale is a quote from Mr. Wilson of which Mr. Wilson had no memory and from the agent who claimed he heard the quote while monitoring the conversation.  However, the best evidence is the tape and it is inconclusive.  It stands to reason that if the government had great confidence in the existence of the additional pills and that Mr. Kebles actually promised to sell them to Mr. Wilson they would have sought an indictment.   Therefore, the District Court erred when it found that the government proved by preponderance of the evidence that Mr. Kebles had promised an additional 400 pills for sale in the future.

# CONCLUSION

Mr. Kebles was entrapped by the government to commit the charged crimes and the District Court erred when it denied the Motions for New Trial and Motions for Judgment of Acquittal.  The government was more than negligent in its handling of the informant who misled the government, acted on his own by providing drugs to targets, made unauthorized contacts with targets, and played upon the sympathies of a law-abiding person in order to consummate a drug transaction.  The government failed to adequately investigate and supervise this informant which contributed to the informant's being able to do what he wanted in entrapping an otherwise unpredisposed Michael Kebles .

Respectfully submitted this the 14th day of April, 2008,

THE LAW OFFICE OF JOHN F. SULLIVAN, III, P.C.,

s/John Sullivan
By:  John F. Sullivan, III
155 S. Madison Street #209
Denver, Colorado  80209
(303) 748-4343

17

# CERTIFICATE OF SERVICE

I hereby certify that I have duly served a copy of the Appellant's
Reply Brief  on  the 14th  day of April 2008  by depositing a true and accurate
copy of same into the U.S. Mail postage prepaid and addressed to:

Mr. Michael Kebles #31863-013
Federal Detention Center
9595 W. Quincy Ave
Littleton, CO 80123

Mr. James Boma
Mr. John Hutchins
Assistant United States Attorneys
1225 17th Street, Suite 700
17th Street Plaza
Denver, CO 80202


s/John Sullivan _____



# CERTIFICATE OF DIGITAL SUBMISSION

All required privacy redactions, if any, have been made and, with the
exception of those redactions, every document submitted in Digital Form or
scanned PDF format is an exact copy of the written document filed with the Clerk.

I certify that the information on this form is true and correct to the best of my
knowledge and belief formed after a reasonable inquiry.

s/John Sullivan _____

18

# Appendix A

U.S. Department of Justice Attachment 3



John W. Suthers
United States Attorney
District of Colorado
Drug Task Force

A

---

1225 17th Street, Suite 700                    (303) 454-0100
Denver, Colorado 80202                          (FAX) 454-0401

June 19, 2003

JUN 2 0 2003

Walter L. Gerash, Esq.
1439 Court Place
Denver, Colorado 80202
(Michael Kebles)

Kenneth F. Eichner, Esq.
1776 Lincoln Street, Suite 1010
Denver, Colorado 80203
(Teresa Kebles)

Re:   Supplemental Discovery
      U.S. v. Michael Kebles, et al.
      Case Number: 03-CR-249-D

Dear Counsel:

        Enclosed please find supplemental discovery materials in this matter, which may be
described as follows: Copies of documents, bearing Bates Stamp page numbers **000379** through
**000430.**

        Regarding the informant in this case, Robert Wilson, NLETS shows an arrest for an
individual by the name of Robert Mark Wilson, with the same date of birth. However, Mr.
Wilson denies that he is this individual. Further, although an individual was arrested for
aggravated car theft, that case was ultimately closed without any disposition. In light of this, Mr.
Wilson has no convictions of record and any reference to this arrest which the informant disputes
and which, in any event, resulted in no conviction, would lack a good faith basis. The
Government would seek appropriate sanctions if this matter were introduced in a hearing or at
trial in an improper attempt to impeach his credibility. Please contact the undersigned if you
have any questions in this regard.

Attachment 3

The Government hereby requests reciprocal discovery under Rule 16(b), Fed. R. Crim. P., and further requests that you identify and provide copies of any such materials which are encompassed by the provisions of the rule.

Sincerely,

JAMES R. BOMA
ASSISTANT UNITED STATES ATTORNEY

Enclosure

**cc(w/Encl):**    S/A Carl Force, DEA, Denver
S/A Brian Palmer, USCS, HIDTA, Denver

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff-Appellee,<br><br>    v.<br><br>MICHAEL KEBLES,<br><br>    Defendant-Appellant. | No. 07-1485<br><br>D.C. No. 03-CR-249-WYD |

**APPELLANT'S *PRO SE* MOTION
TO SUPPLEMENT THE APPELLATE RECORD AND
TO REQUEST A FURTHER EXTENSION OF TIME IN WHICH
TO FILE THE APPELLANT'S *PRO SE* SUPPLEMENTAL OPENING BRIEF**

Michael Kebles, the Appellant *pro se*, pursuant to the Tenth Circuit Court of

Appeals' Order of July 9, 2008, hereby files this Motion to Supplement the Appellate

Record (with the following documents), and to Request a Further Extension of Time in

which to File the Appellant's *pro se* Supplemental Opening Brief; and the proposed

supplemental documents are as follows:

1.      Bates No. 0113:  DEA Report of Investigation prepared and dated 05/28/03.

2.      Bates Nos. 0143 through 0150:  DEA Report of Investigation prepared

06/02/03 and dated 06/04/03.

3.      Bates Nos. 0458 through 0461:  DEA Report of Investigation prepared

08/26/03 and dated 08/27/03.

4. Government's Further Supplemental Response to Defendant Teresa Kebles' Motion for Disclosure of Information Regarding Government Informant, signed by Mr. James R. Boma on February 5, 2004, and including Bates No. 0465: DEA Memorandum dated 01/26/2004.

5.    Exhibits of all invoices submitted by, and all checks submitted to, Michael Kebles or to his construction and remodeling firm, Choice Improvements.

6.    All documents submitted to the District Court by Mr. John F. Sullivan, III, at the sentencing hearing of November 5, 2007, pertaining to his motion for a new trial due to the discovery of new evidence.

7.    As indicated by the attached letter written by the Assistant United States Attorney, Mr. John Hutchins, "[t]he Government has no objection to [the Appellate Record being supplemented] with the precise documents" specified herein.

8.    Furthermore, the Appellant will not be able to file his Supplemental Opening Brief, due August 29th, on time even if he exercises due diligence and gives priority to its preparation because of the following extenuating circumstances: first, the Court, through no fault of its own, has not yet had the opportunity to rule upon the Appellant's Motion to Supplement the Appellate Record, which remains incomplete; second, in early August the Appellant discovered that the existing Record on Appeal, which he wishes to quote and cite, has been "checked out" and is thus unavailable to him; and third, Appellant's recent, unexpected relocation to the F.C.I. Fort Dix, New Jersey, has severely impeded his *pro se* legal work while impairing and interrupting his

2

working relationship with his volunteer law clerk and legal researcher, all making the timely completion of the Supplemental Opening Brief a practical impossibility.

9.   Pursuant to 10th Cir. R. 27.4 (F), this Motion to extend the time to file the brief is not being filed at least five days before the brief's due date of August 29, 2008, because of the aforementioned three reasons.  Appellant has not been able to ascertain the Government's position regarding this requested extension.  Two similar, previous extension requests were made by the Appellant and granted by the Court.

**WHEREFORE**, the Appellant respectfully requests that this Court supplement the Record on Appeal as recommended above; return the existing Record on Appeal to the Clerk's Office to enable the Appellant to incorporate its contents as necessary; and grant the Appellant's motion for a further extension of time in which to file his Supplemental Opening Brief.

Respectfully submitted this second day of September, 2008.

/s/   Michael Kebles
Appellant *pro se*
31863-013
F.C.I. Fort Dix
P.O. Box 2000
Fort Dix, New Jersey 08640

3

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Appellant's *Pro Se* Motion
upon the attorney for the Plaintiff, the United States of America, on this third day of
September, 2008, by depositing a true, correct, and accurate copy thereof into the United
States mail, postage prepaid, and addressed to the following:

Mr. John Hutchins
United States Attorney
District of Colorado
Appellate Division
1225 Seventeenth Street, Suite 700
Seventeenth Street Plaza
Denver, Colorado 80202

Dwane D. Davis
4535 Garland Street
Wheat Ridge, Colorado 80033



## U.S. DEPARTMENT OF JUSTICE

**Troy A. Eid**
United States Attorney
District of Colorado
Appellate Division

| | |
|---|---|
| *1225 Seventeenth Street. Suite 700*<br>*Seventeenth Street Plaza*<br>*Denver, Colorado 80202* | *(303) 454-0100*<br>*(FAX) (303) 454-0402* |

August 22, 2008

Mr. Michael Kebles
Reg. No. 31863-013
Federal Detention Center – Unit A
9595 W. Quincy Ave.
Littleton, Colorado 80123

SUBJECT:   Government's position regarding proposed documents put forward by *pro se*
appellant to supplement the record in *United States v. Michael Kebles*, 07-1485

Dear Mr. Kebles:

Pursuant to the Tenth Circuit **Order**, filed July 9, 2008, regarding your "Motion for
Clarification," this letter replies to your "faxed" letter dated August 21, 2008 (attached).

The Government has no objection to you supplementing with the precise documents
which you specify in your letter dated August 21, 2008. It appears, especially with the Bates
stamp numbers you provide, that all of the documents already have been provided, as discovery,
to you through your trial attorney, Mr. Sullivan, or were trial defense exhibits relied on by Mr.
Sullivan in conducting your defense.

In addition to mailing this (with attachment) to you, a copy (with attachment) will be
"faxed" to (303) 238-5219 this date. That is pursuant to your request.

FOR THE U.S. ATTORNEY,
Troy A. Eid:

John Hutchins
Assistant United States Attorney
District of Colorado

cc: James Boma, AUSA
file

AUG-22-2008 Case 05-1485 US ATTORNEY SUFFICE  303 454 0461   TO:3032385219   Date Filed: 09/04/2008   Page: 6

Attachment 4

August 21, 2008

Mr. John Hutchins
Assistant U.S. Attorney
District of Colorado
Appellate Division
1225 Seventeenth Street, Suite 700
Seventeenth Street Plaza
Denver, Colorado 80202

### BY FACSIMILE TRANSMISSION TO: 303-454-0402

RE: *United States* v. *Michael Kebles*, No. 07-1435: Documents Needed to
Supplement the Appellate Record

Dear Mr. Hutchins:

It is my intention to file a motion with the Tenth Circuit asking that the
appellate record in this case be supplemented with the following documents:

1.     Bates No. 0113: DEA Report of Investigation prepared and dated
05/28/03.

2.     Bates Nos. 0143 through 0150: DEA Report of Investigation
prepared 06/02/03 and dated 06/04/03.

3.     Bates Nos. 0458 through 0461: DEA Report of Investigation
prepared 08/26/03 and dated 08/27/03.

4.     Government's Further Supplemental Response to Defendant Teresa
Kebles' Motion for Disclosure of Information Regarding Government
Informant, signed by Mr. James R. Boma on February 5, 2004, and
including Bates No. 0465: DEA Memorandum dated 01/26/2004.

1

5.   Exhibits of all invoices submitted by, and all checks submitted to, Michael Kebles or to his construction and remodeling firm, Choice Improvements.

6.   All documents submitted to the District Court by Mr. John F. Sullivan, III, at the sentencing hearing of November 5, 2007, pertaining to his motion for a new trial due to the discovery of new evidence.

I am providing you with this list in order to ascertain the Government's position "regarding the precise materials" with which I wish to supplement the appellate record. Please respond as soon as possible, by facsimile transmission, to the following Fax number:

303-238-5219

Sincerely,

Michael Kebles
Appellant pro se
31863-013
Federal Detention Center-Unit A
9595 West Quincy Avenue
Littleton, Colorado 80123

2

FILED
United States Court of Appeals
Tenth Circuit

Attachment 5

September 12, 2008

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

MICHAEL KEBLES,

     Defendant-Appellant.

07-1485
(D.Ct. No.1:03-CR-00249-WYD-1)

---

ORDER

---

Before **HARTZ, McKAY** and **SEYMOUR**, Circuit Judges.

---

This matter is before the court on Mr. Kebles' *Motion To Supplement The Appellate Record And To Request A Further Extension Of Time In Which To File The Appellant's Pro Se Supplemental Opening Brief.* In that request, Mr. Kebles seeks to add certain materials to the appellate record, and also seeks additional time in which to file the supplemental brief this court first authorized in its order dated May 2, 2008.

The request for additional time is granted. The deadline for submitting the supplemental brief is extended to September 29, 2008. We caution Mr. Kebles, however, that the court will not grant any additional extensions of time. If the brief is not received on or before that date we will consider the original authorization forfeited and will proceed to consider this matter based on the pleadings already on file.

Attachment 5

The request to supplement the record is granted in part and denied in part. To the extent Mr. Kebles wishes to have this court consider all the materials on file in the district court, the request is granted. All of those materials are available and will be accessed as necessary. To the extent Mr. Kebles seeks to have this court review materials outside the district court record the request is denied. We will proceed based on the understanding that all of the materials on file in the district court are part of the appellate record.

Finally, to the extent Mr. Kebles' motion also seeks permission to borrow the record on appeal, the request is denied. As a pro se litigant, he need not cite to the record nor incorporate its contents in his brief. General legal arguments are acceptable. Mr. Kebles will be required to submit his brief without physical access to the record on appeal.

Entered for the Court,

ELISABETH A. SHUMAKER
Clerk of Court

-2-

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

    v.

MICHAEL KEBLES,

    Defendant-Appellant.

Case No. 07-1485

---

## APPELLANT'S *PRO SE*

## SUPPLEMENTAL OPENING BRIEF

---

On Appeal From
The United States District Court
for the
District of Colorado.
The Honorable Wiley Y. Daniel, District Judge.
District Court Case No. 03-CR-249-WYD

---

Michael Kebles
Appellant *pro se*
F.C.I. Fort Dix
P.O. Box 2000
Fort Dix, New Jersey 08640

---

ORAL ARGUMENT *NOT* REQUESTED

September 29, 2008

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES........................................................................2

STATEMENT OF THE CASE.......................................................................3, 4

SUMMARY OF THE ARGUMENTS............................................................5, 6

THE ARGUMENTS.....................................................................................7, 17

CONCLUSION.................................................................................................17

CERTIFICATE OF COMPLIANCE.................................................................18

CERTIFICATE OF SERVICE..........................................................................19

1

## STATEMENT OF THE ISSUES

I.      Whether the Jury did what no rational Jury would have done:  found the

Defendant-Appellant, Michael Kebles, guilty despite overwhelming and indisputable

evidence of his inducement, his non-predisposition, and thus of his entrapment.

Whether the District Court committed reversible error on two occasions:  when it denied

Defendant-Appellant's Motion for Judgment of Acquittal and Motion for New Trial

when it twice denied he was entrapped as a matter of law.

II.      Whether the Jury found the Defendant-Appellant guilty of Count Five,

Possession With Intent to Distribute, on the basis of insufficient evidence.

III.      Whether the District Court improperly added, as relevant conduct,

at the sentencing hearing on November 5, 2007, four hundred putative tablets to the total

number actually distributed to the Informant (DEA Confidential Source) Robert Wilson.

IV.      Whether the District Court improperly denied Defendant-Appellant's

Motion for a New Trial, on November 5, 2007, based upon the discovery of new

evidence, specifically *Brady* material.

2

STATEMENT OF THE CASE

In November 2007, Defendant's court-appointed trial attorney, Mr. John F.

Sullivan, III, was reappointed to serve as his appellate attorney during the course of

this appeal.  After Mr. Sullivan filed the Appellant' Opening Brief and the Appellant's

Reply Brief, an irreconcilable conflict arose between him and the Appellant, Michael

Kebles, as to the specific bases of this appeal.  On April 30, 2008, Kebles informed the

Tenth Circuit of his intention to conduct his own appeal, in Mr. Sullivan's stead.  That

same day, Mr. Sullivan filed a Motion seeking the Court's permission to withdraw as

appellate counsel in this case.  On May 2, 2008, Circuit Judge O'Brien granted Mr.

Sullivan's Motion to withdraw, declined to appoint a replacement, vacated the oral

argument set for June 19, 2008, and granted Kebles' request to represent himself, *pro se.*

Judge O'Brien further granted Kebles thirty days in which to file a supplemental brief.

The Tenth Circuit subsequently clarified Judge O'Brien's Order regarding a

supplemental

brief to mean an ***opening*** supplemental brief and granted Kebles a deadline of

August 29th, and finally September 29, 2008, by which to file it.

On April 18, 2008, twelve days before Mr. Sullivan's departure from this

case, the attorney for the United States, Mr. John Hutchins, had sent the Clerk of the

Court, Ms. Elisabeth A. Shumaker,  a letter notifying the Court of supplemental

authorities that forbid issues abandoned from the Appellant's Opening Brief from being

included in the Appellant's Reply Brief.  Mr. Hutchins was, of course, correct, until

Appellant was granted permission to represent himself and to file his own *pro se*

3

Supplemental Opening Brief.  The present *pro se* appeal ensued.

4

SUMMARY OF THE ARGUMENTS

I.      The evidence of Michael Kebles' entrapment was indisputable and

superabundant:  during the year 2003, when he was entrapped by the Informant Robert

Wilson (a DEA Confidential Source), Kebles was the owner of a thriving construction

and remodeling firm known as Choice Improvements, as well as a teacher of Power

Yoga in Denver.  His lawful income had never been higher than during the period he was

approached by the Informant.  He did not need the money the Informant paid to him.

He had no prior criminal record whatsoever.  The undisputed evidence proves he was

induced to commit acts he was not predisposed to commit and thus was entrapped as a

matter of law.

II.      The jury convicted Kebles of Count Five, Possession with Intent to

Distribute seventy-seven tablets, without sufficient evidence.  Kebles' chief accuser,

Special Agent Carl Force, told the grand jury one story, then told the trial jury a second,

and ended up being surpassed in his fabrications by the prosecutor, Mr. James R. Boma,

who told the Court and jury a third story because there was no evidence of possession with intent to distribute.

III.  The four hundred tablets, added by the District Court to the total number actually distributed, were not, in fact, relevant conduct.  The audio tape on which they were mentioned was inaudible; they were never mentioned again; nor, in fact, distributed to Wilson, nor to anyone else; nor recovered at the Kebles residence, nor ever

5

seen by anyone at any time.  And Agent Force, whose testimony was fraught with difficulties, should not, in the absence of a corroborating witness, be believed with respect to the mythical four hundred tablets.

IV.   At the Sentencing Hearing of November 5, 2007, Mr. Sullivan filed a Motion for a New Trial based upon the discovery of new evidence, which is *Brady* material, which demonstrates that Wilson lied before, during, and after his DEA tenure about his criminal record and his real motives for becoming a DEA Informant.  The District Court improperly denied this Motion for a new trial.  The inclusion of this *Brady* material would indubitably have resulted in Kebles' acquittal.

6

THE ARGUMENTS

## 1. ENTRAPMENT AS A MATTER OF LAW

When a district court declines to find entrapment as a matter of law, the standard

of review is *de novo*. *United States* v. *Beal*, 961 F.2d 1512, 1517 (10th Cir.1992).

In *United States* v. *Kebles*, the elements of entrapment—inducement and non-

predisposition—have been so clearly established that the jury erred in failing to find

entrapment as a matter of fact, just as the District Court erred in refusing to find

entrapment as a matter of law. The standard Tenth Circuit definition of inducement

comes from the oft-cited case of *United States* v. *Ortiz*, 804 F.2d 1161, 1165 (10th

Cir.1986):

"Inducement" may be defined as government conduct which creates a

substantial risk that an undisposed person or otherwise law-abiding citizen

would commit the offense. This definition implicates the obvious question

of whether the defendant was eager or reluctant to engage in the charged

criminal conduct.  Governmental inducement may take the form of

"persuasion, fraudulent representations, threats, coercive tactics,

harassment, promises of reward, or pleas based on need, sympathy or

friendship."  *United States* v. *Burkley*, 591 F.2d 903, 913 & n. 18

(D.C.Cir.1978), *cert. denied* (citation omitted).

With these well-chosen words, the Tenth Circuit in Ortiz explained what

7

"inducement" is not:


>    Inducement also will not be shown by evidence that the government agent
>
>    initiated the contact with the defendant or proposed the crime.  *Ortiz*, supra,
>
>    at 1165.


Still mindful, six years later, of its precise explanation in *Ortiz*, the Tenth Circuit

was just as precise when explaining that inducement **had** been proven in *United States* v.

*Beal*, *supra*, in which the informant had been the "initiator of both transactions."  *Beal*,

*supra*, at 1516.  In *Beal*, there was never any dispute as to inducement.  The Government

itself, in both District Court and Appeals Court, conceded that Beal had been induced by

the informant's seven telephone calls and messages, which the Tenth Circuit called

"persistent".  *Beal* at 1517.  After having been induced, Beal twice sold

methamphetamine to Silva, the informant, but *the* Tenth Circuit observed:

> There is no real dispute that Mr. Silva was the initiator of both transactions.
> Although he stated Mr. Beal may have called him to arrange the
> transactions, he also stated he may have made the calls himself.  Therefore,
> his version was equivocal.  *Beal* at 1516.

The jury found Beal not guilty of the first sale, but guilty of the second:  entrapped as to

8

the first, but not entrapped as to the second.  The District Court thereupon granted Beal a

judgment of acquittal, affirmed by the Tenth Circuit, as to the second.  If Floyd

Dewayne Beal was entrapped, Michael Kebles was certainly entrapped.

On pages 42 through 44 of its Answer Brief, the Government brings forth several

minute fragments of supposed evidence that are supposedly indicative of alleged

predisposition:  the girlfriend's "blanket denials" about the microscopic amount of used

marijuana found at the Kebles residence;  the seventy-seven Ecstasy tablets likewise

found there; the brother, Daniel Kebles, who is a fugitive defendant in an unrelated

Ecstasy case; and Michael Kebles's failure simply to call the police.  For all the jury

knew, the marijuana may well have belonged not to Michael, but to his girlfriend, hence

her "blanket denials".  The only tablets recovered at the Kebles house were the very

ones that Agent Force and Wilson claim were promised to Wilson, as a consequence of

Kebles having been entrapped into acquiring such tablets to distribute to Wilson, his

entrapper.  And all of that reminds one that the only illegal magazine discovered at Keith

Jacobson's house was the very one he had purchased as a result of government-

sponsored entrapment, and Jacobson was judged by the Supreme Court to have been

entrapped as a matter of law.  *Jacobson* v. *United States*, 503 U.S. 540, 547 (1992).  As

for Daniel Kebles, the jury, at the District Court's insistence, never heard his name.  And

as for Michael Kebles' alleged failure simply to call the police when first approached by

Wilson, Mr. Hutchins can cite no case in entrapment history wherein the defendant or

appellant was deemed to have been predisposed and thus not entrapped for having failed

9

to summon the police.  Indeed, no such case exists precisely because the entrapment

defense was designed to protect law-abiding, un-predisposed citizens *from* overzealous

police.

Finally, the Appellant hereby repudiates each and every argument contained in his

former counsel, Mr. Sullivan's, Opening Brief or Reply Brief that suggests the

Appellant, Michael Kebles, was vicariously entrapped by his sister, Teresa Kebles.  The

theory of vicarious entrapment is an invalid legal doctrine that has been unanimously

rejected by every one of the appellate circuits, including the Tenth, and is rejected by

this Appellant.  It has no place in the entrapment defense and no place in this appeal.

CONCLUSION

The Appellant, having established entrapment as a matter of law, requests that his convictions on Counts One, Two, Three, and Four of the Superseding Indictment be overturned and reversed.

## II.  CONVICTION ON COUNT FIVE WITHOUT SUFFICIENT EVIDENCE

On August 21, 2007, the Appellant Michael Kebles was convicted of Count Five of the Superseding Indictment:  possession with intent to distribute seventy-seven Ecstasy tablets discovered at his house on May 28, 2003.   The Court of Appeals reviews

10

the record for sufficiency of the evidence *de* novo. Evidence is sufficient to support a conviction if a reasonable jury could find the defendant guilty beyond a reasonable doubt, given the direct and circumstantial evidence along with reasonable inferences therefrom, taken in a light most favorable to the government." *United States* v. *Wilson*, 107 F.3d 774, 778 (10th Cir. 1997).   To sustain Defendant's conviction of possession with intent to distribute under § 841(a), the Government's evidence must be sufficient to persuade the jury beyond any reasonable doubt that Defendant (1) possessed the controlled substance; (2) knew he possessed the controlled substance; and (3) intended to distribute the controlled substance. See United States v. McKissick, 204 F.3d 1282, 1291 (10th Cir. 2000).  With regard to the seventy-seen tablets discovered at Kebles's

house, the first and second requirements were satisfied, but not the third.  In a vain,

sarcastic attempt to meet the third requirement, Mr. James R. Boma, Assistant U.S.

Attorney, told the jurors:

> "He [Kebles] claimed this was personal use.  That is absolutely ludicrous.
> A dosage unit is at most one tablet, per Agent Force's testimony.  If you
> took 70 pills of this, they would be outfitting you for a body bag by
> nightfall.  No way.  He sold three time before this.  He came up with the
> story yet again, no, that was for personal use, I was going to take all these
> 70 pills."  Trial Transcript, pp. 669-70.

11

Mr. Boma's legal-pharmacological principle, if applied exactly as he formulated it,

would mean that every otherwise law-abiding citizen who possesses seventy or more

Bayer aspirin is *ipso facto* guilty of possession with intent to distribute because the

immediate consumption of all seventy tablets would prove fatal.

In *United States* v. *Moore,* 42 Fed Appx 394 (10th Cir.2002), Moore challenged

the sufficiency of the evidence on the charge of possession of marijuana with intent to

distribute.  Although the Government presented no "direct evidence of distribution", it

did provide "several pieces of circumstantial evidence from which the jury could

reasonably infer that Moore intended to distribute marijuana.  The Government found

246 grams of marijuana in various locations in Moore's house.  They also found scales, large quantities of plastic baggies, and a ledger.  A former narcotics officer testified that all of these items were associate with distribution.  Based on this evidence, a rational jury could find beyond a reasonable doubt that Moore intended to distribute marijuana."  No such indicia of distribution were discovered at Kebles' house.

## CONCLUSION

The Appellant, having demonstrated insufficient evidence of possession with intent to distribute, requests that his conviction on Count Five be overturned and reversed.

### III.  FOUR HUNDRED TABLETS NOT RELEVANT CONDUCT

12

On November 5, 2007, the District Court added four hundred uncharged, unseen, undistributed tablets as relevant conduct for the purpose of calculating the Appellant's sentence.  The District Court must calculate drug quantities for sentencing purposes by a preponderance of the evidence, and the Tenth Circuit reviews the drug quantity calculation under a clearly erroneous standard.  *United States* v. *Ortiz*, 993 F.2d 204, 207 (10th Cir.1993).  Because the audio tape of the conversation in question was inaudible, and Wilson had no memory of the four hundred pills Kebles allegedly offered to sell him on April 2, 2003, the District Court decided to rely upon the memory of

Special Agent Force, who was supposedly monitoring the highly inaudible conversation

between Kebles and Wilson.  Force provided no evidence that the same conversation

that was inaudible on audio tape was actually overhead by him.  Force provided no

indicia of reliability, and the District Court erred in supposing Force's tainted memory

provided a preponderance of evidence for including the four hundred unseen, unsold,

un-recovered tablets as relevant conduct.

## CONCLUSION

The four hundred tablets did not meet the preponderance of evidence standard,

and the District Court's decision to include them for sentencing was clearly erroneous.

The Appellant requests the Court of Appeals order that he be resentenced according to a

new drug quantity calculation, minus the putative four hundred tablets.

13

## IV.  NEW TRIAL BASED UPON *BRADY* MATERIAL

Although the Tenth Circuit generally reviews the denial of a motion for a new

trial for an abuse of discretion, it will review *de novo* claims that the prosecution

violated *Brady* v. *Maryland*.  *United States* v. *Hughes*, 33 F.3d 1248, 1251 (10th

Cir.1994).

At the Sentencing Hearing held on November 5, 2007, Appellant Michael Kebles'

attorney, Mr. John F. Sullivan, III, submitted a Motion for a New Trial based upon

*Brady*

material that had been withheld before, during, and after the trial by the Government, specifically by the Assistant U.S. Attorney, Mr. James R. Boma.  The District Court denied the Motion.

In *Brady*,  the Supreme Court held that "the *suppression* by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; see *Kyles* v. *Whitley*, 115 S.Ct. 1555, 1564 (1995).  On July 17, 2003, Mr. Boma signed a document with Appellant's counsel in which he agreed to provide the defense with all of the *Brady*, *Giglio*, and *Bagley* material to which  defense counsel was legally entitled.  In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; see *Kyles* v. *Whitley*, 115 S.Ct. 1555, 1564 (1995).  In *Banks* v. *Reynolds*, 54 F.3d 1508 (10th Cir.1995), the Tenth Circuit said:   "In order to establish a *Brady* violation, a ... petitioner

14

must show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense. *Fero* v. *Kerby*, 39 F.3d 1462, 1472 (10th Cir.1994), *cert. denied*, 115 S.Ct. 2278 (1995); *United States* v.

Attachment 6

*DeLuna*, 10 F.3d 1529, 1534 (10th Cir.1993).

In this case, there is no doubt whatsoever that the prosecution, headed by Mr. Boma, suppressed evidence. On June 19, 2003, he sent Kebles' attorney, Mr. Walter L. Gerash, a letter stating:

> Regarding the informant in this case, Robert Wilson, NLETS shows an arrest for an individual by the name of Robert Mark Wilson, with the same date of birth. However, Mr. Wilson denies that he is this individual. Further, although an individual was arrested for aggravated car theft, that case was ultimately closed without any disposition. In light of this, Mr. Wilson has no convictions of record and any reference to this arrest which the informant disputes and which, in any event, resulted in no conviction, would lack a good faith basis. The Government would seek appropriate sanctions if this matter were introduced in a hearing or at trial in an improper attempt to impeach his credibility.

In fact, the individual arrested for aggravated car theft was Robert Mark Wilson, the selfsame informant in this case. He and the arrested individual had the identical date of birth and identical Social Security number because they are one and the same individual. This evidence was unquestionably favorable to the accused. And the

15

evidence was material to the defense because it proved Wilson lied to Boma and Force about his own well-documented identity, which further proved that Boma and Force

were guilty of a kind of fatuity that prevented them from properly reading a criminal

report and connecting it to their own informant, or guilty of knowingly cooperating with

Wilson in this deception that he perpetrated on the defense, the jury, and the District

Court.

In *United States* v. *Bernal-Obeso*, 989 F.2d 331, 336 (9th Cir. 1993), the Ninth

Circuit wrote:

> If he [the informant] would lie to the DEA to get his well-paying job, why would
>
> he not lie to a jury about the activities of his quarry to keep it, or so goes the
>
> argument.

> Evidence of such a lie might be equivalent to the proverbial smoking gun.  All
>
> the other evidence used by the defense to punch holes in Cabrera-Diaz's
>
> [informant's] credibility amounted only to circumstantial reasons why Cabrera-
>
> Diaz might alter the truth to continue to feather his own nest.  A lie would be
>
> direct proof of this concern, eliminating the need for inferences.  *See United*
>
> *States* v. *Brumel-Alvarez*, 976 F.2d 1235, 1244 (9th Cir.1992) ("Evidence that [the
>
> informant] lied during the investigation. . .would be relevant to his credibility and
>
> the jury was entitled to know of it.")

16

CONCLUSION

Because the deliberate suppression of this Brady evidence did irreparable harm to the Appellant's trial, the District Court erred in denying the Motion for a New Trial. Consequently, the Appellant, Michael Kebles, requests a new trial.

STATEMENT REGARDING ORALARGUMENT

In his Order dated May 2, 2008, Circuit Judge O'Brien ordered this matter submitted on the briefs, without oral argument, which had been previously scheduled for June 19, 2008, but was vacated in conformity with his Order.

Respectfully submitted this twenty-ninth day of September, 2008.

Michael Kebles
Appellant *pro se*
F.C.I. Fort Dix
P.O. Box 2000
Fort Dix, New Jersey 08640

17
CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief is proportionally spaced and contains exactly **3,586** words.  I relied upon my computer to obtain the correct count.

I hereby certify that the information on this Certificate is true and correct to the best of my knowledge and belief, which were formed after conducting a reasonable inquiry.

Dwane D. Davis
4535 Garland Street
Wheat Ridge, Colorado 80033

CERTIFICATE OF SERVICE


I hereby certify that I have served a copy of the foregoing Appellant's *Pro Se* Supplemental Opening Brief upon the attorney for the Plaintiff, the United States of America, on this twenty-ninth day of September, 2008, by depositing a true, correct, and accurate copy thereof into the United States mail, First Class postage prepaid, and addressed to the following:


Mr. John Hutchins
Assistant United States Attorney
District of Colorado
Appellate Division
1225 Seventeenth Street, Suite 700
Seventeenth Street Plaza
Denver, Colorado 80202


Dwane D. Davis
4535 Garland Street
Wheat Ridge, Colorado 80033

19

FILED
United States Court of Appeals
Tenth Circuit

# UNITED STATES COURT OF APPEALS

## TENED CIRCUIT

March 30, 2009

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

MICHAEL KEBLES,

    Defendant-Appellant.

No. 07-1485
(D.C. No. 1:03-CR-00249-WYD-1)
(D. Colo.)

---

## ORDER AND JUDGMENT[*]

---

Before **HARTZ**, **MCKAY**, and **SEYMOUR**, Circuit Judges.

---

On August 21, 2007, a jury found defendant Michael Kebles guilty of five counts relating to the possession, distribution, and conspiracy to possess with intent to distribute MDMA ("ecstacy") in violation of federal drug laws. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 846; 18 U.S.C. § 2. The jury also found Mr. Kebles had not been entrapped. Mr. Kebles appeals, and we affirm.

---

[*]After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

During an undercover DEA investigation, a paid confidential informant befriended Mr. Kebles' sister, Teresa, who arranged a meeting with Mr. Kebles so the informant could purchase ecstasy.  The meeting took place at Teresa's residence and was recorded.  In discussing possible future transactions, Mr. Kebles gave the informant his telephone number.  Mr. Kebles sold 601 ecstacy pills to the informant in three separate transactions occurring over the span of several months.  He also offered to sell the informant an additional 400 ecstacy pills, which the informant declined to purchase.  Although the DEA did not locate the 400 offered pills, it did find 77 ecstacy pills in Mr. Kebles' residence.

While acquiring the ecstacy, the informant violated his agreement with the DEA by illicitly, and without the DEA's knowledge, providing cocaine to Teresa that he consumed with her on several occasions.  The informant also made several unauthorized phone calls to Mr. Kebles that the DEA did not monitor or record.  Upon discovery of the informant's rogue conduct, specifically his cocaine usage with Teresa, the DEA promptly terminated the informant relationship.

On appeal, Mr. Kebles raises four arguments, three of which are from his *pro se* supplemental opening brief, which we authorized him to file after we permitted his counsel to withdraw.  First, he argues the district court erroneously denied his motions for judgment of acquittal and new trial based on entrapment as a matter of law.  Second, he challenges the sufficiency of the evidence respecting count five, possession with intent to distribute the 77 ecstacy pills found in his

residence.  Third, he asserts the district court improperly denied his oral request

for a new trial based on newly discovered *Brady* evidence.  Finally, he argues the

district court erroneously considered the "mythical" 400 ecstacy pills as relevant

conduct in enhancing his sentence.

     *Entrapment as a Matter of Law*:  We review *de novo* the district court's

denial of Mr. Kebles' motions alleging entrapment as a matter of law.  *See United

States v. Beal*, 961 F.2d 1512, 1516 (10th Cir. 1992) (motion for judgment of

acquittal).  Entrapment exists as a matter of law only where the evidence of

entrapment is uncontradicted.  *United States v. Hildreth*, 485 F.3d 1120, 1125

(10th Cir. 2007).  We limit our inquiry to "whether sufficient evidence exists to

support the jury's verdict."  *Id.*  We do not choose between conflicting witnesses

or judge credibility, and we must view the evidence and all reasonable inferences

in the light most favorable to the government.  *Id.*  We "will overturn a jury's

rejection of the entrapment defense only if *no* reasonable jury could have found

that the government proved . . . beyond a reasonable doubt that there was no

entrapment."  *United States v. Young*, 954 F.2d 614, 618 (10th Cir. 1992)

(internal quotation marks omitted) (emphasis and alteration in original).

     Entrapment consists of two elements: inducement and the absence of

predisposition.  *United States v. Nguyen*, 413 F.3d 1170, 1178 (10th Cir. 2005).

Inducement asks whether the government induced the defendant to commit the

criminal act.  *Young*, 954 F.2d at 616.  "Governmental inducement may take the

form of persuasion, fraudulent representations, threats, coercive tactics,

harassment, promises of reward, or pleas based on need, sympathy or friendship."

*United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir. 1986).  Predisposition, on

the other hand, focuses on the defendant's state of mind and asks whether the

defendant was otherwise predisposed to commit the criminal act given the

opportunity.  *Id.*  Predisposition "may be shown by evidence of similar prior

illegal acts or [] may be inferred from defendant's desire for profit, his eagerness

to participate in the transaction, his ready response to the government's

inducement offer, or his demonstrated knowledge or experience in the criminal

activity.  *Nguyen*, 413 F.3d at 1178 (internal quotation marks omitted).

      The evidence in this case "falls far short of pointing conclusively and

unmistakably to entrapment as a matter of law."  *Id.* (internal quotation marks

omitted).  In fact, it clearly shows Mr. Kebles was not induced.  That the

informant made numerous phone calls (both authorized and unauthorized) to Mr.

Kebles after the first purchase, even assuming an average of two to three calls per

week, does not constitute persuasion and harassment.  That the informant

occasionally provided Teresa with cocaine may qualify as inducement of *Teresa*,

but it does not, without more, translate into inducement of Mr. Kebles.  The

informant simply used Teresa as an intermediary.  Contrary to Mr. Kebles'

assertion, moreover, there is no evidence the informant made a plea "based on

need, sympathy or friendship."  *Ortiz*, 804 F.2d at 1165.  The evidence does not

show that Mr. Kebles even knew the informant gave his sister cocaine.  Thus, Mr.

Kebles' entrapment defense necessarily fails because the government sufficiently

disproved inducement.  *See Ford*, 550 F.3d at 982 ("[I]f the government disproves

either element then the entrapment defense will fail.")

*Sufficient Evidence of Intent*: Mr. Kebles challenges the sufficiency of the

evidence only with regard to intent.[1]  He argues the quantity of ecstacy pills found

in his residence, 77 pills total, does not evidence intent.  We review this issue *de*

*novo*, asking "whether, taking the evidence – both direct and circumstantial,

together with the reasonable inferences to be drawn therefrom – in the light most

favorable to the government, a reasonable jury could find the defendant guilty

beyond a reasonable doubt."  *United States v. Kaufman*, 546 F.3d 1242, 1263

(10th Cir. 2008) (alteration omitted).  Given the verdict, we resolve evidentiary

conflicts in favor of the government and assume the jury's credibility

determinations are proper.  *United States v. Doddles*, 539 F.3d 1291, 1293-94

(10th Cir. 2008).  To establish possession with intent to distribute under 21

U.S.C. § 841(a)(1), the government must prove the defendant: "(1) possessed the

controlled substance; (2) knew he possessed the controlled substance, and (3)

---

[1] We note Mr. Kebles did not raise this argument below.  Nevertheless, as
we concluded in *Kaufman*, 546 F.3d at 1263, "a conviction in the absence of
sufficient evidence of guilt is plainly an error, clearly prejudiced the defendant,
and almost always creates manifest injustice."  (Quotation marks and citation
omitted).

intended to distribute or dispense the controlled substance." *United States v. McKissick*, 204 F.3d 1282, 1291 (10th Cir. 2000).

Our precedent is clear that the quantity of contraband can provide sufficient evidence of intent. In *Doddles*, 539 F.3d at 1294, we held that "based on the testimony that twenty pills [of ecstacy] is a distributable quantity and that individual users will not usually own this many pills at one time," evidence was sufficient to establish intent. Here, a DEA agent testified that the number of ecstacy pills found in Mr. Kebles' residence far exceeded a personal consumption quantity. *See* Rec., vol. III at 263 ("For one night, if someone was partying, they [sic] would take one hit, one tablet."). This testimony is sufficient evidence of intent to distribute.

*Brady Claim*: We review *de novo* a *Brady* claim that the prosecution withheld material exculpatory evidence. *United States v. Ford*, 550 F.3d 975, 981 (10th Cir. 2008). *See generally Brady v. Maryland*, 373 U.S. 83 (1963). "A defendant who seeks a new trial based on an alleged *Brady* violation must show by a preponderance of the evidence that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material." *Ford*, 550 F.3d at 981 (internal quotation marks omitted). Materiality requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Banks v. Reynolds*, 54 F.3d 1508, 1518 (10th Cir. 1995). We judge materiality in view of

the entire record, asking whether the excluded evidence creates a reasonable doubt that did not otherwise exist. *Id.*

Mr. Kebles' *Brady* claim arises from the informant's criminal history. More than four years before trial, the government sent a supplemental discovery letter to Mr. Kebles stating that there was a record of a 1985 arrest for aggravated car theft for an individual with the same name and birth date as the informant, but that the informant denied he was this individual. The arrest did not result in a conviction. In light of this information and the fact the informant had no convictions of record, the government advised that any reference to this arrest would lack a good faith basis and constitute an improper impeachment attempt. After Mr. Kebles' trial and within days of sentencing, Mr. Kebles discovered the informant was in fact the person who was arrested for aggravated car theft in 1985. He orally requested a new trial, contending this new evidence was significant because it showed the informant lied to the government about his prior criminal history and his supposed altruistic motive for working with the DEA.[2] Mr. Kebles argued the evidence could be used to impeach the informant's credibility. The district court denied the motion.

---

[2] Mr. Kebles argues that Julia Rutter, a close friend of the informant, testified the informant told her he was working with the DEA to "get points off of him," Reply at 10; *see* Rec., vol. IX at 15, but the record does not support this assertion. Ms. Rutter testified only that the informant told her "he worked for the DEA." Rec., vol. IV at 448.

We are not persuaded a new trial is warranted.  Even assuming that the government suppressed the informant's criminal history[3] and that this information would be favorable to Mr. Kebles, the evidence nevertheless is immaterial.  The Federal Rules of Evidence require a *conviction* for impeachment – not simply an arrest.  *See* Fed. R. Evid. 609.  Moreover, the informant did not begin working with the DEA until at least 2001 or 2002, long after the 1985 arrest.  As the government pointed out, "There is no way that [the informant] was working off . . . an 18-year-old case.  That's ludicrous."  Rec., vol. IX at 18.

Further, even were we to assume this evidence could have lead to *other* evidence that revealed government cooperation, we still would not reach a different result.  The jury heard testimony that the informant was paid for his participation in the undercover investigation.  The jury already knew, therefore, that the informant's motivation was not purely altruistic and that he had a financial interest in catching drug dealers.  In sum, it is not reasonably probable that this impeachment evidence would have altered the jury's verdict.

*Sentencing Enhancement*: We review for clear error the factual findings underlying a district court's sentencing determination.  *United States v. Hooks*, 551 F.3d 1205, 1216 (10th Cir. 2009).  "We will not disturb [a] finding unless it has no support in the record or, after reviewing all the evidence, we are firmly

---

[3] Defense counsel admitted to the district court that he did not think the government had this information.

convinced that an error has been made." *United States v. Ortiz*, 993 F.2d 204, 207 (10th Cir. 1993). The government must prove "the quantity of drugs for sentencing purposes by a preponderance of the evidence." *Id.*

The district court enhanced Mr. Kebles' base offense level under the advisory sentencing guidelines. The court counted as relevant conduct Mr. Kebles' offer to sell the informant 400 additional ecstacy pills. Mr. Kebles contends the government did not produce sufficient evidence to support this finding. To the contrary, the government produced two key pieces of evidence. First, the government played an audio tape, albeit of poor quality, of this transaction during trial. Second, a DEA agent testified that he actually overheard Mr. Kebles offer to sell the informant 400 additional pills. The evidence clearly supports the district court's factual finding.

For the reasons set forth above, we **AFFIRM**.

ENTERED FOR THE COURT

Stephanie K. Seymour
Circuit Judge

Westlaw.

Slip Copy, 2001 WL 1301714 (C.A.10 (Kan.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 2001 WL 1301714 (C.A.10 (Kan.)))**

**H**

Only the Westlaw citation is currently avail-
able.Unpublished opinion. See CTA 10 Rule 32.1
before citing.

NOTE: THIS OPINION WILL NOT BE PUB-
LISHED IN A PRINTED VOLUME. THE DIS-
POSITION WILL APPEAR IN A REPORTER TA-
BLE.

United States Court of Appeals, Tenth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Johnathan Uriah GIBSON, Defendant-Appellant.
**No. 01-3104.**

Oct. 26, 2001.

Before EBEL, KELLY, and LUCERO, Circuit JJ.
FN**

    FN** After examining the briefs and the
appellate record, this three-judge panel has
determined unanimously that oral argu-
ment would not be of material assistance in
the determination of this appeal. *See* Fed.
R.App. P. 34(a); 10th Cir. R. 34.1(G). The
cause is therefore ordered submitted
without oral argument.

ORDER AND JUDGMENT FN*

    FN* This order and judgment is not bind-
ing precedent, except under the doctrines
of law of the case, res judicata, and collat-
eral estoppel. This court generally disfa-
vors the citation of orders and judgments;
nevertheless, an order and judgment may
be cited under the terms and conditions of
10th Cir. R. 36.3.

PAUL J. KELLY, JR., Circuit Judge.

*1 Mr. Gibson seeks to appeal from the district
court's denial of his motion to vacate, set aside, or
correct his sentence, brought pursuant to 28 U.S.C.
§ 2255. Because Mr. Gibson has not made a sub-
stantial showing that the district court's procedural
ruling was erroneous, we dismiss the appeal.

In April 1998, Mr. Gibson pled guilty to one count
of conspiracy to commit armed bank robbery, two
counts of armed bank robbery, and one count of us-
ing and or carrying a firearm during and in relation
to a crime of violence. Mr. Gibson unsuccessfully
sought to withdraw his plea and was sentenced to
181 months' imprisonment. Mr. Gibson's direct ap-
peal was decided on May 12, 1999, *United States v.
Gibson,* 176 F.3d 489 (10th Cir.1999), and he did
not file a petition for a writ of certiorari with the
Supreme Court of the United States. On January 9,
2001, Mr. Gibson filed this habeas motion which
the district court denied as untimely. Mr. Gibson
appeals, arguing that he received ineffective assist-
ance of counsel both as to his right to petition for a
writ of certiorari, and as to his § 2255 claim.

On April 24, 1996, Congress enacted the Antiter-
rorism and Effective Death Penalty Act of 1996
(AEDPA), which requires a § 2255 movant to ob-
tain a certificate of appealability as a prerequisite to
appellate review, 28 U.S.C. § 2253(c)(2), by mak-
ing a "substantial showing of the denial of a consti-
tutional right." Where, as here, the district court
dismisses the habeas motion on a procedural
ground, the appellant must show that jurists of reas-
on would both "find it debatable whether the dis-
trict court was correct in its procedural ruling" and
"find it debatable whether the petition states a valid
claim of the denial of a constitutional right." *Slack
v. McDaniel,* 529 U.S. 473, 484 (2000). Each of
these steps is "part of a threshold inquiry" that must
be satisfied before the appeals court may hear the
habeas appeal. *Id.* at 485.

We examine first whether Mr. Gibson has made a
substantial showing that the district court erred in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2001 WL 1301714 (C.A.10 (Kan.))

**(Table, Text in WESTLAW), Unpublished Disposition**

**(Cite as: 2001 WL 1301714 (C.A.10 (Kan.)))**

dismissing his habeas motion as untimely. The AE-DPA imposes a one-year limitation on a prisoner's right to apply for habeas relief, running from the date that the defendant's conviction becomes final. In cases where a defendant does not file a petition for writ of certiorari after the denial of the direct appeal, the one-year limitation period begins to run when the time for filing a certiorari petition expires. *Unites States v. Burch,* 202 F.3d 1274-1276 (10th Cir.2000).

This court issued its order and judgment affirming the judgment on May 12, 1999. Supreme Court Rule 13.3 requires defendants to petition the Court for review on certiorari within 90 days after the denial of the direct appeal. Because Mr. Gibson did not file a timely petition for a writ of certiorari, the AEDPA's one-year statute of limitations began to run on August 10, 1999, and expired on August 10, 2000. Mr. Gibson filed his § 2255 motion on January 9, 2001, and the district court properly dismissed it as untimely.

**\*2** Mr. Gibson argues that ineffective assistance of counsel precluded the timely filing of his petition for a writ of certiorari. To succeed on a claim of ineffective assistance of counsel, a defendant must show that his attorney's representation was deficient and that he was prejudiced by that deficiency. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). There is no evidence of a deficient performance by Mr. Gibson's attorney in not filing a petition for a writ of certiorari. Mr. Gibson fails to present any evidence that he was unaware of his right to petition the Supreme Court. Nor does Mr. Gibson provide evidence of any requests to file a petition that went unanswered by his attorney.

Mr. Gibson also argues that ineffective assistance of counsel precluded timely filing of his § 2255 motion. But Mr. Gibson does not claim that he was unaware of this court's decision on direct appeal. To the contrary, evidence that Mr. Gibson presented in the form of a letter from his attorney suggests that Mr. Gibson was working on the § 2255 motion before the August 10, 2000 deadline. Mr. Gibson

has no grounds for an ineffective assistance of counsel claim, since counsel is not mandated for collateral attacks. *Coleman v. Thompson,* 501 U.S. 722, 752 (1991).

As Mr. Gibson has not made a substantial showing that the district court erred in its procedural ruling, we need not examine whether the underlying issues raise substantial constitutional questions. *Slack,* 529 U.S. at 484 (encouraging appellate court to resolve procedural questions first).

We DENY a certificate of appealability and DISMISS the appeal.

C.A.10 (Kan.),2001.

U.S. v. Gibson

Slip Copy, 2001 WL 1301714 (C.A.10 (Kan.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

Case 3

Page 1

179 Fed.Appx. 535, 2006 WL 1196449 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 179 Fed.Appx. 535, 2006 WL 1196449 (C.A.10 (Kan.)))**

H

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter. See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Tenth Circuit Rule 32.1. (Find CTA10 Rule 32.1)

United States Court of Appeals,
Tenth Circuit.
UNITED STATES of America, Respondent-Appellee,
v.
Lavelle HENDERSON, Petitioner-Appellant.
**No. 05-3340.**

May 5, 2006.

**Background:** After his convictions for engaging in a continuing criminal enterprise and a money laundering conspiracy were affirmed, 78 Fed.Appx. 91, federal prisoner, who had been sentenced to life imprisonment, filed motion to vacate his sentence. The United States District Court for the District of Kansas, 2005 WL 1457680,Rogers, J., denied his motion. Prisoner sought certificate of appealability (COA) and moved to supplement his initial motion.

**Holdings:** The Court of Appeals, Michael W. McConnell, Circuit Judge, held that:

(1) defense counsel was not ineffective;

(2) prisoner was not prejudiced by alleged *Brady* violation;

(3) government's alleged proffer of perjured testimony did not violate due process; and

(4) issues that were not raised before the district court would not be considered as part of prisoner's application for a COA.

Motion to amend denied, request for COA denied, and appeal dismissed.

West Headnotes

**[1] Criminal Law 110 ⚖1895**

110 Criminal Law
  110XXXI Counsel
    110XXXI(C) Adequacy of Representation
      110XXXI(C)2 Particular Cases and Issues
        110k1895 k. Indictment and Information. Most Cited Cases
        (Formerly 110k641.13(2.1))
Defense counsel's alleged failure to adequately object to district court's amendment of indictment did not prejudice defendant, as required to support claim that counsel was ineffective, since the amendment narrowed the charges, and there was also sufficient evidence to convict defendant of the pre-amendment charges. U.S.C.A. Const.Amend. 6.

**[2] Criminal Law 110 ⚖1969**

110 Criminal Law
  110XXXI Counsel
    110XXXI(C) Adequacy of Representation
      110XXXI(C)2 Particular Cases and Issues
        110k1966 Appeal
          110k1969 k. Raising Issues on Appeal; Briefs. Most Cited Cases
          (Formerly 110k641.13(2.1))
Defense counsel's failure to contend on direct appeal from criminal conviction that government knowingly used perjured testimony did not prejudice defendant, as required to support claim that counsel was ineffective, given absence of evidence that any witness actually committed perjury. U.S.C.A. Const.Amend. 6.

**[3] Criminal Law 110 ⚖1999**

110 Criminal Law
  110XXXI Counsel
    110XXXI(D) Duties and Obligations of Prosecuting Attorneys
      110XXXI(D)2 Disclosure of Information
        110k1993 Particular Types of Information Subject to Disclosure

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

179 Fed.Appx. 535, 2006 WL 1196449 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 179 Fed.Appx. 535, 2006 WL 1196449 (C.A.10 (Kan.)))**

110k1999 k. Impeaching Evidence.
Most Cited Cases
(Formerly 110k700(4))
Prosecutor's failure to disclose that witness who testified against defendant at trial was actually incarcerated for six months of the time that she said she was involved in defendant's criminal enterprise did not prejudice defendant, as would support claim of *Brady* violation, since witness never specifically told jury that she transported drugs during time period that she was incarcerated, amended indictment did not charge defendant for conduct during that time period, and government presented many other witnesses who testified about defendant's drug trafficking. U.S.C.A. Const.Amend. 5.

**[4] Constitutional Law 92 ⇌4632**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(H) Criminal Law
      92XXVII(H)4 Proceedings and Trial
        92k4631 Use of Perjured or Falsified Evidence
          92k4632 k. In General. Most Cited Cases
    (Formerly 92k268(9))

**Criminal Law 110 ⇌1171.8(1)**

110 Criminal Law
  110XXIV Review
    110XXIV(Q) Harmless and Reversible Error
      110k1171 Arguments and Conduct of Counsel
        110k1171.8 Presentation of Evidence
          110k1171.8(1) k. In General. Most Cited Cases
Witness's allegedly false testimony about drug purchases did not have a reasonable likelihood of affecting jury's judgment, and thus did not violate due process on ground that prosecution knowingly proffered perjured testimony, since witness's testimony only served as background information about his relationship with defendant and concerned events that predated the period charged in the in-

dictment. U.S.C.A. Const.Amend. 5.

**[5] Constitutional Law 92 ⇌4632**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(H) Criminal Law
      92XXVII(H)4 Proceedings and Trial
        92k4631 Use of Perjured or Falsified Evidence
          92k4632 k. In General. Most Cited Cases
    (Formerly 92k268(9))

**Criminal Law 110 ⇌2034**

110 Criminal Law
  110XXXI Counsel
    110XXXI(D) Duties and Obligations of Prosecuting Attorneys
      110XXXI(D)5 Presentation of Evidence
        110k2032 Use of False or Perjured Testimony
          110k2034 k. What Constitutes Perjured Testimony. Most Cited Cases
    (Formerly 110k706(2))
Alleged inconsistencies in witnesses' testimony did not alone establish that one of them committed perjury, as would support defendant's claim that prosecution violated his due process rights by knowingly proffering perjured testimony. U.S.C.A. Const.Amend. 5.

**[6] Criminal Law 110 ⇌1073**

110 Criminal Law
  110XXIV Review
    110XXIV(F) Proceedings, Generally
      110k1073 k. Certificate of Probable Cause or Reasonable Doubt. Most Cited Cases
    (Formerly 110k1042)
Issues that were not raised before district court in federal prisoner's motion to vacate sentence would not be considered as part of his application for a certificate of appealability (COA) following the denial of his motion. 28 U.S.C.A. § 2255;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

179 Fed.Appx. 535, 2006 WL 1196449 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 179 Fed.Appx. 535, 2006 WL 1196449 (C.A.10 (Kan.)))**

Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.
**\*536** Thomas G. Luedke, James A. Brown, Asst. U.S. Attorney, Office of the United States Attorney, Topeka, KS, for Respondent-Appellee.

Lavelle Henderson, Florence, CO, for Petitioner-Appellant.

Before HARTZ, SEYMOUR, and McCONNELL, Circuit Judges.

**\*537 ORDER**[FN\*]

FN\* This order is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.

MICHAEL W. McCONNELL, Circuit Judge.

**\*\*1** Lavelle Henderson, a federal prisoner proceeding *pro se,* seeks a certificate of appealability (COA) that would allow him to appeal from the district court's order denying his habeas corpus petition under 28 U.S.C. § 2255. *See* 28 U.S.C. § 2253(c)(1)(B). Because we conclude that Mr. Henderson has failed to make "a substantial showing of the denial of a constitutional right," we deny his request for a COA, and we dismiss the appeal. *Id.* § 2253(c)(2).

## Background

Mr. Henderson was convicted by a jury on one count of engaging in a continuing criminal enterprise pursuant to 21 U.S.C. § 848 and one count of engaging in a money laundering conspiracy pursuant to 18 U.S.C. §§ 1956(h) and 1957(a). The district court imposed an automatic life sentence pursuant to 21 U.S.C. § 848(b). Mr. Henderson filed a direct appeal and, subsequently, sought to vacate his sentence pursuant to 28 U.S.C. § 2255. This Court affirmed his conviction and sentence on direct appeal, *see United States v. Henderson,* 78 Fed.Appx. 91 (10th Cir.2003) (unpublished), and

the district court denied his motion to vacate his sentence under § 2255. Mr. Henderson then sought a COA from the district court, which was denied.

## Discussion

The denial of a motion for relief under § 2255 may be appealed only if the district court or this Court first issues a COA. 28 U.S.C. § 2253(c)(1)(B). A COA will issue "only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). In order to make such a showing, a petitioner must demonstrate that "reasonable jurists could debate whether ... the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (internal quotation marks omitted).

In his request for a COA, Mr. Henderson makes eight arguments, which we construe liberally. Two of those arguments amount to claims of ineffective assistance of counsel, and another two challenge the constitutionality and length of the sentence. Mr. Henderson also alleges a *Brady* violation and a denial of due process. Finally, he challenges the constitutionality of his indictment and the sufficiency of the evidence against him. We consider each argument in turn.

*A. Ineffective Assistance of Counsel*

To support a claim of ineffective assistance of counsel, a defendant must show that his attorney's performance " 'fell below an objective standard of reasonableness' and that the unreasonably deficient performance resulted in prejudice." *Lucero v. Kerby,* 133 F.3d 1299, 1323 (10th Cir.1998) (quoting *Strickland v. Washington,* 466 U.S. 668, 688, 691-92, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Prejudice is shown when a defendant establishes "that there [was] a reasonable probability that, but for counsel's unprofessional errors, the res-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

179 Fed.Appx. 535, 2006 WL 1196449 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 179 Fed.Appx. 535, 2006 WL 1196449 (C.A.10 (Kan.)))**

ult of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Mr. Henderson claims \*538 that he was denied effective assistance of counsel for two reasons.

**\*\*2** [1] First, Mr. Henderson claims that his attorney failed to adequately challenge the district court's decision to amend the indictment. Mr. Henderson does not explain how his attorney's objection, properly raised at trial, was inadequate, but even if the objection to the amendment was somehow deficient, it did not result in prejudice. Generally, to be amended an indictment must be resubmitted to a grand jury, unless the amendment is merely a matter of form. *United States v. Gammill,* 421 F.2d 185, 186 (10th Cir.1970). The district court may amend the dates in an indictment so long as the date is not an essential element of the offense charged. *Id.* ("A defective allegation of time is a matter of form if time is not an essential element of the offense and if the indictment charges facts showing that the offense was committed within the period of the statute of limitations."); *see also United States v. Leichtnam,* 948 F.2d 370, 376-77 (7th Cir.1991) (holding that an indictment need not be resubmitted when an amendment merely narrows the charges to "something less than what the grand jury charged" but which is "still a criminal offense and one that the grand jury clearly set out in its indictment").

In this case, the district court allowed an amendment to the indictment that changed the starting dates of the alleged continuing criminal enterprise, resulting in a shorter period than the grand jury originally charged. Under Count 1, the alleged starting date of the enterprise was changed from April 1, 1992 to January 1, 1994 and the alleged beginning date of the first predicate act was changed from April 14, 1992 to January 1, 1994. This change was merely a matter of form, however, as the temporal scope of a conspiracy is not an "essential" or "material" element of the charge. *United States v. Cina,* 699 F.2d 853, 859 (7th Cir.1983). The amendment narrowed the charges against Mr.

Henderson, but the amended indictment still charged him with a criminal offense clearly set out in the original indictment. Moreover, even if the indictment had not been amended, there was sufficient evidence to convict Mr. Henderson on all counts because the jury found that Mr. Henderson had committed six other predicate acts, which were unamended and sufficient to convict Mr. Henderson of the conspiracy charge. Mr. Henderson therefore suffered no prejudice as a result of any deficiency in his attorney's challenge to the amendment.

[2] Mr. Henderson next charges that he was denied effective assistance of counsel in his direct appeal because his counsel failed to contend that the government knowingly used perjured testimony in its case against him. As discussed below in Section C, Mr. Henderson has not demonstrated that the government knowingly used perjured testimony. Mr. Henderson therefore has not demonstrated that there is a reasonable probability that he would have prevailed on direct appeal had his attorney raised the perjury issue, and he suffered no prejudice as a result of his attorney's performance.

*B. Violation of Brady v. Maryland*

**\*\*3** [3] Mr. Henderson contends that, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution withheld evidence that LaPreasha Wynne, an ex-girlfriend of Mr. Henderson who testified against him, was incarcerated for six months from October 1993 to March 1994. He contends that this evidence is exculpatory impeachment evidence because Ms. Wynne testified at trial that she was involved with Mr. Henderson as part of the continuing criminal \*539 enterprise during this period. Based on a review of Ms. Wynne's testimony, however, it is clear that Mr. Henderson was not prejudiced by any failure to disclose the fact of Ms. Wynne's incarceration. *Brady* violations only occur when "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

179 Fed.Appx. 535, 2006 WL 1196449 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 179 Fed.Appx. 535, 2006 WL 1196449 (C.A.10 (Kan.)))**

*Greene,* 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). In this case, evidence of the incarceration was not necessarily exculpatory. At trial, Ms. Wynne never testified as to the specific dates of her trips she took to transport cocaine for Mr. Henderson, but she agreed generally that she made trips in 1994 and the beginning of 1995. She never specifically told the jury that she made trips during late 1993 or early 1994. Her testimony therefore was consistent with Mr. Henderson's assertion that she was incarcerated only until March 1994. Even if evidence of the incarceration would have undermined testimony by other witnesses concerning Ms. Wynne's (subsequently retracted) statement to police about 1992 and 1993 drug trips, withholding that evidence could not have prejudiced the verdict because the amended indictment only charged Mr. Henderson for conduct after January 1, 1994. Moreover, in a case where the government produced a litany of witnesses to testify about Mr. Henderson's drug trafficking, Ms. Wynne was easily the least effective. She testified that she did not know whether Mr. Henderson was in the courtroom, that she did not know whether her previous statement to the police was truthful, and that some of her previous accounts of Mr. Henderson's drug trafficking activities were entirely fabricated. On cross-examination, she admitted to lying under oath about her trips to California and to telling at least six inconsistent versions of her story to various police and court officers. Yet another piece of impeachment evidence against Ms. Wynne would have made no difference in the verdict. Mr. Henderson has therefore failed to make a substantial showing of the denial of a constitutional right by reason of a *Brady* violation.

*C. Perjured Testimony*

Next, Mr. Henderson argues that the prosecution knowingly proffered perjured testimony. The prosecution's knowing solicitation of, or failure to correct, perjured testimony violates the defendant's due process rights and will be grounds for a new trial " 'if the false testimony could in any reasonable like-

lihood have affected the judgment of the jury.' " *United States v. Vaziri,* 164 F.3d 556, 563 (10th Cir.1999) (citing *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)). In this case, however, Mr. Henderson has failed to demonstrate that any witness committed perjury, let alone that the government solicited perjured testimony. In some cases Mr. Henderson has affirmatively misrepresented the trial testimony, while in others the alleged perjury goes to irrelevant facts.

**\*\*4** [4] For example, Mr. Henderson claims that one witness, Michael Reece, committed perjury by testifying that he bought cocaine from Mr. Henderson "every day of the year from 1988 to 1991." Appellant's Br. 22. Mr. Henderson asserts, without providing any evidence, that Mr. Reece was in fact incarcerated during 19 months of that period. Yet even if we assume that Mr. Reece was indeed incarcerated before 1991, and made the further assumption that the prosecution solicited that perjury, Mr. Henderson has failed to show that the perjury had a reasonable likelihood of affecting the judgment of the jury. Mr. Reece's testimony about 1988 to 1991 simply served as background information**\*540** about the relationship between Mr. Reece and Mr. Henderson, and concerned events that predated the period charged in the indictment by more than three years. That testimony had no material effect on the outcome of the case.

[5] As another example, Mr. Henderson claims that one of two prosecution witnesses, Michael Reece or Heather Reece, must have committed perjury because their testimony was inconsistent. According to Mr. Henderson, Heather Reece testified that the enterprise was distributing $3,000 to $5,000 worth of cocaine per day, while Michael Reece testified that "if anyone said that, it would be a lie." *Id.* Setting aside the fact that witnesses frequently disagree in their interpretation and recollection of events, and that tension between witnesses' testimony does not prove subornation of perjury by the prosecution, the testimony is not actually inconsistent. During the portion of the testimony cited by

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

179 Fed.Appx. 535, 2006 WL 1196449 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 179 Fed.Appx. 535, 2006 WL 1196449 (C.A.10 (Kan.)))**

Mr. Henderson, Michael Reece said that anyone who imputed certain daily drug quantities to the enterprise would be lying, and that the enterprise never took in $5,000 to $8,000 per day. He never disagreed with a figure of $3,000 to $5,000 per day.

Mr. Henderson cites another half-dozen picayune examples and concludes with the extravagant claim that "every one of the government's witnesses committed perjury with the full knowledge of the prosecutor." *Id.* It is as if Mr. Henderson has pored over the trial transcript, hunting for minor inconsistencies between the stories of prosecution witnesses and casting each one as an instance of deliberate prosecution misconduct. To the contrary, we find no evidence of perjury or the solicitation of perjury by the prosecution, and therefore hold that Mr. Henderson has failed to make a substantial showing of the denial of a constitutional right on those grounds.

### D. Issues Not Raised Below

[6] Next, Mr. Henderson raises four issues for the first time on appeal, as part of a supplemental brief entitled "Motion to Amend and/or Supplement an Original Pleading (Movant's Initial 28 U.S.C. § 2255 and Subsequent Application for a Certificate of Appealability) Pursuant to [Fed.R.Civ.P.] 15(a) and (d) in the Interest of Justice so as to Obtain a Fair and Just Result Under the Federal Rules of Habeas Procedure." This motion sets forth four new grounds for relief: (1) that the indictment was constitutionally defective, (2) that Mr. Henderson's sentence was unreasonable, (3) that the district court erred in certain sentencing calculations, and (4) that the evidence was insufficient to support the continuing criminal enterprise conviction. Because Mr. Henderson raised none of these issues before the district court, we decline to consider them as part of the application for a COA.

**\*\*5** Contrary to the title of Mr. Henderson's motion, this Court may not grant leave to amend or supplement an original § 2255 petition under Rule

15. Mr. Henderson had an opportunity to raise all of these claims before the district court, and it was the sole province of that court, acting in accordance with Rule 15(a) or 15(d), to grant leave to amend or supplement the original petition. *See* Fed.R.Civ.P. 1 ("These rules govern the procedure in the United States district courts in all suits of a civil nature...."). We may not authorize Mr. Henderson to retroactively amend his "initial" petition to cover a host of new issues. We therefore deny Mr. Henderson's motion to amend or supplement his original pleadings, and treat all of the new issues raised in his brief as not preserved.

Federal appellate courts only rarely consider an issue not passed upon below. **\*541** *Lyons v. Jefferson Bank & Trust,* 994 F.2d 716, 720 (10th Cir.1993). In this case, Mr. Henderson "does not argue on appeal that any special circumstance requires us to address [his] contention despite lack of preservation below." *United States v. Windrix,* 405 F.3d 1146, 1156 (10th Cir.2005). We therefore do not consider his remaining claims.

### Conclusion

Accordingly, we **DENY** Lavelle Henderson's motion to amend or supplement his initial petition, **DENY** his request for a COA, and **DISMISS** this appeal.

C.A.10 (Kan.),2006.
U.S. v. Henderson
179 Fed.Appx. 535, 2006 WL 1196449 (C.A.10 (Kan.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Case 4

Slip Copy, 2010 WL 1981035 (C.A.10 (Okla.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2010 WL 1981035 (C.A.10 (Okla.)))**

**H**

Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter. See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Tenth Circuit Rule 32.1. (Find CTA10 Rule 32.1)

United States Court of Appeals,
Tenth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Melvin Ellis HOLLY, Defendant-Appellant.
**No. 09-7104.**

May 19, 2010.

**Background:** Defendant, a former sheriff, filed a motion for a new trial following various convictions related to sexual abuse of inmates and employees. The United States District Court for the Eastern District of Oklahoma, Stephen P. Friot, J., 2009 WL 3275087, denied the motion. Defendant appealed.

**Holding:** The Court of Appeals, Carlos F. Lucero, Circuit Judge, held that defendant's evidence did not warrant a new trial.

Affirmed.

West Headnotes

**[1] Criminal Law 110 ☞920**

110 Criminal Law
　110XXI Motions for New Trial
　　110k920 k. Incompetency or Neglect of Counsel for Defense. Most Cited Cases
Evidence that defense counsel for defendant, a former sheriff, may have had a conflict of interest did not warrant a new trial following defendant's

convictions related to sexual abuse of inmates and employees, absent a showing that defendant discovered the evidence after trial or that such evidence was material to principal issues involved in the case. Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[2] Criminal Law 110 ☞918(2)**

110 Criminal Law
　110XXI Motions for New Trial
　　110k918 Errors and Irregularities in Conduct of Trial
　　　110k918(2) k. Irregularities Affecting Witnesses. Most Cited Cases
Evidence that witnesses in prosecution against defendant, a former sheriff, may have engaged in a "drug party" at their hotel or were under the influence of drugs during testimony did not warrant a new trial following defendant's convictions related to sexual abuse of inmates and employees, where such evidence was impeachment evidence, and defendant did not show it would probably lead to his acquittal. Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

Gregory Dean Burris, Office of the United States Attorney, Muskogee, OK, Linda A. Epperley, Robert Gay Guthrie, Sheldon J. Sperling, U.S. Attorney, Office of the United States Attorney, Muskogee, OK, for Plaintiff-Appellee.

Melvin Ellis Holly, Ayer, MA, pro se.

Before KELLY, McKAY, and LUCERO, Circuit Judges.

**ORDER AND JUDGMENT**[FN*]

CARLOS F. LUCERO, Circuit Judge.

**\*1** Melvin Ellis Holly, a federal prisoner proceeding pro se, appeals the denial of his motions for a new trial. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1981035 (C.A.10 (Okla.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2010 WL 1981035 (C.A.10 (Okla.)))**

Holly is a former sheriff. In August 2005, he was convicted on fourteen federal counts related to the sexual abuse of inmates, employees, and an employee's daughter at the Latimer County jail. On direct appeal, we reversed four of those convictions due to a jury-instruction error. *See United States v. Holly,* 488 F.3d 1298 (10th Cir.2007.) Holly then filed a federal habeas petition, which challenged his convictions on the ten remaining counts based on ineffective assistance of counsel. The district court denied habeas relief, and we declined Holly's request for a certificate of appealability ("COA"). *See United States v. Holly,* No. 09-7088, 2010 WL 423120 (10th Cir. Feb.5, 2010) (unpublished).

In October 2009, Holly filed a motion for a new trial followed by a supplemental motion for new trial. After reviewing Holly's claims on the merits, the district court denied both motions. Holly timely appealed.

Federal Rule of Criminal Procedure 33 permits a district court to grant a new trial if required in the interests of justice. "[A] motion for new trial is regarded with disfavor and should only be granted with great caution." *United States v. Quintanilla,* 193 F.3d 1139, 1146 (10th Cir.1999). To show that newly discovered evidence warrants a new trial, a defendant must establish:

> (1) the evidence was discovered after trial, (2) the failure to learn of the evidence was not caused by [his] own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*Id.* at 1147 (citation omitted). We review the denial of a Rule 33 motion for an abuse of discretion. *Id.* at 1146.

Holly alleges that he has obtained new evidence of the following: (1) his counsel had a conflict of interest; (2) prior to trial, the government placed its witnesses in a "Laquinta Inn Motel," where a "drug party" occurred; (3) a prosecution witness was under the influence of drugs when she testified; (4) several witnesses committed perjury and had engaged in illegal activities in the past; (5) DNA evidence was concealed from the jury; (6) Holly was given psychotropic drugs while in jail; and (7) decisions made by the district judge during and after trial violated ethical canons.

[1] For substantially the same reasons set forth by the district court, we conclude that Holly did not make the requisite showings under Rule 33. FN1 With respect to defense counsel's alleged conflict of interest, Holly failed to demonstrate that he discovered this evidence after trial or that such evidence is material to the principal issues involved in his case. We rejected a similar conflict-of-interest claim in denying Holly a COA to appeal the denial of his habeas petition; his arguments here are equally unavailing. *See Holly,* 2010 WL 423120, at *1 (concluding that Holly "fail[ed] to show either an actual conflict of interest or an adverse effect on his counsel's performance").

**\*2** [2] Holly's claims concerning witness placement, drug use, and other misbehavior likewise fail. This evidence is merely impeaching, and Holly has not shown that it would probably lead to his acquittal. The latter is also true of Holly's claim regarding concealed DNA evidence FN2 and his allegation that he was given psychotropic drugs. Finally, Holly's argument that the district judge violated ethical canons is without merit; to the extent the alleged misconduct is evidence, it is immaterial to the principle issues in the case and would not have led to an acquittal. FN3

For the foregoing reasons, we conclude that the district court properly exercised its discretion in denying Holly's motions for a new trial. Accordingly, we **AFFIRM.** Because Holly has failed to advance "a reasoned, nonfrivolous argument on the law and facts in support of the issues raised on appeal," *De-Bardeleben v. Quinlan,* 937 F.2d 502, 505 (10th Cir.1991), we **DENY** his motion to proceed *in forma pauperis.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1981035 (C.A.10 (Okla.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2010 WL 1981035 (C.A.10 (Okla.)))**

FN* The case is unanimously ordered submitted without oral argument pursuant to Fed. R.App. P. 34(a)(2) and 10th Cir. R. 34.1(G). This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

FN1. Like the district court, we note that Holly's motions were untimely. *See* Fed.R.Crim.P. 33(b)(1) (requiring that "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty"). However, the government did not argue timeliness below, and because this issue is not jurisdictional, we do not raise it sua sponte. *See Eberhart v. United States,* 546 U.S. 12, 19, 126 S.Ct. 403, 163 L.Ed.2d 14 (2005).

FN2. Holly did not indicate the name of the alleged DNA donor in any of his pleadings below, nor did he make a reasoned argument that this evidence would result in his acquittal.

FN3. Holly also obliquely raises an issue concerning his *Miranda* rights. This argument was not made before the district court, and we will not consider it on appeal. *See Walker v. Mather* (*In Re Walker* ), 959 F.2d 894, 896 (10th Cir.1992).

C.A.10 (Okla.),2010.
U.S. v. Holly
Slip Copy, 2010 WL 1981035 (C.A.10 (Okla.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  10-cv-01528-WYD
Criminal Action No.  03-cr-00249-WYD

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1.  MICHAEL KEBLES,

        Movant.

---

## ORDER TO SHOW CAUSE

---

        On June 28, 2010, Movant Michael Kebles filed *pro se* a Motion to Vacate, Set

Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255, [ECF No. 451].  It has come

to the attention of the Court that Movant may have been released from the Federal

Bureau of Prisons.  According to the Federal Bureau of Prisons Inmate Locator website,

http://www.bop.gov/iloc2/LocateInmate.jsp, Movant was released from the BOP on

September 30, 2011.  On October 13, 2011, the Government confirmed that Movant

has been released from the custody of the BOP, and provided the Court with Movant's

current address[1].

        Therefore, it is hereby

        **ORDERED** that Movant shall SHOW CAUSE, in writing, on or before

---

[1]Prior to October 13, 2011, the only address on file for Movant was the Federal Correctional
Institution in Fort Dix, New Jersey.  Pursuant to D.C.Colo.LCivR 10.1(m) and D.C.Colo.LCrR 49.3(m),
Movant was required to file a notice of new address with the Court within five days after any change of
address.

**Wednesday, November 30, 2011**, why his motion to vacate should not be DENIED AS

MOOT.

      Dated:  November 7, 2011

                        BY THE COURT:


                        s/ Wiley Y. Daniel
                        Wiley Y. Daniel
                        Chief United States District Judge

# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2011 NOV 30 PM 1:17

GREGORY C. LANGHAM
CLERK

BY_____DEP. CLK

Civil Action No.        10-CV-1528-WYD
Criminal Action No.  03-CR-0249-WYD

UNITED STATES OF AMERICA,

      Plaintiff-Respondent,

v.

MICHAEL KEBLES,

      Defendant-Movant.

---

## MOVANT'S RESPONSE TO THE ORDER TO SHOW CAUSE

---

The Movant, Michael Kebles, *pro se*, hereby files this Response to the

Order to Show Cause, which was issued on November 7, 2011.

## I.    INTRODUCTION

On June 28, 2010, the Movant filed *pro se* a Motion to Vacate, Set

Aside, or Correct Sentence Pursuant to 28 U.S.C. §2255.   On August 3,

2010, the Government filed its Response, and on November 1, 2010, the

Movant filed his Reply.   On September 30, 2011, the Movant was released

from federal custody.   This Court, finding that development to be

1

significant, thereupon ordered the Movant to show cause, in writing, on or before Wednesday, November 30, 2011, why his Motion to Vacate should not be denied as moot. This Response is filed in compliance with that Order because the §2255 Motion is not moot and thus should not be denied.

## II.   BACKGROUND

On November 5, 2007, this Court sentenced the Movant to sixty-three months of federal custody, to be followed by three years of supervised release. The supervised release began on the same day that the federal custody ended, on September 30, 2011. As he wrote on page 13 of his Memorandum of Law filed on June 28, 2010, the Movant challenges not only his sentence and his forfeitures, but most importantly, the underlying *conviction*. The principal ground for collateral appeal specified in the §2255 Motion is a claim of ineffective assistance of counsel, which, if successful, should result in the underlying conviction being overturned, and not merely in the sentence being vacated, set aside, or corrected.

## III.   ARGUMENT

The defendant who seeks relief from his sentence or conviction pursuant to §2255 must first satisfy the custody requirement, which is

specified by both the statute and by Rule 1 of the *Rules Governing §2255 Cases.* He must, consequently, be in custody under a sentence or judgment of the district court. "A motion to vacate a sentence under §2255 . . . will not lie unless the movant is in custody under such sentence." *Blair* v. *United States*, 349 F.2d 405 (10th Cir. 1965). But the defendant must be in custody only at the time his §2255 motion is filed. *Carafas* v. *LaVallee*, 391 U.S. 234, 238-40 (1968); *United States* v. *Bryson*, 981 F.2d 720, 726 (4th Cir. 1992); *Smullen* v. *United States*, 94 F.3d 20, 22 note 1 (1st Cir. 1996).[1]

Once the custody requirement is met -- and the Movant indisputably met his by being in federal custody on the date his Motion was filed -- the subsequent expiration of the term of custody is irrelevant to the already-

---

[1] *Carafas* v. *LaVallee* began as a New York state case and eventually made its way into the federal courts as a case of federal habeas corpus filed pursuant to §2254. It cites 28 U.S.C. §§ 2241, 2242, 2243, 2244, 2245, 2249, 2252, and 2254. It says nothing about §2255. What it says about the custody requirement for §2254 -- that it is determined when the federal habeas "application" is filed -- is applied indiscriminately to both §2254 and §2255. *Bryson*, which is a §2255 case, cites *Carafas*, saying: "Whether an individual is in custody for §2255 purposes is determined at the time the habeas action is filed." *Smullen*, another case about §2255, unreservedly quotes yet another federal habeas case, *Fernos-Lopez* v. *Figarella Lopez*, 929 F.2d 20, 23 (1st Cir.1991), which it summarizes, rather creatively, as a "holding that the 'custody' requirement of 28 U.S.C. §2255 is determined as of the date a habeas petition is filed". This court-sponsored intermingling between the policies, procedures, and terminology of 2254 and 2255 can be bewildering to lawyer and layman alike. Federal habeas relief, which is initiated by *petition*, is not the same thing as §2255 relief, which is initiated by *motion*. (See Advisory Committee Notes, Rule 1, *Rules Governing 2255 Cases.*)

fulfilled custody requirement. *Maleng* v. *Cook*, 490 U.S. 488, 492 (1989).

As the U.S. Supreme Court explained in *Spencer* v. *Kemna*, 523 U.S. 1, 7 (1998):

> The District Court's conclusion that [habeas petitioner] Spencer's release from prison caused his petition to be moot because it no longer satisfied the "in custody" requirement of the habeas statute was in error. Spencer was incarcerated by reason of the parole revocation at the time the petition was filed, which is all the "in custody" provision of 28 U. S. C. §2254 requires. See *Carafas* v. *LaVallee*, 391 U. S. 234, 238 (1968); *Maleng* v. *Cook*, 490 U. S. 488, 490-491 (1989) *(per curiam)*.

The mootness inquiry, however, does not end merely because the release from prison is shown to have had no effect on the "in custody" requirement. There is "a more substantial question" that must then be asked and answered by the court that is evaluating mootness: "whether petitioner's subsequent release caused the petition to be moot because it no longer presented a case or controversy under Article III, §2, of the Constitution." *Spencer*, 523 U.S. at 7:

> This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate . . . . The parties must continue to have a 'personal stake in the outcome' of the lawsuit." This means that, throughout the litigation, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis, supra*, at 477.

4

> An incarcerated convict's (or a parolee's) challenge to the validity of his conviction always satisfies the case-or-controversy requirement, because the incarceration (or the restriction imposed by the terms of the parole) constitutes a concrete injury, caused by the conviction and redressable by invalidation of the conviction. Once the convict's sentence has expired, however, some concrete and continuing injury other than the now-ended incarceration or parole—some "collateral consequence" of the conviction— must exist if the suit is to be maintained.

*Spencer* v. *Kemna*, 523 U.S. at 7 (1998) (citations omitted).

Any lingering concerns about mootness with respect to the pending §2255 Motion have been addressed and resolved by the Supreme Court's decision in *Spencer* v. *Kemna* above. The Movant's sentence has not expired. The physical custody component of the sentence ended on September 30, 2011, whereupon the supervised release custody component began. In the federal justice system, supervised release has replaced parole for all offenses committed after November 1, 1987, and thus what the Supreme Court wrote about a "parolee's challenge to the validity of his conviction" applies absolutely to this Movant during his present sentence of supervised release. His challenge to the validity of his conviction indisputably satisfies the case-or-controversy requirement because the restrictions imposed by the terms of the supervised release constitute a

5

concrete injury, caused by the conviction and redressable by invalidation of the conviction.

In *Dawson* v. *Scott*, 50 F.3d 884, 886 (11th Cir.1995), the petitioner filed his § 2241 habeas corpus petition on May 20, 1992, while serving a term of federal custody. The district court denied his petition and he appealed. In the meantime, he was released from federal custody on May 28, 1993, whereupon the government moved to dismiss his appeal as moot. *Id.* at 886, note 2. "The government argues that, even if [petitioner] Dawson were to obtain relief under 18 U.S.C. § 3585(b), it would be ineffective since Dawson has completed his incarceration term. Thus, the government contends that this appeal is moot." The Eleventh Circuit disagreed, finding the petition was not moot:

> Dawson is still serving his term of supervised release, which is part of his sentence and involves some restrictions upon his liberty. Because success for Dawson could alter the supervised release portion of his sentence, his appeal is not moot. *See Jago* v. *Van Curen*, 454 U.S. 14, 21 n. 3, 102 S.Ct. 31, 36 n. 3, 70 L.Ed.2d 13 (1981) (per curiam); *United States* v. *Eske*, 925 F.2d 205, 206 n.2 (7th Cir.1991). The government's motion to dismiss this appeal is denied.

*Dawson* v. *Scott*, 50 F.3d at 886, note 2.

A similar case with an identical result is *Kusay* v. *United States*, 62 F.3d 192, 193 (7th Cir. 1995), in which the Seventh Circuit wrote:

> Kusay's appointed lawyer responded that, because Kusay has been released from prison, he is no longer "in custody" for purposes of § 2255. This is incorrect. Kusay is serving a term of supervised release, a form of custody that may be abbreviated if he prevails in this action. The case therefore is not moot. *United States* v. *Chavez-Palacios,* 30 F.3d 1290, 1293 (10th Cir.1994). Cf. *Garlotte* v. *Fordice,* 515 U.S.39, 115 S.Ct. 1948, 132 L.Ed.2d 36 (1995).

The Movant's present term of supervised release is clearly a form of custody that signifies the continuance of his sentence, not the expiration of it. His release from one form of custody to another has had no effect whatsoever on the continuing viability of his §2255 Motion. He continues to present this Court with "a case or controversy under Article III, §2, of the Constitution" as required by the Supreme Court in *Spencer* v. *Kemna*. Any suggestion, therefore, that his §2255 Motion is now moot, or is about to become moot, is itself moot.

## IV.   CONCLUSION

The Movant has shown cause, in writing, why his Motion to Vacate should not be denied as moot. He therefore repeats his request that it be granted.

Respectfully submitted on this thirtieth day of November, 2011.


_____

Michael Kebles
Movant *pro se*

# CERTIFICATE OF SERVICE

I do hereby certify that I served the foregoing Movant's Response to the Order to Show Cause upon the Plaintiff-Respondent, the United States of America, on November 30, 2011, by depositing a true, correct, and accurate copy thereof into the United States mail, postage prepaid, and addressed to the Plaintiff-Respondent's attorney at the following address:

Mr. Michael Conrad Johnson
Assistant U.S. Attorney
1225 Seventeenth Street, Suite 700
Seventeenth Street Plaza
Denver, Colorado 80202

Michael Kebles
Movant *pro se*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  10-cv-01528-WYD
Criminal Action No.  03-cr-00249-WYD

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  MICHAEL KEBLES,

      Movant.

---

**ORDER**

---

I.    <u>INTRODUCTION</u>

      This matter is before the Court in connection with Michael Kebles' *pro se* Motion

Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence and his

Memorandum in Support of the Motion filed on June 28, 2010.  A response was filed on

August 3, 2010, and a reply was filed on November 1, 2012.

      Before addressing the merits of the motion, I first note that an Order to Show

Cause was issued on November 7, 2011.  The Order asked Mr. Kebles to show cause

why his § 2255 motion should not be denied as moot since he had been released from

the Federal Bureau of Prisons.  A response was filed on November 30, 2012.

Mr. Kebles acknowledged therein that he had been released from custody, but argued

that his § 2255 motion was not moot.  I agree that the § 2255 motion should not be

denied as moot.  Mr. Kebles' motion was filed when he was in custody and challenges

the underlying conviction.  Under these circumstances, Mr. Kebles' "release from custody does not moot the [2255] request because a conviction carries collateral consequences that persist even after release."  *United States v. McConnel,* No. 12-6092, 2012 WL 2626956, at *2 (10th Cir. July 6, 2012) (citing *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)).  Accordingly, the Order to Show Cause is discharged.  I now turn to Mr. Kebles' § 2255 motion.

II.  <u>FACTUAL BACKGROUND</u>

On August 21, 2007, a jury found Mr. Kebles guilty of five counts relating to the possession, distribution, and conspiracy to possess with intent to distribute MDMA ("ecstasy") in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 846; and 18 U.S.C. § 2.  The jury also found that Mr. Kebles had not been entrapped.  Mr. Kebles appealed, and the Tenth Circuit affirmed.  *United States v. Kebles*, 318 F. App'x 678 (10th.Cir. March 30, 2009) (not selected for official publication).

As noted by the Tenth Circuit, during an undercover DEA investigation, a paid confidential informant befriended Mr. Kebles' sister, Teresa, who arranged a meeting with Mr. Kebles so the informant could purchase ecstasy.  *Kebles*, 318 F. App'x at 679. The meeting took place at Teresa's residence and was recorded.  *Id.*  Mr. Kebles ultimately sold 601 ecstasy pills to the informant, Robert Wilson, in three separate transactions occurring over the span of several months.  *Id.*  Mr. Kebles also offered to sell Mr. Wilson an additional 400 ecstasy pills, which the informant declined to purchase.  *Id.*  While the DEA did not locate the 400 pills, it did find 77 ecstasy pills in Mr. Kebles' residence.  *Id.*

-2-

The Tenth Circuit noted certain rogue behavior on the part of the informant. Thus, "[w]hile acquiring the ecstacy, the informant violated his agreement with the DEA by illicitly, and without the DEA's knowledge, providing cocaine to Teresa that he consumed with her on several occasions." *Kebles*, 318 F. App'x at 679. "The informant also made several unauthorized phone calls to Mr. Kebles that the DEA did not monitor or record." *Id.* Upon discovery of this rogue conduct, the DEA terminated the informant relationship. *Id.*

On appeal, Mr. Kebles raised four arguments. Three of those argument were raised by Mr. Kebles in his *pro se* supplemental opening brief, which was filed after the Tenth Circuit permitted his counsel to withdraw. *Kebles*, 318 F. App'x at 679. First, Mr. Kebles argued that this Court erroneously denied his motions for judgment of acquittal and new trial based on entrapment as a matter of law. *Id.* Second, he challenged the sufficiency of the evidence respecting count five–possession with intent to distribute the 77 ecstacy pills found in his residence. *Id.* Third, he argued that this Court improperly denied his oral request for a new trial based on newly discovered *Brady* evidence. *Id.* Finally, he argues that this Court "erroneously considered the 'mythical' 400 ecstacy pills as relevant conduct in enhancing his sentence." *Id.* As noted above, the Tenth Circuit rejected Mr. Kebles' arguments and affirmed.

As to the entrapment argument, the Tenth Circuit found that "[t]he evidence in this case "falls far short of pointing conclusively and unmistakenly to entrapment as a matter of law." *Kebles*, 318 F. App'x at 679. "In fact, it clearly shows Mr. Kebles was not induced. *Id.* In explanation, the Tenth Circuit stated:

> That the informant made numerous phone calls (both authorized and unauthorized) to Mr. Kebles after the first purchase, even assuming an average of two to three calls per week, does not constitute persuasion and harassment. That the informant occasionally provided Teresa with cocaine may qualify as inducement of *Teresa*, but it does not, without more, translate into inducement of Mr. Kebles. The informant simply used Teresa as an intermediary. Contrary to Mr. Kebles' assertion, moreover, there is no evidence the informant made a plea "based on need, sympathy or friendship.". . .The evidence does not show that Mr. Kebles even knew the informant gave his sister cocaine. Thus, Mr. Kebles' entrapment defense necessarily fails because the government sufficiently disproved inducement . . . .

*Id.*

Mr. Kebles' *Brady* argument arose from the informant's criminal history. Prior to trial the government disclosed a record of a 1985 arrest for aggravated car theft for an individual with the same name and birth date as the informant, and informed Mr. Kebles that the informant denied he was this individual. *Kebles*, 318 F. App'x at 681. This arrest did not result in a conviction. *Id.* The government advised that any reference to this arrest would lack a good faith basis and constitute an improper impeachment attempt. *Id.* However, after trial and shortly before sentencing, Mr. Kebles discovered the informant was in fact the person who was arrested for aggravated car theft in 1985. *Id.* Mr. Kebles "orally requested a new trial, contending this new evidence was significant because it showed the informant lied to the government about his prior criminal history and his supposed altruistic motive for working with the DEA." *Id.* He also argued that the evidence could be used to impeach the informant's credibility. *Id.* at 681-82. This Court denied the motion. *Id.* at 682.

-4-

On appeal, the Tenth Circuit found that a new trial was not warranted.  *Kebles*, 318 F. App'x at 682.  It found that this evidence was "immaterial" as, among other reasons, "[t]he Federal Rules of Evidence require a *conviction* for impeachment–not simply an arrest."  *Id.* (emphasis in original).  The Tenth Circuit also stated that, even if it assumed the evidence could have lead to *other* evidence that revealed government cooperation, . . . [it] still would not reach a different result."  *Id.*  It then stated:

> The jury heard testimony that the informant was paid for his participation in the undercover investigation. The jury already knew, therefore, that the informant's motivation was not purely altruistic and that he had a financial interest in catching drug dealers.  In sum, it is not reasonably probable that this impeachment evidence would have altered the jury's verdict.

*Id.*

III.   ANALYSIS

Defendant's motion raises three grounds for collateral review of his conviction: (1) alleged informant perjury, (2) prosecutorial misconduct, and (3) ineffective assistance of counsel.  The Government concedes, and I find, that the motion was timely filed.

As to the merits, I must construe liberally the § 2255 motion because Mr. Kebles is representing himself.  *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, I should not be the *pro se* litigant's advocate.  *See Hall*, 935 F.2d at 1110.  After reviewing the entire file, I find that an evidentiary hearing is not necessary.  For the reasons stated below, the § 2255 motion will be denied.

All of the issues raised by Mr. Kebles relate to evidence in the form of a DEA

Report of Investigation dated August 27, 2003 (Bates Nos. 000458-000461) in which

Special Agent Carl Force debriefed the informant in this case, Robert Wilson [hereafter

"the DEA Report"].  (United States' Resp. to Order to Answer Mot. Pursuant to 28

U.S.C. ¶ 2255 ["Gov.'s Resp."], Attach. 2.)  During the debriefing, which occurred on

August 25-26, 2003, Mr. Wilson admitted to providing cocaine to Mr. Kebles' sister,

Teresa Kebles, whom he used as an intermediary for obtaining MDMA or Ecstasy

tablets from Mr. Kebles.  The DEA Report also states in pertinent part on page three,

paragraph 11:

> S/A Force asked the CS what his/her motivation for making controlled
> purchases from Teresa and the CS answered that Teresa angered
> him/her by calling the CS a "nigger" and that was his/her motivation.

(*Id.* ¶ 11, Bates No. 000460.)  This evidence was not offered or introduced at trial.

On cross-examination during trial, defense attorney John F. Sullivan, III asked

Mr. Wilson about the beginning of his DEA Tenure:

> Q:  Were you upset when you started working for the DEA, was that tough
> for you?
>
> A:  Working with them was not difficult at all.  It was the people that I had
> to bring myself around on a daily basis that I did not want to be around
> because in life sometimes you have to put things behind you.  And, yes, I
> did do things that I should not have done, but times come in your life when
> you have to change that, and that's what made me come to them [DEA]
> because I wanted to make a difference.

(Trial Transcript, Trial to Jury, Day 2, at 403:18 - 404:1, ECF No. 421 ["Trial Tr. Day 2."])

During direct examination, government counsel James R. Boma asked

Mr. Wilson to elaborate.  The following exchange occurred:

Q: . . .And you mentioned that you weren't interested in money.  What were you interested in?  Why did you go to the DEA in this case or when you, when you initially approached them?

A.  Do you want me to speak about what I was involved in?

Q:  I'd like you to explain why, why you went to the DEA and what – yeah, what your reasons were.

You weren't interested in the money; what was the motivation is what I"m asking.

A:  Seeing people hurt.

Q:  What do you mean by that, sir?

A:  Hurt by drugs.

Q:  All right.  Was that based on your experience and the experience of others?

A:  Yes, and what I did do for years, people or drug dealers would come to me and my friends, my acquaintances, and would want protection.  And I did do that, and that's – but I never dealt drugs.  That's what we did.

Q:  All right.  Was it a bodyguard function?

A:  Yes.

Q:  All right.  And you and other people that you knew –

A: Yeah.

Q:  – did it.

Q:  All right.  And at some point, you decided you'd had enough?

A:  Well, there was a shootout, yeah, and that's when decided [sic] I'm going to    . . . I got to get out, I got to just get away from it.

Q:  All right.  And you weren't involved in the shooting, but you were present when that occurred?

-7-

A: In many, yeah.

Q:  All right.  But so you saw people being hurt?

A:  From the drug use or the guns, year, either or.  They're all kind of intertwined.

Q:  Is that in effect your motivation, then, to approach the DEA?

A.  That's what – I was kind of too, too hard, too hardheaded to be scared. So maybe I had 15 minutes of . . . a clear head.  To make a conscious decision to – that I had to change.

Q:  All right.  And that's what drove you literally, I guess, to DEA?

A.  I went to them.

Q:  And you don't have any expectation of receiving any money as a result of this case in court here today?

A: I have my own job.  I don't need them.

Q: All right.  But do you expect to receive any money from the government?

A:  Don't want anything.

(Trial Tr. Day 2 at 418:15-420:11.)

Mr. Kebles argues that Mr. Wilson's motivation to serve as a DEA informant, as stated in his testimony in court, cannot be reconciled with his motivation for dealing with Teresa Kebles, as stated in the DEA Report in regard to his debriefing.  He further argues that Mr. Wilson's "trial testimony was a courtroom fabrication contrived for the purpose of misleading the jury and it succeeded", and that "[i]t was perjury".  (Mem. of Law in Supp. of Mot. Pursuant to 28 U.S.C. § 2255 [Movant's Mem."], ECF No. 451-1.)

-8-

Related to this, Mr. Kebles argues prosecutorial misconduct on the part of government counsel Mr. Boma in that, notwithstanding documentary evidence to the contrary, Mr. Boma "strenuously asserted the purity of the informant's motivation." (Movant's Mem. at 7.)  He points to Mr. Boma's cross-examination of the defense expert witness, Mr. Michael Levine, regarding the different types of informants, including those "who volunteer their services because they're fed up with crime or violence in their community and they offer their services knowing the risk and agreeing to undertake dangerous, potentially dangerous, jobs in order to help clean up crime in their neighborhood or whatever?"  (Trial Transcript, Trial to Jury, Day 3, at 520:12-17, ECF No. 422 ["Trial Tr. Day 3"].)

Mr. Kebles argues that "Mr. Boma presented the informant as a high-minded, public-spirited, anti-drug crusader who was working tirelessly with the DEA to cleanse his community of drugs and violence."  (Movant's Mem. at 10.)  He further asserts that "Mr. Boma's misconduct was the severest kind of misconduct conceivable, aiding the informant's deception of the jury by making provocative and false statements of his own."  (*Id.*)  According to Mr. Kebles, the jurors were entitled to the information about the informant's true motive for buying drugs from Teresa Kebles and needed it to evaluate his entrapment defense–particularly the issue of inducement–but Mr. Boma deprived them of it.  Mr. Kebles concludes that "a reasonable jury properly informed as to the informant's true motivation would have had abundant evidence of inducement and abundant grounds for acquittal."  (*Id.* at 11.)  Thus, he argues that the prosecutorial misconduct caused him substantial prejudice, rendering the trial unfair.  (*Id.*)

-9-

Finally, Mr. Kebles argues ineffective assistance of his trial counsel Mr. Sullivan

in regard to his failure or refusal to use the evidence in the DEA Report to impeach the

informant.  He asserts that this was "the single and most important piece of information

in his possession" (Movant's Mem. at 11), as it was, in effect, a confession that the

informant "*induced* Teresa Kebles and her brother Michael to violate the drug laws so

that he might incriminate both and thereby satisfy his desire to avenge Teresa's alleged

racial insult."  (*Id.*)  Mr. Kebles further asserts that the informant's "well-documented

hatred for [Teresa] provided Mr. Wilson with a motive to induce and entrap her and

Michael as well" as "his hatred of the sister necessarily carried over to the brother. . . ."

(*Id.* at 12.)  It is argued that the entire trial would have been dramatically altered by the

DEA Report that revealed the informant's motive, and that Mr. Sullivan's representation

was ineffective in failing to introduce this to the jury.

I agree with the government that the first two arguments–alleged perjury by the

informant and alleged prosecutorial misconduct by government counsel Mr. Boma– are

barred.  Claims previously considered and disposed of on direct appeal may not be

reasserted in a § 2255 action.  *United States v. Warner*, 23 F.3d 287, 291 (10th Cir.

1994); *United States v. Prichard*, 875 F.2d 789, 791 (10th Cir. 1989).  In addition, a

motion to vacate pursuant to § 2255 is not available to test the legality of a matter that

should have been raised on direct appeal.  *See United States v. Allen*, 16 F.3d 377, 378

(10th Cir. 1994).  Mr. Kebles is barred from raising in a § 2255 motion a procedurally

defaulted claim "unless he can show cause for his procedural default and

-10-

actual prejudice resulting from the alleged errors, or can show that a fundamental miscarriage of justice will occur if his claim is not addressed." *Id.*

To demonstrate cause for his procedural default, Mr. Kebles must show that some objective factor external to the defense impeded his ability to comply with the relevant procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *United States v. Salazar*, 323 F.3d 852, 855 (10th Cir. 2003). A fundamental miscarriage of justice occurs when "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496; *see also United States v. Cervini*, 379 F.3d 987, 991-92 (10th Cir. 2004). A "substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). To demonstrate a fundamental miscarriage of justice, Mr. Kebles first must "support his allegations of constitutional error with new reliable evidence. . . that was not presented at trial." *Id.* Mr. Kebles then must demonstrate "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327.

Mr. Kebles does not dispute the fact that his first two claims are procedurally defaulted, other than to suggest that the DEA Report was not part of the appellate record. While the government raised the issue of procedural default in its response, Mr. Kebles made no fact-based attempt to demonstrate cause and prejudice or a fundamental miscarriage of justice.

Further, as to the first claim alleging perjury on the part of the informant in connection with his motivation, Mr. Sullivan (Mr. Kebles' trial and appellate counsel)

sufficiently raised this issue to have that prior defense position act as a bar to raising it

again.  While not mentioning the hearsay fact that Mr. Kebles' sister called the informant

a racist name, Mr. Sullivan argued on appeal that Mr. Wilson's "motivation for becoming

an informant was an important issue in trial" and that his stated "motivation to get drugs

off the street that were hurting people" was not his "real motivation".  (Appellant's Reply

Brief at 10, Attach. 3 to Gov.'s Resp.)  In addition, once Mr. Kebles took over his own

appeal, he had an opportunity to advance this claim by arguing for the relevance of the

DEA Report and the connection with the previously raised assertion that the defense

was frustrated in presenting the full story of Mr. Wilson's motivation.  Indeed, the Tenth

Circuit allowed Mr. Kebles to file a *pro se* Supplemental Opening Brief.  (Attach. 6 to

Gov.'s Resp.)

        In now justifying the raising of this impeachment issue in the 2255 proceeding,

Mr. Kebles asserts that the DEA Report was not introduced into the trial record, was not

in the Record on Appeal, and that he did not believe it was not available for direct

appeal.  However, as the government notes, this does not tell the whole story.  While

the DEA Report, Bate-stamped and provided to the defense as part of pretrial

discovery, was not introduced as a trial exhibit by the defense, Mr. Kebles moved,

without Government opposition, to supplement the appellate record with, among other

items, the DEA Report at issue.  (*See* Appellant's *Pro se* Mot. to Supplement the

Appellate R. and to Request a Further Extension of Time in Which to File the

Appellant's Pro se Supplemental Opening Br. at 1, Attach. 4 to Gov.'s Resp.)  However,

Mr. Kebles' motion did not advise the Tenth Circuit that he needed the DEA Report to

-12-

demonstrate perjury of a witness (or misconduct by the prosecution) or for any other reason.  (*Id.*)  Therefore, not surprisingly, the Tenth Circuit said that it would examine the entire trial record, but would not expand the record to include items outside of the district court record.  (Order filed September 12, 2008 at 2, Attach. 5 to Gov.'s Resp.)

Nonetheless, even though Mr. Kebles says that the appellate record lacked this document, the legal issue regarding the credibility of Wilson as to his motivation has been raised previously in the direct appeal.  Indeed, the Tenth Circuit said that the jury knew "that the informant's motivation was not purely altruistic. . . ."  *Kebles*, 318 F. App'x at 682.  Just because Mr. Kebles now wishes the Court to consider an additional document and refine the conclusion of the Tenth Circuit on the lack of purity of Mr. Wilson's motives does not mean that he should get the proverbial "second bite at the apple", especially since the DEA Report at issue is not newly discovered.  *See United States v. Gilmer*, 814 F. Supp. 44, 45 (D. Colo. 1992) (government did not get another chance to introduce more evidence).  Accordingly, this claim is procedurally-barred.  *United States v. Frady*, 456 U.S. 152 (1982); *United States v. Dago*, 441 F.3d 1238, 1243-1244 (10th Cir. 2006).

The second claim of prosecutorial misconduct–that government counsel Mr. Bohn improperly vouched for his witness or otherwise acted improperly in introducing testimony about the informant being altruistic when he knew from the DEA Report that this was false–could also have been raised in the direct appeal.  The Tenth Circuit has made clear that a litigant, through counsel or otherwise, may assert on a direct appeal that a prosecutor has crossed over an ethical line during the conduct of

the trial.  *See, e.g., United States v. Rogers*, 556 F.3d 1130, 1140-1143 (10th Cir. 2009)

(claims regarding allegedly improper prosecutorial closing argument).  While counsel for

Mr. Kebles did not believe this to be the situation, at least regarding any prosecutorial

"hiding of the ball" regarding other negative information about the informant, *Kebles*,

318 F. App'x at 682 n. 3, this could have been raised by Mr. Kebles himself when he

took over the appeal and filed a supplemental opening brief.  Indeed, Mr. Kebles argued

the related issue that the informant lied about "his criminal record and his real motives

for becoming a DEA Informant."  (Appellant's *Pro Se* Supplemental Opening Brief at 5,

Attach. 6 to Gov.'s Resp.)

Accordingly, I find that Mr. Kebles' first and second claims may be dismissed as

procedurally barred.  However, for the reasons stated below, I also find that the claims

lack substantive merit.

First, as to the alleged perjury by the informant, I note that Mr. Kebles cites

*Napue v. Illinois*, 360 U.S. 264 (1959).  That case held:

> The principle that the State may not knowingly use false evidence, including
> false testimony, to obtain a tainted conviction,. . . does not cease to apply
> merely because the false testimony goes only to the credibility of the witness.
> The jury's estimate of the truthfulness and reliability of a given witness may
> well be determinative of guilt or innocence, and is upon such subtle factors
> as the possible interest of the witness in testifying falsely that a defendant's
> life or liberty may depend. . . . "A lie is a lie, no matter what its subject, and,
> if it is any way relevant to the case, the district attorney has the responsibility
> and duty to correct what he knows to be false and elicit the truth. . . . That the
> district attorney's silence was not the result of guilt or a desire to
> prejudice matters little, for its impact was the same, preventing, as it did, a trial that
> could in really sense be termed fair."

*Id.* at 269-70 (quotation omitted).  I further note that "[t]he prosecution's knowing solicitation

-14-

of, or failure to correct, perjured testimony violates the defendant's due process rights and will be grounds for a new trial 'if the false testimony could in any reasonable likelihood have affected the judgment of the jury.'"  *United States v. Henderson*, 179 F. App'x 535, 540 (10th Cir. 2006) (quoting *United States v. Vaziri,* 164 F.3d 556, 563 (10th Cir.1999)).

In this case, however, I find that Mr. Kebles has failed to demonstrate that the informant committed perjury, let alone that the government solicited perjured testimony. That is because Mr. Wilson's testimony that he became an informant because he had seen people get "hurt" by drugs and for the other reasons he articulated on the stand is not necessarily inconsistent with the motivation he may have had regarding making controlled purchases from Teresa Kebles as referenced in the DEA Report.  He may well have had altruistic reasons for becoming an informant generally with the DEA, even if he later became angered at Teresa for calling him a racist name and decided to buy drugs from her in retaliation.  Indeed, Mr. Kebles acknowledges in his motion that Mr. Wilson did not have contact with Teresa until six months *after* he became an informant, and that he could have originally been motivated by altruistic reasons.[1]  Mr. Wilson was never asked about his motivation regarding Teresa Kebles and his decision to buy drugs from her or sell her cocaine; therefore, it cannot reasonably be inferred that he actually lied on the stand.  Nor can I find that the government presented false testimony through the redirect examination as to Mr. Wilson's motives for becoming an informant.

---

[1]  Specifically, Mr. Kebles wrote, "[e]ven if Mr. Wilson's original motivation were [sic] as altruistic as he professed and Mr. Boma guaranteed, he quickly abandoned it six months later when he targeted Teresa directly for revenge. . . ."  (Movant's § 2255 Mot. at 6, Ground Two.)

I also find that Mr. Kebles has not shown that the evidence in the DEA Report about Mr. Wilson's motives regarding Teresa Kebles would have changed the outcome of the trial. On the impeachment issue, the Tenth Circuit noted that the jury already knew that Mr. Wilson's motives were not purely altruistic. Mr. Kebles argues, however, that the jury was entitled to the information about Mr. Wilson's motive as to Teresa "to evaluate the Movant's entrapment defense, particularly the issue of inducement." (Movant's Mem. at 10.) He asserts that the DEA Report shows Mr. Wilson "was, in effect, confessing that he *induced* Teresa and her brother Michael to violate the drug laws so that he might incriminate both and thereby satisfy his desire to avenge Teresa's alleged racial insult." (*Id.* at 11.)

However, as the Tenth Circuit noted, "[t]hat the informant occasionally provided Teresa with cocaine may qualify as inducement of *Teresa*, but it does not, without more, translate into inducement of Mr. Kebles." *Kebles*, 318 F. App'x at 680 (emphasis in original). Indeed, the evidence does not show that Mr. Kebles even knew the informant gave his sister cocaine. *Id.* Further, Mr. Kebles has not shown that Mr. Wilson otherwise induced him to sell him drugs, through "persuasion and harassment" or through "a plea 'based on need, sympathy or friendship.'" *Id.* (quotation omitted). While Mr. Kebles argues that Mr. Wilson's "well-documented hatred for [Teresa] provided Mr. Wilson with a motive to induce and entrap Michael as well", there was no evidence that Mr. Wilson's motivation regarding Teresa carried over to Mr. Kebles and Mr. Wilson's dealings with him.

Finally, there was substantial evidence in the record apart from Mr. Wilson's testimony that supported the jury's verdict. As noted by the Tenth Circuit, "the government played [at trial] an audio tape, albeit of poor quality, of the transaction" with Teresa Kebles,

-16-

Mr. Wilson and Mr. Kebles where they discussed future transactions regarding the purchase of ecstacy.  *Kebles*, 318 F. App'x at  682.  Also, a DEA agent testified that he actually overheard Mr. Kebles offer to sell the informant 400 additional pills.  *Id.*  Further, "a DEA agent testified that the number of ecstasy pills found in Mr. Kebles' residence far exceeded a personal consumption quantity. . . ."  *Id.*  Given that evidence, I find that it is not reasonably probable that this impeachment evidence as to Mr. Wilson would have altered the jury's verdict.

I now turn to the argument regarding prosecutorial misconduct on the part of government counsel.  Even if Mr. Boma's questions on cross-examination of Defendant's expert witness Michael Levine could be read as portraying Mr. Wilson to the jury as a "philanthropic or socially motivated" informant or an informant with other altruistic methods, this does not constitute prosecutorial misconduct or improper vouching for the witness.  First, Mr. Boma's questions were in response to the direct examination of Mr. Levine where he testified about the typical motives of informants, including the fact that "[t]hey will lie if they can get away with it.  They will use their informant status to commit crimes, if they can get away with it, because they're criminals."  (Trial Tr. Day 3 at 502:9-12.)  Thus, his questions were fair cross-examination.  Second, Mr. Boma's questions were based on the record from what Mr. Wilson testified to.  As discussed previously, Mr. Wilson was not necessarily lying when he testified about altruistic motives for becoming an informant generally, even if he had a different motive in regard to purchasing drugs from Teresa Kebles.

Further, Mr. Boma did not improperly vouch for Mr. Wilson . "'Argument or evidence is impermissible vouching only if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony.'" *Thornburg v. Mullin*, 422 F.3d 1113, 1132 (10th Cir. 2005) (quoting *United States v. Magallanez*, 408 F.3d 672, 680 (10th Cir. 2005)).  Mr. Boma's questions did not explicitly provide personal assurances of Mr. Wilson's testimony, nor did they implicitly indicate that information not presented to the jury supports Mr. Wilson's testimony.

Finally, as to the ineffective assistance of counsel claim, the Supreme Court has established a two-prong test to review such claims.  *See Strickland v. Washington*, 466 U.S. 668 (1984).  Mr. Kebles must demonstrate both that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance was prejudicial.  *Id.* at 687.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  There is a "strong presumption" that counsel's performance falls within the range of "reasonable professional assistance."  *Id.*  It is the defendant's burden to overcome this presumption by showing that the alleged errors were not sound strategy under the circumstances.  *Id.*

In the case at hand, Mr. Kebles has identified "the acts or omissions of counsel that are alleged not to have been the result of professional judgment."  *Strickland*, 466 U.S. at 490.  He alleges that Mr. Sullivan was ineffective because he did not present to the jury the evidence of Mr. Wilson's motivation towards Teresa based on her calling

him a racist name as discussed in the DEA Report.  However, I find that Mr. Kebles has not shown that defense counsel's performance fell below an objective standard of reasonableness.

To determine if Mr. Sullivan's performance was deficient, "the relevant inquiry is whether trial counsel's decision was an informed tactical decision that was reasonable under the circumstances of the case."  *See Brecheen v. Reynolds*, 41 F.3d 1343, 1369 (10th Cir. 1994).  In this case, I find that Mr. Sullivan made an informed tactical decision to present the defense of entrapment by the informant.  He argued that the distribution of cocaine to Teresa Kebles was the equivalent, in this supposedly close-knit family, to the entrapment of Mr. Kebles himself.  As Mr. Sullivan argued in closing regarding Mr. Wilson's giving drugs to Teresa Kebles:

> It also allowed him to gain the trust of Teresa. And that's what goes to the inducement part.  You don't expect a government agent to give you drugs. It establishes in a very dark way trust between an agent and the informant. That trust between he [sic] and Teresa enabled her to pull Michael in. Because the sympathy and familial relationships, all this can be considered in entrapment.  When he got her, he got him.  And it was by giving her cocaine that she could trust him and therefore she could tell Michael, hey, you can trust this guy.  But that's okay.  They got the drugs, so don't worry about prosecuting him, he's a great guy, philanthropic or whatever he said.

(Trial Transcript, Trial to Jury Day 4, at 696:22-697:8.)

To have Teresa's inducement be Mr. Kebles' inducement, defense counsel had to emphasize that the close and friendly relationships included, not only family siblings Teresa and Michael, but included Mr. Wilson, as well.  Mr. Sullivan introduced testimony from Julia Anne Rutter that she believed Teresa Kebles and Mr. Wilson were friends, as "they would always tell stories, they had dinner, they were at some party and they were

hanging out." (Trial Tr. Day 3, at 447:8-15.) In further support of this defense, evidence was given by Laura Hemborg, Mr. Kebles' live-in girl friend. Ms. Hemborg testified that Mr. Wilson called two to three times a week in early 2003 and that Mr. Kebles told her that Mr. Wilson was "his sister's friend." (*Id.* at 454:2-17.) Testimony from Mr. Kebles' expert Michael Levine also supported this defense. He testified that this was a case of improper inducement of Mr. Kebles whereby he became a "drug dealer, . . . after the informant's introduction and creation of the whole scenario". (*Id.* at 563:17-19.) He further stated in connection with a hypothetical question about a person in the general population that the reason that person may have become a drug dealer was because "[t]heir sister might be pleading with them to get it." (*Id.* at 563:25-564:4.)

Therefore, I find that this was a situation where defense counsel made an informed tactical decision to portray Mr. Wilson and Ms. Kebles as friendly to support an entrapment defense. This was reasonable under the circumstances of the case, since entrapment can be shown by governmental conduct (in this case from the informant) that "creates a substantial risk that an undisposed person . . . would commit the offense", which can take the form of "pleas based on need, sympathy or friendship." *United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir. 1986). Introduction of the evidence in the DEA Report that Teresa Kebles allegedly called Mr. Wilson a "nigger" would have been inconsistent with this defense, as Teresa would likely not be calling a friend such a racist word. In other words, introduction of the evidence in the DEA Report "might simply have made [Mr. Kebles'] defense more suspect. *Foreman*, 323 F.3d at 505.

-20-

Further, as the defense was implying that the sister and brother were close, and that Mr. Kebles may have been influenced by his sister's actions, the introduction of the racist word at issue could make the jury believe that both Teresa and Mr. Kebles were racists. That apparent racism would certainly not make a favorable impression on the jury. *See United States v. Frasch*, 818 F.2d 631, 634 (7th Cir. 1987) ("the offensive word 'nigger'. . . had a great deal of prejudicial potential"); *Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1423 (7th Cir. 1986) (evidence that a defendant called black people "niggers" was evidence of what his racial attitudes were). Indeed, introducing evidence that Mr. Kebles came from a family of racists could be independent cause for post-conviction complaint.

Accordingly, I find that it was a reasonable trial strategy not to introduce the evidence in the DEA Report. I further find that Defendant has not carried his burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound strategy.'" *Strickland*, 466 U.S. at 689 (quotation omitted). Thus, Mr. Kebles has not shown that his counsel's performance fell below an objective standard of reasonableness, the first prong of an ineffective assistance claim.

Moreover, even if Mr. Kebles could demonstrate deficient performance, I find that he cannot show that he was prejudiced. At best, the evidence about Mr. Wilson's motivation towards Teresa Kebles due to her calling him a racist word would have impeached Mr. Wilson's credibility with the jury. But Mr. Wilson's credibility was already suspect due to the fact he had sold drugs to Teresa in violation of his informant agreement with the government and the fact that the jury knew that his motives were

-21-

not purely altruistic as he was being paid for being an informant.  Accordingly, I find it is

not reasonably probable that this impeachment evidence would have altered the jury's

verdict.  This evidence would also not have supported the inducement defense, as set

forth previously in this Order and by the Tenth Circuit.

Finally, this evidence would not have directly undermined the evidence that

Mr. Kebles was engaged in drug dealing, including the testimony from a DEA agent that

he overheard Mr. Kebles offer to sell the informant 400 additional ecstacy pills and that

fact that ecstacy pills were found at Mr. Kebles' residence in an amount that was not

consistent with personal consumption.  Accordingly, I find that it is not reasonably

probable "that, but for counsel's unprofessional errors, the result of the proceeding

would have been different".  *Strickland*, 466 U.S. at 694.  Thus, I deny Mr. Kebles'

argument that his counsel was ineffective.

IV.    CONCLUSION

Based upon the foregoing, it is

ORDERED that Michael Kebles' Motion Under 28 U.S.C. § 2255 to Vacate, Set

Aside, or Correct Sentence is **DENIED**.

Dated:  November 6, 2012

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge

-22-

# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.    10-CV-1528-WYD
Criminal Action No. 03-CR-0249-WYD

UNITED STATES OF AMERICA,

    Plaintiff-Respondent,

v.

MICHAEL KEBLES,

    Defendant-Movant.

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JAN 7 – 2013

**JEFFREY P. COLWELL**
**CLERK**

---

## MOVANT'S NOTICE OF APPEAL

---

The Movant, Michael Kebles, *pro se*, hereby gives notice that he will appeal to the United States Court of Appeals for the Tenth Circuit from the Order (Nov. 6, 2012) denying his Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence.

1. **NO FILING FEE OR AFFIDAVIT REQUIRED.** Pursuant to Fed.R.App.P. Rule 24(a)(3)(A), the Movant "may proceed on appeal in forma pauperis without further authorization".

2. The sole issue to be appealed is the issue of *ineffective assistance of counsel*.

1

3.    In *Rules Governing Section 2255 Proceedings for the United States District Courts*, Rule 11(a) states, in pertinent part:

> The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue.

4.    Because the District Court has neither issued nor denied a certificate of appealability in this case, the Movant hereby requests that the Court permit "the parties to submit arguments on whether a certificate should issue."

Respectfully submitted on this seventh day of January, 2013.

Michael Kebles
Movant *pro se*
5805 West 51st Avenue
Denver, Colorado 80212

## CERTIFICATE OF SERVICE

I do hereby certify that I have served the foregoing **MOVANT'S NOTICE OF APPEAL** upon the Plaintiff-Respondent, the United States of America, by depositing a true, correct, and accurate copy thereof into the United States mail, first-class postage prepaid, and addressed to the Plaintiff-Respondent's attorney at the following address:

> Mr. Michael Conrad Johnson
> Assistant U.S. Attorney
> 1225 Seventeenth Street, Suite 700
> Seventeenth Street Plaza
> Denver, Colorado 80202

on this seventh day of January, 2013.

Michael Kebles
Movant *pro se*
5805 West 51st Avenue
Denver, Colorado 80212

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
## FACSIMILE COVER SHEET

Pursuant to D.C.COLO.LCivR 5.1, this cover sheet must be submitted with any facsimile filing. A pleading or paper not requiring a filing fee and **no longer than ten pages,** including all attachments, may be filed with the clerk by means of facsimile during a business day. Facsimiles received by the clerk after 5:00 p.m. (Mountain Time) will be considered filed as of the next business day.

Clerk's Office facsimile telephone number: 303-335-2714

1.   Date of Transmission: _January 7, 2013_

2.   Name of attorney or *pro se* party making the transmission: _Michael Kebles_

   Facsimile number _303-733-0445_   Telephone number _303-733-0445_

3.   Case number, caption, and title of pleading or paper: _10CV 1528_
   _United States v Michael Kebles, 03 CR 0249_
   _Movant's Notice of Appeal_

4.   Number of pages being transmitted, including the facsimile cover sheet: _4_

   Instructions, if any: _Please Fax acknowledgement of filing. Thanks!_

(Rev. (12/08)